# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DUSTIN GREEN, Individually and on Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| HUB CYBER SECURITY LTD. f/k/a HUB CYBER SECURITY (ISRAEL) LTD., EYAL MOSHE, HUGO GOLDMAN, UZI MOSCOVICH, ZEEV ZELL, MOSHE RAINES, MANISH AGARWAL, and MOTI FRANKO, | |
| Defendants. | |

Plaintiff Dustin Green ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Hub Cyber Security Ltd. ("HUB" or the "Company") f/k/a Hub Cyber Security (Israel) Ltd. ("Legacy HUB"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all: (a) Legacy HUB stockholders who acquired the Company's common stock through Legacy HUB's merger (the "Merger") with Mount Rainier Acquisition Corp. ("Mount Rainier"); (b) Mount Rainier investors who acquired the Company's securities pursuant and/or traceable to the Offering Documents (as defined below) issued in connection with the Merger; and/or (c) persons and entities that purchased or otherwise acquired Mount Rainier or U.S.-listed HUB securities between March 23, 2022 and June 13, 2023, both dates inclusive (the "Class Period"). Plaintiff pursues claims against Defendants under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").

2.      Legacy HUB was founded in 2017 by veterans of the elite Unit 8200 and Unit 81 of the Israeli Defense Forces and described itself as having "developed unique technology and products in the field of Confidential Computing, and it intends to be a significant player providing effective cybersecurity solutions for a broad range of government entities, enterprises and organizations." Before the Merger, Legacy HUB's ordinary shares and existing warrants traded on the Tel Aviv Stock Exchange ("TASE").

3.      Mount Rainier was a special purpose acquisition company ("SPAC").[1] Before the Merger, Mount Rainier's common stock, units, and redeemable warrants traded on the Nasdaq Stock Market ("NASDAQ"). Following the Merger, Mount Rainier became a wholly owned subsidiary of the Company.

---

[1]      A SPAC, also called a blank-check company, is a development stage company that has no specific business plan or purpose or has indicated that its business plan is to engage in a merger or acquisition with an unidentified company or companies, other entity, or person.

2

4. On March 23, 2022, Legacy HUB and Mount Rainier issued a joint press release stating "that they have entered into a definitive business combination agreement" and that the Company's Founder and Chief Executive Officer ("CEO") Defendant Eyal Moshe ("Moshe") "and the current management team will continue to lead the Combined Company."

5. On August 24, 2022, Legacy HUB filed a registration statement (the "Registration Statement") on Form F-4 with the SEC in connection with the Merger, covering the Company's ordinary shares and warrants issuable to the securityholders of Mount Rainier, which, after several amendments, was declared effective by the SEC on December 8, 2022.

6. On or about October 6, 2022, Legacy HUB solicited its stockholders' approval of the Merger through a mailing (the "Legacy HUB Investor Prospectus"), with that solicitation stating that the private investment in public equity ("PIPE") investors made an absolute and irrevocable commitment to invest in the Company at a value of $10 per share as part of a private placement, and that the PIPE is equal to the minimum amount required to close the Merger.

7. On October 27, 2022, at a Legacy HUB extraordinary general meeting, Legacy HUB's shareholders and optionholders voted to approve the Merger, whereby, among other things, the combined Company's ordinary shares, existing warrants, and new warrants would begin trading on the NASDAQ.

8. On December 9, 2022, Legacy HUB filed a proxy statement/prospectus (the "Mount Rainier Investor Prospectus" and, together with the Registration Statement, the "Offering Documents") on Form 424B3 with the SEC in connection with the Merger, covering the Company's ordinary shares and warrants issuable to the securityholders of Mount Rainier, which incorporated and formed part of the Registration Statement, and which was used to solicit approval of the Merger from Mount Rainier investors.

9. On January 4, 2023, Mount Rainier issued a press release announcing that its stockholders had voted to approve the Merger, that "[t]he business combination is expected to close in late January 2023, subject to the satisfaction of certain customary closing conditions" and that HUB's securities were expected to be listed on the NASDAQ "effective at the consummation of the business combination."

10. The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation. Additionally, throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies. Specifically, the Offering Documents and Defendants made false and/or misleading statements and/or failed to disclose that: (i) PIPE financing in connection with the Merger was not committed; (ii) HUB would not be led by Legacy HUB's then-current management team, including Defendant Moshe; (iii) the Company had downplayed the full scope and severity of deficiencies in its compliance controls and procedures, including its disclosure controls and procedures and internal controls over financial reporting; (iv) the Company overstated its remediation of, and/or ability to remediate, the foregoing deficiencies; (v) accordingly, the Company had hundreds of thousands of dollars of unexplained expenses incurred, and/or funds misappropriated or otherwise fraudulently obtained, by a senior officer of the Company; (vi) the foregoing increased the risk that the Company would be unable to timely file one or more of its periodic financial reports with the SEC, as required by the NASDAQ's listing rules; (vii) as a result, the Company was also at an increased risk of being delisted from the NASDAQ; (viii) all the foregoing, once revealed, was likely to negatively impact the Company's business, financial results, and reputation; and (ix) as a

result, the Offering Documents and Defendants' public statements throughout the Class Period were materially false and/or misleading and failed to state information required to be stated therein.

