UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE HUB CYBER SECURITY LTD.

23-cv-5764 (AS)

23-cv-6668 (AS)

OPINION AND ORDER

ARUN SUBRAMANIAN, United States District Judge:

This is a securities class action against Hub Cyber Security Ltd. ("Hub") and its principals, alleging violations of sections 11, 12(a)(2), and 15 of the Securities Act of 1933. Mount Rainier, a special purpose acquisition company ("SPAC"), acquired Hub, an Israeli cybersecurity company, in a so-called "de-SPAC" transaction. After Hub's disappointing debut on the NASDAQ exchange, plaintiffs filed suit, alleging that Hub's offering documents contained materially misleading statements and omissions. Defendants move to dismiss the amended complaint. For the following reasons, their motions are GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Mount Rainier was a SPAC, which is a "publicly traded compan[y] with no business activities that [is] formed specifically to acquire an existing operating company." Dkt. 45 ¶¶ 34, 40. It went public in October 2021, with its common stock trading on the NASDAQ exchange under the "RNER" ticker. *Id.* ¶¶ 41–42. Although it didn't identify a specific target company at that point, Mount Rainier stated in its IPO documents that it was focused on acquiring "technology focused businesses." *Id.* ¶ 43.

Hub Cyber Security (Israel) Ltd. ("Legacy Hub"), an Israeli company that specialized in cybersecurity services, appeared to be the perfect target. *Id.* ¶¶ 45–46. Legacy Hub was established in 2017 by former members of the Israeli Defense Forces. *Id.* ¶ 45. It claimed to provide "unique cyber security solutions protecting sensitive commercial and government information," including "an advanced encrypted computing solution aimed at preventing hostile intrusions at the hardware level." *Id.* ¶ 46. Legacy Hub traded on the Tel Aviv Stock Exchange ("TASE") under the "HUB" ticker. *See id.* ¶ 53.

In March 2022, Legacy Hub and Mount Rainier announced a "business combination agreement." *Id.* ¶ 47. (The parties refer to this as a "de-SPAC" merger. Dkt. 86 at 3.) According to their press release, Mount Rainier would acquire Legacy Hub in a transaction funded in part by $50 million in private-investment-in-public-equity ("PIPE") financing. Dkt. 45 ¶ 48; Dkt. 86 at 1. The PIPE proceeds were "expected to satisfy the [deal's] minimum cash closing condition." Dkt. 45 ¶ 48. Mount Rainier filed a Form 8-K with the SEC, which explained that a condition of closing the deal was that "the aggregate cash proceeds available for release to SPAC . . . shall equal at least $50,000,000." *Id.* ¶ 49.

On August 24, 2022, Legacy Hub filed a Form F-4 registration statement with the SEC. *Id.* ¶ 52. According to the registration statement, the de-SPAC deal was structured such that "each RNER Share issued and outstanding immediately prior to the Effective Time will be automatically converted into a number of HUB Security ordinary shares." *Id.* Similarly, Legacy Hub shareholders would receive Hub shares registered on NASDAQ. *Id.* ¶ 53. Mount Rainier and Legacy Hub filed the proxy/prospectus for the business combination a few months later. *Id.* ¶ 55. On October 31, 2022, Legacy Hub announced that its shareholders had voted to approve the merger and delist Hub from TASE. *Id.* ¶ 54. In January 2023, Mount Rainier's shareholders also approved the deal. *Id.* ¶ 57.

On February 2, 2023, Legacy Hub issued a press release explaining that its CEO—defendant Eyal Moshe—would take on the role of President of US Operations, and defendant Uzi Moscovich would replace him as CEO. *Id.* ¶ 65. The next day, the company filed a Form 8-K with the SEC disclosing that both Moshe and his wife, Ayelet Bitan, who served as Legacy Hub's Vice President of Human Resources, had resigned. *Id.* ¶ 66. The company said that Moshe's resignation "was not the result of any disagreement with the Company on any matters relating to the Company's operations, policies or practices." *Id.*

On February 28, 2023, the companies announced that the business combination closed, and that Hub shares had been approved for trading on the NASDAQ exchange and delisted from TASE. *Id.* ¶ 61. At the same time, Hub announced that "[t]he PIPE Financing did not consummate at closing of the Business Combination." *Id.* ¶ 73. Because Mount Rainier didn't have enough in its trust account to satisfy the cash condition to closing without the PIPE financing, the parties waived that requirement. *Id.* Hub securities began trading on NASDAQ on March 1, 2023. *Id.* ¶ 63.

A few days later, an online article raised suspicions about Moshe's and Bitan's exit. *Id.* ¶¶ 76, 82. Although the company had announced that Moshe would become President of US Operations, the article noted that "Moshe's name disappeared from the company's website and he was not present at the traditional bell ringing ceremony at Nasdaq, even though executives who are located in Israel traveled to the U.S. for the event on a special flight." *Id.* ¶ 82.

On April 20, 2023, the company disclosed the appointment of an independent committee to investigate allegations of fraud and misappropriation by a "former senior officer of the Company." *Id.* ¶ 83. The same day, an industry article reported that the investigation focused on Moshe and Bitan. *Id.* ¶ 84. The article also said that Moshe had been "ousted" in February, but "[i]n order not to rock the ship," the company had announced that he would become President of US Operations. *Id.* ¶ 85.

After the investigation, Hub issued its 2022 annual report, which disclosed that Moshe and Bitan had embezzled hundreds of thousands of dollars and that one of the company's controllers, with Moshe's permission, used company credit cards for approximately $110,000 in personal expenses. *Id.* ¶ 91. The report also explained that the company had "identified material weaknesses in [its] internal control over financial reporting" that existed as of December 31, 2021, and had not

been remedied by December 31, 2022, including "[i]nsufficient oversight of certain signatory rights relating to [its] financial accounts." *Id.* ¶ 93.

By July 5, 2023, Hub's shares had declined nearly 85% percent from their opening price. *Id.* ¶ 105. The next day, Efrat Investments filed suit on behalf of a class of investors who had exchanged their Legacy Hub ordinary shares for Hub common stock during the merger, alleging that Hub's registration form and prospectus (the "offering documents") contained misleading statements about the status of the PIPE financing and the company's management team. Dkt. 1 ¶¶ 2, 29. A few weeks later, plaintiff Dustin Green sued Hub on behalf a class that also included Mount Rainier investors who had acquired Hub stock through the de-SPAC merger. Dkt. 1 ¶ 1 (23cv6668). On November 8, 2023, the Court consolidated these cases. Dkt. 40 (23cv5764).

In January 2024, Hub's outgoing CEO, Moscovich, gave an interview in which he said that when he took over as CEO, "there was no product and there were no sales," and "[t]he product was not ready at all." Dkt. 45 ¶ 94. In the same article, however, Moscovich explained that "at the time of the IPO on Wall Street, the company's flagship product existed and was being sold, but improvements were required, which indeed happened in the second half of 2023." *Id.* ¶ 95. On January 26, 2024, plaintiffs amended their complaint to include allegations based on Moscovich's statements. *Id.* ¶¶ 124–25.

In their amended complaint, lead plaintiffs Aryeh Agam and Shimon Aharon, and additional plaintiffs Rodrigue Fodjo and Dustin Green, allege violations of sections 11, 12(a)(2), and 15 of the Securities Act of 1933 on behalf of a class of "all individuals and entities that purchased or otherwise acquired Hub securities pursuant and/or traceable to the Offering Documents issued in connection with the Business Combination." *Id.* ¶¶ 19–22, 126. Defendants move to dismiss the amended complaint under the doctrine of *forum non conveniens*, for lack of personal jurisdiction, and for failure to state a claim. Dkts. 71, 85, 92.[1]

## LEGAL STANDARDS

*Forum non conveniens* permits dismissal of a case if "it appears that [the] case may be more appropriately tried in another forum, either for the convenience of the parties or to serve the ends of justice." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 67 (2d Cir. 2003); *see also Sinochem Int'l Co. v. Malay Int'l Shipping Corp.*, 549 U.S. 422, 429–30 (2007). District courts "enjoy broad discretion in applying this principle." *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005).

On a motion to dismiss for lack of personal jurisdiction, the plaintiff must show that its factual allegations, credited as true, "constitute a *prima facie* showing of jurisdiction." *Dorchester Fin.*

---

[1] Defendant Eyal Moshe filed a separate motion to dismiss, Dkt. 92, but he joins the other defendants' motion and vice versa, so the Court doesn't differentiate between the motions. *See* Dkt. 86 at 2 ("Defendants also join the arguments proffered in Eyal Moshe's Motion to Dismiss . . . ."); Dkt. 93 at 20 ("Mr. Moshe joins in and incorporates by reference the arguments set forth in the Company's Motion to Dismiss . . . .").

*Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).

To survive a motion to dismiss for failure to state a claim, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 298–99 (2d Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim is plausible on its face 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* at 299 (quoting *Iqbal*, 556 U.S. at 678). When evaluating whether a complaint clears this bar, the Court must "accept[] all factual allegations in the complaint as true[] and draw[] all reasonable inferences in the plaintiff's favor." *Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).

## DISCUSSION

### I.   Defendants' Motion for Judicial Notice Is Granted in Part and Denied in Part

As an initial matter, defendants move for the Court to take judicial notice of five exhibits. Dkts. 73, 87. Under Federal Rule of Evidence 201(c)(2), a court "must take judicial notice if a party requests it and the court is supplied with the necessary information." A fact is judicially noticeable if it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). If the court takes judicial notice of a matter, it may consider that matter on a motion to dismiss. *See Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 75 (S.D.N.Y. 2015) ("[M]atters of which the Court takes judicial notice are not considered matters outside the pleadings.").

Defendants move for judicial notice of the following documents: Form F-4 (the registration statement) and the PIPE investor "subscription agreement" attached as an exhibit thereto, Dkt 88-1 ("Exhibit A"); Form 424B3 (the proxy/prospectus statement), Dkt. 88-2 ("Exhibit B"); a transcript from the motion-to-dismiss hearing in an Israeli case against Hub, Dkt 88-3 ("Exhibit C"); Form 6-K, which Hub filed with the SEC on January 8, 2024, and two exhibits to that form, showing Hub's revenue for the first half of 2023, Dkt. 88-4 ("Exhibit D"); and a report titled "Immediate Report of a Senior Officer Who Ceased to Serve in His Position," which was filed with the Israel Securities Authority on September 29, 2022, Dkt. 88-5 ("Exhibit E").

Exhibits A, B, and D are public SEC filings and there is no dispute about their authenticity, so the Court takes judicial notice of them, but "only to determine what statements they contain rather than to prove the truth of the documents' contents."[2] *See Sharette*, 127 F. Supp. 3d at 75 (taking judicial notice of public SEC filings discussed in the complaint); *see also Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("Consideration of such documents filed with the SEC is appropriate

---

[2] In his separate motion to dismiss, individual defendant Moshe asks the Court to take judicial notice of three exhibits that were filed with the SEC: an excerpt of the registration statement, an excerpt of the proxy statement, and an investor presentation from April 4, 2022. Dkt. 93 at 3 n.2; *see also* Dkt. 94. For the same reasons (and with the same limitations), the Court also takes judicial notice of these documents.

with respect to a nondisclosure or misrepresentation claim because . . . the court is to consider them on a Rule 12(b)(6) motion 'only to determine *what* the documents stated,' and '*not to prove the truth of their contents*.'" (citation omitted)). Defendants' request to take judicial notice of Exhibit E is denied as moot because the parties have stipulated to dismiss the individual defendant in question. *See* Dkt. 104 at 1 n.2. As for Exhibit C, defendants ask the Court to take judicial notice of this transcript to prove that the defendants are currently in negotiations with the PIPE investors, seeking to enforce their contractual rights. *See* Dkt. 86 at 4. In other words, they ask the Court to assume the truth of the attorney's statements during the hearing. That is not a matter properly subject to judicial notice, so the motion for judicial notice is denied. *See Michael Grecco Prods., Inc. v. RADesign, Inc.*, 112 F.4th 144, 148 n.1 (2d Cir. 2024) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." (citation omitted)).

## II.     The Court Rejects Defendants' *Forum Non Conveniens* Argument

Defendants argue that Israel, where Hub is incorporated and where the lead plaintiffs live, is a more appropriate forum for this suit.

The Second Circuit has established a three-step test for deciding *forum non conveniens* motions. "At step one, a court determines the degree of deference properly accorded the plaintiff's choice of forum." *Norex*, 416 F.3d at 153. "At step two, it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute." *Id.* "Finally, at step three, a court balances the private and public interests implicated in the choice of forum." *Id.*

### A.   Deference to Plaintiff's Choice of Forum

The first inquiry—determining what deference is owed to the plaintiff's choice of forum—depends on the "sliding scale" established in *Iragorri v. United Technologies Corp.*, 274 F.3d 65 (2d Cir. 2001) (en banc). *See Norex*, 416 F.3d at 154. "[G]reater deference" is owed "to a plaintiff's forum choice to the extent that it was motivated by legitimate reasons," while "diminishing deference" is owed "to the extent that [the plaintiff's choice] was motivated by tactical advantage." *Iragorri*, 274 F.3d at 73.

Defendants suggest that plaintiffs' choice of forum is entitled to little deference because they were forum shopping. Dkt. 93 at 10–12. They point to a related, first-filed action in Israel; that plaintiffs engaged in "international business" and so can't claim entitlement to an American forum; and that the lead plaintiffs—Agam and Aharon—reside in Israel, so there's no valid reason to have filed suit here. *Id.* at 10–11. The Court disagrees that these facts suggest that plaintiffs engaged in forum shopping.

As plaintiffs point out, the Israeli action is different because it was filed on behalf of a class of investors who owned Legacy Hub securities traded on TASE from March 2022 until February 2023 (before Hub was delisted). Dkt. 96 at 8; *see also* Dkt. 45 ¶ 77. So this case is unlike *Kingstown Capital Management, L.P. v. Vitek*, 2020 WL 5350492 (S.D.N.Y. Sept. 4, 2020), where a "substantially similar action" filed in Luxembourg raised an inference of forum shopping where

the only "salient difference between the two suits [was] the potential for treble damages under the RICO statute." *Id.* at *8. Here, the salient difference is the class: one includes investors who owned Legacy Hub securities on TASE, and the other investors who owned Hub securities on NASDAQ. Although there may be some overlap between these classes, defendants haven't identified any tactical advantage to plaintiffs' choice to litigate their case here.

Nor does lead plaintiffs' residence in Israel show that they "had an improper motive in bringing suit [here]." *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 28 (2d Cir. 2002). "In fact," here, like in *DiRienzo*, "plaintiffs offer[] a quite valid reason for litigating in federal court: this country's interest in having United States courts enforce United States securities laws." *Id.* Although "this interest is not outcome-determinative," it nonetheless provides a "'bona fide' connection to the United States." *Id.* This isn't a case where the plaintiffs rely on American citizenship, without another connection, to justify their choice of venue. *See RIGroup LLC v. Trefonisco Mgmt. Ltd.*, 949 F. Supp. 2d 546, 553 (S.D.N.Y. 2013) (noting that "where an American plaintiff chooses to invest in a foreign country and then complains of fraudulent acts occurring primarily in that country, the plaintiff's ability to rely upon citizenship as a talisman against *forum non conveniens* dismissal is diminished." (citation omitted)). And of course, defendants don't address that plaintiffs Fodjo and Green don't reside in Israel and aren't alleged to have engaged in any kind of forum shopping.

Accordingly, plaintiffs' choice of forum is entitled to deference.

### B. Adequacy of Alternative Forum

"To secure dismissal of an action on grounds of *forum non conveniens*, a movant must demonstrate the availability of an adequate alternative forum." *Norex*, 416 F.3d at 157. "An alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Id.* (quoting *Pollux*, 329 F.3d at 75). Here, there is no dispute that defendants are amenable to service of process in Israel. Instead, the parties focus on whether Israel permits litigation of the matter in dispute.

"'[T]he availability of an adequate alternative forum does not depend on the existence of the identical cause of action in the other forum,' nor on identical remedies." *Id.* at 158 (quoting *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 74 (2d Cir. 1998)). But defendants fail to explain whether or how Israeli law would permit plaintiffs to litigate their claim for "misstatements and omissions issued in the [United States] about a security that trades in the [United States]." Dkt. 96 at 8.

