**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE HUB CYBER SECURITY LTD., | Master File No. 1:23-cv-05764-AS |
| | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| | **JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

I.      NATURE AND OVERVIEW OF THE ACTION ..............................................................1

II.     JURISDICTION AND VENUE ....................................................................................5

III.    PARTIES ........................................................................................................5

IV.     SUBSTANTIVE ALLEGATIONS ................................................................................8

        A.      Special Purpose Acquisition Companies And Their Inherent Conflicts Of
                Interest..................................................................................................8

        B.      Mount Rainier, A Two-Person SPAC, Goes Public ................................................10

        C.      Mount Rainier Announces That It Will Combine With Legacy Hub, An
                Israeli Cyber Security Company..................................................................11

        D.      Almost All Of Mount Rainier Shareholders Redeem Their Shares Before
                The Business Combination, Which Drains The Trust Of Funds ..........................15

        E.      The Company Announces Its CEO Was To Be "Promoted" Only For Him
                And His Spouse To "Resign" The Same Day.......................................................17

        F.      Contrary To Defendants' Representations, The PIPE Financing Was Not
                Committed To Finance The Business Combination ...............................................18

        G.      It Is Revealed That Moshe And His Wife Had Embezzled Funds From The
                Company And Were Able To Do So Due To A Complete Lack Of Internal
                Controls..................................................................................................28

        H.      The Company Admits That It Did Not Have Adequate Internal Controls ...........34

        I.      Defendant Moscovich Concedes That At All Relevant Times Legacy Hub
                Did Not Have A Mature Or Proven Product For Sale ...........................................36

        J.      The Truth Is Only Fully Revealed After The Entire Senior Management
                Team Changed ..........................................................................................38

V.      DEFENDANTS VIOLATED THEIR DISCLOSURE OBLIGATIONS UNDER
        THE SECURITIES ACT AND ITEMS 303 AND 105 OF REGULATION S-K ...........39

        A.      Section 11 Disclosure Requirements ..................................................................39

        B.      Disclosure Requirements Under Regulation S-K Item 303 ...................................40

        C.      Disclosure Requirements Under Regulation S-K Item 105 ...................................42

VI.    HUB'S OFFERING DOCUMENTS CONTAINED MATERIALLY FALSE AND
        MISLEADING STATEMENTS.........................................................................................43

VII.    CLASS ACTION ALLEGATIONS ...............................................................................48

VIII.   NO SAFE HARBOR .....................................................................................................49

IX.     CAUSES OF ACTION ..................................................................................................50

X.      PRAYER FOR RELIEF .................................................................................................54

Lead Plaintiffs Aryeh Agam and Shimon Aharon ("Lead Plaintiffs"), and additional plaintiffs Rodrigue Fodjo and Dustin Green (collectively, "Plaintiffs"), by and through the undersigned attorneys, individually and on behalf of all others similarly situated, allege the following upon information and belief, except as to allegations specifically concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, Lead Counsel's investigation, which includes without limitation: (i) review and analysis of regulatory filings made by Hub Cyber Security Ltd. ("Hub" or the "Company") f/k/a Mount Rainier Acquisition Corp. ("Mount Rainier") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (ii) review and analysis of analyst and media reports; (iii) review and analysis of press releases and other public statements issued and disseminated by the Company or its authorized agents; and (iv) review of other publicly available information concerning Hub and its predecessor, Hub Cyber Security (Israel) Ltd. ("Legacy Hub").

## I.    NATURE AND OVERVIEW OF THE ACTION

1.    In February 2023, Mount Rainier consummated a business combination with Legacy Hub, and the combined entity was renamed Hub (the "Business Combination"). This is a federal securities class action on behalf of all individuals and entities that purchased or otherwise acquired Hub securities pursuant and/or traceable to the Offering Documents (defined below) issued in connection with the Business Combination, seeking remedies under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act").

2.    On March 23, 2022, Legacy Hub and Mount Rainier issued a joint press release announcing that they had entered into a definitive agreement for the Business Combination. Therein, the entities said that "[c]ash proceeds from the proposed transaction are expected to consist of up to approximately $176 million of cash held in [Mount Rainier]'s trust (before any redemptions by [Mount Rainier]'s public stockholders and the payment of certain expenses) and

1

approximately $50 million attributed to the PIPE investment anchored by Israeli and American institutional and existing investors."  Additionally, Legacy Hub's securities that were traded on the Tel Aviv Stock Exchange ("TASE") would be delisted and, in connection with the completion of the Business Combination, new securities would be issued to the former Legacy Hub and Mount Rainier securities holders.

3.      The Offering Documents[1] issued in connection with the Business Combination, however, were negligently prepared because they failed to disclose: (i) that Legacy Hub's CEO, Eyal Moshe ("Moshe") and his spouse, Ayelet Bitan ("Bitan"), who was Legacy Hub's Vice President of Human Resources, conspired with one of the controllers of Legacy Hub to embezzle massive amounts of funds from the company; (ii) that the claimed institutional PIPE financing that was supposedly in place for the Business Combination was not actually firmly committed; and (iii) that Legacy Hub did not have a mature product that was ready for market.

4.      Prior to the commencement of the Business Combination, Mount Rainier's trust was almost completely drained to satisfy redemptions elected by almost all of Mount Rainier shareholders, which made the PIPE financing all the more important.  Moreover, just before the Business Combination closed, it was first disclosed that "Moshe will be promoted to undertake the role of President of US operations to better focus resources and attention on the North American strategic business development," but then Legacy Hub claimed that Moshe had resigned as an executive but would stay on as a director.

---

[1] "Offering Documents" refers to, collectively, the Registration Statement on Form F-4 that was filed by Legacy Hub on August 24, 2022, and all amendments thereto, and the Proxy/Prospectus filed on Form 424B3 on December 9, 2022, and all supplements thereto. The Proxy/Prospectus and its supplements were incorporated into and formed a part of the Registration Statement that became effective on December 8, 2022.

5.    On February 28, 2023, the Business Combination was completed, and the combined company's ordinary shares and two series of warrants were approved for trading on Nasdaq starting on March 1, 2023.  Moreover, the Company explained that Legacy Hub's shares and warrants had been delisted from TASE.  Also on February 28, 2023, the Nasdaq announced that Hub's new securities were registered.

6.    On March 1, 2023, Hub's securities began trading on the Nasdaq.  Hub's shares opened that day with a trading price of $2.53 per share.

7.    While the Offering Documents repeatedly expressed that the PIPE financing was "committed," upon completion of the Business Combination, the Company revealed that the PIPE financing was not consummated.  This caused Hub's securities to crater.   Hub's shares declined $0.94 per share, or 37.15%, on March 1, 2023, and further declined the next day by $0.34 per share, or 21.38%, to close at $1.25 per share on March 2, 2023.

8.    Soon thereafter, on April 20, 2023, the Company disclosed that it appointed a special committee of independent directors to investigate and assess certain "allegations of potential misappropriation and other potential fraudulent actions raised against a former senior officer of the Company." An article that same day provided more clarity, explaining that Company had hired an external investigative team to look into suspicions that the Moshe and Bitan had used Hub's funds for personal needs, including for the purchase of the house they bought in Tel Aviv and various expenses related to it.

9.    On May 1, 2023, Hub announced that it would be unable to timely file its Annual Report for its 2022 fiscal year due to its ongoing investigation into the potential misappropriation of Company funds and other potentially fraudulent actions by a former executive officer.

10.     On May 15, 2023, the Company announced that it still required additional time to complete the process of investigating the embezzlement and reviewing the Company's internal controls at the Company before filing its Annual Report.

11.     On July 5, 2023, the day before this action commenced, the price of Hub's stock closed at $0.39 per share.  As such, the Company's shares declined 84.52% from their opening price on its first day of trading after the Business Combination.

12.     On August 15, 2023, the Company finally filed its Annual Report for the 2022 fiscal year.  Therein, the Company disclosed that Moshe and Bitan had engaged in an embezzlement scheme where they stole hundreds of thousands of dollars for personal use from a "Company bank account over which Mr. Moshe had sole signatory rights."  Moreover, the Company disclosed that "one of the controllers of the Company, with the permission of Mr. Moshe, used Company credit cards for personal use in the amount of approximately NIS 400,000 (approximately $110 thousand)." But "[t]hese personal expenses were neither factored into the controller's payroll nor properly documented in the Company's financial books and records."  The Annual Report also disclosed that the Company did not have any real internal controls, which enabled this embezzlement scheme to occur.

13.     Thereafter, following the resignation of Moshe's predecessor as CEO, Uzi Moscovich, who was still a Hub board member, admitted that, at the time of the Business Combination, Legacy Hub did not have a mature or proven product for sale.  As he further explained, "there was no product and there were no sales. The product was not ready at all."

14.     As a result of Defendants' wrongful conduct, Plaintiffs and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

15.    The claims asserted herein arise under §§11, 12(a)(2) and 15 of the Securities Act ([15 U.S.C. §§77k, 77*l*(a)(2) and 77o].).

16.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §22 of the Securities Act.

17.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.

18.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.    PARTIES

19.    Lead Plaintiff Aryeh Agam, as set forth in the previously filed certification (ECF No. 23-1) incorporated by reference herein, purchased or otherwise acquired Hub securities pursuant and/or traceable to the Offering Documents issued in connection with the Business Combination, and was damaged thereby.

20.    Lead Plaintiff Shimon Aharon, as set forth in the previously filed certification (ECF No. 23-1) incorporated by reference herein, purchased or otherwise acquired Hub securities pursuant and/or traceable to the Offering Documents issued in connection with the Business Combination, and was damaged thereby.

21.    Additional plaintiff Rodrigue Fodjo, as set forth in the previously filed certification (ECF No. 27-2) incorporated by reference herein, purchased or otherwise acquired Hub securities pursuant and/or traceable to the Offering Documents issued in connection with the Business Combination, and was damaged thereby.

5

22.     Additional plaintiff Dustin Green, as set forth in the previously filed certification (*Green v. Hub Cyber Security Ltd. et al*, Case No. 1:23-cv-06668 (S.D.N.Y. Jul. 31, 2023), ECF Nos. 1-1, 1-2) incorporated by reference herein, purchased or otherwise acquired Hub securities pursuant and/or traceable to the Offering Documents issued in connection with the Business Combination, and was damaged thereby.

23.     Defendant Hub is organized under the laws of Israel with principal executive offices located at 17 Rothschild Boulevard, Tel Aviv 6688120, Israel. HUB's ordinary shares ("shares") trade on the Nasdaq under the ticker symbols "HUBC," and its warrants trade under the symbols "HUBCZ" and "HUBCW." Prior to the Business Combination, Legacy Hub's ordinary shares traded on the Tel Aviv Exchange.

24.     Defendant Moshe served as Legacy Hub's CEO from June 2021 to February 2, 2023, and served as a director on Legacy Hub's Board of Directors (the "Board") at the time of the Business Combination. Defendant Moshe signed or authorized the signing of the Registration Statement.

25.     Defendant Hugo Goldman ("Goldman") served as Legacy Hub's CFO, and later as the Company's CFO, until August 16, 2023. Defendant Goldman signed or authorized the signing of the Registration Statement.

26.     Defendant Uzi Moscovich ("Moscovich")—a/k/a Azriel or Uzi Moskovici, Moskovich, or Moskovitz— served as a director of the Board at the time of the Business Combination and has served as Legacy Hub's CEO, and later the Company's CEO, since February 2, 2023.  Defendant Moscovich signed or authorized the signing of the Registration Statement (under the name Azriel Moskovici).

27.      Defendant Zeev Zell ("Zell") served as a director of the Board at the time of the Business Combination. Defendant Zell signed or authorized the signing of the Registration Statement.