11. On January 26, 2023, the Company issued a press release announcing "that following the receipt of all approvals and compliance with the conditions for the expected merger with Mount Rainier . . . and transition to trading on the [NASDAQ]," the Company expected its shares and warrants to begin trading on the NASDAQ on February 28, 2023, representing a delay of nearly one month from Mount Rainier's earlier announcement that the Merger would close in late January 2023.

12. On this news, Mount Rainier's share price fell $0.48 per share over two consecutive trading days, or 4.75%, to close at $9.63 per share on January 27, 2023.

13. On February 2, 2023, the Company issued a press release stating that Defendant "Moshe will be promoted to undertake the role of President of US operations to better focus resources and attention on the North American strategic business development" and "will be replac[ed] . . . as [CEO]." The same press release also stated, in relevant part, that the Company "has received an irrevocable commitment by A-Labs Advisory & Finance Ltd. to substitute a current HUB PIPE investor, Clover Wolf Fund, in the sum US$ 10 million on the same terms."

14. On this news, Mount Rainier's share price fell $0.29 per share, or 3.05%, to close at $9.21 per share on February 3, 2023.

15. On February 3, 2023, the Company filed a Form 6-K with the SEC, stating that "on February 2, 2023, Ayelet Bitan, the Company's Vice President of Human Resources, resigned from her position as an officer of the Company, effective immediately"; and that, on February 2, 2023, the Board of Directors (the "Board") of "HUB Cyber Security Ltd. (TASE: HUB) (the

'Company') accepted the resignation of [Defendant] Moshe as the Company's [CEO], effective immediately, and appointed him as President of the Company's U.S. operations."

16. On this news, Mount Rainier's share price fell $0.38 per share, or 4.13%, to close at $8.83 per share the next trading day on February 6, 2023.

17. On February 28, 2023, the Company consummated the Merger with Mount Rainier, Mount Rainier became a wholly owned subsidiary of the Company, and the Company's shares closed at $4.99 per share.

18. On March 1, 2023, the combined Company's securities began trading on the NASDAQ, with a first post-Merger closing stock price of $1.59 per share (the "Initial Closing Price").

19. Also on March 1, 2023, HUB filed a Form 6-K with the SEC stating, *inter alia*, that "[t]he PIPE Financing did not consummate at closing of the Business Combination" and that, "[a]s a result of the redemptions from [Mount Rainier]'s trust account and the failure of the PIPE Financing to be consummated, the Company waived the Minimum Cash Condition in order to proceed to close the Business Combination."

20. On this news, HUB's stock price fell $0.34 per share, or 21.38%, to close at $1.25 per share on March 2, 2023.

21. On April 20, 2023, HUB filed a Form 6-K with the SEC stating, *inter alia*, that "[o]n April 19th, 2023, [the Board] of [HUB] appointed a special committee of independent directors . . . in order to investigate and asses [*sic*] certain allegations of potential misappropriation and other potential fraudulent actions raised against a former senior officer of the Company." The Form 6-K further disclosed that "[t]he allegations were raised during on-going reviews by the new management of the Company, and within this framework the new management of the Company

6

discovered certain unexplained expenses . . . estimated at approximately NIS[2] 2.5 million"—*i.e.*, approximately $675,110.

22.     On this news, HUB's stock price fell $0.03 per share, or 2.52%, to close at $1.16 per share on April 20, 2023.

23.     On May 15, 2023, HUB issued a press release disclosing that "due to the previously disclosed internal investigation by a special committee of independent directors . . . that was appointed by the [Board], the Company requires additional time to complete the process and file its Annual Report on Form 20-F for the fiscal year ended December 31, 2022."

24.     On May 22, 2023, HUB issued a press release disclosing that HUB received a notice that the Company was non-compliant with applicable NASDAQ listing rules because the Company had failed to "timely file[] its Annual Report on Form 20-F for the fiscal year ended December 31, 2022 . . . with the [SEC.]"  The Company also disclosed, *inter alia*, that "[t]he Company's management and the Audit Committee are also reviewing the effectiveness of the Company's controls over its disclosure and internal accounting and financial reporting for the year ended December 31, 2022"; and that, "[i]f the Company fails to timely regain compliance with the Nasdaq Listing Rules, the securities of the Company will be subject to delisting from Nasdaq."

25.     On this news, HUB's stock price fell $0.04 per share, or 6.15%, to close at $0.61 per share on May 22, 2023.

26.     Then, on June 13, 2023, HUB issued a press release disclosing that HUB received another notice of non-compliance with applicable NASDAQ listing rules "because for the past 30 consecutive business days preceding the date of the notification . . . the bid price per share of the

---

[2]     "NIS" stands for "New Israel Shekel", which is a form of currency used in the State of Israel ("Israel").

Company's ordinary shares, no par value ('Ordinary Shares') had closed below the $1.00 per share minimum bid price required for continued listing on Nasdaq[.]" The Company further disclosed that "[i]f the Company has not regained compliance within the period(s) granted by Nasdaq, including any extensions, the Ordinary Shares will be subject to delisting, pending an appeal to the Nasdaq Hearing Panel."

27. On this news, HUB's stock price fell $0.04 per share, or 6.78%, to close at $0.55 per share on June 14, 2023—a **65.41%** decline from its Initial Closing Price.

28. On July 5, 2023, the price of HUB's stock closed at $0.3918 per share—a **75.36%** decline from its Initial Closing Price.

29. As of the time this Complaint was filed, HUB's stock was trading significantly below its Initial Closing Price and continues to trade below its initial value from the Merger, damaging investors.

30. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

31. The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2), and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

32. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange

Act (15 U.S.C. § 78aa). In addition, the Company's bylaws designate the federal district courts of the U.S. as the exclusive forum for causes of action arising under the Securities Act.

33. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) because the Company trades on the NASDAQ, which is headquartered in this Judicial District, as a result of the Merger.

34. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

35. Plaintiff, as set forth in the attached Certification, purchased or otherwise acquired HUB securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

36. Defendant HUB is organized under the laws of Israel with principal executive offices located at 17 Rothschild Boulevard, Tel Aviv 6688120, Israel. HUB's stock, existing warrants, and new warrants trade in an efficient market on the NASDAQ under the ticker symbols "HUBC", "HUBCZ", and "HUBCW", respectively.

37. Defendant Moshe served as the Company's CEO from before the start of the Class Period to February 2, 2023, and has served as a Director on the Company's Board at all relevant times. Defendant Moshe signed or authorized the signing of the Registration Statement filed with the SEC.

9

38. Defendant Hugo Goldman ("Goldman") has served as the Company's CFO at all relevant times. Defendant Goldman signed or authorized the signing of the Registration Statement filed with the SEC.

39. Defendant Uzi Moscovich ("Moscovich")—a/k/a Azriel or Uzi Moskovici, Moskovich, or Moskovitch—has served as a Director on the Company's Board at all relevant times, and has served as the Company's CEO since February 2, 2023. Defendant Moscovich signed or authorized the signing of the Registration Statement filed with the SEC (under the name Azriel Moskovici).

40. Defendant Zeev Zell ("Zell") served as a Director on the Company's Board at all relevant times until the closing of the Merger on February 28, 2023. Defendant Zell signed or authorized the signing of the Registration Statement filed with the SEC.

41. Defendant Moshe Raines ("Raines") has served as a Director on the Company's Board at all relevant times. Defendant Raines signed or authorized the signing of the Registration Statement filed with the SEC.

42. Defendant Manish Agarwal ("Agarwal") has served as a Director on the Company's Board at all relevant times. Defendant Agarwal signed or authorized the signing of the Registration Statement filed with the SEC.

43. Defendant Moti Franko ("Franko") served as a Director on the Company's Board at all relevant times until the closing of the Merger on February 28, 2023. Defendant Franko signed or authorized the signing of the Registration Statement filed with the SEC.

44. Defendants Moshe, Goldman, Moscovich, Zell, Raines, Agarwal, and Franko are collectively referred to herein as the "Individual Defendants."

10

45. As directors, executive officers, and/or major shareholders of the Company, the Individual Defendants participated in the solicitation and sale of HUB securities in the Merger for their own benefit and the benefit of the Company. The Individual Defendants were key members of the Merger working group and executives and/or directors of the Company who pitched investors to purchase the shares sold in the Merger.

46. In addition, the Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

47. The Company and the Individual Defendants are collectively referred to herein as "Defendants".

**RELEVANT NON-PARTIES**

48. Mount Rainier was a SPAC listed on the NASDAQ and was formed to merge with another company. Prior to consummation of the Merger, Mount Rainier's common stock, units, and redeemable warrants traded in an efficient market on the NASDAQ under the ticker symbols "RNER", "RNERU", and "RNERW", respectively. Following the Merger, Mount Rainier became the Company's wholly owned subsidiary.

11

**SUBSTANTIVE ALLEGATIONS**

**Background**

49. Legacy HUB was founded in 2017 by veterans of the elite Unit 8200 and Unit 81 of the Israeli Defense Forces and described itself as having "developed unique technology and products in the field of Confidential Computing, and it intends to be a significant player providing effective cybersecurity solutions for a broad range of government entities, enterprises and organizations." Before the Merger, Legacy HUB's ordinary shares and existing warrants traded on the TASE.

50. Mount Rainier was a SPAC that, following the Merger, became a wholly owned subsidiary of the Company. Before the Merger, Mount Rainier's common stock, units, and redeemable warrants traded on the NASDAQ.

**Materially False and Misleading Statements Issued During the Class Period and in the Offering Documents**

51. The Class Period begins on March 23, 2022, when Legacy HUB and Mount Rainier issued a joint press release before markets opened, stating "that they have entered into a definitive business combination agreement." The press release further stated that Legacy "HUB's Founder and [CEO], [Defendant] Moshe, and the current management team will continue to lead the Combined Company" and that "[c]ash proceeds from the proposed transaction are expected to consist of up to approximately $176 million of cash held in [Mount Rainier]'s trust (before any redemptions by [Mount Rainier]'s public stockholders and the payment of certain expenses) and approximately $50 million attributed to the PIPE investment anchored by Israeli and American institutional and existing investors." In addition, the press release stated that "[p]roceeds from the PIPE are expected to satisfy the minimum cash closing condition and will be used as working capital to support continued growth and to fund acquisitions."

12

52.     On April 5, 2022, Legacy HUB filed an investor presentation transcript with the SEC pursuant to Rule 425 under the Securities Act.  That transcript largely quoted Defendant Moshe, who stated, among other things, that "[i]nvestors have made irrevocable commitments to invest approximately $50 million in a PIPE financing at a valuation of $1.28 billion."  The presentation given during that meeting also stated, in part, that "[i]nstitutional investors have made irrevocable commitments to invest approximately $50 million in a PIPE financing at a valuation of $1.28 billion" and that "[t]his $50 million PIPE investment is the minimum investment amount required to close the merger transaction (even if all of the $173 million of SPAC funds are redeemed by SPAC investors)."