Although defendants say that "[t]his court has already determined that Israel is an adequate forum for U.S. securities laws claims," Dkt. 101 at 4, they point to only one case from nearly forty years ago, *Diatronics, Inc. v. Elbit Computers, Ltd.*, 649 F. Supp. 122 (S.D.N.Y. 1986), which didn't directly address the issue.[3] In *Diatronics*, the court dismissed a complaint for *forum non*

---

[3] Defendants' other authorities don't appear to involve Securities Act or Securities Exchange Act claims. *See* Dkt. 93 at 12; *see also Tagger v. Strauss Grp. Ltd.*, 2018 WL 4356725, at *2 (E.D.N.Y. Sept. 12, 2018)

*conveniens* that alleged eight causes of action, including a violation of section 10(b) of the Securities Exchange Act of 1934 and common-law fraud and breach-of-contract claims. *Id.* at 123 n.1, 127. Seven of the eight causes of action in the complaint "ar[o]se under the law of both the United States and Israel." *Id.* at 123 n.1. But Diatronics argued that Israel wasn't an adequate forum because Israeli law requires a complaining party to "pay a non-refundable filing fee of 2% of the amount the party is seeking to recover," which would have required it to pay a cost-prohibitive amount—$400,000—to commence its suit. *Id.* at 127. The court held that the fact that Israel may have been less favorable didn't make it an inadequate alternative forum. *Id.* at 127–28.

Here, unlike in *Diatronics*, the complaint contains only three counts, all of which arise under U.S. securities law. Dkt. 45 ¶¶ 133–54. Defendants provide no explanation as to how plaintiffs could litigate these claims in Israel. Defendants do point to an article explaining that Israeli courts apply American law to dual-listed companies, Dkt. 101 at 4, but Hub is not a dual-listed company. *See In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *19 (S.D.N.Y. Mar. 28, 2018) (explaining that dual-listed companies are "listed on both the stock exchange in Israel and on a stock exchange in the United States" (citation omitted)). According to the complaint, Hub was delisted from TASE before it was listed on NASDAQ. *See* Dkt. 45 ¶ 61. Accordingly, defendants haven't carried their burden of demonstrating that Israel is an adequate alternative forum, and so "the *forum non conveniens* motion must be denied." *Norex*, 416 F.3d at 157.

The lack of an adequate alternative forum is dispositive. *Id.* Nonetheless, assuming that Israel would have jurisdiction over this dispute and would either "apply American law" or "apply [Israeli] laws that offer shareholders somewhat similar protections," *see Howe v. Goldcorp Invs., Ltd.*, 946 F.2d 944, 952 (1st Cir. 1991), the Court proceeds to the third prong of the *forum non conveniens* analysis.

### C. Balancing the Public and Private Interests

The private factors to consider include: "(1) ease of access to evidence; (2) the availability of compulsory process for the attendance of unwilling witnesses; (3) the cost of willing witnesses' attendance; (4) if relevant, the possibility of a view of premises; and (5) all other factors that might make the trial quicker or less expensive." *DiRienzo*, 294 F.3d at 29–30. Meanwhile, the public-interest factors are: "(1) administrative difficulties associated with court congestion; (2) the unfairness of imposing jury duty on a community with no relation to the litigation; (3) the 'local interest in having localized controversies decided at home;' and (4) avoiding difficult problems in conflict of laws and the application of foreign law." *Id.* at 31 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09 (1947)).

On balance, these factors weigh against dismissal. Although some of the witnesses and documentary evidence may be located in Israel, defendants have not shown that travel and

---

(tort claims); *Core Software Tech. v. ImageSat Int'l N.V.*, 2010 WL 21173, at *1 (S.D.N.Y. Jan. 5, 2010) (breach of contract, breach of fiduciary duties, and "other corporate misconduct" claims); *CCS Int'l, Ltd. v. ECI Telesystems, Ltd.*, 1998 WL 512951, at *2 (S.D.N.Y. Aug. 18, 1998) (similar).

translation costs in this case will be "oppressive and vexatious." *Id.* at 30. Plus, there are no issues with compulsory process for unwilling witnesses because "any difficulties that the Court might encounter regarding witnesses whose attendance the Court is unable to compel can most likely be resolved by the use of deposition testimony or letters rogatory." *Overseas Programming Cos., Ltd. v. Cinematographische Commerz-Anstalt*, 684 F.2d 232, 235 (2d Cir. 1982).

As for the public-interest factors, there is no issue with court congestion, and although defendants attempt to paint this as a controversy local to Israel, "[a] strong public interest favors access to American courts for those who use American security markets." *DiRienzo*, 294 F.3d at 33. Defendants say that this public interest isn't as strong as it was in *DiRienzo* because the defendants there engaged in aggressive sales tactics in the United States and the majority of investors were American, whereas here they're Israeli. Dkt. 101 at 2–3. The Court is unconvinced, given that at least some members of the class are American investors who originally purchased stock in Mount Rainier, and the Israeli investors specifically sought access to U.S. securities markets. Finally, although there is pending litigation in Israel, "[t]he existence of such litigation . . . does not obviate United States interests in enforcing securities laws in American courts on behalf of United States investors." *In re Poseidon Concepts Sec. Litig.*, 2016 WL 3017395, at *10 (S.D.N.Y. May 24, 2016).

## III.    Plaintiffs Have Met Their Personal-Jurisdiction Burden

Next, defendants say that this Court lacks personal jurisdiction over them. Dkt. 93 at 15–17. But after plaintiffs pointed out that "[c]ourts in this Circuit regularly have exercised personal jurisdiction over foreign persons who signed allegedly false or misleading statements filed with the Securities and Exchange Commission," *see Mucha v. Volkswagen Aktiengesellschaft*, 540 F. Supp. 3d 269, 283–84 (E.D.N.Y. 2021) (collecting cases), defendants abandoned this argument on reply. In any event, the Court agrees with the reasoning of those cases and holds that the allegations in the complaint that each individual defendant signed either the allegedly misleading registration statement or prospectus are sufficient to establish personal jurisdiction at this stage. Dkt. 45 ¶¶ 24–32; *see Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996) ("Prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction.").

## IV.    Defendants' 12(b)(6) Arguments Are Accepted in Part

### A.    Statutory Standing

Defendants argue that plaintiffs lack statutory standing to pursue their section 11 and 12(a)(2) claims.[4] Dkt. 86 at 7–9. Section 11 "prohibits materially misleading statements or omissions in

---

[4] "Statutory standing . . . refers to a nonjurisdictional inquiry that does not implicate 'the court's statutory or constitutional *power* to adjudicate the case.'" *Evolution Fast Food One, LP v. HVFG, LLC*, 720 F. Supp. 3d 251, 260 (S.D.N.Y. 2024) (quoting *Lexmark Int'l, Inc. v. Static Control Components*, Inc., 572 U.S. 118, 128 n.4 (2014)). "Instead, it concerns whether a plaintiff 'has a cause of action under the statute.'" *Id.*

registration statements filed with the SEC," *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010), and creates a private right of action for investors. Specifically, the statute provides that "[i]n case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security . . . may, either at law or in equity, in any court of competent jurisdiction, sue," among others, "every person who signed the registration statement" and "every person who was a director of . . . the issuer." 15 U.S.C. § 77k(a). As for section 12(a)(2), it provides "similar redress [to section 11] where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions." *In re Morgan Stanley*, 592 F.3d at 359. The statute says that "[a]ny person who . . . offers or sells a security . . . by means of a prospectus or oral communication" that "includes an untrue statement of a material fact . . . shall be liable . . . to the person purchasing such security from him." 15 U.S.C. § 77*l*(a).

### 1. Section 11

To have standing to sue under section 11, a plaintiff "must be able to 'trace their shares to an allegedly misleading registration statement.'" *In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 206 (S.D.N.Y. 2003) (quoting *DeMaria v. Andersen*, 318 F.3d 170, 178 (2d Cir. 2003)); *see also id.* at 207 (holding that "plaintiffs [must] plead as well as prove that their shares were issued pursuant to the misleading registration statement"). At the motion-to-dismiss stage, "[p]laintiffs need only assert that they purchased shares 'issued pursuant to, or traceable to the public offerings.'" *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Tech. Corp.*, 450 F. Supp. 3d 379, 403 (S.D.N.Y. 2020) (quoting *Perry v. Duoyan Printing, Inc.*, 2013 WL 4505199, at *10 (S.D.N.Y. Aug. 22, 2013)).

Plaintiffs have satisfied that burden here. The amended complaint alleges that each of the plaintiffs "purchased or otherwise acquired Hub securities pursuant and/or traceable to the Offering Documents issued in connection with the Business Combination." Dkt. 45 ¶¶ 19–22. These "general allegations" of traceability suffice at this stage. *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 373 (S.D.N.Y. 2011) (citation omitted).