28.      Defendant Levana Shifman ("Shifman") served as a director of the Board at the time of the Business Combination. Defendant Shifman signed or authorized the signing of the Registration Statement.

29.      Defendant Moshe Raines ("Raines") served as a director of the Board at the time of the Business Combination. Defendant Raines signed or authorized the signing of the Registration Statement.

30.      Defendant Manish Agarwal ("Agarwal") served as a director of the Board at the time of the Business Combination. Defendant Agarwal signed or authorized the signing of the Registration Statement.

31.      Defendant Moti Franko ("Franko") served as a director of the Board at the time of the Business Combination. Defendant Franko signed or authorized the signing of the Registration Statement filed with the SEC.

32.      Defendant Matthew Kearney ("Kearney") was the Chairman and CEO of Mount Rainier, was named as a director nominee in the Registration Statement, signed the Proxy/Prospectus, and served as a director on the Company's Board following the Business Combination.

33.      Defendants Moshe, Goldman, Moscovich, Zell, Shifman, Raines, Agarwal, Franko and Kearney are collectively referred to hereinafter as the "Individual Defendants."  Each of the Individual Defendants signed the Registration Statement, except Defendant Kearney, who was a director nominee of the Company with his consent in the Registration Statement.  In addition, the

Individual Defendants participated in the solicitation and sale of Hub securities to investors in the Business Combination for their own benefit and the benefit of Hub as directors, executive officers, and/or major shareholders of the Company.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Special Purpose Acquisition Companies And Their Inherent Conflicts Of Interest

34.    Special purpose acquisition companies ("SPACs") are publicly traded companies with no business activities that are formed specifically to acquire an existing operating company. The capital from the SPAC's initial public offering ("IPO") is held in trust for a specific period of time to fund the acquisition.

35.    If a merger or acquisition is successfully made within the allocated time frame, founders and managers of the SPAC can profit through their ownership of the SPAC's securities (typically about 20% of the SPAC's stock, in addition to warrants to purchase additional shares). However, if an acquisition is not completed within that time frame, then the SPAC is dissolved, the money held in trust is returned to investors, and no compensation is paid to the founders and managers of the SPAC, whose SPAC securities expire worthless. Accordingly, the founders and management team of a SPAC are highly incentivized to complete an acquisition before their deadline, even if the benefits of that transaction for the public shareholders of the SPAC are dubious.

36.    The business combination effectuated by a SPAC is in many respects similar to a traditional IPO, in that a previously private company becomes publicly traded. However, SPAC transactions and IPOs have certain key differences. In a traditional IPO, banks underwrite the offering and perform substantial due diligence in order to evaluate the company going public, to formulate appropriate disclosures to prospective investors, and to accurately price its securities. In

8

a SPAC transaction, there are no underwriters; the due diligence and the disclosures supporting the business combination are solely determined by the SPAC and its controlling persons, who have strong incentives to agree to and obtain shareholder approval for an acquisition regardless of its true merits.

37.    Typically, common stockholders of a SPAC are granted voting rights to approve or reject the business combination proposed by the management team. Thus, when the management team identifies a target, a proxy statement must be distributed to all SPAC stockholders, which includes the target company's financial statements and the terms of the proposed business combination. Public stockholders in SPACs rely on management of the SPAC and the target company to honestly provide accurate information about any contemplated transactions.

38.    Amidst a recent boom in SPAC transactions, the SEC has warned the public about serious, widespread concerns characteristic of these mergers, including "risks from fees, conflicts, and sponsor compensation, . . . and the potential for retail participation drawn by baseless hype."[2] These concerns raise questions as to whether SPAC sponsors have "sufficient incentives to do appropriate due diligence on the target and its disclosures to public investors, especially since SPACs are designed not to include a conventional underwriter."

39.    Numerous other commentators have similarly noted the conflict of interest between SPAC management and shareholders with respect to the completion of a business combination. For example, in the Yale Journal on Regulation, law professors at Stanford and New York University address "misaligned incentives inherent in the SPAC structure," including that "the sponsor has an incentive to enter into a losing deal for SPAC investors if its alternative is to

---

[2] John Coates, Acting Director, SEC Division of Corporation Finance, Apr. 8, 2021, SPACs, IPOs and Liability Risk under the Securities Laws, *available at*: https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws.

liquidate."[3] Based on empirical research of post-merger returns to SPAC shareholders, that paper concludes that "SPAC sponsors have proposed losing propositions to their shareholders, which is one of the concerns raised by the incentives built into the SPAC structure. . . . [S]ponsors do quite well, even where SPAC shareholders have experienced substantial losses."

> **B.    Mount Rainier, A Two-Person SPAC, Goes Public**

40.    Mount Rainier, a SPAC, was incorporated in Delaware on February 10, 2021, for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses.

41.    The registration statement for Mount Rainer's IPO was declared effective on October 4, 2021, and the IPO was consummated on October 7, 2021.  In the IPO, Mount Rainier sold 17,250,000 units (the "Units") at $10.00 including the full exercise of the underwriters' over-allotment option, generating gross proceeds of $172.5 million, and incurring transaction costs of approximately $12.3 million.  Each Unit consists of one share of common stock and one warrant, where each warrant entitles the holder to purchase three-fourths of a share of common stock at a price of $11.50 per whole share.  Simultaneously with the closing of the IPO, Mount Rainier completed the private sale of 596,200 Units at a purchase price of $10.00 per Private Placement Unit (the "Private Placement") to the Sponsor (DC Rainier SPV LLC), Mount Rainier's CEO, and its CFO, generating gross proceeds of approximately $6.0 million.[4]

---

[3] Klausner, Michael D. and Ohlrogge, Michael and Ruan, Emily, A Sober Look at SPACs (December 20, 2021). YALE JOURNAL ON REGULATION, 2022, Volume 39, Issue 1, *available at*: SSRN: https://ssrn.com/abstract=3720919

[4] As explained in the IPO documents, "[o]n March 26, 2021, our sponsor, along with certain of our directors and officers and the representative of the underwriters purchased 4,312,500 of our common shares for an aggregate purchase price of $25,000, which includes 1,265,000 representative shares issued to A.G.P., and which serve as part of the underwriting compensation for this offering. On September 27, 2021 and September 30, 2021, A.G.P. transferred 300,000

42.     Mount Rainier placed the net proceeds of $175.95 million from the IPO and the Private Placement in a trust account.  On or about October 5, 2021, Mount Rainier's units began to trade on the NASDAQ exchange under the symbol "RNERU," and the shares of common stock and warrants began separately trading on the NASDAQ under the symbols "RNER" and "RNERW," respectively, on or about January 3, 2022.

43.     Though the IPO documents did not identify a target business with which Mount Rainier would combine, Mount Rainier stated that it "intend[ed] to focus on established, technology focused businesses that have an aggregate enterprise value of approximately $500 million to $2.0 billion and would benefit from access to public markets and the operational and strategic expertise of our management team and board of directors."

44.     According to Mount Rainier, its management team, including Defendant Kearney had "extensive experience as private equity investors and as C-level executives in a variety of industries including media, financial institutions, and fintech." Moreover, Mount Rainier claimed it "will seek to capitalize on the significant experience of our management team in consummating an initial business combination with the ultimate goal of pursuing attractive returns for our shareholders."

**C.      Mount Rainier Announces That It Will Combine With Legacy Hub, An Israeli Cyber Security Company**

45.     Legacy Hub was established in Israel in 2017 by veterans of intelligence units of the Israeli Defense Forces.  In June 2021, Legacy Hub merged with A.L.D. Advanced Logistics

---

shares and 50,000 shares, respectively, to the sponsor, and agreed to transfer an additional 50,000 shares if the over-allotment option is exercised in full. Such shares are referred to herein as "founder shares" or "insider shares," and include an aggregate of up to 562,500 shares that are subject to forfeiture to the extent that the over-allotment option is not exercised in full or in part so that our initial stockholders (including the representative) will collectively own 20% of our issued and outstanding shares after this offering."

Development Ltd. ("ALD"), a leading provider of quality and reliability certification training and services.

46.     According to Legacy Hub, the company specialized in unique cyber security solutions protecting sensitive commercial and government information, and it had debuted an advanced encrypted computing solution aimed at preventing hostile intrusions at the hardware level while introducing a novel set of data theft prevention solutions.  Legacy Hub claimed that it operated in over 30 countries and provides innovative cybersecurity computing appliances as well as a wide range of cybersecurity services worldwide.

47.     On March 23, 2022, Legacy Hub and Mount Rainier issued a joint press release stating "that they have entered into a definitive business combination agreement" and that the Defendant Moshe, "and the current management team will continue to lead the Combined Company."  In the joint press release, Legacy HUB and Mount Rainier further described Legacy Hub's business as follows:

> HUB develops and markets Confidential Computing solutions and services that aim to disrupt cybersecurity for enterprises and governments worldwide. HUB's proprietary hardware solutions enable the protection of sensitive IT data through a computer's RAM memory or processor, creating a Trusted Execution Environment (TEE). HUB provides a holistic cyber defense of end-to-end data protection across all phases of the data lifecycle and offers next-generation encryption solutions, including advanced quantum computing defense. The Company has received FIPS 140-2 Level 3 to meet stringent U.S. security standards and the highest level of security for cryptographic modules.

48.     In addition, the press release stated that "[p]roceeds from the PIPE are expected to satisfy the minimum cash closing condition and will be used as working capital to support continued growth and to fund acquisitions." Moreover, "[c]ash proceeds from the proposed transaction are expected to consist of up to approximately $176 million of cash held in [Mount Rainier]'s trust (before any redemptions by [Mount Rainier]'s public stockholders and the payment

of certain expenses) and approximately $50 million attributed to the PIPE investment anchored by Israeli and American institutional and existing investors."

49.    That same day, Mount Rainier filed a Form 8-K with the SEC to explain the "Conditions of Closing" of the business combination, including that:

> the aggregate cash proceeds available for release to SPAC from the Trust Account in connection with the transactions contemplated by the Business Combination Agreement (after giving effect to all of the SPAC Stockholder Redemptions) plus (b) the PIPE Financing Amount (the "Aggregate Transaction Proceeds") shall equal at least $50,000,000.

50.    On July 5, 2022, Legacy Hub announced that it had submitted a formal request to the Israeli District Court to allow Legacy Hub's shareholders to decide on same-day delisting from the TASE and start of its expected trading on the Nasdaq.

51.    On August 9, 2022, Legacy HUB disclosed that it had received formal approval from the Israeli District Court to summon a shareholders' meeting for the approval of the upcoming SPAC meeting and listing terms on the Nasdaq.

52.    On August 24, 2022, Legacy Hub filed the Registration Statement on Form F-4 for the Business Combination.  According to Registration Statement, the Business Combination was structured such that Mount Rainier securities holders would receive newly registered Hub securities:

> (a) each unit of RNER ("RNER Unit") issued and outstanding immediately prior to the Effective Time will be automatically detached and the holder of each such RNER Unit will be deemed to hold one share of RNER common stock, par value $0.0001 per share ("RNER Common Stock" and each share of RNER Common Stock, "RNER Share") and one warrant of RNER entitling the holder to purchase three-fourths of one RNER Share per warrant at a price of $11.50 per whole share (each, a "RNER warrant"), (b) ***each RNER Share issued and outstanding immediately prior to the Effective Time will be automatically converted into a number of HUB Security ordinary shares equal to the quotient of*** (i) an aggregate number of HUB Security ordinary shares equal to the amount obtained by dividing (A) $221,582,000 less the amounts payable to the RNER stockholders pursuant to the right of the holders of RNER Shares to redeem all or a portion of their RNER Shares in connection with the Transactions contemplated by the Business

Combination Agreement or otherwise (the "RNER Stockholder Redemptions") by (B) $7.61 divided by (ii) the aggregate number of RNER Shares issued and outstanding immediately prior to the Effective Time, after taking into account of the RNER Stockholder Redemptions (the "Per Share Consideration"), and (c) each **RNER warrant issued and outstanding immediately prior to the Effective Time** will be assumed by HUB Security **and will become one warrant of HUB Security** ("HUB Security warrant"), with the number of HUB Security ordinary shares underlying the HUB Security warrants and the exercise price of such HUB Security warrants subject to adjustment in accordance with the Business Combination Agreement and in the event of a stock split, share dividend or distribution, or any change in HUB Security's share capital by reason of any split-up, reverse share split, recapitalization, combination, reclassification, exchange of shares or other similar transaction with respect to HUB Security ordinary shares subsequent to the Effective Time.