53.     On July 5, 2022, Legacy HUB submitted a formal request to the Israeli District Court to allow Legacy HUB's shareholders to decide on same-day delisting from the TASE and start of its expected trading on the NASDAQ.

54.     On August 9, 2022, Legacy HUB disclosed that it had received formal approval from the Israeli District Court to summon a shareholders' meeting for the approval of the upcoming SPAC meeting and listing terms on the NASDAQ.

55.     On August 24, 2022, Legacy HUB filed the Registration Statement on Form F-4 with the SEC in connection with the Merger, covering the Company's ordinary shares and warrants issuable to the securityholders of Mount Rainier, which, after several amendments, was declared effective by the SEC on December 8, 2022.

56.     On August 25, 2022, Legacy HUB made a submission to the Israeli Securities Authority stating, in part, that the completion of the Merger and the start of trading on the NASDAQ was subject to several conditions precedent, including the approval of the Company's shareholders to carry out the Merger.

57.     On or about October 6, 2022, Legacy HUB solicited its stockholders' approval of the Merger through the Legacy HUB Investor Prospectus, with that solicitation stating that the PIPE investors made an absolute and irrevocable commitment to invest in the Company at a value of $10 per share as part of a private placement, and that the PIPE is equal to the minimum amount required to close the Merger.

58.     On October 27, 2022, at a Legacy HUB extraordinary general meeting, Legacy HUB's shareholders and optionholders voted to approve the Merger.

59.     On December 9, 2022, Legacy HUB filed the Mount Rainier Investor Prospectus on Form 424B3 with the SEC in connection with the Merger, covering the Company's ordinary shares and warrants issuable to the securityholders of Mount Rainier, which incorporated and formed part of the Registration Statement, and which was used to solicit approval of the Merger from Mount Rainier investors.  The Mount Rainier Investor Prospectus stated that "HUB's ability to manage its operations and future growth will require HUB to continue to improve its operational, financial and management controls, compliance programs and reporting systems" and assured investors that "HUB is currently in the process of strengthening its compliance programs, including its compliance programs related to [*inter alia*] . . . anti-corruption."

60.     The Mount Rainier Investor Prospectus also purported to warn that "HUB may not be able to implement improvements in an efficient or timely manner and may discover deficiencies in existing controls, programs, systems and procedures, which could have an adverse effect on its business, reputation and financial results."  Plainly, the foregoing risk warning was a generic, boilerplate provision that was not tailored to the Company's actual known risks regarding the full scope and severity of deficiencies in the Company's compliance controls and procedures, much

less that the Company was particularly vulnerable to unexplained executive expenses and/or misappropriation of Company funds or related fraudulent activities.

61. In addition, the Mount Rainier Investor Prospectus purported to warn that the Company had a material weakness in its internal control over financial reporting, while simultaneously downplaying the full scope and severity of that material weakness, stating, in relevant part:

> ***[The Company] has identified a material weakness in its internal control over financial reporting. If [the Company]'s remediation of the material weakness is not effective, or it fails to develop and maintain effective internal controls over financial reporting, [the Company]'s ability to produce timely and accurate financial statements or comply with applicable laws and regulations could be impaired.***
>
> As [the Company] prepared the financial statements that are included in this prospectus, its management determined that [the Company] has a material weakness in its internal control over financial reporting. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of HUB's annual or interim consolidated financial statements will not be prevented or detected on a timely basis.
>
> Specifically, the deficiencies identified relate to a lack of certain defined processes and controls over information technology, in the areas of access management, segregation of duties, change management, data governance and defined processes and controls over the financial statement close process. These deficiencies, when aggregated, are a material weakness and ***could*** result in a material misstatement to [the Company]'s financial statements that ***may*** not be able to be prevented or detected. Prior to the consummation of the Business Combination, [the Company] does not have sufficient resources assigned to ensure the necessary processes and controls to effectively implement information technology and financial statement close controls required of a public company in the United States.

(First emphasis in original.) Plainly, this risk warning, too, was a generic, boilerplate provision that was not tailored to the Company's actual known risks regarding the full scope and severity of deficiencies in the Company's compliance controls and procedures, much less that the Company

15

was particularly vulnerable to unexplained executive expenses and/or misappropriation of Company funds or related fraudulent activities.

62.     Further downplaying the full scope and severity of deficiencies in the Company's compliance controls and procedures, including its internal controls over financial reporting, the Mount Rainier Investor Prospectus assured investors, in relevant part:

[Legacy HUB] is taking the following actions to remediate this material weakness:

- the hiring of additional accounting and finance resources with public company experience;

- broadening the scope and improving the effectiveness of existing information technology general controls for identity and access management, segregation of duties, change management, data governance, and program development;

- reviewing, strengthening, and developing policies related to each of these areas of information technology general controls;

- engaging internal and external resources to assist us with remediation and monitoring remediation progress;

- delivering periodic training to our team members, including but not limited to technology and accounting staff, on internal controls over financial reporting; and

- strengthening HUB's information technology compliance and accounting functions with additional experienced hires to assist in the expansion and effectiveness of the existing risk assessment, management processes and the design and implementation of controls responsive to those deficiencies.