Nonetheless, defendants say that plaintiffs can't prove standing as a matter of law because they bought shares in Mount Rainier and Legacy Hub before the business combination closed. Relying on *In re CarLotz, Inc. Securities Litigation*, 667 F. Supp. 3d 71 (S.D.N.Y. 2023), defendants say that plaintiffs' shares aren't traceable to Hub's registration statement because plaintiffs purchased Mount Rainier/Legacy Hub shares and so didn't acquire securities issued under the challenged registration statement. *See id.* at 81 (rejecting argument that shares purchased "*before* any securities were offered pursuant to the merger" could support section 11 standing).

---

(quoting *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016)). Accordingly, the Court considers defendants' standing arguments under the ordinary Rule 12(b)(6) rubric.

The Court disagrees.[5] In *CarLotz*, the court rejected section 11 standing for SPAC shareholders who acquired shares in the target company through a de-SPAC merger, holding that the plaintiffs' theory was "foreclosed" by *DeMaria*, 318 F.3d 170, which held "that a Section 11 plaintiff can only challenge the same registration statement under which her securities were issued." *In re CarLotz*, 667 F. Supp. 3d at 81. But the Court doesn't see how this principle bars standing here, where (as far as the Court can tell from the complaint) there was only one offering of Hub shares, issued under one registration statement, and plaintiffs acquired those shares. The complaint alleges that according to the registration statement itself, Mount Rainier securities holders "would receive newly registered Hub securities." Dkt. 45 ¶ 52 (quoting registration statement as stating that "each RNER Share issued and outstanding immediately prior to the Effective Time will be automatically converted into a number of HUB Security ordinary shares"). The complaint also alleges that "the securities holders of Legacy Hub would also receive newly registered Hub securities in the Business Combination." *Id.* ¶ 53. So plaintiffs plainly fall into the category of "any person acquiring" the securities at issue. *See DeMaria*, 318 F.3d at 175–76.

Nor does the Court see why plaintiffs' acquisition of these securities would not be "traceable" to the relevant offering documents. *See Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 863–64 (9th Cir. 2013) ("[B]ecause the exchange of shares—which occurred after the Registration Statement was filed—constituted Hildes' acquisition of those securities pursuant to a registration statement, he has stated a potentially meritorious Section 11 claim."); *Felipe v. Playstudios Inc.*, 2024 WL 1380802, at *7 (D. Nev. Mar. 31, 2024) ("These shares were acquired pursuant to a misleading registration statement because, if the registration statement had contained accurate information, the merger and exchange of shares would not have taken place."). Defendants point to *Rose v. Butterfly Network, Inc.*, 2025 WL 501427 (D.N.J. Feb. 13, 2025), where the court rejected the argument that shares bought before a de-SPAC registration statement was filed were traceable to that registration statement, explaining that "[t]his is common sense. A plaintiff could not have been damaged by a '[misleading] registration statement' if the shares she bought were issued before the registration statement came out in the first place." *Id.* at *3 (alteration in original) (citing *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 767 (2023)). But as the Ninth Circuit has explained, in the de-SPAC merger context, "misrepresentations contained in the Registration Statement [can] play[] a role in the causal chain that result[s] in the exchange of stock." *Hildes*, 734 F.3d at 862. In any event, *Rose* is factually distinguishable because there "the Plaintiffs put forward no reason to think that a given share issued under the [SPAC] registration statement was converted or exchanged at the merger (so that, on the Plaintiffs' argument, it counts as having been issued under the [de-SPAC] registration statement) or was simply renamed at the merger (so that, even on the Plaintiffs' argument, it presumably does not count as having been issued under the [de-SPAC] registration

---

[5] *CarLotz* was reassigned to this Court after the 2023 opinion issued. The Court didn't revisit the rulings at issue for procedural reasons particular to that case. *See In re CarLotz, Inc. Sec. Litig.*, 2024 WL 1348749, at *3–4 (S.D.N.Y. Mar. 29, 2024).

statement).["6] *Rose*, 2025 WL 501427, at *6. Here, by contrast, plaintiffs plausibly allege that they received newly registered shares issued under the de-SPAC registration statement.

Regardless, plaintiffs also allege that they bought aftermarket shares traceable to the Hub registration statement, *see* Dkt. 96 at 14–15, and it is well-established that "aftermarket purchasers have standing to sue under" section 11. *DeMaria*, 318 F.3d at 176. Defendants argue that "[p]laintiffs' aftermarket purchases cannot rescue their standing argument," Dkt. 102 at 2, but they offer no support for this position. Accordingly, plaintiffs have sufficiently alleged statutory standing under section 11.

### 2. Section 12(a)(2)

Unlike section 11, aftermarket purchasers don't have standing to pursue a section 12(a)(2) claim. *See In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 445 (S.D.N.Y. 2009) ("Liability pursuant to section 12(a)(2) only attaches to plaintiffs who purchased their shares directly in the initial public offering, and not the so-called 'aftermarket.'"). Plaintiffs claim that they have standing anyway based on the shares they acquired in connection with the de-SPAC merger. *See* Dkt. 96 at 15.

To have standing under section 12(a)(2), "plaintiffs must have purchased securities directly from the defendants" in a "public offering[]." *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 141 (2d Cir. 2013) (citing *Yung v. Lee*, 432 F.3d 142, 147–49 (2d Cir. 2005)). Defendants first argue that plaintiffs don't have section 12(a)(2) standing because they acquired their shares in a de-SPAC merger and not a traditional initial public offering. *See In re CarLotz*, 667 F. Supp. 3d at 83 ("[A] plaintiff may maintain a section 12(a)(2) claim only where the plaintiff purchased securities directly in the initial public offering . . . ." (alteration in original) (citation omitted)). But they don't explain why a de-SPAC merger isn't a public offering. To the contrary, in a supplemental letter, defendants conceded that "[t]here was a public offering." Dkt. 111 at 1. And the statute's text doesn't limit liability under section 12(a)(2) to purchases in traditional IPOs: it just provides that "[a]ny person who . . . offers or sells a security . . . by means of a prospectus . . . which includes an untrue statement of a material fact or [omission] . . . shall be liable . . . to the person purchasing such security from him." 15 U.S.C. § 77*l*(a)(2). So nothing in the statute itself precludes de-SPAC mergers from giving rise to section 12(a)(2) liability. *See United States v. Epskamp*, 832 F.3d 154, 162 (2d Cir. 2016) ("As with any question of statutory interpretation, we begin with the text of the statute to determine whether the language at issue has a plain and unambiguous meaning." (quoting *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 108 (2d Cir. 2012))).

Nor does Supreme Court or Second Circuit precedent preclude section 12(a)(2) standing for these types of transactions. In *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995), the Supreme

---

[6] The Court questions whether this is a meaningful distinction. *See In re Faraday Future Intelligent Elec. Inc. S'holder Litig.*, 2025 WL 445038, at *9 (Del. Ch. Feb. 10, 2025) ("The notion that these shares changed in name only rests on a fundamental misperception of the business combination. The shares of the combined company after a de-SPAC transaction are an 'economically different security than the SPAC's shares.'" (citation omitted)).

Court held that liability under section 12(a)(2) "cannot attach unless there is an obligation to distribute the prospectus in the first place." *Id.* at 571. In *Yung*, 432 F.3d 142, the Second Circuit further clarified this standard, holding that "*Gustafson*'s definition of a prospectus as 'a document that describes a *public offering* of securities' compels the conclusion that a Section 12(a)(2) action cannot be maintained by a plaintiff who acquires securities through a private transaction, whether primary or secondary." *Id.* at 149 (quoting *Gustafson*, 513 U.S. at 584). Although defendants say that section 12(a)(2) only applies to an IPO *qua* IPO, they don't explain why, and neither *Gustafson* nor *Yung* draws such a fine distinction.[7] Instead, under these cases, "the issue is whether the defendants . . . were obligated to distribute a prospectus in connection with the . . . transaction at issue." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 625 (S.D.N.Y. 2007). Here, defendants don't dispute that they were required to distribute a prospectus in connection with the de-SPAC merger and that some of the plaintiffs obtained shares directly in that initial public issuance of stock.

Defendants also suggest that section 12(a)(2)'s text forecloses standing because it provides a cause of action only to those who "purchase" a security. *See* Dkt. 102 at 2. The "[c]oncepts of purchase and sale are to be construed flexibly in order to accomplish the purpose of the securities laws." Thomas Lee Hazen, 3 *Treatise on the Law of Securities Regulation* § 12:22 (2024); *cf. Gelles v. TDA Indus., Inc.*, 44 F.3d 102, 104 (2d Cir. 1994) (explaining that "[a] transaction need not involve cash to constitute a purchase or sale under Rule 10b-5"). The Securities Act defines a sale as the "disposition of a security or interest in a security[] for value." 15 U.S.C. § 77b(a)(3). It doesn't define "purchase," but the Supreme Court has explained that "'sells' and 'purchases' have obvious correlative meanings." *Pinter v. Dahl*, 486 U.S. 622, 645 (1988). "Exchanges of securities ordinarily would implicate" this definition "because when an investor parts with one security in exchange for another, he or she is giving up value in exchange for the security to be acquired." Hazen, *supra*, § 5:3.