53.     Likewise, the securities holders of Legacy Hub would also receive newly registered Hub securities in the Business Combination.  As the Registration Statement explained:

> HUB Security's ordinary shares and existing warrants are currently traded on the Tel Aviv Stock Exchange ("TASE") under the symbols "HUB" and "HUB.W1" respectively. Although HUB Security is not currently a public reporting company in the United States, following the effectiveness of the registration statement of which this proxy statement/prospectus is a part and the closing of the Business Combination, HUB Security will become subject to the reporting requirements of the Securities Exchange Act of 1934, as amended ("Exchange Act"). **HUB Security intends to apply for listing of the HUB Security ordinary shares, HUB Security warrants and HUB Security existing warrants on the Nasdaq Capital Market** under the proposed symbols "HUBC", "HUBCW" and "HUBCW1", respectively, to be effective at the consummation of the Business Combination. It is a condition of the consummation of the Transactions that the HUB Security ordinary shares and HUB Security warrants are approved for listing on Nasdaq (subject only to official notice of issuance thereof and round lot holder requirements).

54.     On October 31, 2022, Legacy Hub issued a press release announcing that on October 27, 2022, its shareholders and option holders voted to approve the Business Combination and delisting from the Tel Aviv Stock Exchange (TASE).

55.     On December 9, 2022, Mount Rainier and Legacy Hub filed the Proxy/Prospectus on Form 424B3 for the Business Combination.

**D.    Almost All Of Mount Rainier Shareholders Redeem Their Shares Before The Business Combination, Which Drains The Trust Of Funds**

56.    On December 21, 2022, Mount Rainier held a special meeting of stockholders to approve an extension of the date by which Mount Rainier has to consummate a business combination from January 7, 2023 to March 1, 2023. However, in connection with the vote to approve the extension amendment, the holders of 14,535,798 shares of common stock properly exercised their right to redeem their shares for approximately $10.3003 per share, for an aggregate redemption amount of approximately $149.7 million. As such, approximately 84.3% of the public shares were redeemed, and approximately 15.7% of the public shares remain outstanding. After these redemptions, the balance in Mount Rainier's trust account was approximately $28.5 million.

57.    On January 4, 2023, Mount Rainier held a special meeting of stockholders (the "Merger Meeting") to consider and vote upon, among other things, the Business Combination and related matters.  At the Merger Meeting, the Business Combination was approved by an affirmative vote of 16.58 million shares.  However, Mount Rainier received requests for redemption from holders with respect to 2,580,435 shares. These redemptions were at a price of approximately $10.28 per share for an aggregate redemption amount of approximately $26,526,872.

58.    Following the two rounds of redemptions, the aggregate redemption amount was approximately $149,864,077, and the total amount of shares redeemed prior to the closing of the Business Combination represented approximately 99.2% of the total Mount Rainier shares then outstanding and eligible for redemption.

59.    On January 26, 2023, Mount Rainier and Legacy Hub announced that the Business Combination was expected to close on February 27, 2023, and the stock will begin trading on the Nasdaq on February 28, 2023, representing a delay of nearly one month from Mount Rainier's earlier announcement that the Merger would close in late January 2023.

60.     On January 31, 2023, Mount Rainier filed preliminary proxy for a special meeting to be held on February 27, 2023 to extend the date by which the Business Combination must be completed from March 1, 2023 to March 31, 2023. This proposal was approved by shareholders on February 27, 2023.

61.     On February 28, 2023, Hub announced the completion of its Business Combination with Mount Rainier and that the combined company's ordinary shares and two series of warrants have been approved for trading on Nasdaq under the ticker symbols "HUBC," "HUBCW, and "HUBCZ" respectively starting on March 1, 2023.  Moreover, the Company explained that Legacy Hub's shares and warrants were delisted from TASE.

62.     Also on February 28, 2023, the Nasdaq announced that Hub's new securities were registered.  Per the announcement that was signed by Eun Ah Chi, Senior Vice President, U.S. Listing Qualifications & Market Surveillance:

> This is to certify that on February 28, 2023, The Nasdaq Stock Market LLC (the "Exchange") received Hub Cyber Security Ltd. (the "Registrant") a copy of the Registrant's application on Form 8-A 12(b) for the registration of the following securities:
>
> Ordinary shares, no par value per share
> Warrants expiring 2023 to purchase ordinary shares
> Warrants expiring 2028 to purchase ordinary shares
>
> We further certify that the security described above has been approved by the Exchange for listing and registration upon official notice of issuance.
>
> We understand that the Registrant is seeking immediate acceleration of the effective date of registration, and we hereby join in such request.

63.     On March 1, 2023, Hub's securities began trading on the Nasdaq.  Hub's shares opened that day with a trading price of $2.53 per share and closed at $1.59 per share.

E.    **The Company Announces Its CEO Was To Be "Promoted" Only For Him And His Spouse To "Resign" The Same Day**

64.    CEO Moshe and his spouse, Bitan, Legacy Hub's Vice President of Human Resources, were to be big beneficiaries of the Business Combination. In mid-November 2022, Legacy Hub convened a shareholder meeting to vote on moves designed to "adjust the company to the standards of a public company traded on the Nasdaq stock exchange."  While the shareholders were supposed to vote on changing the compensation policy and amending the options plan, which would have led to a five-fold jump in the total salary of Moshe and Bitan, the company removed the issue from the agenda just before the vote.

65.    On February 2, 2023, Legacy Hub issued a press release stating that Defendant "Moshe will be promoted to undertake the role of President of US operations to better focus resources and attention on the North American strategic business development." The press release further explained that Legacy Hub's Chairman, "Mr. Uzi Moskovitch, Major General (Ret.) will be replacing Mr. Moshe as Chief Executive Officer (CEO)."

66.    On February 3, 2023, Legacy Hub filed a Form 8-K with the SEC that further disclosed that Moshe had resigned on February 2, 2023 as CEO. The Form 8-K also stated that Legacy Hub had "appointed him as President of the Company's U.S. operations" and that "Mr. Moshe will remain as a member of the Board as well."  Moreover, the Company disclosed that his wife, "Ayelet Bitan, the Company's Vice President of Human Resources, resigned from her position as an officer of the Company, effective immediately" on February 2, 2023 as well. Notably, Moshe's resignation "was not the result of any disagreement with the Company on any matters relating to the Company's operations, policies or practices."

**F.    Contrary To Defendants' Representations, The PIPE Financing Was Not Committed To Finance The Business Combination**

67.    On April 4, 2022, Legacy Hub filed an investor presentation slideshow with the SEC pursuant to Rule 425 under the Securities Act.  The slideshow in relevant part stated that "[i]nstitutional investors have made irrevocable commitments to invest approximately $50 million in a PIPE financing at a valuation of $1.28 billion" and that "[t]his $50 million PIPE investment is the minimum investment amount required to close the merger transaction (even if all of the $173 million of SPAC funds are redeemed by SPAC investors)."

68.    The next day, April 5, 2022, Legacy Hub filed investor presentation transcript with the SEC pursuant to Rule 425 of the Securities Act.  Therein, Defendant Moshe is quoted as stating that "[i]nvestors have made irrevocable commitments to invest approximately $50 million in a PIPE financing at a valuation of $1.28 billion."

69.    Similar statements were also repeated and contained in the Offering Documents. For example, the Registration Statement stated that that the PIPE investors had committed to invest in the Company at a value of $10 per share as part of a private placement and that the PIPE is equal to the minimum amount required to close the Business Combination:[5]

> According to the merger transaction, qualifying Israeli and U.S. institutional investors ("the PIPE investors") ***committed to invest*** a gross US$ 50 million based on the merger company's agreed value as described above (in a private placement) as the minimum investment commitment required for closing the merger transaction.
>
> \*\*\*
>
> The Business Combination is also subject to a condition in favor of HUB that the minimum cash condition is satisfied (***despite the minimum cash condition currently being equal to the amount committed as part of the PIPE Investment***)
>
> \*\*\*

---

[5] All emphasis in bold and italics hereinafter is added unless otherwise specified.

Nonetheless, the consummation of the Business Combination is conditioned upon, among other things, the combined company having an aggregate cash amount of at least $50 million available at Closing from the Trust Account (after giving effect to all of the RNER stockholder redemptions) and the PIPE Investors (though this condition may be waived by HUB Security) (the "Minimum Cash Condition").

\*\*\*

Concurrently with the execution of the Business Combination Agreement, HUB Security entered into the Subscription Agreements with certain parties subscribing for HUB Security ordinary shares, pursuant to which the PIPE Investors **have agreed to purchase**, and HUB Security has agreed to sell the PIPE Investors, an aggregate of 5,000,000 HUB Security ordinary shares at a purchase price of $10.00 per share, for an aggregate purchase price of $50,000,000, which price per share and aggregate purchase price assume that HUB Security has effected the Stock Split prior to the Effective Time. The obligations to consummate the transactions contemplated by the Subscription Agreements are conditioned upon, among other things, the consummation of the transactions contemplated by the Business Combination Agreement.

\*\*\*

… the consummation of the Business Combination is conditioned upon, among other things, the combined company having an aggregate cash amount of at least $50 million available at Closing from the Trust Account (after giving effect to all of the RNER stockholder redemptions) and the PIPE Investors (though this condition may be waived by HUB Security) (the "Minimum Cash Condition").

70.    On February 2, 2023, Legacy Hub disclosed that it "had received an irrevocable commitment by A-Labs Advisory & Finance Ltd. to substitute a current HUB PIPE investor, Clover Wolf Fund, in the sum US$ 10 million on the same terms."  A-Labs was serving as a financial advisor to Legacy Hub in the Business Combination.[6]

---

[6] As a later article disclosed, A-Labs was associated with Eli Reifman - who was sentenced in 2011 to four years in prison for financial fraud for his involvement the fraud at the Israeli company Emblaze - and is a figure who works behind the scenes at A-Labs. *See* https://www.calcalistech.com/ctechnews/article/edjal1p7g; *see also* https://www.haaretz.com/israel-news/business/2011-09-20/ty-article/emblaze-founder-eli-reifman-sentenced-to-4-years/0000017f-e3d7-d7b2-a77f-e3d746580000 (explaining the egregious fraud that resulted in his prison sentence).