63.     With respect to PIPE financing for the Merger, the Mount Rainier Investor Prospectus assured investors, in relevant part, that "qualifying Israeli and U.S. institutional investors ('the PIPE investors') *committed* to invest a gross US$ 50 million based on the merger company's agreed value as described above (in a private placement) as the minimum investment commitment required for closing the merger transaction" (emphasis added).

16

64.     The Mount Rainier Investor Prospectus also stated that Mount Rainier and Legacy HUB "anticipate that the current executive officers and directors of [Legacy HUB], as of the date of this proxy statement/prospectus, will remain as the executive officers and directors of [the Company] following the [Merger.]"

65.     The statements referenced in ¶¶ 51-52, 57, and 59-64 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.  In addition, the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.  Specifically, the Offering Documents and Defendants made false and/or misleading statements and/or failed to disclose that: (i) PIPE financing in connection with the Merger was not committed; (ii) HUB would not be led by Legacy HUB's then-current management team, including Defendant Moshe; (iii) the Company had downplayed the full scope and severity of deficiencies in its compliance controls and procedures, including its disclosure controls and procedures and internal controls over financial reporting; (iv) the Company overstated its remediation of, and/or ability to remediate, the foregoing deficiencies; (v) accordingly, the Company had hundreds of thousands of dollars of unexplained expenses incurred, and/or funds misappropriated or otherwise fraudulently obtained, by a senior officer of the Company; (vi) the foregoing increased the risk that the Company would be unable to timely file one or more of its periodic financial reports with the SEC, as required by the NASDAQ's listing rules; (vii) as a result, the Company was also at an increased risk of being delisted from the NASDAQ; (viii) all the foregoing, once revealed, was likely to negatively impact the Company's business, financial

results, and reputation; and (ix) as a result, the Offering Documents and Defendants' public statements throughout the Class Period were materially false and/or misleading and failed to state information required to be stated therein.

**The Truth Emerges**

66. On January 4, 2023, Mount Rainier issued a press release announcing that its stockholders had voted to approve the Merger, that "[t]he business combination is expected to close in late January 2023, subject to the satisfaction of certain customary closing conditions" and that HUB's securities were expected to be listed on the NASDAQ "effective at the consummation of the business combination."

67. Then, on January 26, 2023, during intraday trading, the Company issued a press release announcing "that following the receipt of all approvals and compliance with the conditions for the expected merger with Mount Rainier . . . and transition to trading on the [NASDAQ]," the Company expected its shares and warrants to begin trading on the NASDAQ on February 28, 2023, representing a delay of nearly one month from Mount Rainier's earlier announcement that the Merger would close in late January 2023.

68. On this news, Mount Rainier's share price fell $0.48 per share over two consecutive trading days, or 4.75%, to close at $9.63 per share on January 27, 2023.

69. On February 2, 2023, after markets closed, the Company issued a press release stating that Defendant "Moshe will be promoted to undertake the role of President of US operations to better focus resources and attention on the North American strategic business development" and "will be replac[ed] . . . as [CEO]." The same press release also stated, in relevant part, that the Company "has received an irrevocable commitment by A-Labs Advisory & Finance Ltd. to

18

substitute a current HUB PIPE investor, Clover Wolf Fund, in the sum US$ 10 million on the same terms."

70.     On this news, Mount Rainier's share price fell $0.29 per share, or 3.05%, to close at $9.21 per share on February 3, 2023.

71.     On February 3, 2023, after markets closed, the Company filed a Form 6-K with the SEC, stating that "on February 2, 2023, Ayelet Bitan, the Company's Vice President of Human Resources, resigned from her position as an officer of the Company, effective immediately"; and that "[o]n February 2, 2023, the Board . . . of HUB Cyber Security Ltd. (TASE: HUB) (the 'Company') accepted the resignation of [Defendant] Moshe as the Company's [CEO], effective immediately, and appointed him as President of the Company's U.S. operations."

72.     On this news, Mount Rainier's share price fell $0.38 per share, or 4.13%, to close at $8.83 per share the next trading day on February 6, 2023.

73.     On February 28, 2023, the Company consummated the Merger with Mount Rainier, Mount Rainier became a wholly owned subsidiary of the Company, and the Company's shares closed at $4.99 per share.

74.     On March 1, 2023, the combined Company's securities began trading on the NASDAQ, with an Initial Closing Price of $1.59 per share.

75.     On March 1, 2023, after markets closed, HUB filed a Form 6-K with the SEC stating, in relevant part:

*PIPE Financing*

Concurrently with the execution of the Business Combination Agreement, the Company and certain qualified institutional buyers and accredited investors (the "PIPE Investors") entered into a series of subscription agreements ("Subscription Agreements"), providing for the purchase by the PIPE Investors at the Effective Time of an aggregate of 5,000,000 Company Ordinary Shares at a price per share of $10.00 for gross proceeds to the Company of $50,000,000 (collectively, the

19

"PIPE Financing"). ***The PIPE Financing did not consummate at closing of the Business Combination.***

The Business Combination Agreement provides that the consummation of the Business Combination is conditioned upon, among other things, the satisfaction or waive[r] by the Company of a requirement that the combined company have an aggregate cash amount of at least $50,000,000 (the "Minimum Cash Condition") available on the Closing Date from [Mount Rainier]'s trust account (after giving effect to all of the [Mount Rainier] stockholder redemptions) and the PIPE Investors. ***As a result of the redemptions from [Mount Rainier]'s trust account and the failure of the PIPE Financing to be consummated, the Company waived the Minimum Cash Condition in order to proceed to close the Business Combination.***

(Emphases in bold and italics added.)