Here, the complaint alleges that in connection with the de-SPAC merger, each Mount Rainier investor converted their RNER shares to Hub shares based on a formula laid out in the offering

---

[7] The SEC has in fact adopted rules deeming de-SPAC transactions to be a sale of securities and bringing the disclosure requirements for de-SPAC transactions in line with those for IPOs. *See generally* 89 Fed. Reg. 14158 (Feb. 26, 2024); *see also Mullen v. Terran Orbital Operating Corp.*, 2024 WL 3553134, at *5 n.3 (S.D.N.Y. July 26, 2024) (noting based on this rule that "the regulatory landscape has changed in several (likely material) ways since the *Carlotz* decision"). These rules aren't retroactive, *see In re CarLotz*, 2024 WL 1348749, at *4 n.1, and the Court doesn't rely on them to interpret the statute's application to the facts in this case. But they reflect the lack of a convincing reason to treat de-SPACs and IPOs differently under provisions like section 12(a)(2). As numerous courts have noted, IPOs and de-SPAC transactions accomplish the same goal: allowing private companies to go public. *See Vogel v. Boris*, 2023 WL 5471400, at *1 (S.D.N.Y. Aug. 23, 2024) (explaining that de-SPACs "provide alternative ways for private companies to go public while avoiding the red tape associated with undertaking an initial public offering"); *In re Grab Holdings Ltd. Sec. Litig.*, 2024 WL 1076277, at *1 (S.D.N.Y. Mar. 12, 2024) ("A de-SPAC transaction thus offers a private company seeking to go public an alternative to undertaking a traditional IPO."); *Pierce v. Better Holdco., Inc.*, 2023 WL 6386920, at *1 n.2 (S.D.N.Y. Sept. 29, 2023) ("In lieu of a traditional initial public offering, a company can go public through what is formally known as a 'de-SPAC transaction.'").

documents. Dkt. 45 ¶ 52. Defendants confirmed that RNER shareholders received, in exchange for their RNER shares, Hub shares issued as part of the transaction. Dkt. 111 at 1–2. That's enough to plausibly allege that the plaintiffs "purchased" Hub securities, given the Securities Act's definition encompassing the "disposition of a security or interest in a security[] for value." The de-SPAC merger was designed to give Mount Rainier's shareholders an ownership stake in Hub's securities in exchange for Hub's access to capital from public investors, just as in an IPO. Holding that there was nevertheless no purchase here as a matter of law would improperly elevate form over substance. *See United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975) ("Because securities transactions are economic in character Congress intended the application of these statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto.").

However, the same can't be said of the Legacy Hub securities. The complaint is hazy on the details of how Legacy Hub shareholders came into possession of Hub securities, and unlike the Mount Rainier shares, there is no allegation plausibly supporting the "purchase" of shares from Hub. All the complaint says is that Legacy Hub shareholders "would also receive newly registered Hub securities in the Business Combination." Dkt. 45 ¶ 53. For this reason, Aryeh Agam's and Shimon Aharon's section 12(a)(2) claim on behalf of Legacy Hub shareholders is dismissed. If plaintiffs wish to revive this claim, they may file a limited motion to amend the complaint with allegations indicating how and when Agam and Aharon made qualifying purchases of Hub securities, paying close attention to the statutory text and law on this issue.

Finally, defendants briefly suggest that plaintiffs fail to plead section 12(a)(2) standing because the complaint says that they "purchased or otherwise acquired Hub securities pursuant to or traceable to the Offering Documents." *See* Dkt. 45 ¶¶ 19–22; Dkt. 93 at 18–19. True, "[c]ourts within this district have been appropriately wary of allegations that a plaintiff purchased a security 'pursuant or traceable to' an offering, as compared to simply 'pursuant to an offering,' because it is ambiguous whether the plaintiff is alleging they were a direct or indirect purchaser." *In re BioScrip, Inc., Sec. Litig.*, 95 F. Supp. 3d 711, 745 (S.D.N.Y. 2015). But the complaint incorporates by reference schedules indicating that plaintiffs Rodrigue Fodjo and Dustin Green exchanged shares in Mount Rainier for Hub. *See* Dkt. 45 ¶¶ 21–22; Dkt. 27-2 (Fodjo); Dkt. 1-2 (23cv6668) (Green). Under plaintiffs' theory of liability, this is evidence of "direct participation in the offering." *In re BioScrip*, 95 F. Supp. 3d at 745. Accordingly, Green and Fodjo have adequately alleged that they have standing to bring a section 12(a)(2) claim against Hub.

The Court agrees, however, that plaintiffs don't have standing to assert section 12(a)(2) claims against the individual defendants. "Whereas the reach of section 11 is expressly limited to specific offering participants, the list of potential defendants in a section 12(a)(2) case is governed by a judicial interpretation of section 12 known as the 'statutory seller' requirement." *In re Morgan Stanley*, 592 F.3d at 359. "An individual is a 'statutory seller'—and therefore a potential section 12(a)(2) defendant—if he: (1) 'passed title, or other interest in the security, to the buyer for value,' or (2) 'successfully solicit[ed] the purchase [of a security,] motivated at least in part by a desire to

serve his own financial interests or those of the securities['] owner.'" *Id.* (alterations in original) (quoting *Pinter*, 486 U.S. at 642, 647).

Plaintiffs say they've adequately alleged that the individual defendants were statutory sellers because they signed the allegedly misleading offering documents. Dkt. 95 at 18. Although the Second Circuit has yet to determine whether signing offering documents constitutes solicitation, courts in this circuit have consistently held that "[a] pleading must allege that a defendant did more than merely sign a registration statement or prospectus to allege liability under Section 12(a)(2)." *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 245 (S.D.N.Y. 2020); *see also id.* ("[E]very Court of Appeals to have considered the issue has concluded that 'an individual's signing a registration statement does not itself suffice as solicitation under Section 12(a)(2).'" (quoting *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 512 (S.D.N.Y. 2010))); *see also Yi Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 646 (S.D.N.Y. 2017) ("Courts in this District have consistently followed the rule from *Citiline* since the decision was issued."). The Court agrees with the reasoning of these decisions. Plaintiffs don't offer any other basis for holding the individual defendants liable under this statute, so the section 12(a)(2) claim will be dismissed as against them.

### B. Pleading Standard

"When assessing the sufficiency of claims under section 11 and 12(a)(2) of the Securities Act, the structure of the analysis is guided by a preliminary inquiry into the nature of the plaintiff's allegations." *In re Morgan Stanley*, 592 F.3d at 358. "Where the claims are 'premised on allegations of fraud,' the allegations must satisfy the heightened particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure." *Id.* (quoting *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)). "However, if the pleading does not sound in fraud, then Rule 8(a) governs." *Id.* The parties dispute how this threshold inquiry plays out here. Defendants say that plaintiffs' claims are premised on allegations of fraud and so Rule 9(b) applies. Dkt. 86 at 9. Plaintiffs disagree and say that Rule 8(a)'s notice-pleading standard governs. Dkt. 95 at 7.

The Second Circuit has provided little guidance on how to distinguish between Securities Act claims that sound in fraud and claims that sound in negligence. In *Rombach*, the leading case on this issue, the Second Circuit held that plaintiffs' section 11 claims sounded in fraud because "the wording and imputations of the complaint [were] classically associated with fraud: that the Registration statement was 'inaccurate *and* misleading;' that it contained '*untrue* statements of material facts;' and that 'materially *false* and *misleading* written statements' were issued." 355 F.3d at 172. As district courts in this circuit have recognized, however, "[t]his passage presents something of a conundrum, because applied literally, it would seem to require applying a 9(b) standard to all claims under § 11." *In re Refco*, 503 F. Supp. 2d at 631; *see also Levy v. Young Adult Inst., Inc.*, 103 F. Supp. 3d 426, 442–43 (S.D.N.Y. 2015) (discussing *In re Refco*). To harmonize this passage with *Rombach*'s holding that not all section 11 claims are subject to Rule 9(b)'s pleading standard, it "should be read in the context of the pleadings at issue in that case, in which the plaintiffs '[did] not assert any claim of negligence on the part of the Individual

Defendants, nor [did] they specify any basis for such a claim.'" *In re Refco*, 503 F. Supp. 2d at 632 (alterations in original) (quoting *Rombach v. Chang*, 2002 WL 1396986, at *4 (E.D.N.Y. June 7, 2002)). So "*Rombach* necessarily requires a case-by-case analysis of particular pleadings to determine whether 'the gravamen of the complaint is plainly fraud.'" *Id.* (quoting *Rombach*, 355 F.3d at 172).