71.     However, on February 5, 2023, an article written by Almog Azar entitled, "A crack in the SPAC? Hub Security's SPAC merger in danger of falling through" was published on the website Ctech by Calcalist (the "February 5 Article").[7]  The February 5 Article provided additional background on this purported "substitution."  As the article explained:

> The Israeli cybersecurity company Hub Security is dreaming of completing a huge IPO in the U.S., but in the meantime its coffers are emptying and the difficulties ahead of its merger with a SPAC company are piling up. These include the exit of one of the investors, the difficulty of diversifying the investor profile and changes at the top of the company. Will the merger be completed and the company, which has already announced that it will be delisted from trading on the Tel Aviv Stock Exchange, begin trading on Nasdaq?
>
> Hub Security was supposed to complete the merger at a value of $1.28 billion at the beginning of this month. It is currently traded on the Tel Aviv Stock Exchange with a market cap of approximately NIS 670 million ($196 million). However, two weeks ago the company announced that it was postponing the completion date of the merger to the end of this month. Last Thursday, two weeks after the announcement of the postponement of the completion date of the merger, Hub Security revealed the reason for the postponement: one of the investors in the company, the Clover Wolf hedge fund, withdrew and decided not to invest in the company as part of the merger. This $10 million investment was part of the PIPE fundraising (private investment in public equity).
>
> SPACs (Special Purpose Acquisition Company) are companies that are issued and raise money from the public with the aim of merging into private companies. They undertake to do this within a specified period of time, usually two years, and if they fail to do so, they return the money to the investors plus interest. This is not a new investment tool, but it gained momentum in 2020-2021, and through it many companies, including various Israeli companies, reached the U.S. stock exchanges.
>
> While the SPAC is raising the money from the investors, it does not know which company it will merge with, and that is why it is possible to withdraw the money after a merger deal has been concluded. After signing such a deal, the company embarks on another fundraiser known as a PIPE - which is done when the investors know what they are choosing to invest in. ***This investment round usually includes "stronger hands" such as institutional bodies and hedge funds, and these investors do not get the option to redeem the investment. Clover Wolf invested at this stage, so its withdrawal is a real drama.***
>
> ***In the first announcement by Hub Security regarding Clover Wolf's withdrawal, the company said that the fund was disbanding and therefore the investment was***

---
[7] Available at https://www.calcalistech.com/ctechnews/article/ao52w1pyk

*canceled, but two and a half hours later the company corrected the report and said that Clover Wolf was not disbanding, but "decided to stop this type of investment". Hub Security said that it has instead received an irrevocable commitment by A-Labs Advisory & Finance Ltd. to invest another $10 million on the same terms as Clover Wolf. A-Labs is a consulting and investment body that also provides underwriting services, in exchange for commissions and options. This is the body that led Hub Security's $50 million PIPE investment, and now it is also the most significant investor in Hub Security, since the SPAC investors withdrew almost all the money they invested.* In other words, the PIPE funds are almost the only funds that will flow into the company's coffers, while Hub Security reported that the merger should results in $50-$225 million of new funding (taking into account the SPAC fundraising funds and the PIPE funds).

In addition, Hub Security was not able to attract significant Israeli or international institutional bodies to its PIPE round. As mentioned, A-Labs will be responsible for the bulk of the amount, and will also receive $2.5 million in commissions upon completion of the transaction. Other investors include a family office named Mofo headed by Moshe Schlisser and hedge fund manager Guy Ben-Artzi.

The difficulties do not end there. Calcalist has learned that Hub Security is currently trying to raise about NIS 10 million in debt from Israeli investors in order to improve the company's finances. Hub Security approached Israeli institutions and private investors in the capital market, offered an interest rate of almost 10%, along with options in the company, but in the meantime has failed to raise the requested amount. In relation to this move, Hub Security told Calcalist that "the company strives to increase its funding resources, partly as a bridge to a delayed but certain drawdown based on existing contracts."

Hub Security, which became a public company on the TASE in June 2021 after merging with the skeleton ALD, reports in the format of a small corporation. That is, it publishes its financial reports twice a year, in the middle of the year, and not every quarter. According to the most recent information, as of the end of June 2022, the company's coffers have cash and cash equivalents amounting to only NIS 38 million ($11.1 million). The expenses for the merger have so far reached NIS 15 million ($4.4 million), and they are set to soar. Based on its results in the first half of 2022, its annual loss rate stands at NIS 140 million ($41 million), which puts its cash fund in danger, and clarifies its need to raise expensive debt as long as the completion of the merger is postponed and the company has difficulty collecting funds from customers.

72.    On February 26, 2023, an article written by Almog Azar entitled, "Show me the

money: Investors in Hub Security's SPAC still haven't deposited the money" was published on

the website Ctech by Calcalist (the "February 26 Article").[8]   The February 26 Article explained

that the supposedly "committed" PIPE financing was falling through, including funds committed

by A-Labs, a financial advisor to the deal, but that Legacy Hub had found alternative sources of

funding.  As the February 26 Article explained:

> The Israeli cyber company, which is supposed to merge with an American SPAC
> at a value of $1.28 billion, canceled Sunday's shareholders' meeting during which
> the change in the identity of the investors in the offering was set to be approved.
> The reason: the investors have not yet deposited the money.

> Will Hub Security's SPAC offering on Nasdaq be canceled? The cybersecurity
> company canceled the shareholders' meeting scheduled for Sunday, where the
> change in the identity of the PIPE investors participating in the company's SPAC
> merger with Mount Rainier, which is scheduled to be closed this week, was
> supposed to be approved. In addition, Hub Security announced that the participants
> of the offering have not yet deposited the money in preparation for the closing, as
> is customary in a SPAC deal. **A-Labs, a consulting and investment body that
> also provides underwriting services in exchange for commissions and options,
> was meant to be responsible for the bulk of the investment, as well as receiving
> $2.5 million in commissions upon completion of the transaction**. Other investors
> include a family office named Mofo headed by Moshe Schlisser and hedge fund
> manager Guy Ben-Artzi. In order for the SPAC to be completed, the scope of the
> offerings must be at least $50 million.

> Hub Security was supposed to complete the merger at a value of $1.28 billion at
> the beginning of February. However, two weeks beforehand the company
> announced that it was postponing the completion date of the merger to the end of
> this month. Two weeks after the announcement of the postponement of the
> completion date of the merger, Hub Security revealed the reason behind it: one of
> the investors in the company, the Clover Wolf hedge fund, withdrew and decided
> not to invest in the company as part of the merger. This $10 million investment was
> part of the PIPE fundraising (private investment in public equity).

> ***

> While the SPAC is raising the money from the investors, it does not know which
> company it will merge with, and that is why it is possible to withdraw the money
> after a merger deal has been concluded. After signing such a deal, the company
> embarks on another fundraiser known as a PIPE - which is done when the investors
> know what they are choosing to invest in. This investment round usually includes
> "stronger hands" such as institutional bodies and hedge funds, and these investors
> do not get the option to redeem the investment. Clover Wolf invested at this stage,

---

[8] Available at https://www.calcalistech.com/ctechnews/article/skpaa9u0s

so its withdrawal is a real drama. In the first announcement by Hub Security regarding Clover Wolf's withdrawal, the company said that the fund was disbanding and therefore the investment was canceled, but two and a half hours later the company corrected the report and said that Clover Wolf was not disbanding, but "decided to stop this type of investment".

*Lawsuit to come?*

***Amazingly, although the grantee's money has not yet been transferred to the company's bank account in the U.S., sources close to Hub Security told Calcalist that the company did not appeal to the grantees with a demand for the transfer of the capital to which they had pledged even though it is clear that the grantee's commitments cannot be canceled. This decision was made, among other things, with the aim of allowing Hub Security to sue them later. If the merger is canceled, Mount Rainier is expected to sue Hub Security, who will then sue the grantees. These answers from those close to the company raise a very large question mark regarding how committed these grantees were to investing in the first place.***

***Sources close to the company also said that Hub Security found alternative sources for those grantees but refused to reveal their identity and the scope of their investment. Finding new investors within a few days would be particularly surprising in light of Calcalist's report from the beginning of the month, according to which representatives of Hub Security, led by the former CEO Eyal Moshe, tried to raise NIS 10 million in debt from Israeli investors, institutional and private, to improve the company's balance due to the difficulties in collecting from customers. Hub Security offered an interest rate of almost 10%, along with options in the company, but was unable to raise the requested amount.***

Against the background of these difficulties, Moshe was removed from the position of CEO and replaced by director Uzi Moskovitz. Moshe's partner, Ayelet Bitan, who was the vice president of human resources, also resigned. Hub Security announced that Moshe will serve as president and focus on its activities in the U.S., but his name no longer appears on the company's website.

Hub Security, which began trading in Tel Aviv in June 2021 after merging with ELD, publishes its financial reports only twice a year. As of the end of June 2022, it had only NIS 38 million in cash (approximately $10.3 million). The merger expenses have so far reached to NIS 15 million ($4.1 million), and they are set to jump for the second half of 2022. Based on its results in January-June 2022, its annual loss rate stands at NIS 140 million ($38.2), which clarifies why the company has reached the finish line for its Wall Street IPO desperate for cash.

73.    However, on February 28, 2023, upon the completion of the Business Combination,

the Company revealed that the PIPE financing was not consummated.  As the Company disclosed:

**PIPE Financing**

Concurrently with the execution of the Business Combination Agreement, the Company and certain qualified institutional buyers and accredited investors (the "PIPE Investors") entered into a series of subscription agreements ("Subscription Agreements"), providing for the purchase by the PIPE Investors at the Effective Time of an aggregate of 5,000,000 Company Ordinary Shares at a price per share of $10.00 for gross proceeds to the Company of $50,000,000 (collectively, the "PIPE Financing"). ***The PIPE Financing did not consummate at closing of the Business Combination.***

The Business Combination Agreement provides that the consummation of the Business Combination is conditioned upon, among other things, the satisfaction or waive by the Company of a requirement that the combined company have an aggregate cash amount of at least $50,000,000 (the "Minimum Cash Condition") available on the Closing Date from RNER's trust account (after giving effect to all of the RNER stockholder redemptions) and the PIPE Investors. As a result of the redemptions from RNER's trust account and the failure of the PIPE Financing to be consummated, the Company waived the Minimum Cash Condition in order to proceed to close the Business Combination.

74.     On this news, Hub's shares declined $0.94 per share, or 37.15%. Thereafter, Hub's

stock price continued to decline the next day by $0.34 per share, or 21.38%, to close at $1.25 per

share on March 2, 2023.

75.     On March 3, 2023, an article written by Almog Azar entitled, "Hub Security

valuation keeps falling as company fails to calm investors" was published on the website Ctech by

Calcalist (the "March 3 Article").[9]  The March 3 Article explained, in relevant part:

Israeli cyber company Hub Security, which at the beginning of this month began trading on Nasdaq following a merger with a SPAC, will publish its financial reports in the coming days.

On Tuesday, Hub held a webinar for investors, led by the new CEO Uzi Moscovich, who replaced the founder Eyal Moshe. However, instead of calming investors down, it seems that Moscovich's words only made them more nervous, with the stock price falling by 16% in one day. The webinar started at 10:00 AM US time, lasted about 25 minutes, during which the fall in the stock began, bringing the company's market cap to $145 million - a far cry from the $1.28 billion valuation at which the SPAC merger was signed.

The investors wanted to understand how many shares the company has, a figure that is in question in view of a credit line of $100 million given to the company as

_____
[9] Available at https://www.calcalistech.com/ctechnews/article/81pwdq33m

part of an equity line - a line of credit against the use of which the company allocates shares.

Hub Security did not tell the investors the price of the shares included as part of the equity line - a figure that will ultimately determine by how much investors will be diluted. The investors expected to hear about developments in the company's business, but did not receive any such information. They also wondered why a webinar should be held a few days before the publication of the results. To this the company replied: "From time to time Hub Security holds a dialogue with investors about its financial reports with the aim of getting to know the company better."

One of the investors present at the webinar told Calcalist that Hub Security did not refer to its financial situation at all. "We need to hear real news about the company. Nothing else will fix its situation," he said.