76. On this news, HUB's stock price fell $0.34 per share, or 21.38%, to close at $1.25 per share on March 2, 2023.

77. On March 14, 2023, HUB issued a press release, also attached to a Form 6-K that the Company filed with the SEC the same day, stating, in relevant part:

HUB . . . today announced that it had issued and sold approximately 400,000 shares to two of the original PIPE investors at a price per share of $10 for proceeds of approximately $4 million dollars, in a private placement. The shares were sold pursuant to the original PIPE terms entered into in connection with the Company's business combination . [*sic*] ***The remaining PIPE funds are currently being negotiated with investors and the Company remains in discussions with the investors to receive those funds.***

(Emphasis added.)

78. On March 15, 2023, HUB issued a press release, also attached to a Form 6-K that the Company filed with the SEC the same day, stating, in relevant part, that "the Israeli investment bank, A-Labs Advisory & Finance Ltd. . . . . has reaffirmed its irrevocable commitment to invest $20 million in HUB as an equity PIPE investment at $10 per share, previously made in connection with the Company's business combination."

79. On April 20, 2023, before markets opened, HUB filed a Form 6-K with the SEC stating, in relevant part, that:

20

On April 19th, 2023, [the Board] of [HUB] appointed a special committee of independent directors (the "Special Committee") in order to investigate and asses [sic] certain allegations of potential misappropriation and other potential fraudulent actions raised against a former senior officer of the Company. The Board, as part of its review, is seeking to ensure that the Company is adhering to the highest standards of conduct.

The allegations were raised during on-going reviews by the new management of the Company, and within this framework the new management of the Company discovered certain unexplained expenses, [sic] Based on preliminary findings, the amount of the examined expenses is estimated at approximately NIS 2.5 million [i.e., approximately $675,110.]

The Special Committee includes three (3) independent directors, and will be headed by, Mr. Ilan Flato, chair of the Company's audit committee.

The Special Committee's review is ongoing, and it is working diligently with outside advisers to complete its investigation as soon as possible. The Company is committed to working with the Special Committee to complete its work in order to assess the validity of these allegations and provide transparency to its shareholders as soon as feasible.

80.     On this news, HUB's stock price fell $0.03 per share, or 2.52%, to close at $1.16

per share on April 20, 2023.

81.     On May 15, 2023, HUB issued a press release, also attached to a Form 6-K that the

Company filed with the SEC the same day, stating, in relevant part:

[D]ue to the previously disclosed internal investigation by a special committee of independent directors (the "Special Committee") that was appointed by the [Board], the Company requires additional time to complete the process and file its Annual Report on Form 20-F for the fiscal year ended December 31, 2022.

"Since being appointed CEO in February of this year, I have been focused on creating a disciplined management team and organization accountable to results as well as transparency to investors." said Uzi Moskovich, Chief Executive Officer of HUB Security. "As part of the internal investigation that began in April, we continue to review all Company controls and are committed to properly and thoroughly completing the investigation in a thoughtful and comprehensive manner." Moskovich continued. "At the same time, we are focused on maximizing our market opportunity and, following the completion of the Committee's important work, look forward to updating the investment community on the significant strides we have made to maintain the momentum of our business as "One HUB", and its impact on traction for our Confidential Computing and cyber security solutions with our clients."

21

The internal investigation was commenced as a result of certain matters that were identified by the new management team during an overview of the Company's financial statements in which a number of unexplained expenses incurred by a former senior officer of the Company were discovered. The Special Committee is resolved to completing a meticulous and comprehensive process, with the highest level of transparency. Based on preliminary findings from the Special Committee, the Company believes that the investigation will not have a material impact on its financial statements

The Special Committee, with the assistance of independent advisors, is working to complete its investigation and advise on potential remediation measures as soon as practicable. The new senior management team is actively collaborating with the Special Committee to ensure a rigorous process and is determined to fully support the Special Committee in this endeavor. The Company intends to file its Form 20F as soon as practicable.

82.     On May 22, 2023, before markets opened, HUB issued a press release, also attached

to a Form 6-K that the Company filed with the SEC the same day, stating, in relevant part:

[A]s expected . . . [HUB] has received a notice (the "Notice") from The Nasdaq Stock Market LLC ("Nasdaq") indicating that, as a result of not having timely filed its Annual Report on Form 20-F for the fiscal year ended December 31, 2022 (the "Annual Report") with the [SEC], the Company is not in compliance with Nasdaq Listing Rule 5250(c)(1), which requires timely filing of all required periodic financial reports with the SEC . [*sic*] The Notice has no immediate effect on the listing or trading of the Company's securities, which will continue to trade on Nasdaq, subject to the Company's compliance with the other continued listing requirements of Nasdaq.

As previously disclosed, a special committee of independent directors of the [Board] ("Special Committee") is working to complete its investigation into unexplained expenses incurred by a former senior officer of the Company and, as such, the Company requires additional time to file the Annual Report.

The Special Committee is resolved to completing a meticulous and comprehensive process, with the highest level of transparency. Based on preliminary findings from the Special Committee, the Company believes that the investigation will not have a material impact on its financial statements. The Company's management and the Audit Committee are also reviewing the effectiveness of the Company's controls over its disclosure and internal accounting and financial reporting for the year ended December 31, 2022.