Here, plaintiffs' allegations plainly sound in negligence, not fraud. The complaint provides that it "does not allege, and does not intend to allege, fraud or fraudulent intent, . . . and any implication of fraud or fraudulent intent is hereby expressly disclaimed." Dkt. 45 ¶¶ 135, 143, 149. And while "[p]laintiffs cannot evade the Rule 9(b) strictures by summarily disclaiming any reliance on a theory of fraud or recklessness," *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005), the complaint also contains allegations "consistent with negligence." *Nayani v. LifeStance Health Grp., Inc.*, 2023 WL 3260260, at *2 (S.D.N.Y. May 4, 2023); *see* Dkt. 45 ¶ 139 ("Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents. . . . Because Defendants failed to make" such an investigation, "the Offering Documents contained misrepresentations and/or omissions of material fact."); *id.* ¶ 145 ("Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Offering Documents set forth above."). Moreover, this isn't a case where plaintiffs are disavowing already-pled fraud allegations, because unlike many similar cases, plaintiffs haven't alleged claims under section 10(b) of the Securities Exchange Act. *See Sharma v. Rent the Runway, Inc.*, 2024 WL 4287229, at *8 (E.D.N.Y. Sept. 28, 2024) ("[W]hile '[p]laintiffs cannot evade the Rule 9(b) strictures by summarily disclaiming any reliance on a theory of fraud or recklessness,' here it is crucial that Plaintiffs do not bring claims under section 10(b) of the Securities Exchange Act, which would require satisfying the heightened pleading under Rule 9(b)." (second alteration in original) (quoting *JP Morgan*, 363 F. Supp. 2d at 635)).

Defendants nonetheless say that the amended complaint "sounds in fraud" because plaintiffs allege that defendants' statements were "false and misleading," included "untrue statements of material facts," "concealed and failed to disclose material facts," and omitted information "known" to defendants. Dkt. 86 at 9. "But just because 'a fact was known and not disclosed does not mean, as a matter of law, that the circumstances of the resulting omission sound in fraud.'" *In re Grab Holdings Ltd. Sec. Litig.*, 2024 WL 1076277, at *14 (S.D.N.Y. Mar. 12, 2024) (quoting *Wallace v. IntraLinks*, 2013 WL 1907685, at *12 (S.D.N.Y. May 8, 2013)); *see also Nayani*, 2023 WL 3260260, at *2 (rejecting argument that complaint sounded in fraud because it alleged that the defendants "*knew* of a material decline in clinician retention but still touted LifeStance's historical clinician retention rate"). Moreover, allegations about "false and misleading" statements and "untrue statements of material facts" "simply track the elements of section 11, and a plaintiff cannot be held to allege fraud whenever he tracks those elements." *See Nayani*, 2023 WL 3260260, at *2; *see also Fresno Cnty. Emps. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 559 (S.D.N.Y. 2017) ("To hold that bare recitations of the elements of the causes of action triggered Rule 9(b) would be contrary to the holding of the Court of Appeals in *Rombach*."); *In re Refco*,

503 F. Supp. 2d at 631–32 ("Fraud, of course, implies more than falsity, and the mere fact that a statement is misleading (as are all false statements, whether intentionally, negligently or innocently made) does not make it fraudulent.").

Accordingly, the complaint is governed by Rule 8(a)'s more lenient pleading standard.

### C. Misleading Statements and Omissions

To state a claim under section 11 or 12(a)(2), the plaintiff must allege that the offering documents "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *See In re Morgan Stanley*, 592 F.3d at 358–59 (quoting 15 U.S.C. § 77k(a)); *see also* 15 U.S.C. § 77l(a)(2). Defendants argue that plaintiffs have failed to plausibly allege such material misstatements or omissions.[8]

As a threshold matter, the parties disagree about whether the truth of the statements should be "adjudged by the facts as they existed when the registration statement became *effective*," *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *7 (S.D.N.Y. Dec. 2, 2013) (citation omitted), or by the facts as they existed when the de-SPAC merger closed. *See* Dkt. 95 at 14. For plaintiffs' section 11 claim, the relevant point of reference is the facts as they existed when the registration statement became effective. *See* 15 U.S.C. § 77k(a) (creating liability "[i]n case any part of the registration statement, *when such part became effective*, contained an untrue statement of a material fact" (emphasis added)).

Section 12(a)(2) presents a different situation. *See* Hazen, *supra*, § 2:45 ("[A]lthough the registration statement need not be updated for most developments subsequent to the effective date, the prospectus must continue to be accurate."). "Unlike Section 11, Section 12(a)(2) 'does not specify the point in time to which materiality is related.'" *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 185 (S.D.N.Y. 2003) (quoting *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, 2000 WL 1357509, at *7 (S.D.N.Y. Sept. 20, 2000)); *see also id.* (explaining that section 12(a)(2) provides "recourse [for plaintiffs] when events that occur after the effective date of a registration statement/prospectus render statements therein misleading"). Accordingly, courts in this district have held that defendants can be held liable under section 12(a)(2) for misstatements or omissions in the offering documents that were misleading at "the time of purchase." *Id.* (quoting *In re Dreyfus*, 2000 WL 1357509, at *7).

The time of purchase is the date when investors "have made an irrevocable commitment to take shares." *Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 422 (S.D.N.Y. 2008). In

---

[8] Plaintiffs argue that defendants challenge only the complaint's allegations that defendants violated their disclosure obligations under Regulation S-K. Dkt. 95 at 9. But defendants argue that plaintiffs have failed to allege either "misstatements" or "omissions" in the offering documents and ask for dismissal of the complaint in its entirety, *see* Dkt. 86 at 11–18, so the Court rejects plaintiffs' argument that defendants have waived any argument unrelated to Regulation S-K.

most cases, that date is easy to pinpoint: it is "the date that a plaintiff bought stock on a public exchange." *In re Alliance*, 279 F. Supp. 2d at 185. In other circumstances, it might be the date investors voted to approve the merger. *Id.* But here, assuming that approving the business combination "did not irrevocably commit [plaintiffs] to exchange [their RNER] shares for [Hub] shares," *Hildes*, 734 F.3d at 860, "[a]ny exchange of shares remained contingent on the consummation of the merger." *Id.* Accordingly, for the purposes of this motion, the Court will assume that the relevant point of reference for the section 12(a)(2) claim is the day the business combination closed.[9]

### 1. The PIPE Financing

First, plaintiffs claim that statements in the offering documents characterizing the PIPE financing as "committed" were misleading because the financing "was *not* committed," as evidenced by the fact that defendants had to obtain a substitute investment that later fell through. *See* Dkt. 45 ¶¶ 117–19; Dkt. 95 at 13–14. Defendants counter that the PIPE financing was indeed committed, and the fact that the PIPE investors pulled out of the deal doesn't mean that the statement was false or misleading when the registration statement became effective or the business combination closed. Dkt. 86 at 12–13.

"[T]he relevant inquiry 'is not whether [the statement] later turned out to be correct, but rather whether . . . , at the [relevant reference] time[,] . . . the statement was untrue.'" *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 393–94 (S.D.N.Y. 2014) (second alteration in original) (quoting *Zirkin v. Quanta Cap. Holdings Ltd.*, 2009 WL 185940, at *10 (S.D.N.Y. Jan. 23, 2009)). So "[p]laintiffs must, 'at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering.'" *Id.* at 394 (quoting *Lin*, 574 F. Supp. 2d at 421).

For section 11 purposes, nothing in the complaint suggests that the PIPE financing was not committed in December 2022 when the registration statement became effective.[10] The complaint doesn't allege, for example, that the PIPE investors "purported to repudiate the agreement or expressed any uncertainty about it before the registration statement became effective." *Merritt v. Molecular Partners AG*, 2024 WL 495140, at *6 (S.D.N.Y. Feb. 5, 2024) ("[T]he complaint fails to plausibly allege that the Amgen agreement was in fact in jeopardy at the time the registration statement became effective."); *see also In re Hi-Crush Partners*, 2013 WL 6233561, at *11 (dismissing section 11 claim because there was "no reason to suspect at the time that the Registration Statement became effective . . . that [a customer] would attempt to repudiate the agreement, as it did the following month").