76.     On March 6, 2023, an article written by Almog Azar entitled, "Nightmare on Wall Street: Hub Security's value plummets after SPAC merger" was published on the website Ctech by Calcalist (the "March 6 Article").[10]  The March 6 Article explained that even though the public had been assured that funding was committed, it was not and the Company was "forced to rely on $11 million borrowed at a high interest rate to complete the offering."  As the article explained:

Hub Security's promises to go public via a SPAC merger according to a valuation of $1.3 billion were shattered last week by the harsh reality. Against the background of the investors' refusal to participate in the company's IPO on Nasdaq, the price of the cyber company's share today stands at just under $1.7, 84% lower than the price that Hub promised its investors in Israel. The company's market cap was estimated at just $157 million as of Friday.

Hub Security stopped trading in Tel Aviv two weeks ago at a value of NIS 740 million (approximately $205 million). The company's management and its controlling owners promised investors until the very last minute that the moment is coming when the company will reach Nasdaq and trade at a value of $1.28 billion (NIS 4.6 billion). In other words, the company's management's promise to investors was that the value of their holding would be multiplied 3.6 times within a day. As part of the merger with the Mount Rainier SPAC, the Israeli investors were supposed to receive 0.7 shares of Hub in Nasdaq for each share they held in Tel Aviv, but even after the dilution, the offer seemed promising since it was supposed to provide the investors in Tel Aviv with a 2.5-times profit.

The last day of trading in Hub stock in Tel Aviv was Thursday, February 23, and one of the reasons for the suspension of trading on the TASE was the desire to

---

[10] Available at https://www.calcalistech.com/ctechnews/article/edjal1p7g

prevent the price from being fixed and the creation of arbitrage between the shares. The theoretical share price for the start of trading on Nasdaq, due to the conversion ratio, was $2.29 per share, and an investor who managed to sell their shares at this price exited the investment in a balanced position. In practice, the share began trading on March 1st on Nasdaq at a higher price, of $2.69 per share, but two days later it had already dropped by 37.7%, to the price of $1.67 as mentioned.

As is often the case in the capital market, promises and reality are two separate things, although at Hub Security they took this expression to the extreme. *The promise of a PIPE offering in which "large institutions" would purchase shares amounting to $50 million did not happen, and the company is now forced to rely on $11 million borrowed at a high interest rate to complete the offering. The founder no longer takes an active part in the company, the management has been replaced, the external directors resigned, and the stock collapsed.*

*Due to a lack of funding from PIPE investors, which was a precondition for the merger to take place, and in order to complete the move to the U.S. anyway, the company entered into an "Equity Line" agreement. This agreement characterizes companies in problematic situations and results in a deal with underwriters to provide a line of credit in exchange for shares and options.*

Hub received the $100 million credit line of the SPAC into which it was merged after the owner of the SPAC closed a line of credit for the company in preparation for its registration in New York. The terms of the credit placement specifically for Hub are not known and it is not clear according to what value the framework was established, but these are expected to weigh on Hub's balance sheet and further dilute Hub's existing and established investors from Israel. In fact, considering that the infusion of funds and the raising of the money according to a high value was not ultimately carried out, Hub's move to Nasdaq cannot be considered an IPO but only a re-registration of the public company in the U.S.

Under these conditions, it is not surprising that within two trading days the company is trading at a value that is even lower than the value at which it was traded in Tel Aviv.

In March 2022, Hub reported the signing of a merger agreement with the SPAC Mount Rainier, which raised $173 million as of that date. *In addition, Hub received a commitment from four institutional bodies to invest $50 million in the company.* SPAC companies are issued and raise money from the public with the aim of merging with private companies within a specified period of time, usually two years. If they are not successful in this, they return the money to the investors plus interest.

When the SPAC raises the money from the investors, they do not know which company they will merge with, and because of that they get the option to withdraw the money after the merger deal is signed. After signing such a deal, the company

embarks on another fundraising, which is done when the investors, mostly institutional, know what they are choosing to invest in.

***The large institutions that were promised by Hub Security as PIPE investors in the first half of 2022 never arrived, but amounted to two small investment companies, A-Labs and Mofo alongside two small hedge funds, one of which was Clover Wolf, investing amounts ranging from $5-10 million. However, even these companies did not transfer the money as promised.***

77.    On March 7, 2023, Hub disclosed that a class action had been filed in Tel Aviv District Court against the Company and its officers and directors.  As the Company disclosed, the lawsuit covers securities traded on TASE from March 2022 until February 2023 and is based on the fact that Legacy Hub and its officers and directors had misrepresented that it had irrevocable investment commitments of $50 million in PIPE financing that was to be consummated simultaneously with the closing of the Business Combination.

78.    On March 14, 2023, Hub announced that it had issued and sold approximately 400,000 shares to two of the original PIPE investors at $10 per share for proceeds of approximately $4 million dollars in a private placement.

79.    Thereafter, on March 15, 2023, Hub issued a press release stating, in relevant part, that "the Israeli investment bank, A-Labs Advisory & Finance Ltd. . . . has reaffirmed its irrevocable commitment to invest $20 million in HUB as an equity PIPE investment at $10 per share, previously made in connection with the Company's business combination."  The release also disclosed that "ALabs has already fulfilled more than 10% (~$2.2 million) of its commitment (as previously announced by the Company on March 14, 2023) and expects to complete the remainder of the funding in the near future."  Again, A-Labs had served as a financial advisor to Legacy Hub in the Business Combination.

80.    On June 16, 2023, the Company disclosed that on June 12, 2023, one of the financial advisors to Legacy Hub that was hired to find an acquiror, Oppenheimer & Co., Inc.

("Oppenheimer"), sued Hub for non-payment for investment banking advice and services provided in connection with the Business Combination. As the Company explained, "The complaint alleges that the Company owes Oppenheimer in excess of $12 million (as well as its costs and legal fees associated with the claim) with regards to the business combination, pursuant to a financial advisory agreement entered into by and between Oppenheimer and the Company in December 2021."

81.    In that action, Hub admitted that it approached Oppenheimer prior to the closing of the Business Combination to renegotiate fees because "it would be able to pay Oppenheimer only if it could generate liquidity based on the value of Hub Cyber stock following the transaction" and that Legacy Hub "was under pressure to close the Transaction and address certain outstanding issues relating to third party fees."[11]

### G.    It Is Revealed That Moshe And His Wife Had Embezzled Funds From The Company And Were Able To Do So Due To A Complete Lack Of Internal Controls

82.    The March 6 Article alluded to the fact that Moshe and Bitan's departure appeared suspicious in that, even though the Company claimed that Moshe had been promoted and his resignation as CEO "was not the result of any disagreement with the Company on any matters relating to the Company's operations, policies or practices," his name had disappeared from the company website.  As the article in relevant part stated:

> Less than a month ago, the Hub board ousted its founder, CEO Eyal Moshe, and his place was taken by Uzi Moskowitz. Moshe's partner, Ayelet Bitan, who served as VP of Human Resources, also resigned. In order not to rock the ship, the company announced that Moshe would become the president of the company and concentrate on its activities in the U.S., however Moshe's name disappeared from the company's website and he was not present at the traditional bell ringing ceremony at Nasdaq, even though executives who are located in Israel traveled to

---

[11] *See Oppenheimer & Co. Inc., v. Hub Cyber Security (Israel) Ltd.*, Case No. 1:23-cv-04909-JPC (S.D.N.Y. Oct. 4, 2023), Dkt. No. 23 at 3.

the U.S. for the event on a special flight. Attempts to contact the company and Moshe and receive comments on this issue were declined.

83.    On April 20, 2023, the Company disclosed that on April 19, 2023, it had "appointed a special committee of independent directors (the "Special Committee") in order to investigate and assess certain allegations of potential misappropriation and other potential fraudulent actions raised against a former senior officer of the Company." The Company further disclosed that it was investigating "certain unexplained expenses . . . estimated at approximately NIS 2.5 million."

84.    That same day, a scathing article was published online Ctech by Calcalist. The article was entitled, "Hub Security investigating suspicions that founder and former CEO was embezzling company funds," by Golan Hazani (the "April 20 Article").[12] The April 20 Article explained that the Company had hired an external investigative team to look into suspicions that the couple used Hub's funds for personal needs, including for the purchase of the house they bought in Tel Aviv and various expenses related to it. As the article explained,

> There seems to be no end in sight to the drama at Hub Security. Calcalist has learned that the shareholders of the Israeli cybersecurity company traded on Nasdaq, headed by Guy Ben-Artzi, and the company's management, led by CEO Uzi Moskowitz, are going to war against the former CEO and founder Eyal Moshe.

> Ben-Artzi and Moskowitz hired an external investigative firm in order to investigate suspicions that Moshe and his partner, Ayelet Bitan, who served as the vice president of human resources at the company, embezzled millions of shekels from the company's funds. The investigative firm is looking into suspicions that the couple used Hub Security's funds for personal needs, including for the purchase of the house they bought in Tel Aviv and various expenses related to it. In recent weeks, members of the investigative firm met with professionals hired to renovate Moshe's house in order to check how they were paid and where the money came from.

---

[12] Available at https://www.calcalistech.com/ctechnews/article/r1y5ms0fh

85.     The April 20 Article further explained that even though Moshe was effectively fired

by the Company in February, Hub did not want to disclose it before the Business Combination "in

order not to rock the ship." As the article explained, in relevant part:

> Moshe, who was ousted from the company in practice but formally still serves as president, told Calcalist that he is aware of the investigation and is studying the issue.
>
> ***
>
> In February, the Hub board ousted its founder Moshe, and his place was taken by Moskowitz. In order not to rock the ship, the company announced that Moshe would become the president of the company and concentrate on its activities in the U.S. However, Moshe's name disappeared from the company's website and he was not present at the traditional bell-ringing ceremony at Nasdaq, even though executives who are located in Israel traveled to the U.S. for the event on a special flight.

86.     The April 20 Article also disclosed that there were suspicions regarding the

reliability of the Company's reporting about two transactions.  As the article explained:

> In addition, during the inspection initiated by the new management of Hub Security, alleged suspicions arose regarding the reliability of the company's reports regarding two transactions. In the first from 2021, it reported the sale of servers and the use of its software by a customer for an amount of NIS 81 million (currently approximately $22 million). In the second, from 2022, the company announced that it purchased software from a European company, probably German, for $10 million, plus a conditional payment of $12 million.[13]

87.     On May 1, 2023, the Company announced that it would be unable to timely file its

Annual Report for its 2022 fiscal year.  This inability to file was because of the investigation into

---

[13] A later article implied that this lack of reliability lead, in part, to the replacement of Moshe as CEO. *See* Almog Azor, "Hub Security entered Nasdaq at $1.3B valuation despite not having a mature product or significant sales, admits outgoing CEO" (Jan 17, 2024) (available at https://www.calcalistech.com/ctechnews/article/rk4dazrtp) ("Moscovich replaced founder Eyal Moshe as CEO after alleged suspicions arose regarding the reliability of the company's reports concerning two transactions during his time at the helm. In 2021, the company reported a joint venture for the sale of servers and the use of its software to a company controlled by Visa Global in the amount of NIS 81 million (approximately $21 million); and the second from 2022, during which the company purchased software from a European company, probably German, for $10 million, plus a contingent payment of $12 million.").

the allegations regarding potential misappropriation of Company funds and other potentially
fraudulent actions regarding the use of Company funds by a former executive officer. As the
Company, in relevant part, stated:

> HUB Cyber Security Ltd. (the "Company") is unable, without unreasonable effort
> or expense, to file its Annual Report on Form 20-F for the year ended December
> 31, 2022 (the "2022 Form 20-F") with the Securities and Exchange Commission
> (the "SEC") within the prescribed time period due to the reasons described below.
>
> As previously reported in the Company's Report of Foreign Private Issuer on Form
> 6-K furnished to the SEC on April 20, 2023, allegations have been made regarding
> potential misappropriation of Company funds and other potentially fraudulent
> actions regarding the use of Company funds by a former executive officer of the
> Company. These matters were identified during an ongoing review by
> management, during which management discovered certain unexplained expenses.
> In response to these matters, the Company appointed a special committee of
> independent directors (the "Special Committee") to oversee an internal
> investigation. The Special Committee, with the assistance of independent advisors,
> is working to complete its investigation and advise on potential remediation
> measures as soon as practicable. The Company believes that the amounts in
> question will not be material when compared to the Company's financial position,
> operating losses and cash flows. However, due to the pendency of the ongoing
> internal investigation, the Company and their independent auditors need additional
> time to complete the analysis to conclude on that matter and complete the
> preparation of its Annual Report, financial statements, required disclosures and
> assessment of internal control over financial reporting. However, the Company is
> currently unable to predict precise outcome of the internal investigation or the
> nature or timing of any remediation measures that the Special Committee may
> recommend.