Under the Nasdaq Listing Rules, the Company has 60 calendar days until July 18, 2023 to submit a plan to regain compliance and if Nasdaq accepts the Company's plan, then Nasdaq may grant an exception of up to 180 calendar days from the prescribed due date of the Annual Report, or until November 13, 2023, to regain

compliance. However, there can be no assurance that Nasdaq will accept the Company's plan to regain compliance or that the Company will be able to regain compliance within any extension period granted by Nasdaq. If the Company fails to timely regain compliance with the Nasdaq Listing Rules, the securities of the Company will be subject to delisting from Nasdaq.

83. On this news, HUB's stock price fell $0.04 per share, or 6.15%, to close at $0.61 per share on May 22, 2023.

84. Then, on June 13, 2023, after markets closed, HUB issued a press release, also attached to a Form 6-K that the Company filed with the SEC the same day, stating, in relevant part:

> HUB . . . received a notification on June 9, 2023 from The Nasdaq Stock Market ("Nasdaq") notifying the Company that it is no longer in compliance with Nasdaq Listing Rule 5450(a)(1), because for the past 30 consecutive business days preceding the date of the notification ("Notice"), the bid price per share of the Company's ordinary shares, no par value ("Ordinary Shares") had closed below the $1.00 per share minimum bid price required for continued listing on Nasdaq (the "Minimum Bid Price Requirement").
>
> The Notice has no immediate effect on the listing of the Company's Ordinary Shares, and the Company's Ordinary Shares continue to trade on Nasdaq under the symbol "HUBC".
>
> Pursuant to Nasdaq Listing Rule 5810(c)(3)(A), the Company has been provided with an initial 180-calendar day period, ending on December 6, 2023, (the "Initial Compliance Period") to regain compliance with the Minimum Bid Price Requirement. If at any time during the Initial Compliance Period, the closing bid price per share of the Ordinary Shares is at least U$$1.00 for a minimum of 10 consecutive business days, it is expected that Nasdaq will provide the Company a written confirmation of compliance and the matter will be closed.
>
> If the Company does not regain compliance within the Initial Compliance Period, it may be eligible for an additional 180- calendar day compliance period, pursuant to Nasdaq Listing Rule 5810(c)(3)(A)(ii), provided that it meets the applicable market value of publicly held shares requirement for continued listing and all applicable standards for initial listing on the Nasdaq Capital Market (except the Minimum Bid Price Requirement) and notifies Nasdaq of its intent to cure this deficiency during this second compliance period. If the Company has not regained compliance within the period(s) granted by Nasdaq, including any extensions, the Ordinary Shares will be subject to delisting, pending an appeal to the Nasdaq Hearing Panel.

The Company's business operations are not affected by the receipt of the Notification Letter. The Company intends to monitor the closing bid price of its Ordinary Shares and will consider its options in order to regain compliance with the Minimum Bid Price Requirement.

85. On this news, HUB's stock price fell $0.04 per share, or 6.78%, to close at $0.55 per share on June 14, 2023—a **65.41%** decline from its Initial Closing Price.

86. On July 5, 2023, the price of HUB's stock closed at $0.3918 per share—a **75.36%** decline from its Initial Closing Price.

87. As of the time this Complaint was filed, HUB's stock was trading significantly below its Initial Closing Price and continues to trade below its initial value from the Merger, damaging investors.

88. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

89. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all: (a) Legacy HUB stockholders who acquired the Company's common stock through the Merger; (b) Mount Rainier investors who acquired the Company's securities pursuant and/or traceable to the Offering Documents issued in connection with the Merger; and/or (c) persons and entities that purchased or otherwise acquired Mount Rainier or U.S.-listed HUB securities during the Class Period; and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

90.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Mount Rainier and the Company's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by HUB or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

91.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

92.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

93.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether the Company offered or solicited the sale of HUB securities to Legacy HUB's shareholders;

- whether Defendants' statements misrepresented or omitted to state material facts in connection with offering or soliciting the purchase of HUB securities by Plaintiff and other Class members;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of the Company;

- whether the Individual Defendants caused the Company to issue false and misleading financial statements during the Class Period;

- whether certain Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Mount Rainier or U.S.-listed HUB securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

94.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

95.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- HUB securities are, and Mount Rainier securities were, traded in an efficient market;

- Mount Rainier and U.S.-listed HUB shares were liquid and traded with moderate to heavy volume during the Class Period;

- Mount Rainier and HUB traded on the NASDAQ and were covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Mount Rainier and HUB securities; and

- Plaintiff and members of the Class purchased, acquired, and/or sold Mount Rainier and/or HUB securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

96.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

97.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 11 of the Securities Act Against All Defendants)**

98.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

99.     This Count is asserted against all Defendants and is based upon Section 11 of the Securities Act, 15 U.S.C. § 77k.

100.    This Count does not sound in fraud.  With respect to this Count, Plaintiff does not allege that Defendants had scienter or fraudulent intent, which are not elements of a Section 11 claim.

101.    The Offering Documents for the Merger were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

27

102.    The Company is the registrant for the shares issued pursuant to the Offering Documents.  Defendants named herein were responsible for the contents and dissemination of the Offering Documents.

103.    As issuer of the shares, the Company is strictly liable to Plaintiff and the Class for the misstatements and omissions in the Offering Documents.

104.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

105.    By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

106.    Plaintiff acquired HUB securities pursuant and/or traceable to the Offering Documents for the Merger.

107.    Plaintiff and the Class have sustained damages.  The value of HUB securities has declined substantially subsequent to and because of Defendants' violations.