---

[9] The Court will also assume for the purposes of this motion that any statements in the offering documents can support a section 12(a)(2) claim. *See Gustafson*, 513 U.S. at 569 ("[W]hatever else 'prospectus' may mean, the term is confined to a document that, absent an overriding exemption, must include the 'information contained in the registration statement.'"). Defendants don't suggest otherwise.

[10] Legacy Hub filed its registration statement on August 24, 2022, and the proxy/prospectus on December 9, 2022. Dkt. 45 at 2 n.1. The proxy/prospectus and its supplements were incorporated into and formed a part of the registration statement that became effective on December 8, 2022. *Id.*

However, for section 12(a)(2) purposes, the complaint plausibly alleges that the PIPE financing was not committed when the merger closed. Plaintiffs point to an article published on February 5, 2023, reporting that one of the hedge funds that had committed PIPE funds had withdrawn its $10 million investment. Dkt. 45 ¶ 71. True, that same article reported that a different hedge fund had made an "irrevocable commitment" to "invest another $10 million on the same terms as" the original hedge fund, *id.*, and this article was based on Legacy Hub's February 2, 2023, disclosure that it had received a substitute commitment. *Id.* ¶ 70. But further reporting suggested that the new hedge fund hadn't deposited the funds that it had purportedly committed to Hub, leaving Hub to scramble for new investors. *Id.* ¶ 72. And ultimately, right after the business combination closed, Hub disclosed that "[t]he PIPE Financing did not consummate at closing of the Business Combination." *Id.* ¶ 73. The Court can't determine from the face of the complaint exactly when the PIPE financing fell through prior to the merger closing. Nor can it determine from the face of the complaint or the materials of which it has taken judicial notice whether defendants are, as they claim, currently seeking to enforce their contractual rights against the PIPE investors. Dkt. 86 at 4. However, given the timing of Hub's disclosure, the complaint plausibly alleges that representations that PIPE financing was committed were misleading. Depending on what comes out in discovery concerning the substance and timing of the dealings with the PIPE investors, things could turn out differently at summary judgment. For now, plaintiffs' section 12(a)(2) claim against Hub based on the PIPE-financing statements survives.

### 2. Internal Control Issues

Second, plaintiffs claim that the following statements in the offering documents were misleading because they downplayed the company's internal control issues, presented risks as hypothetical when they were already occurring, and failed to disclose Moshe's and Bitan's embezzlement:

- "HUB Security has identified a material weakness in its internal control over financial reporting. If HUB security's remediation of the material weakness is not effective, or if it fails to develop and maintain effective internal controls over financial reporting, HUB Security's ability to produce timely and accurate financial statements or comply with applicable laws and regulations could be impaired." Dkt. 45 ¶ 120.

- "HUB has experienced rapid growth, and if HUB fails to effectively manage its growth, then its business, results of operations and financial condition could be adversely affected." *Id.* ¶ 122.

In support of their argument, plaintiffs point out that the investigative committee, which was convened in April 2023 to investigate Moshe's and Bitan's embezzlement, determined that the company had certain internal control weaknesses that existed "as of December 31, 2021," long before the offering documents became effective or the business combination closed. *See* Dkt. 45 ¶¶ 83, 93; *see also* Dkt. 95 at 10. Plaintiffs say that the offering documents were misleading in light of these discoveries. Defendants claim that they were "only required to disclose omitted facts that they knew," so they can't be held liable for not disclosing information that they learned months

later. Dkt. 86 at 14. Plaintiffs counter that "[t]here is no knowledge requirement" for a section 11 or 12(a)(2) claim. Dkt. 95 at 11.

The Court agrees with plaintiffs that they "are not required to allege that defendants in Section 11 and Section 12 claims knew, or should have known, of any material omitted facts or misstatements at the pleading stage"; to survive a motion to dismiss, a given fact need only be "knowable" at the time the misstatement or omission was made, meaning that "the relevant event had already transpired at the time of the offering." *Winter v. Stronghold Digital Mining, Inc.*, 686 F. Supp. 3d 295, 306 (S.D.N.Y. 2023); *see also Lian v. Tuya*, 2024 WL 966263, at *11 (S.D.N.Y. Mar. 5, 2024) ("Section 11 does not have a requirement that the omitted fact be known, or should have been known, by issuers."). Hub's investigation turned up evidence of internal control issues and embezzlement that existed long before the offering documents became effective. Dkt. 45 ¶ 93. That's enough to suggest that those issues were "knowable" both at the time the offering documents became effective (for section 11) and before the de-SPAC merger closed (for section 12(a)(2))—i.e., if defendants looked, they would have found them.

Next, defendants say they can't be held liable because the offering documents *did* disclose Hub's internal control issues. And "when a registration statement warns of the exact risk that later materialized, a section 11 claim will not lie as a matter of law." *Yaroni v. Pintec Tech. Holdings Ltd.*, 600 F. Supp. 3d 385, 395 (S.D.N.Y. 2022) (quoting *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013)). But plaintiffs object to defendants' failure to identify the *extent* of Hub's internal control issues, including that it had "insufficient oversight of certain signatory rights relat[ed] to [its] financial accounts," which ultimately enabled the embezzlement. Dkt. 45 ¶ 93. Further, the statements suggested that the internal control issues "could" hypothetically impair Hub's ability to comply with financial-reporting laws and regulations, when Moshe and Bitan already had capitalized on the company's lack of internal controls by embezzling money. This isn't the "exact" risk that defendants warned about in the offering documents. *See Yaroni*, 600 F. Supp. 3d at 396; *see also Lian*, 2024 WL 966263, at *14 ("Most fundamentally, the risk disclosures Defendants highlight do not 'pertain[] to the specific risk that was realized.'" (alteration in original) (citation omitted)).

Finally, defendants argue that the embezzlement wasn't material. Dkt. 86 at 15–16. "Materiality is an 'inherently fact-specific finding' that is satisfied when a plaintiff alleges 'a statement or omission that a reasonable investor would have considered significant in making investment decisions.'" *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716–17 (2d Cir. 2011) (first quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 236 (1988); and then quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161–62 (2d Cir. 2000)). Defendants say that the total value of the embezzlement, $761,000, was only 0.5% of the company's March 3, 2023, market capitalization, so it was not material as a matter of law. Dkt. 86 at 16. They base this argument on *Ganino*, 228 F.3d 154, in which the Second Circuit indicated that "both quantitative and qualitative factors must be considered in determining materiality." *See ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009) (discussing *Ganino*); *see also id.* ("[T]he five percent numerical threshold is a good starting place for assessing the materiality of the alleged

misstatement."). But while the *Ganino* court held that "an alleged misrepresentation relating to less than two percent of defendant's assets, when taken in context, could be immaterial as a matter of law," it specifically rejected the use of "bright-line numerical tests for materiality." *Id.* Qualitative factors to consider, for example, include whether "the misstatement concealed an unlawful transaction." *Id.* Here, the fact that the company's CEO was the one doing the embezzling might also affect the analysis. Accordingly, the Court rejects defendants' attempt to impose an entirely quantitative assessment of materiality.

### 3. Flagship Product

Third, plaintiffs say that the following statements in the offering documents were misleading, based on Moscovich's admissions that "Legacy Hub's flagship product was not ready for market and improvements were still required" when he took over as CEO, and that it took eight months under his leadership to develop a mature product. Dkt. 45 ¶¶ 95, 125:

- "HUB Security is an established business, with established products, client base, and revenue stream." *Id.* ¶ 124.
- "HUB Security is cash positive with a range of new products providing significant growth potential." *Id.*

Defendants argue these statements aren't misleading because Moscovich also said that "at the time of the IPO on Wall Street, the company's flagship product existed and was being sold, but improvements were required, which indeed happened in the second half of 2023." *Id.* ¶ 95.