88.    On May 15, 2023, the Company announced that it still required additional time to

complete the process of investigating the embezzlement and reviewing its internal controls before

filing its Annual Report. As the Company, in relevant part, stated:

> "Since being appointed CEO in February of this year, I have been focused on
> creating a disciplined management team and organization accountable to results as
> well as transparency to investors." said Uzi Moskovich, Chief Executive Officer of
> HUB Security. "As part of the internal investigation that began in April, we
> continue to review all Company controls and are committed to properly and
> thoroughly completing the investigation in a thoughtful and comprehensive
> manner."

***

31

The internal investigation was commenced as a result of certain matters that were identified by the new management team during an overview of the Company's financial statements in which a number of unexplained expenses incurred by a former senior officer of the Company were discovered. The Special Committee is resolved to completing a meticulous and comprehensive process, with the highest level of transparency. Based on preliminary findings from the Special Committee, the Company believes that the investigation will not have a material impact on its financial statements.

The Special Committee, with the assistance of independent advisors, is working to complete its investigation and advise on potential remediation measures as soon as practicable.

89.    On May 22, 2023, the Company disclosed that it had received a notice from the Nasdaq indicating that Hub was not in compliance with listing rules due to its failure to timely file its Annual Report on Form 20-F for the fiscal year ended December 31, 2022. Again, the Company claimed that the delay was due to the Special Committee review.  Moreover, the Company revealed that it was "reviewing the effectiveness of the Company's controls over its disclosure and internal accounting and financial reporting for the year ended December 31, 2022."

90.    On June 13, 2023, the Company disclosed that it had received a notification on June 9, 2023 from Nasdaq that Hub was not in compliance with listing rules because its ordinary shares had traded below $1.00 for the past 30 days.

91.    On August 15, 2023, the Company finally filed its Annual Report for the 2022 fiscal year.  Therein, the Company disclosed that its former CEO, Moshe, and his wife, Bitan, had engaged in an embezzlement scheme where they stole hundreds of thousands of dollars for personal use from a "Company bank account over which Mr. Moshe had sole signatory rights." Moreover, the Company disclosed that "one of the controllers of the Company, with the permission of Mr. Moshe, used Company credit cards for personal use in the amount of approximately NIS 400,000 (approximately $110 thousand)" and "These personal expenses were neither factored into the controller's payroll nor properly documented in the Company's financial books and records."

Additionally, Defendant Moshe allowed the same controller to pay a bonus to a third party at the controller's direction. The Annual Report, in relevant part, stated:

> As previously disclosed in the Company's Report of Foreign Private Issuer on Form 6-K on April 20, 2023, our board of directors appointed a Special Committee of Independent Directors (the "Special Committee") to oversee an internal investigation (the "Internal Investigation") in order to review certain allegations of misappropriation of Company funds and other potential fraudulent actions regarding the use of Company funds by a former senior officer of the Company. During the course of the Internal Investigation, the Special Committee, together with its outside advisers, believed that it found sufficient evidence to support a determination that Mr. Eyal Moshe, our former Chief Executive Officer and President of U.S. operations and former member of the board of directors, and Ms. Ayelet Bitan, our former Chief of Staff and wife of Mr. Moshe, misappropriated (from a Company bank account over which Mr. Moshe had sole signatory rights) a total of approximately NIS 2 million (approximately $582 thousand) for personal use. Further, in certain instances, evidence reviewed by the Special Committee demonstrated that Mr. Moshe authorized payments to contractors without either (i) proper documentation and signatory approval; or (ii) required budget and expense reports. The employment of Eyal Moshe, was terminated effective July 24, 2023 for cause and Mr. Moshe resigned from our board on August 15, 2023. Additionally, the Company has commenced a legal action in Israel against Ms. Bitan to dispute her requests for severance payments in accordance with Israeli law in connection with these determinations by the Special Committee.

> Additionally, the Special Committee believed that it found sufficient evidence to determine that, one of the controllers of the Company, with the permission of Mr. Moshe, used Company credit cards for personal use in the amount of approximately NIS 400,000 (approximately $110 thousand). These personal expenses were neither factored into the controller's payroll nor properly documented in the Company's financial books and records. Additionally, Mr. Moshe approved a bonus of NIS 250,000 to the controller. However, this bonus was not paid to the controller but instead was paid to a third-party at the controller's direction.

> The Internal Investigation is complete, although the Company continues to pursue recovery of the misappropriated funds. These events regarding the Special Committee and Internal Investigation are the subject of possible regulatory review and expose the Company and its directors and officers to possible investigations and possible enforcement actions by regulators both in Israel and the United States, including the Israel Securities Authority ("ISA"), Israel Tax Authority, U.S. Securities and Exchange Commission ("SEC"), the Nasdaq Stock Market LLC ("Nasdaq") and/or U.S. Department of Justice ("DOJ"). The Company has provided certain information and documentation to certain regulatory authorities and is prepared to respond to any regulatory inquiry it may receive.

92.     In sum, the Company's Special Committee believed that it found sufficient

evidence to support the following findings as a result of its investigation:

A.     Misappropriation by Eyal Moshe and Ayelet Bitan. Mr. Moshe and Ms. Bitan misappropriated (from a Company bank account over which Mr. Moshe had sole signatory rights) a total of approximately NIS 2 million (approximately $582,000) for use in renovations of their private residence and other personal expenses.

B.     Payments to one of the Controllers. One of the controllers, with the permission of Mr. Moshe, used Company credit cards for personal use in the amount of approximately NIS 400,000 (approximately $110,000). These personal expenses were neither factored into the controller's payroll nor properly documented in the Company's financial books and records. Additionally, Mr. Moshe approved a bonus of NIS 250,000 to the controller. However, this bonus was not paid to the controller but instead was paid to a third-party at the controller's direction.

C.     Payments to Contractors. In certain instances, Mr. Moshe authorized payments to contractors without either (i) proper documentation and signatory approval; or (ii) approved budget and expense reports.

**H.     The Company Admits That It Did Not Have Adequate Internal Controls**

93.     In the August 15, 2023 Annual Report, the Company also admitted that there was

a lack of adequate internal controls that they were now attempting to remediate.  As the Annual

Report explained, these material weaknesses were significant and substantial changes needed to

be implemented to remediate them:

*We have identified material weaknesses in our internal control over financial reporting. If our remediation of the material weaknesses is not effective, or we fail to develop and maintain effective internal controls over financial reporting, our ability to produce timely and accurate financial statements or comply with applicable laws and regulations could be impaired.*

As described above, we appointed the Special Committee to oversee an internal investigation related to alleged misappropriation of Company funds and other potentially fraudulent actions regarding the use of Company funds by a former senior officer of the Company. As such, when preparing the financial statements that are included in this Annual Report, ***our management and our independent registered public accounting firm determined that we have material weaknesses in our internal control over financial reporting as of December 31, 2021, which had not been remedied as of December 31, 2022.*** A material weakness is a

deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements will not be prevented or detected on a timely basis.

***The material weaknesses as of December 31, 2022 and 2021 identified include, but are not limited to:***

●      Lack of sufficient number of personnel with an appropriate level of knowledge and experience in accounting for complex or non-routine transactions;

●      ***The fact that our policies and procedures with respect to the review, supervision and monitoring of our accounting and reporting functions were either not designed, not properly put in place or not operating effectively***;

●      ***Deficiencies in the design and operations of the procedures relating to the timely closing of financial books at the quarter and fiscal year end***;

●      ***Insufficient oversight of certain signatory rights relating to our financial accounts***;

●      Ineffective design and implementation of Information Technology General Controls ("ITGC"). The Company's ITGC deficiencies included improperly designed controls pertaining to change management and user access rights over systems that are critical to the Company's system of financial reporting; and

●      ***Incomplete segregation of duties in certain types of transactions and processes.***

As a result of the material weaknesses, management has concluded that our internal control over financial reporting was ineffective as of each of December 31, 2022 and 2021.

Further, there can be no guarantee that the Internal Investigation and subsequent inquiries revealed all instances of inaccurate disclosure or other deficiencies, or that other existing or past inaccuracies or deficiencies will not be revealed in the future. Our failure to correct these deficiencies or our failure to discover and address any other deficiencies could result in inaccuracies in our financial statements and could also impair our ability to comply with applicable financial reporting requirements and related regulatory filings on a timely basis. As a result, our business, financial condition, results of operations and prospects, as well as the trading price of our ordinary shares and warrants, may be materially adversely affected.

We, together with any additional remediation actions to be suggested by the Special Committee, have taken and will continue to take the following actions to remediate these material weaknesses:

● the hiring of additional accounting and finance resources with public company experience to assist in the expansion and effectiveness of the existing risk assessment, management processes and the design and implementation of controls responsive to those deficiencies;

● broadening the scope and improving the effectiveness of existing ITGC for identity and access management, segregation of duties, change management, data governance and program development;

● the implementation of enhanced corporate policies and practices including with respect to gifts, loans, conflicts of interest and workplace conduct;

● engaging internal and external resources to assist us with remediation and monitoring remediation progress; and

● delivering periodic training to our team members, including but not limited to technology and accounting staff, on the responsibilities of officers and leaders related to workplace conduct and various compliance issues and internal controls over financial reporting.

I. **Defendant Moscovich Concedes That At All Relevant Times Legacy Hub Did Not Have A Mature Or Proven Product For Sale**

94. On January 17, 2024, an article written by Almog Azar entitled, "Hub Security entered Nasdaq at $1.3B valuation despite not having a mature product or significant sales, admits outgoing CEO" was published on the website Ctech by Calcalist (the "January 17, 2024 Article").[14]   As the January 17, 2024 Article explained,  Defendant Moscovich admits that "There was no product and there were no sales. The product was not ready at all" at the time of the issuance of the Offering Documents and Business Combination.  The January 17, 2024 Article, in relevant part, disclosed:

> Did Israeli cybersecurity company Hub Security, founded seven years ago, possess a mature and proven product for sale when it went public last year? According to Uzi Moscovich, who served as CEO until a month ago, and is currently a director at the company after previously also serving as the chairman, the answer is no. The reports from the Nasdaq-traded cybersecurity company for the first half of 2023, published last week, revealed revenues of only $570,000 from cyber products. This figure reflects an annual sales rate of $1.1 million, significantly below the forecast

---

[14] Available at https://www.calcalistech.com/ctechnews/article/rk4dazrtp

presented by Hub Security in 2022 when it projected that cyber product revenues in 2023 would be around $92 million.