## COUNT II

**(Violations of Section 12(a)(2) of the Securities Act Against the Company)**

108.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

109.    This Count is asserted against the Company and is based upon Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2).

110.    This Count does not sound in fraud.  With respect to this Count, Plaintiff does not allege that the Company had scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

28

111. Section 12(a)(2) of the Securities Act states that "[a]ny person who offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraphs (2) and (14) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable, subject to subsection (b), to the person purchasing such security from him . . . ."

112. HUB stock is a security as defined by the Securities Act and is not excepted from Section 12(a)(2). *See* 15 U.S.C §§ 77b(1), 77l(a)(2).

113. The Company offered HUB's common stock by means of the mails, through a prospectus as defined by the Securities Act. *See* 15 U.S.C § 77b(10) (defining a prospectus as a "prospectus, notice, circular, advertisement, letter, or communication, written or by radio or television, which offers any security for sale or confirms the sale of any security"). Neither exception to that definition applies because there is no effective date of a registration statement and no communication identifying where a prospectus may be obtained. The Legacy HUB Investor Prospectus and other solicitations to Legacy HUB stockholders relating to the Merger were mailings that included a letter and other information directly from the Company confirming, if not explicitly offering, the sale of a security within the meaning of 15 U.S.C § 77b(3).

114. The Legacy HUB Investor Prospectus and other solicitations to Legacy HUB stockholders relating to the Merger omitted to state material facts necessary in order to make their

contents, in the light of the circumstances under which they were made, not materially misleading, including the fact that the PIPE was not irrevocable and that the Company had no reasonable basis to believe the minimum cash closing condition would be satisfied.

115. By means of the defective Legacy HUB Investor Prospectus, the Company promoted, solicited, and encouraged members of the Class to vote in favor of the Merger and to exchange shares of Legacy HUB for shares of HUB, and thereby offered or sold HUB's common stock to members of the Class in connection with the Merger.

116. The Legacy HUB Investor Prospectus concealed and failed to disclose material facts, as alleged above. The Company owed members of the Class the duty to make a reasonable and diligent investigation of the statements contained in the Legacy HUB Investor Prospectus and other solicitations to Legacy HUB stockholders relating to the Merger to ensure that such statements were true and that there was no omission to state a material fact required to be stated to make the statements contained therein not materially misleading. The Company, in the exercise of reasonable care, should have known of the materialization of risks contained in the Legacy HUB Investor Prospectus and other solicitations to Legacy HUB stockholders relating to the Merger.

117. Members of the Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Legacy HUB Investor Prospectus and other solicitations to Legacy HUB stockholders relating to the Merger at the time members of the Class acquired HUB's common stock.

118. By reason of the conduct alleged herein, the Company violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Class members who received HUB's common stock pursuant to the Legacy HUB Investor Prospectus and other solicitations to Legacy HUB stockholders relating to the Merger from the Company sustained

damages in connection with their purchases of HUB's common stock.  Accordingly, members of the Class who hold HUB's common stock issued for shares in Legacy HUB pursuant to the Merger have the right to rescind and recover the consideration paid for their shares, and hereby tender their HUB common stock to the Company sued herein or otherwise seek an equivalent measure of damages.

## COUNT III

### (Violations of Section 15 of the Securities Act Against the Individual Defendants)

119.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

120.    This Count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o.

121.    This Count does not sound in fraud.  With respect to this Count, Plaintiff does not allege that the Individual Defendants had scienter or fraudulent intent, which are not elements of a Section 15 claim.

122.    The Individual Defendants, by virtue of their offices, directorship, and specific acts, were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of the Company within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power and influence and exercised the same to cause the Company to engage in the acts described herein.

123.    The Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

124.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

31

**COUNT IV**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

125. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

126. This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

127. During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Mount Rainier and U.S.-listed HUB securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Mount Rainier and/or U.S.-listed HUB securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

128. Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described

32

above, including statements made to securities analysts and the media that were designed to influence the market for Mount Rainier and U.S.-listed HUB securities. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company's finances and business prospects.

129. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each of the Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

130. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of the Company's internal affairs.

131. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to, and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Company's

businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market prices of Mount Rainier and U.S.-listed HUB securities were artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Mount Rainier and/or U.S.-listed HUB securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendants, and were damaged thereby.

132. During the Class Period, Mount Rainier and U.S.-listed HUB securities were traded on an active and efficient market. Plaintiff and other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Mount Rainier and U.S.-listed HUB securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Mount Rainier and U.S.-listed HUB securities was substantially lower than the prices paid by Plaintiff and other members of the Class. The market price of Mount Rainier and U.S.-listed HUB securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

133. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

134.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of Mount Rainier and U.S.-listed HUB securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT V

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

135.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

136.    This Count is asserted against the Individual Defendants and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

137.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of income and expenses and false financial statements.

138.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

139.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which the Company disseminated in the marketplace during the Class Period

35

concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Mount Rainier and U.S.-listed HUB securities.

140. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

141. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding rescission or a rescissory measure of damages;

D.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

E.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 31, 2023

Respectfully submitted,

POMERANTZ LLP

*/s/ J. Alexander Hood II*
J. Alexander Hood II
Jeremy A. Lieberman
James M. LoPiano
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
ahood@pomlaw.com
jalieberman@pomlaw.com
jlopiano@pomlaw.com

*Attorneys for Plaintiff*