The Court disagrees. "The test for whether a statement is materially misleading [is] . . . whether representations, viewed as a whole, would have misled a reasonable investor." *In re BioScrip*, 95 F. Supp. 3d at 742 (quoting *Rombach*, 355 F.3d at 178 n.11). The Court has no trouble concluding that a reasonable investor might be misled by the promise that Hub was a cash-positive, "established business" with a "client base" and "established products" when, in fact, Hub's flagship product was nowhere near ready for market.[11]

### 4. Items 303 and 105 of Regulation S-K

Plaintiffs also premise their claims on violations of Items 303 and 105 of Regulation S-K, which "impose[] disclosure requirements on companies filing SEC-mandated reports." *See Stratte-McClure v. Morgan Stanley*, 776 F. 3d 94, 101 (2d Cir. 2015) (discussing Item 303); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) ("One of the potential bases for liability under §§ 11 and 12(a)(2) is an omission in contravention of an affirmative legal disclosure obligation."); *see also* Dkt. 45 ¶¶ 106–15. Item 303 requires disclosure of "known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way"

---

[11] Defendants argue that the fact that they had "meaningful revenue during the first six months of 2023 belies the suggestion that there was no 'established' product." Dkt. 86 at 17. A factfinder may agree. But this isn't an issue for the Court to decide on a motion to dismiss.

and "known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303. Item 105, meanwhile, requires that the offering documents "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and "explain how each risk affects the registrant or the securities being offered." *Id.* § 229.105.

Plaintiffs say that defendants violated Item 303 by not disclosing that Moshe and Bitan were "conspiring with one of the controllers of Legacy Hub to embezzle massive amounts of funds from the company, that the PIPE financing was not committed[,] and that Legacy Hub did not have a mature product that was ready for market." Dkt. 45 ¶ 113. But these aren't "trends" or "uncertainties." *See City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011) ("The plaintiffs do not allege that the Zion Trust Fund was trending toward inadequacy, but rather that it was already inadequate and remained so."). They're simply issues that plaintiffs allege "were always present." *Id.* So plaintiffs "have failed to allege a failure to make disclosures required by Item 303." *Id.* Accordingly, plaintiffs claims are dismissed to the extent that they're predicated on a violation of Item 303.

Plaintiffs argue that Item 105 required the same disclosures. Dkt. 45 ¶ 115. The parties dispute whether, to state a claim premised on Item 105, plaintiffs are required to allege facts that give rise to a plausible inference that defendants had actual knowledge of the undisclosed risks. *See* Dkt. 86 at 14; Dkt. 95 at 16. The Court agrees with the "majority view" that "an issuer must know of the relevant risk factor to be held liable for a violation of Item 105," and so plaintiffs must "plead facts that could give rise to a plausible inference of actual knowledge." *Lian*, 2024 WL 966263, at *9; *see also Wandel v. Gao*, 590 F. Supp. 3d 630, 646 (S.D.N.Y. 2022) (holding that plaintiffs' argument "that they need not plead actual knowledge to create an obligation under Items 105 or 303" "is contrary to the regulations' own text and refuted by a long line of authority in this Circuit").

As discussed above, plaintiffs have plausibly alleged that defendants knew the PIPE financing wasn't committed before the merger closed, but there's nothing in the complaint to suggest that defendants had actual knowledge of that fact when the offering documents became effective. Accordingly, while plaintiffs' section 12(a)(2) claim based on this alleged Item 105 violation survives, the section 11 allegation fails.

As for the embezzlement and internal-control allegations, plaintiffs allege that defendants tried not to "rock the ship" by covering up Moshe's exit in February, after the offering documents became effective but before the merger closed. *See* Dkt. 45 ¶ 82. This is enough to sustain their section 12(a)(2) claim against Hub premised on Item 105. As for section 11, however, there is no indication in the complaint that any of the individual defendants, aside from Moshe himself, knew at the time the offering documents became effective about the extent of Hub's internal control issues or about Moshe's embezzlement. So to the extent that plaintiffs' section 11 claim against the individual defendants other than Moshe is premised on their failure to disclose these issues, it is dismissed.

Finally, the complaint plausibly alleges that defendants knew at the time the offering documents became effective that it might take months to get their flagship product to market. Defendants argue that they *did* disclose this fact, pointing to the disclosure of several risks about Hub's product, including that Hub would need to "continually modify and improve its products," and that its products may "contain[] undetected defects or errors." Dkt. 94-1 at 46, 57. As plaintiffs point out, however, none of those purported risk disclosures identifies the fundamental "risk" at issue: that it might takes months for Hub to get a mature product to market. Accordingly, plaintiffs' section 11 and 12(a)(2) claims premised on the failure to make this disclosure as required by Item 105 survive.

### D.  Section 15

Finally, the Court turns to plaintiffs' section 15 claim against the individual defendants. "Section 15 . . . creates liability for individuals or entities that 'control[] any person liable' under section 11 or 12." *In re Morgan Stanley*, 592 F.3d at 358 (alteration in original) (quoting 15 U.S.C. § 77*o*). "To state a claim under this provision[,] a plaintiff must plead: (1) a primary violation; and (2) control over the primary violator." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 457 (S.D.N.Y. 2005). As discussed above, plaintiffs have plausibly alleged that Hub violated sections 11 and 12(a)(2). The only remaining question is whether plaintiffs have plausibly alleged that the individual defendants were control persons under section 15.

"At the pleading stage," it is sufficient to assert that individual defendants "signed or authorized the signing of" a registration statement or prospectus to establish control-person liability. *See City of Omaha*, 450 F. Supp. 3d at 428; *see also In re Alstom SA*, 406 F. Supp. 2d 433, 494 (S.D.N.Y. 2005) ("It 'comport[s] with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report.'" (alteration in original) (citation omitted)); *Plumbers' & Pipefitters' Loc. No. 562 Supplemental Plan & Tr. v. J.P. Morgan Acceptance Corp.*, 2012 WL 601448, at *20 (E.D.N.Y. Feb. 23, 2012) (collecting cases). And here, the complaint alleges that all the individual defendants signed or authorized the signing of either the registration statement or prospectus. *See* Dkt. 45 ¶¶ 24–33.

Defendants don't address this case law; they just say that boilerplate allegations about "control" and officer-and-director status aren't enough to allege control-person liability. They also point out that defendant Matthew Kearney was the CEO of Mount Rainier, not Hub, when he signed the prospectus. (He was named as a director nominee of Hub in the registration statement. *Id.* ¶ 32.) But as discussed above, the complaint does more than allege that the individual defendants had "control" over Hub; it alleges that they signed the offering documents. As for Kearney's status as CEO of Mount Rainier, it's not clear why this would overcome the inference that someone who signs a report has some control over those who write the report.

Defendants also say that plaintiffs fail to allege control-person liability because they fail to allege "meaningful culpable conduct [by an individual defendant] beyond mere status as a director or officer." *Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010) (alteration in original) (citation omitted). Some courts in this circuit have

imported this "culpable conduct" requirement from section 20(a) of the Securities Exchange Act of 1934 into section 15, while others have held that the requirements under the two statutes are not the same. *See In re Lehman Bros. Mortgage-Backed Sec. Litig.*, 650 F. 3d. 167, 185–86 (2d Cir. 2011) (summarizing cases and declining to reach this disagreement). This Court agrees with courts that have reached the latter conclusion. As Judge Lynch explained in *In re Refco*, although sections 15 and 20(a) are "substantially identical," they differ in at least one important way: "[s]ection 15 provides that there shall be no liability where 'the controlling person had no *knowledge of or reasonable ground to believe* in the existence of the facts by reason of which the liability of the controlled person is alleged to exist,'" whereas section 20(a) "gives rise to no liability where 'the controlling person acted *in good faith* and did not directly or indirectly induce the act or acts constituting the violation or cause of action.'" *In re Refco*, 53 F. Supp. 2d at 660 n.43 (first quoting 15 U.S.C. § 77*o*; and then quoting 15 U.S.C. § 78t(a)). Because the Second Circuit inferred the "culpable conduct" requirement in part from section 20(a)'s language requiring a lack of "good faith," the Court agrees with Judge Lynch that section 15 liability does not require the same showing. *Id.* Accordingly, plaintiffs' section 15 claim against the individual defendants survives.

## CONCLUSION

For these reasons, defendants' motions to dismiss the complaint are GRANTED IN PART and DENIED IN PART. Plaintiffs' section 11 claim survives against all defendants, except insofar as liability is premised on theories the Court rejected in section IV(C). Agam's and Aharon's section 12(a)(2) claim is dismissed. Fodjo's and Green's section 12(a)(2) claim is dismissed against the individual defendants but survives as to Hub. Plaintiffs' section 15 claim survives against the individual defendants. Within 14 days, the parties should jointly submit a case-management plan with a proposed schedule for this action moving forward.

The Clerk of Court is directed to terminate Dkts. 71, 73, 85, 87, and 92, and to terminate plaintiffs Efrat Investments LLC and Reese Tripp, who are not named in the operative complaint.

SO ORDERED.

Dated: March 20, 2025
New York, New York

ARUN SUBRAMANIAN
United States District Judge