***In a conversation with Calcalist, Moscovich admitted that when he entered the role of CEO "there was no product and there were no sales. The product was not ready at all." Moscovich emphasized that after eight months of work under his guidance, the company now has a mature product.*** Moscovich served as CEO from February 2023 until December, succeeding ousted founder Eyal Moshe. Moscovich previously served as the company's chairman for a year and now serves as a director on the board.

95.     Certainly, if it took eight months of work under Moscovich to get a "mature product," there was not one before his appointment as CEO.  Moscovich concurs with this assessment and admitted that this was the reason the Company did not meet its revenue forecasts. As the January 17, 2024 Article, in relevant part, disclosed:

The year 2023 marked the second consecutive year in which Hub Security failed to meet its revenue forecasts. In 2021, the company predicted cyber product revenues of $38 million for 2022, but the actual figure was only $1.7 million. The former CEO attributes this failure to the fact that "at the time of the IPO on Wall Street, the company's flagship product existed and was being sold, but improvements were required, which indeed happened in the second half of 2023. The company today has a mature technology and product."

                                        ***

In the absence of a cyber product, Hub Security reported a loss of $69 million in January-June 2023, more than three times the loss in the corresponding period. The loss deepened due to SPAC-related merger expenses of $40 million. Consequently, the company's operating cash flow (EBITDA), which neutralizes one-time expenses, stood at $5 million in January-June, reflecting an annual rate of $10 million—half of the 2022 loss of $21 million. The company's total revenues in the reported period were $31 million compared to $37 million in the corresponding period.

96.     In fact, the lack of a mature product was the reason that Hub agreed to merge with another company that did have such a product after the Business Combination.  As the January 17, 2024 Article, in relevant part, explained:

Additionally, Hub Security signed a non-binding agreement to merge with another cybersecurity company—Blackswan Technologies. Moscovich notes that this

company already possesses a mature product and real sales, operating in the data field.

**J.     The Truth Is Only Fully Revealed After The Entire Senior Management Team Changed**

97.     After the removal of Moshe as CEO and the Business Combination, there was a mass exodus of executives and directors.  In fact, as the January 17, 2024 Article summarized, "[d]uring Moscovich's tenure, the entire senior management team at Hub Security changed, including in the finance, product, strategy, and operations departments."

98.      On March 29, 2023, Defendant Raines resigned from the Board and all committees thereof, effective immediately.

99.     On May 19, 2023, Defendant Agarwal resigned from the Board and all committees thereof, effective immediately.

100.     On May 31, 2023, Michal Arlosoroff, a member of the Board of Directors resigned from the Board and all committees thereof, effective immediately.

101.     On July 26, 2023, David Riker resigned from his position as Global Chief Operating Officer of Hub, effective immediately.  This was only after being hired for the position on April 11, 2023.

102.     On August 16, 2023, Defendant Goldman informed the Company of his decision to step down from his position as CFO.

103.     On December 4, 2023, Noah Hershcoviz, the Company's Chief Strategy Officer and member of the Board, was appointed the Company's Chief Executive Officer, effective immediately, replacing Uzi Moskovitch as CEO, who had resigned.

104.     On December 31, 2023, Andrey Iaremenko resigned from his position as Chief Technology Officer of Hub, effective immediately.

*       *       *

38

105.     On July 5, 2023, the day before this  action commenced, the price of Hub's stock closed at $0.39 per share.  As such, the Company's shares declined 84.52% from its opening price on its first day of trading after the Business Combination.

## V.    DEFENDANTS VIOLATED THEIR DISCLOSURE OBLIGATIONS UNDER THE SECURITIES ACT AND ITEMS 303 AND 105 OF REGULATION S-K

106.     "The Securities Act of 1933 . . . was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976); *see also Pinter v. Dahl*, 486 U.S. 622, 638 (1988) ("The primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce.").

107.     To effectuate this purpose, a company's registration statement must provide a full disclosure of material information.  Failure to do so gives rise to private rights of action under the Securities Act.

### A.    Section 11 Disclosure Requirements

108.     Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC.  *See* 15 U.S.C. § 77k.  Accordingly, Section 11 gives rise to liability if "any part of [a company's] registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a). Section 11 provides for a cause of action by the purchaser of a registered security against certain statutorily enumerated parties, including: "(1) every person who signed the

registration statement; (2) every person who was a director . . . at the time of the filing of . . . the

registration statement with respect to which his liability is asserted; (3) every person who, with his

consent, is named in the registration as being or about to become a director [;]" (4) "any person . .

. who has with his consent been named as having prepared or certified any part of the registration

statement[;]" and (5) "every underwriter with respect to such security."  15 U.S.C. § 77k(a)(1)-(5).

### B. Disclosure Requirements Under Regulation S-K Item 303

109.    Item 303 of Regulation S-K imposes an affirmative duty on issuers to disclose

"known trends or any known demands, commitments, events or uncertainties that will result in or

that are reasonably likely to result in the registrant's liquidity increasing or decreasing in a material

way."  S.E.C. Release No. 6835, 1989 WL 1092885, at *4; *see also* 17 C.F.R. § 229.303(a).

"Disclosure of known trends or uncertainties that the registrant reasonably expects will have a

material impact on net sales, revenues, or income from continuing operations is also required."  *Id.*

110.    Pursuant to Item 303(a), for a fiscal year, a registrant thus has an affirmative duty

to:

> a.    Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which the income was so affected.

> b.    Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(i)-(ii); *see also* S.E.C. Release No. 6835, 1989 WL 1092885, at *8 (May

18, 1989) ("Other non-recurring items should be discussed as unusual or infrequent events or

transactions that materially affected the amount of reported income from continuing operations.") (citation and quotation omitted).

111.    Thus, even a one-time event, if "reasonably expect[ed]" to have a material impact on results, must be disclosed.  Examples of such required disclosures include: "[a] reduction in the registrant's product prices; erosion in the r[e]gistrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract."  S.E.C. Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

112.    Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information."  *See* Mgmt.'s Discussion and Analysis of Fin. Condition and Results of Operation, S.E.C. Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989).  Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future."  *Id.* At *3, *17.  Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects."  *See* Comm'n Guidance Regarding Mgmt.'s Discussion and Analysis of Fin. Condition and Results of Operations, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (Dec. 19, 2003).

113.    Here, that Legacy Hub's CEO and his spouse (the Vice President of Human Resources) was conspiring with one of the controllers of Legacy Hub to embezzle massive amounts of funds from the company, that the PIPE financing was not committed and that Legacy Hub did not have a mature product that was ready for market were all known trends or uncertainties

likely to have a material unfavorable impact on Hub's business, sales, revenues, and prospects. As Defendants have admitted, all of these facts were known at the time of the issuance of the Offering Documents. As such, specific disclosures regarding these issues should have been contained in the Offering Documents.

### C.    Disclosure Requirements Under Regulation S-K Item 105

114.    Item 105 of Regulation S-K requires that offering documents "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a). Item 105 further requires the offering documents to "[c]oncisely explain how each risk affects the registrant or the securities being offered." 17 C.F.R. § 229.105(b). The discussion of risk factors:

> must be specific to the particular company and its operations, and should explain how the risk affects the company and/or the securities being offered. Generic or boilerplate discussions do not tell the investors how the risks may affect their investment.

Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers, 1998 WL 425894, at *14 (July 29, 1998).

115.    Here, Defendants failed to adequately disclose in the "Risk Factors" section of the Registration Statement, the risks to Hub from its CEO and his spouse, Legacy Hub's Vice President of Human Resources, conspiring with one of the controllers of Legacy Hub to embezzle massive amounts of funds from the company, that the PIPE financing was not committed and that Legacy Hub did not have a mature product that was ready for market. These risks were some of the most significant factors that made an investment in Hub speculative or risky. Instead, the Registration Statement contained boilerplate discussions of hypothetical, future issues, but failed to disclose that these risks had already materialized.

## VI.    HUB'S OFFERING DOCUMENTS CONTAINED MATERIALLY FALSE AND MISLEADING STATEMENTS

116.    The Offering Documents contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make necessary disclosures required under the rules and regulations governing its preparation (specifically including Item 303 and Item 105 of SEC Regulation S-K).

117.    In the Registration Statement, Hub misleadingly stated that the PIPE investments were "committed":

> The Business Combination is also subject to a condition in favor of HUB that the minimum cash condition is satisfied (***despite the minimum cash condition currently being equal to the amount committed as part of the PIPE Investment***).

> \*\*\*

> ***According to the merger transaction, qualifying Israeli and U.S. institutional investors ("the PIPE investors") committed to invest a gross US\$ 50 million based on the merger company's agreed value as described above (in a private placement) as the minimum investment commitment required for closing the merger transaction***. Out of said amount, the Company retained a cash reserve of US\$ 15 million for repurchasing the shares from certain shareholders of Mount Rainier assuming that a tax duty is levied in respect of the merger transaction (repurchase subject to obtaining various approvals such as the Court's approval).

> \*\*\*

> Nonetheless, the consummation of the Business Combination is conditioned upon, among other things, the combined company having an aggregate cash amount of at least \$50 million available at Closing from the Trust Account (after giving effect to all of the RNER stockholder redemptions) and the PIPE Investors (though this condition may be waived by HUB Security) (the "Minimum Cash Condition").

> \*\*\*

> Concurrently with the execution of the Business Combination Agreement, HUB Security entered into the Subscription Agreements with certain parties subscribing for HUB Security ordinary shares, ***pursuant to which the PIPE Investors have agreed to purchase***, and HUB Security has agreed to sell the PIPE Investors, an aggregate of 5,000,000 HUB Security ordinary shares at a purchase price of \$10.00 per share, for an aggregate purchase price of \$50,000,000, which price per share and aggregate purchase price assume that HUB Security has effected the Stock Split

43

prior to the Effective Time. The obligations to consummate the transactions contemplated by the Subscription Agreements are conditioned upon, among other things, the consummation of the transactions contemplated by the Business Combination Agreement.

118.    Similarly, the Proxy/Prospectus likewise indicated that the PIPE financing was

committed:

> Subject to the terms of the Merger Agreement, as amended, and customary adjustments set forth therein, the aggregate consideration for the Business Combination and related transactions is expected to be approximately $226,885,000 of equity consideration, as set forth in the Merger Agreement, which amount includes the funds in the trust account established in connection with the Company's initial public offering (the "Trust Account") and **PIPE Financing commitments**. The Merger Agreement, as amended, provides that the outside date for the closing of the Business Combination is January 22, 2023. All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Merger Agreement.

> Contemporaneously with the execution of the Merger Agreement, HUB Security entered into subscription agreements (the "PIPE Subscription Agreements") with certain qualified institutional buyers and accredited investors (the "Subscribers"), pursuant to which, among other things, the Subscribers have agreed to subscribe for ordinary shares of HUB Security that will be issued in connection with the Closing (the "PIPE Shares"), for aggregate gross proceeds of approximately $50,000,000 at a purchase price of $10.00 per share, in a private placement (the equity financing under all Subscription Agreements, collectively, the "PIPE Financing"). The purpose of the PIPE Financing is to raise additional capital for use in connection with the Business Combination. The PIPE Shares will be identical to ordinary shares of HUB Security that will be issued to existing stockholders of RNER at the time of the Closing, except that the PIPE Shares will not be entitled to any redemption rights and will not be registered with the SEC. The closing of the sale of PIPE Shares will be contingent upon the substantially concurrent consummation of the Business Combination.

119.    The foregoing statements in the preceding two paragraphs were materially false and

misleading when made because they failed to disclose that the PIPE financing was ***not*** committed.

120.    In the Registration Statement, it was disclosed generally that Legacy Hub had a

material weakness in its internal control over financial reporting, while simultaneously

downplaying the full scope and severity of that material weakness:

HUB Security has identified a material weakness in its internal control over financial reporting. If HUB Security's remediation of the material weakness is not effective, or it fails to develop and maintain effective internal controls over financial reporting, HUB Security's ability to produce timely and accurate financial statements or comply with applicable laws and regulations could be impaired.

***

***HUB Security has identified a material weakness in its internal control over financial reporting. If HUB Security's remediation of the material weakness is not effective, or it fails to develop and maintain effective internal controls over financial reporting, HUB Security's ability to produce timely and accurate financial statements or comply with applicable laws and regulations could be impaired.*** [emphasis in original]

As HUB Security prepared the financial statements that are included in this prospectus, its management determined that HUB Security has a material weakness in its internal control over financial reporting. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of HUB's annual or interim consolidated financial statements will not be prevented or detected on a timely basis.

Specifically, the deficiencies identified relate to a lack of certain defined processes and controls over information technology, in the areas of access management, segregation of duties, change management, data governance and defined processes and controls over the financial statement close process. These deficiencies, when aggregated, are a material weakness and could result in a material misstatement to HUB Security's financial statements that may not be able to be prevented or detected. Prior to the consummation of the Business Combination, HUB Security does not have sufficient resources assigned to ensure the necessary processes and controls to effectively implement information technology and financial statement close controls required of a public company in the United States.

121.    The Registration Statement also claimed that Legacy Hub was already working on

remedying this weakness:

HUB Security is taking the following actions to remediate this material weakness:

•    the hiring of additional accounting and finance resources with public company experience;

- broadening the scope and improving the effectiveness of existing information technology general controls for identity and access management, segregation of duties, change management, data governance, and program development;

- reviewing, strengthening, and developing policies related to each of these areas of information technology general controls;

- engaging internal and external resources to assist us with remediation and monitoring remediation progress;

- delivering periodic training to our team members, including but not limited to technology and accounting staff, on internal controls over financial reporting; and

- strengthening HUB's information technology compliance and accounting functions with additional experienced hires to assist in the expansion and effectiveness of the existing risk assessment, management processes and the design and implementation of controls responsive to those deficiencies.

122.    The Registration Statement also contained risk warnings regarding financial control and compliance issues that were presented as hypothetical when they were already occurring:

***HUB has experienced rapid growth, and if HUB fails to effectively manage its growth, then its business, results of operations and financial condition could be adversely affected.*** [emphasis in original.]

HUB has experienced substantial growth in its business since 2020. For example, HUB has experienced significant growth in the number of employees, corporate divisions, and office locations. This growth has placed and may continue to place significant demands on its corporate culture, operational infrastructure and management. Any failure to manage HUB's anticipated growth and organizational changes in a manner that preserves the key aspects of its culture could hurt its chance for future success, including its ability to recruit and retain personnel, and effectively focus on and pursue its corporate objectives. This, in turn, could adversely affect its business, results of operations and financial condition.

In addition, HUB's ability to manage its operations and future growth will require HUB to continue to improve its operational, financial and management controls, compliance programs and reporting systems. HUB is currently in the process of strengthening its compliance programs, including its compliance programs related to export controls, privacy and cybersecurity and anti-corruption. HUB may not be able to implement improvements in an efficient or timely manner and may discover deficiencies in existing controls, programs,

systems and procedures, which could have an adverse effect on its business, reputation and financial results.

123. The foregoing statements in the preceding three paragraphs were materially false and misleading when made because they failed to disclose and misrepresented that: (i) the Company lacked any semblance of adequate internal controls and had undisclosed control issues, including insufficient oversight of certain signatory rights relating to our financial accounts, ineffective design and implementation of Information Technology General Controls and incomplete segregation of duties in certain types of transactions and processes; (ii) the Company's CEO, Moshe, and his spouse, Bitan, had engaged in an embezzlement scheme where they stole hundreds of thousands of dollars for personal use from a Legacy Hub bank account where Moshe had signatory rights; (iii) one of the controllers of the Company, with the permission of Defendant Moshe used Legacy Hub credit cards for personal use in an amount greater than one hundred thousand dollars and these personal expenses were neither factored into the controller's payroll nor properly documented in the financial books and records; (iv) the foregoing increased the risk that Hub would be unable to timely file one or more of its periodic financial reports after the Business Combination; (v) as a result, the Company was also at an increased risk of being delisted from the Nasdaq; and (vi) all the foregoing, once revealed, were likely to negatively impact the Company's business, financial results and reputation.

124. The Registration Statement touted that Legacy Hub was a business with "established products" and a "range of new products":

> In evaluating the Business Combination, the RNER's board of directors considered the criteria and guidelines to evaluate prospective business opportunities set by the RNER's management team in the RNER IPO prospectus and has determined that HUB Security meets all of these criteria. Specifically, the RNER's board of directors noted, among others, that:
>
> • **_Established Business._** HUB Security is an **_established business, with established products, client base, and revenue stream_**.

47

> • *Business with Growth Potential. **HUB Security is cash positive with a range of new products providing significant growth potential***.

125.    The foregoing statements in the preceding paragraph were materially false and misleading when made because, as Moscovich admitted, Legacy Hub's flagship product was not ready for market and improvements were still required.

## VII.    CLASS ACTION ALLEGATIONS

126.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the "Class," consisting of all individuals and entities that purchased or otherwise acquired Hub securities pursuant and/or traceable to the Offering Documents issued in connection with the Business Combination, seeking remedies under Sections 11, 12(a)(2) and 15 of the Securities Act.

127.    The members of the Class are so numerous that joinder is impracticable.  Hub securities are actively traded on the Nasdaq.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through discovery, Plaintiffs believe there are hundreds, if not thousands, of members in the Class.  Record owners and other Class members may be identified from records procured from or maintained by the Company or its transfer agent and may be notified of the pendency of this action using a form of notice similar to that customarily used in securities class actions.

128.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including:

   a.   whether Defendants violated the Securities Act, as alleged herein;

   b.   whether the Offering Documents misrepresented and/or omitted material information in violation of the Securities Act;

    c.   whether the Individual Defendants are control persons of Hub for purposes of Section 15 of the Securities Act; and

    d.   whether and to what extent Class members have sustained damages, as well as the proper measure of damages.

129.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

130.    Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in securities class actions.

131.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible and impracticable, for Class members to individually redress the wrongs alleged. There will be no difficulty in managing this action as a class action.

## VIII.  NO SAFE HARBOR

132.    Defendants are liable for any false and misleading forward-looking statements made in connection with the IPO.  The safe harbor provision of §27A of the Securities Act, 15 U.S.C. §77z-2(b)(2)(D), specifically excludes those statements "contained in a registration statement," "made in connection with a tender offer," or "made in connection with an initial public offering," which includes all of the false and misleading statements made in connection with the Business Combination alleged herein.

## IX.    CAUSES OF ACTION

### COUNT I

### Violation of Section 11 of the Securities Act Against All Defendants

133.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

134.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

135.    This claim does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of §11, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.  This claim is based solely on strict liability and negligence.

136.    The Registration Statement and Proxy/Prospectus for the Business Combination were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

137.    Hub is the registrant for the Business Combination.  The Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement. The Individual Defendants signed or authorized the signing of the Registration Statement or Proxy/Prospectus on their behalves or were directors or director nominees in the Offering Documents.

138.    As issuer of the shares, Hub is strictly liable to Plaintiffs and the Class for the misstatements and omissions.  Signatories of the Registration Statement, and possibly other defendants may also be strictly liable to Plaintiffs and the Class for such material misstatements and omissions.  None of the Defendants made a reasonable investigation or possessed reasonable

grounds to believe that the statements in the Offering Documents were complete, accurate or non-misleading.

139.    Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents.  Each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements in the Offering Documents inaccurate.  Because Defendants failed to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents, the Offering Documents contained misrepresentations and/or omissions of material fact.  As such, Defendants are strictly liable to Plaintiffs and the Class.

140.    By reason of the conduct alleged herein, Defendants violated §11 of the Securities Act.  Plaintiffs and the Class members purchased or otherwise acquired Hub securities pursuant and/or traceable to the Offering Documents and have sustained damages as a result.  The value of the securities has declined substantially subsequent and due to Defendants' violations.  At the time of their purchases, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.

141.    Because of the foregoing, Plaintiffs and the members of the Class are entitled to damages under Section 11 of the Securities Act.

## <u>COUNT II</u>

### Violations of Section 12(a)(2) of the Securities Act Against All Defendants

142.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

143.    This claim does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of §12(a)(2), and any implication of fraud or fraudulent intent is hereby expressly disclaimed.  This claim is based solely on strict liability and negligence.

144.    By means of the defective Offering Documents, the Defendants promoted and sold Hub securities to Plaintiffs and the Class.

145.    The Offering Documents contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. The Defendants owed Plaintiffs and the Class the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Offering Documents set forth above.

146.    By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the 1933 Act. As a direct and proximate result of such violations, Plaintiffs and the other members of the Class that purchased and/or otherwise acquired Hub securities pursuant to the Offering Documents sustained substantial damages in connection with their purchases or acquisitions. Plaintiffs and the class who hold the securities issued pursuant to the Business Combination have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares to the defendants sued in this Count.  Plaintiffs and Class members who have sold their stock seek damages to the extent permitted by law.

## COUNT III

**Violations of Section 15 of the Securities Act Against the Individual Defendants**

147.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

148.    This claim is brought under §15 of the Securities Act (15 U.S.C. §77o), against the Individual Defendants.

149.    This claim does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of §15, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.  This claim is based solely on strict liability and negligence.

150.    As detailed herein, each of the Individual Defendants committed primary violations of the Securities Act by committing conduct in contravention of §11 of the Securities Act.

151.    By reason of the conduct alleged herein, the Individual Defendants violated §15 of the Securities Act, and Plaintiffs and the Class have suffered harm as a result.

152.    The Individual Defendants, due to their control, ownership, offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Hub within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power, influence, and knowledge—and exercised the same—to cause Hub to engage in the acts described herein.

153.    The Individual Defendants, at all relevant times, participated in the operation and management of Hub, and conducted and participated, directly and indirectly, in the conduct of Hub's business affairs.  The Individual Defendants were under a duty to disseminate accurate and truthful information with respect to Hub.  Because of their positions of control and authority as officers and directors of Hub, the Individual Defendants were able to, and did, control the contents of the Offering Documents, which contained materially untrue and/or misleading statements and/or omitted to state material facts required to be stated therein.

154.    Because of their conduct, the Individual Defendants are liable under Section 15 of the Securities Act to Plaintiffs and the members of the Class who purchased or otherwise acquired

Hub securities pursuant and/or traceable to the Offering Documents.  As a direct and proximate result of the Individual Defendants' wrongdoing, Plaintiffs and the other members of the Class suffered damages in connection with their purchase and acquisition of Hub securities pursuant to the Registration Statement.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: January 26, 2024                    **GLANCY PRONGAY & MURRAY LLP**

By:   _/s/ Casey E. Sadler_____
Robert V. Prongay
Casey E. Sadler (admitted *pro hac vice*)
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
glinkh@glancylaw.com

54

**THE LAW OFFICE OF JACOB SABO**
Jacob Sabo
22a Mazzeh St.
Tel-Aviv, Israel
Telephone: (++972) 39070770

*Counsel for Lead Plaintiffs and Co-Lead Counsel
for the Class*

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Counsel for Additional Plaintiffs Rodrigue Fodjo
and Dustin Green*

## **PROOF OF SERVICE**

I hereby certify that on this 26th day of January, 2024, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

_s/ Casey E. Sadler_
Casey E. Sadler