# Exhibit B

424B3 1 tm2223104-17_424b3.htm 424B3
TABLE OF CONTENTS

**Filed Pursuant to Rule 424B3**
**Registration No. 333-267035**

**PROXY STATEMENT/PROSPECTUS**





## PROXY STATEMENT FOR SPECIAL MEETING OF STOCKHOLDERS
## OF
## MOUNT RAINIER ACQUISITION CORP.

## PROSPECTUS FOR UP TO 22,158,700 ORDINARY SHARES, 17,846,200 WARRANTS,
## AND 13,384,650 ORDINARY SHARES UNDERLYING WARRANTS
## OF
## HUB CYBER SECURITY (ISRAEL) LTD.

The board of directors of Mount Rainier Acquisition Corp., a Delaware corporation ("RNER"), has approved the Business Combination Agreement (the "Business Combination Agreement"), dated as of March 23, 2022, as amended on June 19, 2022, by and among RNER, HUB Cyber Security (Israel) Ltd., a company organized under the laws of the State of Israel (the "Company" or "HUB Security") and Rover Merger Sub Inc., a Delaware corporation and wholly owned subsidiary of the Company ("Merger Sub"). Pursuant to the Business Combination Agreement, Merger Sub will merge with and into RNER, with RNER surviving the merger (the "Business Combination"). As a result of the Business Combination, and upon consummation of the Business Combination and the other transactions contemplated by the Business Combination Agreement (the "Transactions"), RNER will become a wholly owned subsidiary of the Company, with the securityholders of RNER becoming securityholders of the Company.

Prior to the effective time of the Business Combination (the "Effective Time"), HUB Security intends to effect a reverse stock split to cause the value of the outstanding HUB Security ordinary shares immediately prior to the Effective Time to equal $10.00 per share (the "Stock Split"). The consideration to be issued to securityholders of RNER will be adjusted if the Stock Split is not effected or if the Stock Split results in a price per HUB Security ordinary share other than $10.00.

Pursuant to the Business Combination Agreement and assuming the Stock Split has been effected, at the Effective Time, (a) each unit of RNER (a "RNER Unit") issued and outstanding immediately prior to the Effective Time will be automatically detached and the holder of each such RNER Unit will be deemed to hold one share of RNER common stock, par value $0.0001 per share (the "RNER Common Stock" and each share of RNER Common Stock, a "RNER Share") and one warrant of RNER entitling the holder to purchase three-fourths of one RNER Share per warrant at a price of $11.50 per whole share (each, a "RNER warrant"), (b) each RNER Share issued and outstanding immediately prior to the Effective Time will be automatically converted into a number of HUB Security ordinary shares equal to the quotient of (i) an aggregate number of HUB Security ordinary shares equal to the amount obtained by *dividing* (A) $221,582,000 *less* the amounts payable to the RNER stockholders pursuant to the right of the holders of RNER Shares to redeem all or a portion of their RNER Shares in connection with the Transactions contemplated by the Business Combination Agreement or otherwise (the "RNER Stockholder Redemptions") by (B) $10.00 *divided by* (ii) the aggregate number of RNER Shares issued and outstanding immediately prior to the Effective Time, after taking into account the RNER Stockholder Redemptions (the "Per Share Consideration"), and (c) each RNER warrant issued and outstanding immediately prior to the Effective Time will be assumed by HUB Security and will become one warrant of HUB Security (a "HUB Security warrant"), with the number of HUB Security ordinary shares underlying the HUB Security warrants and the exercise price of such HUB Security warrants subject to adjustment in accordance with the Business Combination Agreement and in the event of a stock split, share dividend or distribution, or any change in HUB Security's share capital by reason of any split-up, reverse share split, recapitalization, combination, reclassification, exchange of shares or other similar transaction with respect to HUB Security ordinary shares subsequent to the Effective Time.

Concurrently with the execution of the Business Combination Agreement, HUB Security and certain accredited investors (the "PIPE Investors") entered into a series of subscription agreements ("Subscription Agreements"), providing for the purchase by the PIPE Investors at the Effective Time of an aggregate of 5,000,000 HUB Security ordinary shares ("PIPE Shares") at a price per share of $10.00 (assuming the Stock Split has been effected), for gross proceeds to HUB Security of $50,000,000 (collectively, the "PIPE Investment"). The closing of the PIPE Investment is conditioned upon the consummation of the Transactions.

TABLE OF CONTENTS

In addition, as of the date of the proxy statement/prospectus, HUB Security has an aggregate class of 9,664,932 existing warrants (the "HUB Security existing warrants") outstanding. The HUB Security existing warrants are exercisable for one HUB Security ordinary share each, with an exercise price of NIS 5.3 per HUB Security ordinary share. The HUB Security existing warrants will expire on August 22, 2023.

It is anticipated that, upon completion of the Business Combination, RNER's existing public stockholders will own approximately 14.5%, DC Rainier SPV LLC ("Sponsor") will own approximately 4.1%, PIPE Investors will own approximately 4.2% and HUB Security's existing securityholders will own approximately 77.2% of the Company's outstanding ordinary shares. These percentages are calculated based on a number of assumptions and are subject to adjustment in accordance with the terms of the Business Combination Agreement. These percentages assume that none of RNER's existing stockholders exercise their redemption rights in connection with the Business Combination. If any of RNER's stockholders exercise their redemption rights, or any of the other assumptions underlying these percentages become inaccurate, these percentages may vary from the amounts shown above. See "*Unaudited Pro Forma Condensed Combined Financial Information*" for further information.

As discussed in more detail below under "*Certain Material U.S. Federal Income Tax Considerations — U.S. Federal Income Tax Considerations of the Business Combination,*" there are significant factual and legal uncertainties as to (i) whether the Business Combination will qualify as a "reorganization" within the meaning of Section 368(a) of the U.S. Internal Revenue Code of 1986, as amended (the "Code") and (ii) whether the Business Combination will result in gain being recognized by U.S. Holders (as defined below under "*Certain Material U.S. Federal Income Tax Considerations*") of RNER Common Stock and RNER warrants under Section 367(a) of the Code.

There are many requirements that must be satisfied in order for the Business Combination to qualify as a "reorganization" within the meaning of Section 368(a) of the Code, some of which are based upon factual determinations, and the reorganization treatment could be adversely affected by events or actions that occur or are taken after the Business Combination. One such requirement, among others, is that the acquiring corporation continue, either directly or indirectly through certain controlled entities, either a significant line of the acquired corporation's historic business or use a significant portion of the acquired corporation's historic business assets in a business, in each case, within the meaning of Treasury Regulations Section 1.368-1(d). However, due to the absence of guidance bearing directly on how the above rules apply in the case of an acquisition of a corporation with no active business and only investment-type assets, such as RNER, although the parties intend that the Business Combination qualifies as a "reorganization" within the meaning of Section 368(a) of the Code, the qualification of the Business Combination as a reorganization is not free from doubt. In addition, the treatment of the Business Combination as a reorganization would depend on whether sufficient stockholders of RNER exchange their common stock for HUB Security ordinary shares rather than redeem it for cash and the amount of certain transaction expenses paid by RNER in connection with Closing. If a significant number of stockholders of RNER decide to redeem their common stock and/or RNER uses significant amounts of remaining cash to pay certain transaction expenses in connection with the Business Combination, the "continuity of business enterprise" requirement that is necessary to qualify as a reorganization under Section 368 of the Code may not be satisfied and the requirement that RNER retain "substantially all" of its assets to qualify as a reorganization under Section 368 of the Code may not be satisfied. In addition, the requirements of Section 368(a) of the Code limit the property other than HUB Security ordinary shares ("other property" or "boot") that may be used as consideration to acquire the RNER outstanding shares. "Other property" or "boot" can take many different forms and, if a sufficient threshold of "other property" or "boot" consideration is received by RNER stockholders in connection with the Business Combination, the Business Combination may not qualify as a "reorganization" within the meaning of Section 368(a) of the Code. The holders of RNER shares that are parties to the Put and Call Option Agreement (as discussed later in this proxy statement/prospectus) may be treated as receiving valuable legal rights and entitlements that could constitute "other property," "boot" or a separate class of what is treated as equity for U.S. tax purposes of HUB Security in the Business Combination and this treatment, as well as the generally uncertain treatment of the Put and Call Option Agreement under the provisions of Section 368(a) of the Code, raises additional risk that the Business Combination will not qualify as a "reorganization" within the meaning of Section 368(a) of the Code or otherwise be taxable.

Moreover, even if the Business Combination qualifies as a reorganization within the meaning of Section 368(a) of the Code, Section 367(a) of the Code and the applicable Treasury Regulations promulgated thereunder provide that where a U.S. Holder exchanges stock in a U.S. corporation for stock in a non-U.S. corporation in a transaction that would otherwise qualify as a reorganization within the meaning of Section 368(a) of the Code, the U.S. Holder is required to recognize gain, but not loss, realized on such exchange unless certain requirements are met. In general, for the Business Combination to meet these additional requirements, certain reporting requirements must be satisfied and (i) no more than 50% of both the total voting power and the total value of the stock of the transferee foreign corporation may be received, in the aggregate, by the "U.S. transferors" (as defined in the Treasury Regulations and computed taking into account direct, indirect and constructive ownership) in the transaction; (ii) no more than 50% of each of the total voting power and the total value of the stock of the transferee foreign corporation may be owned, in the aggregate, immediately after the transaction by "U.S. persons" (as defined in the Treasury Regulations) that are either officers or directors or "five-percent target shareholders" (as defined in the Treasury Regulations and computed taking into account direct, indirect and constructive ownership) of the transferred U.S. corporation; and (iii) the "active trade or business test" as defined in Treasury Regulations Section 1.367(a)-3(c)(3) must be satisfied. There are significant factual and legal uncertainties concerning the determination of whether these requirements will be satisfied in the case of the Business Combination.

At this point, because of the legal and factual uncertainties described above, RNER and HUB may be unable to take a reporting position on their applicable tax returns that the Business Combination qualifies as a "reorganization" within the meaning of Section 368(a) of the Code.

TABLE OF CONTENTS

If, as of the Closing Date, the Business Combination does not qualify as a "reorganization" within the meaning of Section 368(a) of the Code, a U.S. Holder that exchanges its RNER securities for the consideration under the Business Combination would recognize gain or loss in an amount equal to the difference, if any, between the fair market value (as of the Closing Date) of HUB Security ordinary shares and/or HUB Security warrants received in the Business Combination, over such U.S. Holder's aggregate tax basis in the corresponding RNER securities surrendered by such U.S. Holder in the Business Combination.

If, as of the Closing Date, the Business Combination qualifies as a "reorganization" within the meaning of Section 368(a) of the Code, but any requirement for Section 367(a) of the Code and the applicable Treasury Regulations promulgated thereunder is not satisfied, then a U.S. Holder of RNER securities would recognize gain (but not loss) in an amount equal to the excess, if any, of the fair market value as of the Closing Date of HUB Security ordinary shares and/or HUB Security warrants received in the Business Combination, over such U.S. Holder's aggregate tax basis in the corresponding RNER securities surrendered by such U.S. Holder in exchange for HUB Security ordinary shares and/or HUB Security warrants in the Business Combination.

This proxy statement/prospectus covers the HUB Security ordinary shares and HUB Security warrants issuable to the securityholders of RNER as described above, which includes the HUB Security ordinary shares issuable in exchange for the 4,312,500 Founder Shares purchased by the Sponsor on March 26, 2021, for which it paid an aggregate purchase price of $25,000, as compared to the purchase price of $10.00 per RNER Unit sold in RNER's initial public offering. Accordingly, we are registering up to an aggregate of 22,158,700 HUB Security ordinary shares, 17,846,200 HUB Security warrants, and 13,384,650 HUB Security ordinary shares issuable upon the exercise of the HUB Security warrants. We are not registering the HUB Security ordinary shares held by the HUB Security existing securityholders or issuable to the PIPE Investors. We are also not registering the HUB Security ordinary shares issuable upon the exercise of the HUB Security existing warrants, nor are we registering the HUB Security existing warrants.

Proposals to approve the Business Combination Agreement and the other matters discussed in this proxy statement/prospectus will be presented at the special meeting of RNER stockholders scheduled to be held on December 30, 2022 in virtual format.

HUB Security's ordinary shares and existing warrants are currently traded on the Tel Aviv Stock Exchange ("TASE") under the symbols "HUB" and "HUB.W1" respectively. Although HUB Security is not currently a public reporting company in the United States, following the effectiveness of the registration statement of which this proxy statement/prospectus is a part and the closing of the Business Combination, HUB Security will become subject to the reporting requirements of the Securities Exchange Act of 1934, as amended ("Exchange Act"). HUB Security intends to apply for listing of the HUB Security ordinary shares, HUB Security warrants and HUB Security existing warrants on the Nasdaq Capital Market under the proposed symbols "HUBC", "HUBCW" and "HUBCW1", respectively, to be effective at the consummation of the Business Combination. It is a condition of the consummation of the Transactions that the HUB Security ordinary shares and HUB Security warrants are approved for listing on Nasdaq (subject only to official notice of issuance thereof and round lot holder requirements). While trading on Nasdaq is expected to begin on the first business day following the date of completion of the Business Combination, there can be no assurance that HUB Security's securities will be listed on Nasdaq or that a viable and active trading market will develop. If such listing condition is not met or if such confirmation is not obtained, the Business Combination will not be consummated unless the Nasdaq condition set forth in the Business Combination Agreement is waived by the applicable parties. See "*Risk Factors*" beginning on page 18 for more information.

On October 27, 2022, at the HUB Security extraordinary general meeting called pursuant to Section 350 of the Israeli Companies Law (as defined herein), the shareholders and optionholders of HUB Security voted to approve the Business Combination and delisting from the TASE. 100% of the votes cast at the HUB Security extraordinary general meeting (minus abstentions) were cast in favor of the approval of the Business Combination and delisting from the TASE.

**HUB Security will be an "emerging growth company" as defined in the Jumpstart Our Business Startups Act of 2012, and is therefore eligible to take advantage of certain reduced reporting requirements otherwise applicable to other public companies.**

**HUB Security will also be a "foreign private issuer" as defined in the Exchange Act and will be exempt from certain rules under the Exchange Act that impose certain disclosure obligations and procedural requirements for proxy solicitations under Section 14 of the Exchange Act. In addition, HUB Security's officers, directors and principal shareholders will be exempt from the reporting and "short-swing" profit recovery provisions under Section 16 of the Exchange Act. Moreover, HUB Security will not be required to file periodic reports and financial statements with the U.S. Securities and Exchange Commission as frequently or as promptly as U.S. companies whose securities are registered under the Exchange Act.**

The accompanying proxy statement/prospectus provides RNER stockholders with detailed information about the Business Combination and other matters to be considered at the special meeting of RNER stockholders, including RNER stockholders' right to redeem their shares for a pro rata portion of the cash held in RNER's trust account in connection with the Business Combination. See "*Questions and Answers About the Business Combination and the Special Meeting*" for additional detail regarding the redemption process. We encourage you to read the entire accompanying proxy statement/prospectus, including the Annexes and other documents referred to therein, carefully and in their entirety. You should also carefully consider the risk factors described in "Risk Factors" beginning on page 18 of the accompanying proxy statement/prospectus.

Neither the Securities and Exchange Commission, the Israel Securities Authority nor any state securities commission has approved or disapproved of the securities to be issued in connection with the Business Combination, or determined if this proxy statement/prospectus is accurate or adequate. Any representation to the contrary is a criminal offense.

This proxy statement/prospectus is dated December 9, 2022, and is first being mailed to RNER stockholders on or about December 9, 2022.

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

tm2223104-17_424b3 - none - 138.6881299s

**Notice of Special Meeting of Stockholders
of Mount Rainier Acquisition Corp.
To Be Held on December 30, 2022**

TO THE STOCKHOLDERS OF MOUNT RAINIER ACQUISITION CORP.:

NOTICE IS HEREBY GIVEN that a special meeting of stockholders of Mount Rainier Acquisition Corp., a Delaware corporation ("RNER"), will be held at 10:00 a.m. Eastern Time, on December 30, 2022 (the "special meeting"). Due to health concerns stemming from the COVID-19 pandemic, and to support the health and well-being of our stockholders, the special meeting will be a virtual meeting. You are cordially invited to attend and participate in the special meeting online by visiting https://web.lumiagm.com/297859227 using the password "mtrainier2022" and control number on your proxy card. The special meeting will be held for the following purposes:

(1)  **Proposal No. 1 — The Business Combination Proposal —** to consider and vote upon a proposal (the "Business Combination Proposal'') to approve and adopt the Business Combination Agreement, a copy of which is attached to this proxy statement/prospectus as Annex A, and the transactions contemplated therein, including the Business Combination whereby Rover Merger Sub Inc., a Delaware corporation ("Merger Sub"), will merge with and into RNER, with RNER surviving the merger as a wholly owned subsidiary of HUB Cyber Security (Israel) Ltd., a company organized under the laws of Israel ("HUB Security");

(2)  **Proposal No. 2 — The Charter Proposals —** to approve the following material differences between RNER's amended and restated certificate of incorporation (the "RNER Charter") and HUB Security's amended and restated articles of association (the "HUB Security Articles") to be effective upon the consummation of the Business Combination:

(i)  the name of the new public entity will be "HUB Cyber Security (Israel) Ltd." as opposed to "Mount Rainier Acquisition Corp.";

(ii)  HUB Security's corporate existence is perpetual as opposed to RNER's corporate existence terminating if a business combination is not consummated within a specified period of time; and

(iii)  the HUB Security Articles will not include the various provisions applicable only to special purpose acquisition corporations that the RNER Charter contains (collectively, the "Charter Proposals");

(3)  **Proposal No. 3 — The Adjournment Proposal —** to consider and vote upon a proposal to adjourn the special meeting to a later date or dates, if necessary, if the parties are not able to consummate the Business Combination (the "Adjournment Proposal").

We also will transact any other business as may properly come before the special meeting or any adjournment or postponement thereof.

**The items of business listed above are more fully described elsewhere in the proxy statement/prospectus. Whether or not you intend to attend the special meeting, we urge you to read the attached proxy statement/prospectus in its entirety, including the annexes and accompanying financial statements, before voting. IN PARTICULAR, WE URGE YOU TO CAREFULLY READ THE SECTION IN THE PROXY STATEMENT/PROSPECTUS ENTITLED "RISK FACTORS."**

Only holders of record of common stock of RNER, par value $0.0001 per share ("RNER Common Stock"), at the close of business on November 18, 2022 (the "record date") are entitled to notice of the special meeting and to vote and have their votes counted at the special meeting and any adjournments or postponements of the special meeting.

After careful consideration, RNER's board of directors has determined that each of the proposals listed is fair to and in the best interests of RNER and its stockholders and recommends that you vote or give instruction to vote "**FOR**" each of the proposals set forth above. When you consider the recommendations of RNER's board of directors, you should keep in mind that RNER's directors and officers may have interests in the Business Combination that conflict with, or are different from, your interests as a stockholder

of RNER. See the section entitled "*Proposal One — The Business Combination Proposal — Interests of Certain Persons in the Business Combination*."

The closing of the Business Combination is conditioned on approval of the Business Combination Proposal and the Charter Proposals. If either of these proposals is not approved and the applicable closing condition in the Business Combination Agreement is not waived, the remaining proposals will not be presented to stockholders for a vote. The Adjournment Proposal is not conditioned on the approval of any other proposal set forth in this proxy statement/prospectus.

All RNER stockholders are cordially invited to attend the special meeting, which will be held virtually over the Internet at https://web.lumiagm.com/297859227 using the password "mtrainier2022" and control number on your proxy card. To ensure your representation at the special meeting, however, you are urged to complete, sign, date and return the enclosed proxy card as soon as possible. If you are a holder of record of RNER Common Stock on the record date, you may also cast your vote at the special meeting. If your RNER Common Stock is held in an account at a brokerage firm or bank, you must instruct your broker or bank on how to vote your shares or, if you wish to attend the special meeting, obtain a proxy from your broker or bank.

A complete list of RNER stockholders of record entitled to vote at the special meeting will be available for ten days before the special meeting at the principal executive offices of RNER for inspection by stockholders during business hours for any purpose germane to the special meeting.

Your vote is important regardless of the number of shares you own. **Whether you plan to attend the special meeting virtually or not, please complete, sign, date and return the enclosed proxy card as soon as possible in the envelope provided. If your shares are held in "street name" or are in a margin or similar account, you should contact your broker to ensure that votes related to the shares you beneficially own are properly voted and counted.**

If you have any questions or need assistance voting your RNER Common Stock, please contact Karen Smith at Advantage Proxy, Inc. Questions can also be sent by email to KSmith@advantageproxy.com. This notice of special meeting is and the proxy statement/prospectus relating to the Business Combination will be available at https://www.astproxyportal.com/ast/98550.

Thank you for your participation. We look forward to your continued support.

By Order of the Board of Directors,

Matthew Kearney
Chief Executive Officer

December 9, 2022

**IF YOU RETURN YOUR SIGNED PROXY CARD WITHOUT AN INDICATION OF HOW YOU WISH TO VOTE, YOUR SHARES WILL BE VOTED IN FAVOR OF EACH OF THE PROPOSALS.**

**REDEMPTION RIGHTS**

**ALL HOLDERS (THE "PUBLIC STOCKHOLDERS") OF SHARES OF COMMON STOCK ISSUED IN RNER'S INITIAL PUBLIC OFFERING (THE "PUBLIC SHARES") HAVE THE RIGHT TO HAVE THEIR PUBLIC SHARES REDEEMED FOR CASH IN CONNECTION WITH THE PROPOSED BUSINESS COMBINATION. PUBLIC STOCKHOLDERS ARE NOT REQUIRED TO AFFIRMATIVELY VOTE FOR OR AGAINST THE BUSINESS COMBINATION PROPOSAL, TO VOTE ON THE BUSINESS COMBINATION PROPOSAL AT ALL, OR TO BE HOLDERS OF RECORD ON THE RECORD DATE IN ORDER TO HAVE THEIR SHARES REDEEMED FOR CASH.**

**THIS MEANS THAT ANY PUBLIC STOCKHOLDER HOLDING PUBLIC SHARES MAY EXERCISE REDEMPTION RIGHTS REGARDLESS OF WHETHER THEY ARE EVEN ENTITLED TO VOTE ON THE BUSINESS COMBINATION PROPOSAL.**

**TO EXERCISE REDEMPTION RIGHTS, HOLDERS MUST TENDER THEIR STOCK TO AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC, RNER'S TRANSFER AGENT, NO**

TABLE OF CONTENTS

**LATER THAN TWO (2) BUSINESS DAYS PRIOR TO THE SPECIAL MEETING. YOU MAY TENDER YOUR STOCK BY EITHER DELIVERING YOUR STOCK CERTIFICATE TO THE TRANSFER AGENT OR BY DELIVERING YOUR SHARES ELECTRONICALLY USING THE DEPOSITORY TRUST COMPANY'S DEPOSIT/WITHDRAWAL AT CUSTODIAN SYSTEM. IF THE BUSINESS COMBINATION IS NOT COMPLETED, THEN THESE SHARES WILL NOT BE REDEEMED FOR CASH. IF YOU HOLD THE SHARES IN STREET NAME, YOU WILL NEED TO INSTRUCT THE ACCOUNT EXECUTIVE AT YOUR BANK OR BROKER TO WITHDRAW THE SHARES FROM YOUR ACCOUNT IN ORDER TO EXERCISE YOUR REDEMPTION RIGHTS. SEE "*SPECIAL MEETING OF RNER STOCKHOLDERS — REDEMPTION RIGHTS*" FOR MORE SPECIFIC INSTRUCTIONS.**

TABLE OF CONTENTS

**TABLE OF CONTENTS**

| | |
|---|---|
| ABOUT THIS PROXY STATEMENT/PROSPECTUS | i |
| INDUSTRY AND MARKET DATA | ii |
| TRADEMARKS, TRADE NAMES AND SERVICE MARKS | iii |
| SELECTED DEFINITIONS | iv |
| QUESTIONS AND ANSWERS ABOUT THE BUSINESS COMBINATION AND THE SPECIAL MEETING | vi |
| SUMMARY | 1 |
| SUMMARY UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION | 15 |
| RISK FACTORS | 18 |
| CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS; MARKET, RANKING AND OTHER INDUSTRY DATA | 73 |
| SPECIAL MEETING OF RNER STOCKHOLDERS | 77 |
| PROPOSAL ONE — THE BUSINESS COMBINATION PROPOSAL | 85 |
| PROPOSAL TWO — THE CHARTER PROPOSALS | 110 |
| PROPOSAL THREE — THE ADJOURNMENT PROPOSAL | 111 |
| THE BUSINESS COMBINATION AGREEMENT | 112 |
| AGREEMENTS ENTERED INTO IN CONNECTION WITH THE BUSINESS COMBINATION AGREEMENT | 123 |
| INFORMATION ABOUT THE COMPANIES | 126 |
| RNER'S BUSINESS | 127 |
| HUB SECURITY'S BUSINESS | 133 |
| RNER'S MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 153 |
| HUB SECURITY'S MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 158 |
| UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION | 175 |
| MANAGEMENT FOLLOWING THE BUSINESS COMBINATION | 192 |
| CERTAIN RELATIONSHIPS AND RELATED PERSON TRANSACTIONS | 212 |
| CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS | 214 |
| CERTAIN MATERIAL ISRAELI TAX CONSIDERATIONS | 230 |
| DESCRIPTION OF HUB SECURITY ORDINARY SHARES | 236 |
| DESCRIPTION OF HUB SECURITY WARRANTS | 244 |
| COMPARISON OF RIGHTS OF HUB SECURITY SHAREHOLDERS AND RNER STOCKHOLDERS | 247 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT OF RNER, HUB SECURITY AND THE COMBINED COMPANY | 255 |
| FUTURE SHAREHOLDER PROPOSALS AND NOMINATIONS | 259 |
| APPRAISAL RIGHTS | 260 |
| STOCKHOLDER COMMUNICATIONS | 261 |
| LEGAL MATTERS | 262 |
| EXPERTS | 263 |
| DELIVERY OF DOCUMENTS TO SHAREHOLDERS | 264 |
| ENFORCEABILITY OF CIVIL LIABILITIES | 265 |

| TRANSFER AGENT AND REGISTRAR | 267 |
| WHERE YOU CAN FIND MORE INFORMATION | 268 |
| INDEX TO FINANCIAL STATEMENTS | F-1 |
| ANNEXES | A-1 |

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

TABLE OF CONTENTS

**ABOUT THIS PROXY STATEMENT/PROSPECTUS**

This proxy statement/prospectus, which forms a part of a registration statement on Form F-4 filed with the Securities and Exchange Commission, or SEC, by HUB Security, constitutes a prospectus of HUB Security under Section 5 of the Securities Act of 1933, as amended (the "Securities Act"), with respect to the HUB Security ordinary shares to be issued to RNER stockholders in connection with the Business Combination, as well as the warrants to acquire HUB Security ordinary shares to be issued to RNER warrant holders and the HUB Security ordinary shares underlying such warrants. This document also constitutes a proxy statement of RNER under Section 14(a) of the Exchange Act, and the rules thereunder, and a notice of meeting with respect to the special meeting of RNER stockholders to consider and vote upon the proposals to adopt the Business Combination Agreement, to adopt the Charter Proposals (as defined herein) and to adjourn the meeting, if necessary, to permit further solicitation of proxies because there are not sufficient votes to adopt the Business Combination Agreement.

Unless otherwise indicated or the context otherwise requires, all references in this proxy statement/prospectus to the terms "HUB Security" and the "Company" refer to HUB Cyber Security (Israel) Ltd., together with its subsidiaries. All references in this proxy statement/prospectus to "RNER" refer to Mount Rainier Acquisition Corp.

i

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

TABLE OF CONTENTS

**INDUSTRY AND MARKET DATA**

Unless otherwise indicated, information contained in this proxy statement/prospectus concerning HUB Security's industry and the regions in which it operates, including HUB Security's general expectations and market position, market opportunity, market share and other management estimates, is based on information obtained from various independent publicly available sources and other industry publications, surveys and forecasts, which HUB Security believes to be reliable based upon its management's knowledge of the industry. HUB Security assumes liability for the accuracy and completeness of such information to the extent included in this proxy statement/prospectus. Such assumptions and estimates of HUB Security's future performance and growth objectives and the future performance of its industry and the markets in which it operates are necessarily subject to a high degree of uncertainty and risk due to a variety of factors, including those discussed under the headings "*Risk Factors*," "*Cautionary Statement Regarding Forward-Looking Statements; Market, Ranking and Other Industry Data*" and "*HUB Security's Management's Discussion and Analysis of Financial Condition and Results of Operations*" in this proxy statement/prospectus.

ii

®

TABLE OF CONTENTS

**TRADEMARKS, TRADE NAMES AND SERVICE MARKS**

This document contains references to trademarks, trade names and service marks belonging to other entities. Solely for convenience, trademarks, trade names and service marks referred to in this proxy statement/prospectus may appear without the ® or TM symbols, but such references are not intended to indicate, in any way, that the applicable licensor will not assert, to the fullest extent under applicable law, its rights to these trademarks and trade names. We do not intend our use or display of other companies' trade names, trademarks or service marks to imply a relationship with, or endorsement or sponsorship of us by, any other companies.

iii

## SELECTED DEFINITIONS

| | |
|---|---|
| "A-Labs" | means A-Labs Finance and Advisory Ltd. |
| "A.G.P." | means A.G.P./Alliance Global Partners, the representative of the underwriters in the RNER IPO and a stockholder of RNER. |
| "Aggregate Transaction Proceeds" | means an amount equal to the aggregate cash proceeds available for release to RNER from RNER's trust account in connection with the transactions contemplated by the Business Combination Agreement (after, for the avoidance of doubt, giving effect to all of the RNER Stockholder Redemptions (as defined herein)) plus the aggregate purchase price under all subscription agreements entered into in respect of the PIPE Investment. |
| "Ancillary Documents" | means the Sponsor Support Agreement (as defined herein), the Subscription Agreements (as defined herein), the HUB Security Support Agreement (as defined herein) and each other agreement, document, instrument and/or certificate contemplated by the Business Combination Agreement executed or to be executed in connection with the transactions contemplated thereby. |
| "Company" | means HUB Cyber Security (Israel) Ltd. |
| "Companies Law" | means the Israeli Companies Law, 1999. |
| "Confidential Computing" | means HUB's confidential computing protection solution. |
| "Closing" | means the consummation of the Business Combination. |
| "Closing Date" | means the date on which the Closing occurs. |
| "DGCL" | means the Delaware General Corporation Law, as amended. |
| "Exchange Act" | means the Securities Exchange Act of 1934, as amended. |
| "Founder Shares" | means the 4,312,500 shares of common stock of RNER held by the Sponsor, certain of RNER's executive officers and directors and A.G.P., which were acquired for an aggregate purchase price of $25,000 prior to the RNER IPO. |
| "GAAP" | means accounting principles generally accepted in the United States of America. |
| "HUB Security existing warrants" | means the existing warrants of HUB Security currently traded on the TASE under the symbol "HUB.W1". |
| "HUB" or "HUB Security" | means HUB Cyber Security (Israel) Ltd. |
| "HUB Security warrants" | means the warrants to be received by warrant holders of RNER in exchange for RNER warrants pursuant to the Business Combination Agreement. |
| "IASB" | means International Accounting Standards Board. |
| "IFRS" | means International Financial Reporting Standards |

iv

| | |
|---|---|
| | as set forth by the IASB. |
| "PCAOB" | means the Public Company Accounting Oversight Board. |
| "private placement warrants" | means the 596,200 warrants underlying the RNER Private Placement Units. |
| "Put and Call Option Agreement" | means the agreement entered into concurrently with the Business Combination Agreement, as amended, providing certain RNER stockholders with specified put and call rights as set forth therein. |
| "RNER" | means Mount Rainier Acquisition Corp. |
| "RNER IPO" | means the initial public offering of RNER, which was consummated on October 7, 2021. |
| "RNER Initial Stockholders" | means the Sponsor, certain of RNER's executive officers and directors and A.G.P., each of which holds shares of RNER Common Stock issued prior to the RNER IPO. |
| "RNER Private Placement" | means the sale of the RNER Private Placement Units to the Sponsor and certain officers and directors via private placement in connection with the RNER IPO at a purchase price of $10.00 per RNER Private Placement Unit. |
| "RNER Private Placement Units" | means the 596,200 units, each consisting of one share of RNER common stock and one redeemable warrant entitling the holder to purchase three-fourths of one share of RNER common stock for $11.50 per whole share, sold in the RNER Private Placement. |
| "Securities Act" | means the Securities Act of 1933, as amended. |
| "Sponsor" | means DC Rainier SPV, LLC, a Delaware limited liability company. |
| "Stock Split" | means a reverse stock split HUB Security intends to effect prior to the Closing to cause the value of the outstanding HUB Security ordinary shares immediately prior to the Effective Time to equal $10.00 per share |
| "Transactions" | means the transactions contemplated by the Business Combination Agreement and the Ancillary Documents. |
| "units" | means the 17,250,000 units sold as part of the RNER IPO, including the 2,250,000 units sold to the underwriters following the full exercise of its over-allotment option, each consisting of one share of RNER common stock and one redeemable warrant entitling the holder to purchase three-fourths of one share of RNER common stock for $11.50 per whole share. |

v

## QUESTIONS AND ANSWERS ABOUT THE BUSINESS COMBINATION AND THE SPECIAL MEETING

*The questions and answers below highlight only selected information set forth elsewhere in this proxy statement/prospectus and only briefly address some commonly asked questions about the special meeting and the proposals to be presented at the special meeting, including with respect to the proposed Business Combination. The following questions and answers do not include all the information that may be important to RNER stockholders. RNER stockholders are urged to carefully read this entire proxy statement/prospectus, including the annexes and the other documents referred to herein, to fully understand the proposed Business Combination and the voting procedures for the special meeting.*

**Q:   Why am I receiving this proxy statement/prospectus?**

**A:**   RNER and HUB Security have agreed to a business combination under the terms of the Business Combination Agreement that is described in this proxy statement/prospectus. A copy of the Business Combination Agreement is attached to this proxy statement/prospectus as Annex A, and RNER encourages its stockholders to read it in its entirety. RNER's stockholders are being asked to consider and vote upon a proposal to approve the Business Combination Agreement, which, among other things, provides for Merger Sub to be merged with and into RNER with RNER being the surviving corporation in the Business Combination and becoming a wholly owned subsidiary of HUB Security, and the other Transactions contemplated by the Business Combination Agreement. See the section entitled "*Proposal One — The Business Combination Proposal*."

**Q:   Are there any other matters being presented to stockholders at the meeting?**

**A:**   In addition to voting on the Business Combination Proposal, the stockholders of RNER will vote on the following proposals:

- To approve the following material differences between the RNER Charter and the HUB Security Articles to be effective upon the consummation of the Business Combination: (i) the name of the new public entity will be "HUB Cyber Security (Israel) Ltd." as opposed to "Mount Rainier Acquisition Corp."; (ii) HUB Security's corporate existence is perpetual as opposed to RNER's corporate existence terminating if a business combination is not consummated within a specified period of time; and (iii) the HUB Security Articles will not include the various provisions applicable only to special purpose acquisition corporations that the RNER Charter contains. See the section of this proxy statement/prospectus titled "*Proposal Two — The Charter Proposals*."

- To consider and vote upon a proposal to adjourn the special meeting to a later date or dates, if necessary, if the parties are not able to consummate the Business Combination for any reason. See the section of this proxy statement/prospectus titled "*Proposal Four — The Adjournment Proposal*."

RNER will hold the special meeting of its stockholders to consider and vote upon these proposals. This proxy statement/prospectus contains important information about the proposed Business Combination and the other matters to be acted upon at the special meeting. RNER stockholders should read it carefully.

**The vote of stockholders is important. Regardless of how many shares you own, you are encouraged to vote as soon as possible after carefully reviewing this proxy statement/prospectus.**

**Q:   Why is RNER providing stockholders with the opportunity to redeem their shares for cash in connection with the Business Combination?**

**A:**   Pursuant to the RNER Charter, RNER is required to provide stockholders with an opportunity to have their shares of RNER Common Stock redeemed for cash, either through a stockholder meeting or tender offer, in connection with a business combination. Due to the structure of the Transactions, RNER is providing this opportunity through a stockholder vote.

vi

**Q:   Why am I receiving this proxy statement/prospectus if I only own RNER warrants?**

**A:**   The RNER warrants will become exercisable 30 days following the Business Combination and will entitle holders to purchase HUB Security ordinary shares, as described in more detail herein. This proxy statement/prospectus includes important information about HUB Security, the HUB Security Articles to be in effect following the closing of the Business Combination and the business of HUB Security and its subsidiaries following the closing of the Business Combination. Because holders of RNER warrants will be entitled to purchase HUB Security ordinary shares after the closing of the Business Combination, we urge you to read the information contained in this proxy statement/prospectus carefully.

**Q:   What will happen to RNER's securities upon consummation of the Business Combination?**

**A:**   RNER's units, common stock and warrants are currently listed on Nasdaq under the symbols RNERU, RNER and RNERW, respectively. RNER's securities will cease trading upon consummation of the Business Combination. If you own RNER units, immediately prior to the consummation of the Business Combination, your RNER units will split into the underlying shares of common stock and warrants, and you will receive HUB Security ordinary shares in exchange for your RNER Common Stock and HUB Security warrants in exchange for your RNER warrants as described herein. HUB Security intends to apply for listing of the HUB Security ordinary shares and HUB Security warrants on Nasdaq under the proposed symbols "HUBC" and "HUBCW," respectively, to be effective upon the consummation of the Business Combination. It is a condition of the consummation of the Transactions that the HUB Security ordinary shares and HUB Security warrants are approved for listing on Nasdaq (subject only to official notice of issuance thereof and round lot holder requirements). While trading on Nasdaq is expected to begin on the first business day following the consummation of the Business Combination, there can be no assurance that HUB Security's securities will be listed on Nasdaq or that a viable and active trading market will develop. If such listing condition is not met or if such confirmation is not obtained, the Business Combination will not be consummated unless the Nasdaq condition set forth in the Business Combination Agreement is waived by the applicable parties. See "*Risk Factors — Risks Related to the Combined Company Following the Business Combination*" for more information.

**Q:   Why is RNER proposing the Business Combination?**

**A:**   RNER was organized to effect a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or other similar business combination with one or more businesses or entities.

On October 7, 2021, RNER consummated the RNER IPO of units, with each unit consisting of one share of its common stock and one RNER warrant, raising total gross proceeds of approximately $172.5 million.

Simultaneously with the closing of the RNER IPO, RNER consummated the RNER Private Placement to the Sponsor and certain executive officers and directors, generating gross proceeds of approximately $6.0 million. The aggregate proceeds held in RNER's trust account (the "Trust Account") resulting from the RNER IPO and the sale of the RNER Private Placement Units were approximately $176.0 million. Since the RNER IPO, RNER's activity has been limited to the evaluation of business combination candidates.

RNER believes HUB Security is a company with an appealing market opportunity and growth profile, a strong position in its industry and a compelling valuation. As a result, RNER believes that the Business Combination will provide RNER stockholders with an opportunity to participate in the ownership of a company with significant growth potential. See the section entitled "*Proposal One — The Business Combination Proposal — RNER's Board of Directors' Reasons for the Business Combination and Recommendation of the Board of Directors*."

vii

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

TABLE OF CONTENTS

**Q:** **What is the "PIPE" transaction?**

**A:** Concurrently with and following the execution of the Business Combination Agreement, HUB Security entered into subscription agreements with certain parties subscribing for HUB Security ordinary shares pursuant to which such investors have agreed to purchase, and HUB Security has agreed to sell to them, an aggregate of 5,000,000 HUB Security ordinary shares, for a purchase price of $10.00 per share and an aggregate purchase price of $50,000,000, to be consummated in connection with the Closing.

The $10.00 per share purchase price represents a 1.6% discount to the trading price of RNER's common stock on the record date.

**Q:** **Did RNER's board of directors obtain a third-party valuation or fairness opinion in determining whether or not to proceed with the Business Combination?**

**A**: The board of directors of RNER originally determined that it would attempt to obtain a fairness opinion in order to support its decision. However, the negotiation of the transaction progressed at an accelerated pace and the analysis of Hub Security required significant time and resources. As a result, the investment banking firm that was engaged was not able to complete its review prior to the completion of negotiations. RNER's officers and directors have substantial experience in evaluating the operating and financial merits of companies from a wide range of industries and have substantial experience with mergers and acquisitions. Furthermore, in analyzing the Business Combination, RNER's board of directors conducted significant due diligence on HUB Security and again concluded that its members' collective experience and backgrounds, together with the experience and sector expertise of RNER's advisors, enabled it to make the necessary analyses and determinations regarding the Business Combination. Accordingly, the board of directors of RNER, after a thorough analysis, made the determination that the Business Combination was in the best interest of the stockholders of the Company and decided to proceed with the transaction notwithstanding the fact that the firm had not completed its analysis. The board of directors determined that it would attempt to obtain the fairness opinion after the execution of the definitive Business Combination Agreement as additional support for the decision made by the board of directors. After the execution of the Business Combination Agreement, RNER once more commenced the process to obtain the fairness opinion with the firm. However, shortly thereafter, the firm notified RNER that it did not intend to continue the engagement since the Business Combination Agreement had already been signed. The Board of RNER has decided not to obtain a fairness opinion in connection with the Business Combination.

Accordingly, investors may be relying solely on the judgment of RNER's board of directors and its advisors in valuing HUB Security and will be assuming the risk that the RNER board of directors may not have properly valued the business.

We note that the prospectus for the RNER IPO provides that if RNER seeks to complete a business combination with an entity affiliated with the Sponsor or RNER's officers or directors, RNER would be required to obtain an opinion from an independent investment banking firm or another independent entity that commonly renders valuation opinions that such an initial business combination is fair from a financial point of view. HUB Security is not an entity affiliated with the Sponsor or RNER's officers or directors and while still seeking to obtain a fairness opinion following the signing of the transaction, RNER's board of directors determined that hiring an independent valuation firm or appointing a committee of independent directors was not necessary to evaluate the proposed transaction prior to determining whether to proceed with the Business Combination.

**Q:** **Do I have redemption rights?**

**A:** If you are a holder of common stock issued in the RNER IPO (the "public shares"), you have the right to demand that RNER redeem such shares for a pro rata portion of the cash held in the Trust Account, calculated as of two business days prior to the consummation of the Business Combination ("redemption rights").

Notwithstanding the foregoing, a holder of public shares, together with any affiliate of such holder or any other person with whom such holder is acting in concert or as a "group" (as defined in

viii

tm2223104-17_424b3 - none - 138.6881299s

TABLE OF CONTENTS

Section 13(d)(3) of the Exchange Act), will be restricted from seeking redemption rights with respect to 15% or more of the public shares, without the prior consent of RNER. Accordingly, all public shares in excess of 15% held by a public stockholder, together with any affiliate of such holder or any other person with whom such holder is acting in concert or as a "group," will not be converted into cash, without the prior consent of RNER.

Under the RNER Charter, the Business Combination may not be consummated unless RNER (or any successor) has net tangible assets of at least $5,000,001 upon consummation of such Business Combination.

**Q:  How do I exercise my redemption rights?**

**A:**  A holder of public shares may exercise redemption rights regardless of whether it votes for or against the Business Combination Proposal or does not vote on such proposal at all, or if it is a holder of public shares on the record date. If you are a holder of public shares and wish to exercise your redemption rights, you must demand that RNER convert your public shares into cash and deliver your public shares to RNER's transfer agent, either physically or electronically using The Depository Trust Company's Deposit/Withdrawal at Custodian ("DWAC") System no later than two (2) business days prior to the special meeting. Any holder of public shares seeking redemption will be entitled to their pro rata portion of the amount then in the Trust Account (which, for illustrative purposes, was approximately $177.4 million, or approximately $10.26 per share, as of the record date), less any owed but unpaid taxes on the funds in the Trust Account. Such amount will be paid promptly upon consummation of the Business Combination. There are currently no owed but unpaid income taxes on the funds in the Trust Account.

Any request for redemption, once made by a holder of public shares, may be withdrawn at any time prior to the time the vote is taken with respect to the Business Combination Proposal at the special meeting. If you deliver your shares for redemption to RNER's transfer agent and later decide prior to the special meeting not to elect redemption, you may request that RNER's transfer agent return the shares (physically or electronically). You may make such request by contacting RNER's transfer agent at the address listed at the end of this section.

Any written demand of redemption rights must be received by RNER's transfer agent at least two (2) business days prior to the vote taken on the Business Combination Proposal at the special meeting. No demand for redemption will be honored unless the holder's stock has been delivered (either physically or electronically) to the transfer agent.

If you are a holder of public shares (including through the ownership of RNER units) and you exercise your redemption rights, it will not result in the loss of any RNER warrants that you may hold (including those contained in any units you hold). Your whole warrants will become exercisable to purchase three-fourths of one HUB Security ordinary share following consummation of the Business Combination.

Following the Business Combination, holders of RNER warrants will retain warrants with an aggregate value of approximately $2,760,000 based on the closing price of the RNER warrants on December 8, 2022, regardless of the degree of redemption rights that are exercised. However, as a result of redemptions, the trading market for the HUB Security ordinary shares may be less liquid than the market for the RNER common stock was prior to consummation of the Business Combination, and HUB Security may not be able to meet the listing standards for Nasdaq or another national securities exchange.

**Q:  Do I have appraisal rights if I object to the proposed Business Combination?**

**A:**  Under Section 262 of the DGCL, the holders of RNER Common Stock and RNER warrants will not have appraisal rights in connection with the Business Combination.

ix

|  | (1) | (2) |
|---|---|---|
|  | % | % |
| (3) | % | % | % |
| (4) | % | % | % |
|  | % | % | % |
|  | % | % | % |

**Q:** **What equity stake will the current HUB Security shareholders and RNER stockholders hold in the public company immediately after the consummation of the Business Combination?**

**A**: It is anticipated that, upon completion of the Business Combination, the ownership interests in HUB Security as the public company will be as set forth in the table below:

| | No Redemption Scenario | | 50% Redemption Scenario[1] | | Max Redemption Scenario[2] | |
|---|---|---|---|---|---|---|
| | Shares | % | Shares | % | Shares | % |
| RNER Public Stockholders | 17,249,611 | 14.23% | 8,514,747 | 7.57% | — | — |
| HUB Security Shareholders[3] | 94,071,819 | 77.60% | 94,071,819 | 83.67% | 94,071,819 | 91.99% |
| RNER Initial Stockholders[4] | 4,908,589 | 4.05% | 4,845,953 | 4.31% | 3,192,671 | 3.12% |
| PIPE Investors | 5,000,000 | 4.12% | 5,000,000 | 4.45% | 5,000,000 | 4.89% |
| Closing Shares | 121,230,019 | 100.0% | 112,432,519 | 100.0% | 102,264,490 | 100.0% |

(1) Assumes that holders of 8,625,000 public shares, or 50% of the maximum redemption amount, exercise their redemption rights in connection with the Business Combination (the "50% redemption amount").

(2) Assumes that holders of 17,250,000 public shares exercise their redemption rights in connection with the Business Combination, which is the maximum number of public shares that can be redeemed while still ensuring Minimum Cash Condition (defined below) is satisfied (the "Maximum Redemption Amount").

(3) Excludes potential dilutive effect of outstanding HUB Security options, warrants and restricted share units.

(4) Assumes no forfeiture of the Founder Shares pursuant to the Sponsor Support Agreement.

The share numbers set forth above do not take into account (a) RNER's warrants that will remain outstanding following the Business Combination and may be exercised thereafter (commencing 30 days after the Closing of the Business Combination), or (b) the issuance of any shares upon completion of the Business Combination under HUB Security's 2022 Share Incentive Plan or upon exercise of the HUB Security existing warrants. If the actual facts are different than the assumptions set forth above, the share numbers set forth above will be different.

Based on RNER's public trading price at market close on December 8, 2022 ($10.28), the estimated implied dollar value of the Sponsor's post-Business Combination ordinary shares is approximately $50.46 million under the no redemption scenario assuming no forfeiture of the Founder Shares.

The table below reflects the ownership percentages immediately after the consummation of the Business Combination if all RNER warrants are exercised assuming no redemptions, 50% redemptions and maximum redemptions.

| | No Redemption Scenario | | 50% Redemption Scenario[1] | | Max Redemption Scenario[2] | |
|---|---|---|---|---|---|---|
| | Shares | % | Shares | % | Shares | % |
| RNER Public Stockholders[3] | 30,186,819 | 22.42% | 21,286,869 | 16.94% | 12,026,891 | 10.48% |
| HUB Security Shareholders[4] | 94,071,819 | 69.88% | 94,071,819 | 74.87% | 94,071,819 | 82.01% |
| RNER Initial Stockholders[5] | 5,355,729 | 3.98% | 5,287,387 | 4.21% | 3,608,349 | 3.15% |
| PIPE Investors | 5,000,000 | 3.71% | 5,000,000 | 3.98% | 5,000,000 | 4.36% |
| Closing Shares | 134,614,367 | 100.0% | 125,646,075 | 100.0% | 114,707,059 | 100.0% |

(1) Assumes that holders of 8,625,000 public shares, or 50% redemption amount, exercise their redemption rights in connection with the Business Combination.

x

(2)   Assumes that holders of 17,250,000 public shares exercise their redemption rights in connection with the Business Combination, which is the Maximum Redemption Amount.

(3)   Includes 12,937,208 (under no redemption scenario), 12,772,121 (under 50% redemption scenario) and 12,026,891 (under max redemption scenario) shares that are issuable upon exercise of all RNER public warrants.

(4)   Excludes potential dilutive effect of outstanding HUB Security options, warrants and restricted share units.

(5)   Includes 447,140 (under no redemption scenario), 441,434 (under 50% redemption scenario) and 415,677 (under max redemption scenario) shares issuable upon exercise of the RNER private placement warrants held by the Sponsor. Assumes no forfeiture of the Founder Shares.

For more information, please see the section entitled "Unaudited Pro Forma Condensed Combined Financial Information."

It should be noted that when the RNER warrants become exercisable, we may require the public warrants to be exercised on a cashless basis and the private placement warrants may be exercised on a cashless basis at the option of each holder thereof.

**Q:**  **What happens to the funds deposited in the Trust Account after consummation of the Business Combination?**

**A:**  The net proceeds of the RNER IPO and a portion of the amount raised from the simultaneous private placement of the RNER Private Placement Units totaling approximately $176.0 million were placed in the Trust Account immediately following the RNER IPO. After consummation of the Business Combination, the funds in the Trust Account will be used to pay, on a pro rata basis, holders of the public shares who exercise redemption rights, to pay fees and expenses incurred in connection with the Business Combination (including aggregate fees of approximately $6.9 million to the representative of the underwriters of the RNER IPO) and for working capital and general corporate purposes.

**Q:**  **What happens if a substantial number of public stockholders vote in favor of the Business Combination Proposal and exercise their redemption rights?**

**A:**  RNER's public stockholders may vote in favor of the Business Combination and still exercise their redemption rights, although they are not required to vote in any way to exercise such redemption rights. Accordingly, the Business Combination may be consummated even though the funds available from the Trust Account and the number of public stockholders are substantially reduced as a result of redemptions by public stockholders. Nonetheless, the consummation of the Business Combination is conditioned upon, among other things, the combined company having an aggregate cash amount of at least $50 million available at Closing from the Trust Account (after giving effect to all of the RNER stockholder redemptions) and the PIPE Investors (though this condition may be waived by HUB Security) (the "Minimum Cash Condition").

If the Business Combination is consummated, but we experience a significant level of redemptions, this may result in fewer public shares and public shareholders, which may result in the trading market for HUB Security ordinary shares being less liquid than the market for RNER's common stock was prior to consummation of the Business Combination. In addition, HUB Security may not be able to meet the listing standards for Nasdaq or another national securities exchange. Furthermore, with less funds available from the Trust Account, the capital infusion from the Trust Account into HUB Security's business will be reduced. As such, HUB Security's ability to perform against its business plan may be negatively impaired if redemptions by RNER's public stockholders are significant. See a discussion of risks related to redemption rights in "*Risk Factors Relating to RNER and the Business Combination*".

Public stockholders who purchased units as part of the RNER IPO for $10.00 may experience dilution if they elect not to redeem in connection with the Business Combination. The expense of the business combination agreement fees would be borne by those stockholders who elect not to redeem.

xi

tm2223104-17_424b3 - none - 138.6881299s

TABLE OF CONTENTS

The Business Combination also involves the $50,000,000 PIPE Investment for ordinary shares of HUB Security. RNER also has warrants outstanding, which may be dilutive to the combined company's investors if the price per share exceeds $11.50, which is the exercise price per share of the HUB Security warrants.

The tables above in Q&A discussing the ownership of HUB Security shareholders and RNER stockholders post-Business Combination show possible sources of dilution and the extent of such dilution that non-redeeming RNER public stockholders could experience in connection with the closing of the Business Combination. In an effort to illustrate the extent of such dilution, the table above shows the effect of the exercise of all warrants, which are exercisable for three-fourths of one whole share at a price of $11.50 per share at any time commencing on the later of 12 months from the closing of the RNER IPO and 30 days after the completion of the Business Combination. The table is presented assuming (i) no redemptions, (ii) 50% of the maximum redemptions and (iii) maximum redemptions that may occur but which would still provide for the satisfaction of the Minimum Cash Condition.

The business combination agreement commissions in connection with the RNER IPO will be released to the underwriters only on completion of the Business Combination, in an amount equal to $6.9 million. Below is a summary of the total Business Combination Agreement commission to be paid upon closing of the Business Combination, assuming (i) no redemptions, (ii) 50% redemptions and (iii) maximum redemptions.

|  | Underwriting Fee | | |
|---|---|---|---|
|  | No Redemptions | 50% Redemptions | Maximum Redemptions |
| Redemptions ($) | $ 0 | $87,975,000 | $175,950,000 |
| Redemptions (Shares) | 0 | 8,625,000 | 17,250,000 |
| Effective Underwriting (Total Underwriting less redemptions) | $172,500,000 | $84,525,000 | $ (3,450,000) |
| Total Deferred Fee (%) | 4% | 4% | 4% |
| Total Business Combination Agreement Fee ($) | $ 6,900,000 | $ 6,900,000 | $ 6,900,000 |
| *Effective Business Combination Agreement Fee (as a percentage of cash remaining in Trust Account post redemptions)* | *4%* | *8.2%* | * |

---

\*    Not meaningful.

**Q:    What happens if the Business Combination is not consummated?**

**A:**    If RNER does not complete the Business Combination with HUB Security for whatever reason, RNER would search for another target business with which to complete a business combination. If RNER does not complete the Business Combination with HUB Security or another business combination by January 7, 2023 (or such later date as may be approved by RNER's stockholders in an amendment to the RNER Charter), RNER must redeem 100% of the outstanding public shares, at a per-share price, payable in cash, equal to an amount then held in the Trust Account (net of taxes payable and less up to $100,000 of interest to pay dissolution expenses) divided by the number of outstanding public shares. The Sponsor and RNER's officers and directors have waived their redemption rights with respect to their Founder Shares in the event a business combination is not effected in the required time period, and, accordingly, their Founder Shares will be worthless. Additionally, in the event of such liquidation, there will be no distribution with respect to RNER's outstanding warrants. Accordingly, the warrants will expire worthless. On December 5, 2022, RNER filed a proxy statement in connection with a special meeting of stockholders to (a) extend the date by which RNER has to consummate a business combination from January 7, 2023 to March 1, 2023 and (b) adjust the net tangible assets requirement under the RNER Charter. The special meeting is scheduled to take place on December 21, 2022 at 10:00 a.m., Eastern Time, for shareholders of record at the close of business on November 18, 2022.

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

tm2223104-17_424b3 - none - 138.6881299s

TABLE OF CONTENTS

**Q:**  **How do the Sponsor and the officers and directors of RNER intend to vote on the proposals?**

**A:**  The Sponsor, as well as other RNER Initial Stockholders, beneficially own and are entitled to vote an aggregate of approximately 22.2% of the outstanding RNER Common Stock. These holders have agreed to vote their shares in favor of the Business Combination Proposal. These holders have also indicated that they intend to vote their shares in favor of all other proposals being presented at the meeting. In addition to the shares of RNER Common Stock held by the Sponsor and RNER's officers and directors, RNER would need 6,170,651 shares, or approximately 35.8%, of the 17,250,000 public shares to be voted in favor of the Business Combination Proposal and other proposals in order for them to be approved (assuming all outstanding shares are voted on each proposal).

**Q:**  **What interests do the Sponsor and the current officers and directors of RNER have in the Business Combination?**

**A:**  In considering the recommendation of RNER's board of directors to vote in favor of the Business Combination, stockholders should be aware that, aside from their interests as stockholders, the Sponsor and certain of RNER's directors and officers have interests in the Business Combination that are different from, or in addition to, those of other stockholders generally. RNER's directors were aware of and considered these interests, among other matters, in evaluating the Business Combination, in recommending to stockholders that they approve the Business Combination and in agreeing to vote their shares in favor of the Business Combination. Stockholders should take these interests into account in deciding whether to approve the Business Combination. These interests include, among other things, the fact that:

- If the Business Combination with HUB Security or another business combination is not consummated by January 7, 2023 (or such later date as may be approved by RNER's stockholders in an amendment to the RNER Charter), RNER will cease all operations except for the purpose of winding up, redeeming 100% of the outstanding public shares for cash and, subject to the approval of its remaining stockholders and board of directors, dissolving and liquidating. In such event, the 4,312,500 Founder Shares held by the Sponsor, which were acquired for an aggregate purchase price of $25,000 prior to the RNER IPO, would be worthless because the holders are not entitled to participate in any redemption or distribution with respect to such shares. Such shares had an aggregate market value of approximately $44.3 million based upon the closing price of $10.28 per share on Nasdaq on December 8, 2022 (assuming no shares are forfeited pursuant to the Sponsor Support Agreement). On the other hand, if the Business Combination is consummated, each outstanding share of RNER Common Stock (other than the shares forfeited pursuant to the Sponsor Support Agreement) will be converted into the Per Share Consideration. In the aggregate, the 4,312,500 Founder Shares will be exchanged for 4,312,403 HUB Security ordinary shares.

- The Sponsor, as well as RNER's CEO and CFO, purchased an aggregate of 596,200 private placement units from RNER for $10.00 per unit. This purchase took place on a private placement basis simultaneously with the consummation of the RNER IPO. Nearly all of the proceeds RNER received from these purchases were placed in the Trust Account. Such private placement units had an aggregate market value of approximately $6.1 million based upon the closing price of $10.20 per unit on Nasdaq on December 8, 2022. The private placement units are each composed of one share of RNER common stock and one RNER warrant. The shares of RNER Common Stock and RNER warrants underlying the private placement units will become worthless if RNER does not consummate a business combination by January 7, 2023 (or such later date as may be approved by RNER's stockholders in an amendment to the RNER Charter). On the other hand, if the Business Combination is consummated, each share of RNER Common Stock will be converted into one HUB Security ordinary share and each outstanding private placement warrant (other than the warrants forfeited pursuant to the Sponsor Support Agreement) will be exchanged for one warrant of HUB Security, assuming that the Stock Split has been effected.

- If RNER is unable to complete a business combination within the required time period under the RNER Charter, the Sponsor will be liable under certain circumstances described herein to

xiii

tm2223104-17_424b3 - none - 138.6881299s

TABLE OF CONTENTS

ensure that the proceeds in the Trust Account are not reduced by the claims of target businesses or claims of vendors or other entities that are owed money by RNER for services rendered or contracted for or products sold to RNER. If RNER consummates a business combination, on the other hand, RNER will be liable for all such claims.

- The Sponsor and RNER's officers and directors and their affiliates are entitled to reimbursement of activities on RNER's behalf, such as identifying and investigating possible business targets and business combinations. However, if RNER fails to consummate a business combination within the required time period under the RNER Charter, they will not have any claim against the Trust Account for reimbursement. Accordingly, RNER may not be able to reimburse these expenses if the Business Combination or another business combination is not completed by January 7, 2023 (or such later date as may be approved by RNER's stockholders in an amendment to the RNER Charter). As of the record date, the Sponsor and RNER's officers and directors and their affiliates had incurred approximately $136,000 of unpaid reimbursable expenses.

- The Sponsor will benefit from the completion of a business combination and may be incentivized to complete an acquisition of a less favorable target company or on terms less favorable to public stockholders rather than liquidate.

- Based on the difference in the purchase price of $0.006 that the Sponsor paid for the 4,312,500 Founder Shares for an aggregate purchase price of $25,000, as compared to the purchase price of $10.00 per Public Unit sold in the IPO, the Sponsor may earn a positive rate of return even if the share price of the combined company after the Closing falls below the price initially paid for the Public Units in the RNER IPO and the Public Shareholders experience a negative rate of return following the Closing of the Business Combination.

- In the event that a business combination is not effected, the Sponsor will not be entitled to any reimbursement of funds invested in RNER. In total, the Sponsor has invested $5,987,000 for securities that would be worthless absent the completion of a business combination.

- The Business Combination Agreement provides for the continued indemnification of RNER's current directors and officers and the continuation of directors and officers liability insurance covering RNER's current directors and officers.

- RNER's Sponsor, officers and directors (or their affiliates) may make loans from time to time to RNER to fund certain capital requirements. On March 12, 2021, the Sponsor agreed to loan RNER an aggregate of up to $975,000 to cover expenses related to the RNER IPO pursuant to a promissory note that was repaid in full upon the completion of the RNER IPO. On October 26, 2022, the Sponsor agreed to loan RNER up to an aggregate total of $300,000 to be used for working capital. Additional loans may be made after the date of this proxy statement/prospectus. If the Business Combination is not consummated, the loans will not be repaid and will be forgiven except to the extent there are funds available to RNER outside of the Trust Account.

- Matthew Kearney, RNER's chairman and CEO will be a member of the board of directors of HUB Security following the closing of the Business Combination and, therefore, in the future Mr. Kearney will receive any cash fees, stock options or stock awards that HUB Security's board of directors determines to pay to its non-executive directors.

- Each of RNER's directors and officers presently has fiduciary or contractual obligations to other entities pursuant to which such officer or director is required to present a business combination opportunity to such entity. RNER's directors and officers also may have become aware of business combination opportunities that may have been appropriate for presentation to RNER and the other entities to which they owe certain fiduciary or contractual duties. Accordingly, they may have had conflicts of interest in determining to which entity a particular business opportunity should have been presented. These conflicts may not have been resolved in RNER's favor and such potential business combination opportunities may have been presented to other entities prior to their presentation to RNER. RNER's Amended and Restated Certificate of Incorporation provides that, to the extent permitted by applicable law, RNER renounces any interest or expectancy in, or in being offered an opportunity to participate in, any potential transaction or matter (i) which may be a business combination opportunity for an

xiv

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

entity related to a director or officer of RNER, on the one hand, and RNER, on the other, or (ii) the presentation of which would breach an existing legal obligation of a director or officer to another entity, and RNER waives any claim or cause of action it may have in respect thereof. RNER does not believe, however, that the fiduciary duties or contractual obligations of its officers or directors or waiver of corporate opportunity materially affected its search for an acquisition target nor will materially impact its ability to complete the proposed Business Combination.

**Q:**  **When do you expect the Business Combination to be completed?**

**A:**  It is currently anticipated that the Business Combination will be consummated promptly following the RNER special meeting, which is set for December 30, 2022; however, such meeting could be adjourned or postponed to a later date, as described above. The Closing (as defined below) is also subject to the approval of the shareholders of HUB Security, as well as other customary closing conditions. For a description of the conditions for the completion of the Business Combination, see the section entitled "*The Business Combination Agreement — Conditions to Closing of the Transactions*."

**Q:**  **What do I need to do now?**

**A:**  RNER urges you to carefully read and consider the information contained in this proxy statement/prospectus, including the annexes, and to consider how the Business Combination will affect you as a stockholder and/or a warrant holder of RNER. Stockholders should then vote as soon as possible in accordance with the instructions provided in this proxy statement/prospectus and on the enclosed proxy card.

**Q:**  **When and where will the special meeting take place?**

**A:**  The special meeting will be held on December 30, 2022, at 10:00 a.m., Eastern Time, solely over the Internet by means of a live audio webcast. You may attend the special meeting webcast by accessing the web portal located at https://web.lumiagm.com/297859227 and following the instructions set forth below. Stockholders participating in the special meeting will be able to listen only and will not be able to speak during the webcast. However, in order to maintain the interactive nature of the special meeting, virtual attendees will be able to:

- vote via the web portal during the special meeting webcast; and
- submit questions or comments to RNER's directors and officers during the special meeting.

Stockholders may submit questions or comments during the meeting through the special meeting webcast by typing in the "Submit a question" box.

**Q:**  **How do I attend the special meeting?**

**A:**  The special meeting will be held virtually. To register for and attend the special meeting, please follow these instructions as applicable to the nature of your ownership of RNER common stock:

- *Shares Held of Record.*  If you are a record holder, and you wish to attend the virtual special meeting, go to https://web.lumiagm.com/297859227, enter the password "mtrainier2022" and the control number you received on your proxy card or notice of the meeting and click on the "Click here to register for the online meeting" link at the top of the page. Immediately prior to the start of the special meeting, you will need to log back into the meeting site using your control number.

- *Shares Held in Street Name.*  If you hold your shares in "street" name, which means your shares are held of record by a broker, bank or nominee, and you who wish to attend the virtual special meeting, you must obtain a legal proxy from the stockholder of record and e-mail a copy (a legible photograph is sufficient) of your proxy to proxy@astfinancial.com no later than 72 hours prior to the special meeting. Holders should contact their bank, broker or other nominee for instructions regarding obtaining a proxy. Holders who e-mail a valid legal proxy will be issued a meeting control number that will allow them to register to attend and participate in the

xv

TABLE OF CONTENTS

special meeting. You will receive an e-mail prior to the meeting with a link and instructions for entering the special meeting. "Street" name holders should contact American Stock Transfer & Trust Company, RNER's transfer agent, on or before December 27, 2022.

**Q:  How do I vote?**

**A:**  If you are a holder of record of RNER common stock on the record date, you may vote by virtually attending the special meeting and submitting a ballot via the special meeting webcast or by submitting a proxy for the special meeting. You may submit your proxy by completing, signing, dating and returning the enclosed proxy card in the accompanying pre-addressed postage paid envelope. If you hold your shares in "street name," you should contact your broker, bank or nominee to ensure that votes related to the shares you beneficially own are properly voted and counted. In this regard, you must provide the broker, bank or nominee with instructions on how to vote your shares or, if you wish to attend the virtual special meeting and vote through the web portal, obtain a legal proxy from your broker, bank or nominee.

**Q:  If my shares are held in "street name," will my broker, bank or nominee automatically vote my shares for me?**

**A:**  Your broker, bank or nominee can vote your shares without receiving your instructions on "routine" proposals only. Your broker, bank or nominee cannot vote your shares with respect to "non-routine" proposals unless you provide instructions on how to vote in accordance with the information and procedures provided to you by your broker, bank or nominee.

The Charter Proposal to approve the name of the public company being "HUB Cyber Security (Israel) Ltd." is considered a routine proposal. Accordingly, your broker, bank or nominee may vote your shares with respect to such proposal without receiving voting instructions.

The Business Combination Proposal, each other Charter Proposal and the Adjournment Proposal are non-routine proposals. Accordingly, your broker, bank or nominee may not vote your shares with respect to these proposals unless you provide voting instructions.

**Q:  May I change my vote after I have mailed my signed proxy card?**

**A:**  Yes. Stockholders of record may send a later-dated, signed proxy card to RNER's transfer agent at the address set forth below so that it is received prior to the vote at the special meeting or virtually attend the special meeting and submit a ballot through the web portal during the special meeting webcast. Stockholders of record also may revoke their proxy by sending a notice of revocation to RNER's transfer agent, which must be received prior to the vote at the special meeting. If you hold your shares in "street name," you should contact your broker, bank or nominee to change your instructions on how to vote. If you hold your shares in "street name" and wish to virtually attend the special meeting and vote through the web portal, you must obtain a legal proxy from your broker, bank or nominee.

**Q:  What constitutes a quorum for the special meeting?**

**A:**  A quorum is the minimum number of shares of RNER Common Stock that must be present to hold a valid meeting. A quorum will be present at the RNER special meeting if a majority of the voting power of the issued and outstanding shares of RNER Common Stock entitled to vote at the meeting are represented at the virtual special meeting or by proxy. Abstentions will count as present for the purposes of establishing a quorum, but broker non-votes will not.

**Q:  What stockholder vote thresholds are required for the approval of each proposal brought before the special meeting?**

- **Business Combination Proposal** — The approval of the Business Combination Proposal will require the affirmative vote of the holders of a majority of the issued and outstanding RNER Common Stock. Abstentions will have the same effect as a vote "against" the Business Combination Proposal. Brokers are not entitled to vote on the Business Combination Proposal

xvi

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

absent voting instructions from the beneficial holder and, consequently, broker non-votes will have the same effect as a vote "against" the Business Combination Proposal. Under its Amended and Restated Certificate of Incorporation, RNER will not consummate any Business Combination unless it (or any successor) has net tangible assets of at least $5,000,001 upon consummation of such Business Combination.

- **Charter Proposals** — The approval of each of the Charter Proposals will require the affirmative vote of the holders of a majority of the issued and outstanding RNER Common Stock. Abstentions will have the same effect as a vote "against" the Charter Proposals. The Charter Proposal to approve "HUB Cyber Security (Israel) Ltd." as the name of the new public entity is a routine proposal and, accordingly, your broker, bank or nominee may vote your shares with respect to such proposal without receiving voting instructions. Consequently, there should be no broker non-votes with respect to such proposal. Each of the other Charter Proposals is considered a non-routine proposal, and, accordingly, brokers are not entitled to vote on those proposals without receiving voting instructions, and broker non-votes with respect to such other Charter Proposals will have the same effect as a vote "against" each such proposal.

- **Adjournment Proposal** — The approval of the Adjournment Proposal will require the affirmative vote of the holders of a majority of the shares of RNER Common Stock present and entitled to vote at the special meeting. Abstentions will have the same effect as a vote "against" on the Adjournment Proposal. Broker non-votes will have no effect on the Adjournment Proposal.

**Q: What happens if I fail to take any action with respect to the special meeting?**

**A:** If you fail to take any action with respect to the meeting and the Business Combination is approved by the RNER stockholders and consummated, you will become a shareholder and/or warrant holder of HUB Security.

If you fail to take any action with respect to the special meeting and the Business Combination is not approved, you will continue to be a stockholder and/or warrant holder of RNER, as applicable, and RNER will continue to search for another target business with which to complete an initial business combination. If RNER does not complete an initial business combination by January 7, 2023 (or such later date as may be approved by RNER's stockholders in an amendment to the RNER Charter), RNER must cease all operations except for the purpose of winding up, redeem 100% of the outstanding public shares, at a per-share price, payable in cash, equal to an amount then held in the Trust Account (net of taxes payable and less up to $100,000 of interest to pay dissolution expenses), and as promptly as reasonably possible following such redemption, subject to the approval of RNER's remaining stockholders and its board of directors, dissolve and liquidate.

**Q: What should I do with my share and/or warrant certificates?**

**A:** Warrant holders and those stockholders who do not elect to have their shares of RNER Common Stock redeemed for a pro rata share of the Trust Account should wait for instructions from RNER's transfer agent regarding what to do with their certificates. RNER stockholders who exercise their redemption rights must deliver their share certificates to RNER's transfer agent (either physically or electronically) no later than two (2) business days prior to the special meeting as described above.

Upon consummation of the Transactions, the RNER warrants will be exchanged for HUB Security warrants that will entitle holders to purchase shares of HUB Security. Therefore, warrant holders need not deliver their warrants to RNER or HUB Security at that time.

**Q: What should I do if I receive more than one set of voting materials?**

**A:** Stockholders may receive more than one set of voting materials, including multiple copies of this proxy statement/prospectus and multiple proxy cards or voting instruction cards. For example, if you hold your shares in more than one brokerage account, you will receive a separate voting instruction card for each brokerage account in which you hold shares. If you are a holder of record and your shares are registered in more than one name, you will receive more than one proxy card. Please complete, sign, date

xvii

and return each proxy card and voting instruction card that you receive in order to cast a vote with respect to all of your shares of RNER Common Stock.

**Q:**  **What are the U.S. federal income tax consequences of exercising my redemption rights?**

**A:**  In the event that a U.S. Holder (as defined in "*Certain Material U.S. Federal Income Tax Considerations*") elects to redeem its RNER Common Stock for cash, the treatment of the transaction for U.S. federal income tax purposes will depend on whether the redemption qualifies as sale or exchange of the RNER Common Stock under Section 302 of the Internal Revenue Code (the "Code"). If the redemption qualifies as a sale or exchange of the RNER Common Stock, the U.S. Holder will be treated as recognizing capital gain or loss equal to the difference between the amount realized on the redemption and such U.S. Holder's adjusted tax basis in the RNER Common Stock surrendered in such redemption transaction. Any such capital gain or loss generally will be long-term capital gain or loss if the U.S. Holder's holding period for the RNER Common Stock redeemed exceeds one year. Long-term capital gains recognized by non-corporate U.S. Holders will be eligible to be taxed at reduced rates. It is unclear, however, whether the redemption rights with respect to the RNER Common Stock have suspended the applicable holding period for this purpose. The deductibility of capital losses is subject to limitations. See the section titled "*Certain Material U.S. Federal Income Tax Considerations — Consequences to U.S. Holders Exercising Redemption Rights with Respect to RNER Common Stock.*"

**Q:**  **Will holders of RNER Common Stock or RNER warrants be subject to U.S. federal income tax consequences on the receipt of the Hub Security ordinary shares or Hub Security warrants in the Business Combination?**

**A:**  There are significant factual and legal uncertainties as to (i) whether the Business Combination will qualify as a "reorganization" within the meaning of Section 368(a) of the Code and (ii) whether the Business Combination will result in gain being recognized by U.S. Holders (as defined in "*Certain Material U.S. Federal Income Tax Considerations*") of RNER Common Stock and RNER warrants under Section 367(a) of the Code. Neither RNER nor HUB, nor any of their respective advisors or affiliates, makes any representations or provides any assurances regarding the tax treatment of the Business Combination, including (i) whether the Business Combination will qualify as a "reorganization" within the meaning of Section 368(a) of the Code or (ii) whether the Business Combination will result in gain being recognized by U.S. Holders of RNER Common Stock and RNER warrants under Section 367(a) of the Code. Due to the absence of guidance bearing directly on whether an acquisition of a corporation with no active business can qualify as a "reorganization" under Section 368(a) of the Code, Loeb & Loeb LLP, legal counsel to RNER on U.S. federal income tax matters is not able to render an opinion that the Business Combination will qualify as a "reorganization" under Section 368(a) of the Code. No ruling has been, or will be, sought by RNER or HUB Security from the IRS with respect to the Business Combination and there can be no assurance that the IRS will not challenge the qualification of the Business Combination as a "reorganization" under Section 368(a) of the Code or that a court would not sustain such a challenge. The U.S. federal income tax consequences of the Business Combination are complex and will depend on your particular circumstances. For a description of certain material U.S. federal income tax consequences of the Business Combination, please see "*Certain Material U.S. Federal Income Tax Considerations*" beginning on page 214.

**Q:**  **Who can help answer my questions?**

**A:**  If you have questions about the Business Combination or if you need additional copies of this proxy statement/prospectus or the enclosed proxy card, you should contact the proxy solicitor at:

Advantage Proxy
P.O. Box 13581
Des Moines, WA 98198
Toll Free: 877-870-8565
Collect: 206-870-8565
Email: KSmith@advantageproxy.com

xviii

th

You may also obtain additional information about RNER from documents filed with the SEC by following the instructions in the section entitled "*Where You Can Find More Information*." If you are a holder of public shares and you intend to seek redemption of your shares, you will need to deliver your shares (either physically or electronically) to RNER's transfer agent at the address below at least two (2) business days prior to the vote at the special meeting. If you have questions regarding the certification of your position or delivery of your stock, please contact:

American Stock Transfer & Trust Company, LLC
6201 15th Avenue
Brooklyn, New York 11219
Attn: SPAC SUPPORT TEAM
Email: SPACSUPPORT@ASTFINANCIAL.COM

xix

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

tm2223104-17_424b3 - none - 138.6881299s

**SUMMARY**

*This summary highlights selected information from this proxy statement/prospectus. It may not contain all of the information that is important to you. You should carefully read the entire proxy statement/prospectus and the other documents referred to in this proxy statement/prospectus, including the annexes, to fully understand the Business Combination Agreement, the Business Combination and the other matters being considered at the special meeting of RNER's stockholders. For additional information, see "Where You Can Find More Information" beginning on page 258. Each item in this summary refers to the page of this proxy statement/prospectus on which that subject is discussed in more detail.*

**The Parties to the Business Combination**

*HUB Cyber Security (Israel) Ltd.*

HUB Security specializes in unique cyber security solutions protecting sensitive commercial and government information. HUB Security was established in 2017 by veterans of the 8200 and 81 elite intelligence units of the Israeli Defense Forces. HUB Security has debuted an advanced encrypted computing solution aimed at preventing hostile intrusions at the hardware level while introducing a novel set of data theft prevention solutions.

The mailing address of HUB Security's principal executive office is 17 Rothschild St., Tel Aviv, Israel.

*Mount Rainier Acquisition Corp.*

RNER was formed for the purpose of effectuating a merger, share exchange, asset acquisition, stock purchase, reorganization or other similar business combination with one or more businesses. RNER was incorporated under the laws of the State of Delaware on February 10, 2021.

On October 7, 2021, RNER consummated the RNER IPO of 17,250,000 units, including 2,250,000 units issued pursuant to the full exercise of the underwriters' over-allotment option, with each unit ("RNER unit") consisting of one share of common stock, par value $0.0001 per share ("RNER common stock" and each share of RNER Common Stock, "RNER share") and one redeemable warrant (each, a "RNER warrant"), with each whole warrant entitling the holder to purchase three-fourths of a RNER share at a price of $11.50 per whole share commencing on the later of 30 days after the consummation of an initial business combination or 12 months from the closing of the RNER IPO. Simultaneously with the closing of the RNER IPO, RNER consummated the sale of 596,200 private placement units at a price of $10.00 per unit in a private placement to the Sponsor and RNER's CEO and CFO.

RNER units, RNER common stock and the RNER warrants are listed on Nasdaq under the symbols RNERU, RNER and RNERW, respectively.

The mailing address of RNER's principal executive office is 256 W. 38th Street, 15th Floor, New York, NY 10018, and its telephone number is (212) 785-4680.

*Rover Merger Sub, Inc.*

Rover Merger Sub, Inc. ("Merger Sub") is a newly formed Delaware corporation and a wholly owned, direct subsidiary of HUB Security. Merger Sub was formed solely for the purpose of effecting the Transactions and has not carried on any activities other than those in connection with the Transactions. The address and telephone number for Merger Sub's principal executive offices are the same as those for HUB Security.

**The Business Combination Agreement (page 104)**

The terms and conditions of the merger of Merger Sub with and into RNER, with RNER surviving the merger as a wholly owned subsidiary of HUB Security (the "Business Combination") are contained in the Business Combination Agreement, which is attached as Annex A to this proxy statement/prospectus. We encourage you to read the Business Combination Agreement carefully in its entirety, as it is the legal document that governs the Business Combination.

1

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

TABLE OF CONTENTS

*Merger Consideration*

Prior to the consummation of the Transactions (the "Effective Time"), HUB Security intends to effect a reverse stock split to cause the value of the outstanding HUB Security ordinary shares immediately prior to the Effective Time to equal $10.00 per share (the "Stock Split"). The consideration to be issued to securityholders of RNER will be adjusted if the Stock Split is not effected or if the Stock Split results in a price per HUB Security ordinary share other than $10.00.

The pro forma enterprise valuation of the Company upon consummation of the Transactions is estimated to be approximately $1,280,000,000. We estimate that, at the Effective Time, assuming none of RNER's public stockholders demand redemption (the "RNER Stockholder Redemptions") pursuant to RNER's amended and restated certificate of incorporation (the "RNER Charter"), the securityholders of HUB Security will own approximately 75.1% of the outstanding HUB Security ordinary shares and the securityholders of RNER and the investors purchasing PIPE Shares will own the remaining HUB Security ordinary shares. We estimate that, at the Effective Time, assuming the maximum number of RNER's public stockholders demand redemption of their public shares pursuant to the RNER Charter, the securityholders of HUB Security will own approximately 90.9% of the outstanding HUB Security ordinary shares, and the securityholders of RNER and the investors purchasing PIPE Shares will own the remaining HUB Security ordinary shares.

Pursuant to the Business Combination Agreement and assuming the Stock Split has occurred, at the Effective Time, (a) each RNER Unit issued and outstanding immediately prior to the Effective Time will be automatically detached and the holder of each such RNER Unit will be deemed to hold one RNER share and one RNER warrant, (b) each RNER share issued and outstanding immediately prior to the Effective Time will be automatically converted into a number of HUB Security ordinary shares equal to the quotient of (i) an aggregate number of HUB Security ordinary shares equal to the amount obtained by *dividing* (A) $221,582,000 *less* the amounts payable to the RNER stockholders pursuant to the RNER Stockholder Redemptions *by* (B) $10.00 *divided by* (ii) the aggregate number of RNER shares issued and outstanding immediately prior to the Effective Time, after taking into account of the RNER Stockholder Redemptions (the "Per Share Consideration"), and (c) each RNER warrant issued and outstanding immediately prior to the Effective Time will be assumed by HUB Security and will become a warrant of HUB Security (each, a "HUB Security warrant"), with the number of HUB Security ordinary shares underlying the HUB Security warrants and the exercise price of such HUB Security warrants subject to adjustment in accordance with the Business Combination Agreement and in the event of a stock split, share dividend or distribution, or any change in HUB Security's share capital by reason of any split-up reverse stock split, recapitalization, combination, reclassification, exchange of shares or other similar transaction with respect to HUB Security ordinary shares subsequent to the Effective Time.

No fractional shares will be issued pursuant to the Business Combination Agreement. All fractions of HUB Security ordinary shares that otherwise would be issued under the Business Combination Agreement will be aggregated and the resulting fraction of a HUB Security ordinary share will be rounded up to a whole share.

**Agreements Entered Into in Connection with the Business Combination Agreement (page 115)**

*Subscription Agreements*

Concurrently with the execution of the Business Combination Agreement, HUB Security entered into subscription agreements (each, a "Subscription Agreement" and collectively, the "Subscription Agreements") with certain parties subscribing for HUB Security ordinary shares (the "PIPE Investors"), pursuant to which the PIPE Investors have agreed to purchase, and HUB Security has agreed to sell to the PIPE Investors, an aggregate of 5,000,000 HUB Security ordinary shares, at a purchase price of $10.00 per share, for an aggregate purchase price of $50,000,000, which price per share and aggregate purchase price assume that HUB Security has effected the Stock Split prior to the Effective Time. The obligations to consummate the transactions contemplated by the Subscription Agreements are conditioned upon, among other things, the consummation of the transactions contemplated by the Business Combination Agreement.

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

The Subscription Agreements provide for the sale of HUB Security ordinary shares rather than RNER shares because the issued and outstanding RNER shares will be exchanged for HUB Security ordinary shares at the closing of the Business Combination. There are important differences between the rights of holders of RNER shares and holders of HUB Security ordinary shares. See "*Comparison of Rights of HUB Security Shareholders and RNER Stockholders*" for a discussion of the different rights associated with holding HUB Security securities. In addition, each RNER share was originally sold in the RNER IPO as a component of the RNER units for $10.00 per unit. The RNER units consist of one RNER share and one RNER warrant. As of December 8, 2022, the closing price on Nasdaq of the RNER units was $10.20 per unit and the closing price of RNER shares was $10.28 per share. The purchase price of $10.00 per ordinary share to the PIPE Investors reflects the expected price of the HUB Security ordinary shares after giving effect to the Stock Split. None of the Sponsor or RNER's officers, directors or their affiliates is a PIPE Investor.

The Subscription Agreements provide that HUB Security is required to file with the SEC, within forty-five (45) calendar days (the "Subscription Filing Deadline") after the closing of the Transactions (the "Closing"), a registration statement registering the resale of the shares of HUB Security ordinary shares to be issued to any such investor and to use its commercially reasonable efforts to have such registration statement declared effective as soon as practicable after the filing thereof, but no later than the earlier of (i) the 90th calendar day (or 120th calendar day if the SEC notifies HUB Security that it will "review" such registration statement) after the filing of the registration statement and (ii) the 10th business day after the date HUB Security is notified (orally or in writing, whichever is earlier) by the SEC that such registration statement will not be "reviewed" or will not be subject to further review.

### Support Agreements

Concurrently with the execution of the Business Combination Agreement, HUB Security and RNER entered into a support agreement (each, a "Support Agreement" and collectively, the "Support Agreements") with certain shareholders of HUB Security (each, a "Supporting HUB Security Shareholder" and collectively, the "Supporting HUB Security Shareholders") that collectively hold HUB Security ordinary shares representing approximately 22.2% of the voting power of the HUB Security ordinary shares. Each Support Agreement provides, among other things, that each Supporting HUB Security Shareholder will (i) vote all HUB Security ordinary shares beneficially owned by such Shareholder in favor of the Business Combination and each other proposal related to the Business Combination on the agenda at the meeting of HUB Security shareholders called to approve the Business Combination, (ii) appear at such shareholder meeting for the purpose of establishing a quorum, (iii) vote all such shares against any action that would reasonably be expected to impede, interfere with, delay, postpone, or adversely affect the Transactions and (iv) not transfer, assign, or sell such shares, except to certain permitted transferees, prior to the consummation of the Transactions.

### Registration Rights Agreement

Concurrently with the execution of the Business Combination Agreement, HUB Security, certain equityholders of RNER and certain equityholders of HUB Security, entered into a registration rights agreement (the "Registration Rights Agreement"), pursuant to which HUB Security agreed to file a shelf registration statement with respect to the registrable securities defined therein within forty-five (45) calendar days of the Closing Date. Pursuant to the Registration Rights Agreement, certain HUB Security equityholders of registrable securities may collectively request to sell all or any portion of their registrable securities in an underwritten offering up to four (4) times in any 12-month period and certain former RNER holders of registrable securities may collectively request to sell all or any portion of their registrable securities in an underwritten offering up to two (2) times in any 12-month period, in each case, so long as the total offering price is reasonably expected to exceed $25,000,000; provided, however, that such HUB Security equityholders and such former RNER holders may not collectively request more than two (2) underwritten shelf takedowns in any 12-month period. HUB Security also agreed to provide customary "piggyback" registration rights. The Registration Rights Agreement also provides that HUB Security will pay certain expenses relating to such registrations and indemnify the shareholders against certain liabilities.

### Amended and Restated Warrant Agreement

Upon the closing of the Business Combination, Hub, RNER and American Stock Transfer & Trust Company, LLC ("AST") will enter into an amended and restated warrant agreement (the "Amended and

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

Restated Warrant Agreement"). Such agreement will amend and restate that certain Warrant Agreement, dated as of October 4, 2021, by and between RNER and AST (the "Existing Warrant Agreement"), to provide for the assignment by RNER of all its rights, title and interest in the outstanding warrants of RNER to HUB Security. Pursuant to the Amended and Restated Warrant Agreement, all RNER warrants under the Existing Warrant Agreement will no longer be exercisable for RNER shares, but instead will be exercisable for HUB Security ordinary shares.

### Sponsor Support Agreement

Concurrently with the execution of the Business Combination Agreement, the Sponsor and each of the holders of RNER shares issued prior to the initial public offering of RNER entered into a sponsor support agreement (the "Sponsor Support Agreement") in favor of HUB Security and RNER, pursuant to which they agreed to (a) vote all RNER shares beneficially owned by them in favor of the Business Combination and each other proposal related to the Business Combination on the agenda at the meeting of RNER stockholders called to approve the Business Combination, (b) appear at such stockholder meeting for the purpose of establishing a quorum, (c) vote all such shares against any action that would reasonably be expected to impede, interfere with, delay, postpone, or adversely affect the Transactions and (d) not transfer, assign, or sell such shares, except to certain permitted transferees, prior to the consummation of the Transactions. The Sponsor and the other holders of RNER shares party to the Sponsor Support Agreement beneficially own and are entitled to vote an aggregate of approximately 4,908,700 RNER shares, or approximately 22.2% of the outstanding RNER shares. In addition to the RNER shares held by the Sponsor and the other holders of RNER shares party to the Sponsor Support Agreement, RNER would (i) need 6,170,651 shares, or approximately 35.8%, of the 17,250,000 public shares to be voted in favor of the Business Combination Proposal and other proposals in order for them to be approved (assuming all outstanding shares are voted on each proposal).

The holders of RNER shares issued prior to the initial public offering of RNER, agreed not to transfer their Covered Shares (as defined in the Sponsor Support Agreement) for a period of nine (9) months after the Closing Date and not to transfer their Company warrants (or any Company ordinary shares issued or issuable upon the exercise of the Company warrants) during the 30 days after the closing date of the Business Combination Agreement (the "Closing Date"), and (c) forfeit, for no consideration, on a pro rata basis, an aggregate amount of Company ordinary shares issuable in respect of such holders' SPAC shares pursuant to the Business Combination Agreement equal to the aggregate amount by which the Unpaid SPAC Liabilities and Unpaid SPAC Expenses (as defined in the Sponsor Support Agreement) collectively exceed $10,000,000 without the prior written consent of the Company. The lock-up provisions do not apply to: (1) transfers or distributions to Stockholder's current or former general or limited partners, managers or members, stockholders, other equity holders or direct or indirect affiliates, or to the estates of any of the foregoing; (2) transfers by bona fide gift to a member of Stockholder's immediate family or to a trust, the beneficiary of which is Stockholder or a member of Stockholder's immediate family for estate planning purposes; (3) by virtue of the laws of descent and distribution upon death of Stockholder; (4) pursuant to a qualified domestic relations order, in each case where any permitted transferee enters into a written agreement with the Company agreeing to be bound by the transfer restrictions and other restrictions contained in the Sponsor Support Agreement, or (5) transfers pursuant to certain put and call agreements entered into by and between the Stockholders, the Company and certain other parties. Also, all Covered Shares will be released from the lock-up restrictions upon the consummation of a Change of Control after the Closing Date.

### Put and Call Option Agreement

Concurrently with the execution of the Business Combination Agreement, HUB Security and each of the holders of RNER shares issued prior to the initial public offering of RNER entered into a put and call option agreement, as amended, (the "Put and Call Option Agreement"), pursuant to which, in the event it is determined by HUB Security or the IRS pursuant to the terms set forth in the Put and Call Agreement that the Business Combination does not qualify for the Intended Tax Treatment (as defined in the Business Combination Agreement) or Treasury Regulations Section 1.367(a)-3(c)(1), such RNER stockholders would have the right (the "Put Right") to cause HUB Security to purchase, or, in the event such RNER stockholders have elected not to exercise all or a portion of the Put Right, HUB Security shall have the

4

tm2223104-17_424b3 - none - 138.6881299s

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

TABLE OF CONTENTS

right (the "Call Right") to cause such RNER stockholders to sell, all or a portion of certain of the HUB Security ordinary shares held by such RNER stockholders, following the exercise of the Put Right or Call Right, as applicable, and in each case pursuant and subject to the terms set forth in the Put and Call Option Agreement. For the avoidance of doubt, the Initial Stockholders (as defined below) of RNER are the sole beneficiaries of the Put and Call Option Agreement and will derive all of its benefits.

Loeb & Loeb LLP is not serving as tax counsel to the sponsor and founding stockholders of RNER ("Initial Stockholders"), and, as such, is not providing tax advice with respect to the tax consequences of the Business Combination to the Initial Stockholders. However, in the event the Business Combination does not qualify as a "reorganization" within the meaning of Section 368(a) of the Code or is taxable under Section 367(a) of the Code, RNER stockholders that are U.S. Holders (as defined in "*Certain Material U.S. Federal Income Tax Considerations*") that exchange their RNER shares for the consideration under the Business Combination would generally be expected to recognize gain or, except if the Business Combination qualifies as a "reorganization" but is taxable under Section 367(a) of the Code, loss, in an amount equal to the difference, if any, between the fair market value (as of the Closing Date) of HUB Security ordinary shares received in the Business Combination and such stockholder's aggregate tax basis in the corresponding RNER shares exchanged by such stockholder in the Business Combination. While the public RNER stockholders purchased units in RNER's initial public offering at $10 per unit, with each unit consisting of one share of RNER common stock and one warrant to purchase three-fourths of one share of common stock, the Initial Stockholders acquired 4,312,500 shares common stock of RNER for approximately $0.006 per share for their RNER shares. Accordingly, the Initial Stockholders are expected to have a significantly lower tax basis in their RNER shares than the RNER stockholders that are not Initial Stockholders and, as a result, potentially a significantly higher U.S. federal, state and local income tax liability in the event the Business Combination does not qualify as a "reorganization" within the meaning of Section 368(a) of the Code or is taxable under Section 367(a) of the Code. Further, the Initial Stockholders are unable to redeem their shares in connection with the Business Combination. For a more detailed description of certain material U.S. federal income tax consequences of the Business Combination, please see "*Certain Material U.S. Federal Income Tax Considerations*" beginning on page 214.

The HUB Security ordinary shares received in the Business Combination and owned by the Initial Stockholders are subject to a lockup for 9 months from the consummation of the Business Combination and are unable to be sold by the Initial Stockholders to satisfy any tax obligations of the Initial Stockholders during that period. In addition, due to the large number of RNER shares owned by the Initial Stockholders, it is unlikely that such shareholders would be able to sell a sufficient number of shares in the open market to offset the potential U.S. federal, state or local income tax on gain recognized in the exchange described above without negatively impacting the trading price of the HUB Security ordinary shares. Due to the lockup and in order to enable the Initial Stockholders to satisfy certain potential U.S. federal state or local income tax obligations without selling a significant number of HUB Security ordinary shares in the open market, HUB Security agreed to enter into the Put and Call Option Agreement with the Initial Stockholders.

Pursuant to the terms of the Put and Call Option Agreement, HUB Security may be required to purchase all or a portion of the HUB Security ordinary shares received by the Initial Stockholders in the Business Combination and held by the Initial Stockholders in an amount of consideration up to $15 million to cover their potential U.S. federal, state and local income tax liability. The purchase price per share is the lowest of (i) $10, (ii) the per-share redemption price that a public stockholder would receive if such stockholder chose to redeem a RNER share in connection with the Business Combination and (iii) the closing price of HUB Security's ordinary shares on the day after the consummation of the Business Combination Agreement. In addition, in consideration of the fact that HUB Security agreed to repurchase such HUB Security ordinary shares, pursuant to the terms of the Put and Call Option Agreement, in the event that the Initial Stockholders have the right and do not elect to exercise the option to cause HUB Security to repurchase such HUB Security ordinary shares, HUB Security may have the option to elect to purchase such HUB Security ordinary shares.

To ensure HUB Security's compliance with its obligations under the Put and Call Option Agreement, HUB Security covenanted to keep $15 million of cash on its balance sheet until the expiration of its obligations pursuant to the Put and Call Option Agreement. Such $15 million in cash is a material portion of the total amount of capital that HUB Security will raise through the Business Combination. HUB Security's

5

expenditure of all or part of such sum in the event it must purchase shares from the Indemnitees may negatively affect HUB Security's ability to achieve its business development goals and may have an adverse effect on HUB Security's financial results and, as a result, could negatively impact HUB Security's stock price.

**The Charter Proposals**

The RNER stockholders will vote on separate proposals to approve the following material differences between the RNER Charter and the HUB Security Articles to be effective upon the consummation of the Business Combination: (i) the name of the new public entity will be "HUB Cyber Security (Israel) Ltd." as opposed to "Mount Rainier Acquisition Corp."; (ii) HUB Security's corporate existence is perpetual as opposed to RNER's corporate existence terminating if a business combination is not consummated within a specified period of time; and (iii) the HUB Security Articles do not include the various provisions applicable only to special purpose acquisition corporations that the RNER Charter contains. The HUB Security Articles to be in effect upon consummation of the Business Combination is attached as Annex B to this proxy statement/prospectus. See the section of this proxy statement/prospectus titled "*Proposal Two — The Charter Proposals*."

**The Adjournment Proposal**

If RNER is unable to consummate the Business Combination at the time of the special meeting for any reason, the chairman presiding over the special meeting may submit a proposal to adjourn the special meeting to a later date or dates, if necessary. See the section of this proxy statement/prospectus titled "*Proposal Four — The Adjournment Proposal*."

**Date, Time and Place of Special Meeting of RNER's Stockholders**

The special meeting will be held at 10:00 a.m., Eastern time, on December 30, 2022, via live webcast at https://web.lumiagm.com/297859227, or such other date, time and place to which such meeting may be adjourned, to consider and vote upon the proposals.

**Special Meeting of RNER Stockholders — Record Date; Persons Entitled to Vote**

RNER stockholders will be entitled to vote or direct votes to be cast at the special meeting if they owned common stock at the close of business on November 18, 2022, which is the record date for the special meeting. RNER stockholders will have one vote for each share of common stock owned at the close of business on the record date. If your shares are held in "street name" or are in a margin or similar account, you should contact your broker to ensure that votes related to the shares you beneficially own are properly counted. RNER warrants do not have voting rights. On the record date, there were 22,158,700 shares of common stock outstanding, of which 17,250,000 were public shares with the rest being held by the initial stockholders and their respective affiliates (including the Sponsor).

**Special Meeting of RNER Stockholders — Redemption Rights**

Pursuant to the RNER Charter, a holder of public shares may demand that RNER redeem such shares for cash if the Business Combination is consummated; provided that RNER may not consummate the Business Combination if it (or any successor) has net tangible assets of at least $5,000,001 upon consummation of such Business Combination. Holders of public shares will be entitled to receive cash for these shares only if they deliver their shares to RNER's transfer agent no later than two (2) business days prior to the special meeting. Holders of public shares do not need to affirmatively vote on the Business Combination Proposal or be a holder of such public shares as of the record date to exercise redemption rights. If the Business Combination is not consummated, these shares will not be redeemed for cash. If a holder of public shares properly demands redemption, delivers his, her or its shares to RNER's transfer agent as described above, and the Business Combination is consummated, RNER will redeem each public share for a pro rata portion of the Trust Account, calculated as of two (2) business days prior to the date of the special meeting. It is anticipated that this would amount to approximately $10.26 per share, based on the amounts held in the Trust Account as of the record date, after deducting unpaid income and franchise tax obligations. If a holder of public shares exercises his, her or its redemption rights, then such holder will be exchanging his, her or its shares of RNER common stock for cash and will not become a shareholder of

6

tm2223104-17_424b3 - none - 138.6881299s

TABLE OF CONTENTS

HUB Security. See the section of this proxy statement/prospectus titled "*Special Meeting of RNER Stockholders — Redemption Rights*" for a detailed description of the procedures to be followed if you wish to redeem your shares into cash.

RNER warrant holders do not have redemption rights with respect to such securities.

**Appraisal Rights**

RNER stockholders and RNER warrant holders do not have appraisal rights in connection with the Transactions under the DGCL. See the section of this proxy statement/prospectus titled "*Special Meeting of RNER Stockholders — Appraisal Rights*."

**RNER's Board of Directors' Reasons for the Business Combination**

In evaluating the Business Combination, RNER's board of directors reviewed a number of materials, including the transaction documentation, certain due diligence summary materials prepared by RNER's management and advisors, investor presentations, and various industry and financial data and consulted with RNER's management, legal, financial, and other advisors. The advisors had full access to all of the materials provided to RNER and advised the board of directors on the opportunity and risks of the Business Combination.

In light of the number and wide variety of factors considered in connection with its evaluation of the Business Combination, the RNER's board of directors did not consider it practicable to, and did not attempt to, quantify or otherwise assign relative weights to the specific factors that it considered in reaching its determination and supporting its decision to approve the Business Combination. The RNER's board of directors viewed its decision as being based on all of the information available and the factors presented to and considered by it. In addition, individual directors may have given different weight to different factors. This explanation of the RNER's board of directors' reasons for the Business Combination and all other information presented in this section is forward-looking in nature and, therefore, should be read in light of the factors discussed under "*Cautionary Statement Regarding Forward-Looking Statements; Market, Ranking and Other Industry Data*."

The officers and directors of RNER have substantial experience in evaluating the operating and financial merits of companies within the cybersecurity sector and concluded that their experience and background and sector expertise enabled them to make the necessary analyses and determinations regarding the Business Combination. In addition, RNER's officers and directors have substantial experience with mergers and acquisitions across a variety of sectors in the cybersecurity industry.

In evaluating the Business Combination, the RNER's board of directors considered the criteria and guidelines to evaluate prospective business opportunities set by the RNER's management team in the RNER IPO prospectus and has determined that HUB Security meets all of these criteria. Specifically, the RNER's board of directors noted, among others, that:

- *Established Business.* HUB Security is an established business, with established products, client base, and revenue stream.

- *Business with Growth Potential.* HUB Security is cash positive with a range of new products providing significant growth potential.

- *Established Leadership Team.* HUB Security has an established leadership team and a desire to on board new senior talent to better execute against the growth plan. Since the Business Combination Agreement was signed, HUB Security has appointed two very strong candidates to the Chairman and CFO positions.

- *Need to improve Security Measures.* Cyber security threats are increasing and organizations are aware of the need to improve security measures and increase spend to counter such threats.

- *Technology Leadership.* HUB Security has technology leadership in cyber security with a team recruited from the elite Unit 8200 and Unit 81 of the Israeli Defense Forces, a globally recognized leader in the field. The team's competence was further confirmed in interviews conducted by cyber security consultant Northcliffe Consulting, commissioned by RNER as part of the due diligence.

7

https://www.sec.gov/Archives/edgar/data/1905660/000110465922185805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

- *Loyal Client Base.*  HUB Security has good relations with a loyal client base, confirmed by client interviews conducted by RNER as part of the due diligence.

- *Strong Potential for M&A.*  HUB Security has a strong potential for M&A in Europe and the US with the prospect of helping to drive new cyber security solutions, customer acquisition, top line growth and adjusted EBITDA.

- *Long-Term Intrinsic Value Potential*.  Because of the abovementioned factors, among others, the RNER Board believes that HUB Security has attractive long term intrinsic value potential because of its growth potential, the importance of network cyber security, the ineffectiveness of the traditional cyber security solutions and HUB Security's advanced technology.

- *Redemption rights*.  If the Business Combination closes, holders of RNER Common Stock may have all or any portion of their shares redeemed for cash, regardless of whether they vote for or against the Business Combination Proposal. This redemption option will allow each holder of RNER Common Stock to choose whether or not to invest in HUB Security. If the Business Combination fails to close, this redemption option will not be available until RNER finds and closes an alternative transaction in the future, which could take substantial time and may never occur. Given the state of the market, there are a more limited number of targets available for special purpose acquisition companies (each a "SPAC"), and it will be more difficult for RNER to identify and close an alternative transaction

- *Attractive valuation that can provide attractive returns for public investors*.  The board of directors believes that HUB Security's valuation is attractive relative to comparable publicly traded companies. Moreover, the valuation is supported by investors that have subscribed to the PIPE.

- *HUB Security would benefit from our team's expertise*.  The RNER team's continued involvement in HUB Security as shareholders, as well as Mr. Kearney's involvement as a board member, following the Business Combination and their diverse experience in cybersecurity work, research, technology development and operations management can add substantial value to accelerate HUB Security's research and development and commercialization efforts.

RNER's board of directors also considered a variety of uncertainties and risks and other potentially negative factors concerning the Business Combination, including, but not limited to, the following:

- *Future Financial Performance*.  The risk that future financial performance may not meet RNER's expectations due to factors in our control or out of our control, including due to economic cycles or other macroeconomic factors.

- *Potential for Benefits not Achieved.*  The risk that the potential benefits of the Business Combination, including HUB's future value-creation strategies and identified cost savings or revenue opportunities, may not be fully achieved, or may not be achieved within the expected timeframe.

- *Macroeconomic Risks and Uncertainty*.  Macroeconomic and geo-political risks could prohibit HUB Security from achieving the full benefits of the proposed Business Combination.

- *Regulatory changes*.  Regulatory changes or actions of certain geographical locations may restrict the use of digital assets or the operation of digital asset networks in a manner that may require HUB to cease certain or all operations, which could have a material adverse effect on its business, financial condition, operations and growth prospects.

- *Public company experience*.  Most of HUB's management has limited experience in operating a public company. The public company requirements may strain HUB's resources and divert management's attention.

- *Fees and expenses.*  The legal, accounting, advisory and compliance expenses associated with completing the Business Combination may exceed HUB's expectations.

- *Redemption Risk*.  The potential that a significant number of RNER stockholders elect to redeem their shares prior to the consummation of the Business Combination and pursuant to RNER's existing charter, which would potentially make the Business Combination more difficult or impossible to complete.

8

- **Stockholder Vote**.   The risk that RNER's stockholders may fail to provide the respective votes necessary to effect the Business Combination.

- **Closing Conditions**.   The fact that completion of the Business Combination is conditioned on the satisfaction of certain closing conditions that are not within the RNER's control.

- **Litigation**.   The possibility of litigation challenging the Business Combination or that an adverse judgment granting permanent injunctive relief could indefinitely enjoin consummation of the Business Combination.

In addition to considering the factors described above, RNER's board of directors also considered other factors including, without limitation:

- **Interests of Certain Persons**.   Some officers and directors of RNER may have interests in the Business Combination. See the section titled "*Proposal One — The Business Combination Proposal — Interests of Certain Persons in the Business Combination*" beginning on page 96 of this proxy statement/prospectus; and

- **Other Risks**.   Various other risks associated with HUB Security's business, as described in the section entitled "Risk Factors" appearing elsewhere in this proxy statement/prospectus.

RNER's board of directors concluded that the potential benefits that it expected RNER and its stockholders to achieve as a result of the Business Combination outweighed the potentially negative factors associated with the Business Combination. Accordingly, RNER's board of directors determined that the Business Combination Agreement and the Business Combination contemplated therein were advisable, fair to and in the best interests of RNER and its stockholders.

### Interests of RNER's Directors and Officers in the Business Combination

In considering the recommendation of RNER's board of directors to vote in favor of the Business Combination Proposal and the Charter Proposals, stockholders should keep in mind that the Sponsor and RNER's directors and executive officers have interests in such proposals that are different from, or in addition to, those of RNER's stockholders generally. In particular:

- If the Business Combination with HUB Security or another business combination is not consummated by January 7, 2023 (or such later date as may be approved by RNER's stockholders in an amendment to the RNER Charter), RNER will cease all operations except for the purpose of winding up, redeeming 100% of the outstanding public shares for cash and, subject to the approval of its remaining stockholders and board of directors, dissolving and liquidating. In such event, the 4,312,500 Founder Shares held by the Sponsor, which were acquired for an aggregate purchase price of $25,000 prior to the RNER IPO, would be worthless because the holders are not entitled to participate in any redemption or distribution with respect to such shares. Such shares had an aggregate market value of approximately $44.3 million based upon the closing price of $10.28 per share on Nasdaq on December 8, 2022 (assuming no shares are forfeited pursuant to the Sponsor Support Agreement). On the other hand, if the Business Combination is consummated, each outstanding share of RNER Common Stock (other than the shares forfeited pursuant to the Sponsor Support Agreement) will be converted into one HUB Security ordinary share. In the aggregate, the 4,312,500 Founder Shares will be exchanged for 4,312,403 HUB Security ordinary shares.

- The Sponsor, as well as RNER's CEO and CFO, purchased an aggregate of 596,200 private placement units from RNER for $10.00 per unit. This purchase took place on a private placement basis simultaneously with the consummation of the RNER IPO. Nearly all of the proceeds RNER received from these purchases were placed in the Trust Account. Such private placement units had an aggregate market value of approximately $6.1 million based upon the closing price of $10.20 per unit on Nasdaq on December 8, 2022. The private placement units are each composed of one share of RNER common stock and one RNER warrant. The shares of RNER Common Stock and RNER warrants underlying the private placement units will become worthless if RNER does not consummate a business combination by January 7, 2023 (or such later date as may be approved by RNER's stockholders in an amendment to the RNER Charter). On the other hand, if the Business Combination is consummated, each share of RNER Common Stock will be converted into one HUB

9

TABLE OF CONTENTS

Security ordinary share and each outstanding private placement warrant (other than the warrants forfeited pursuant to the Sponsor Support Agreement) will be exchanged for one warrant of HUB Security, assuming that the Stock Split has been effected.

- If RNER is unable to complete a business combination within the required time period under the RNER Charter, the Sponsor will be liable under certain circumstances described herein to ensure that the proceeds in the Trust Account are not reduced by the claims of target businesses or claims of vendors or other entities that are owed money by RNER for services rendered or contracted for or products sold to RNER. If RNER consummates a business combination, on the other hand, RNER will be liable for all such claims.

- The Sponsor and RNER's officers and directors and their affiliates are entitled to reimbursement of activities on RNER's behalf, such as identifying and investigating possible business targets and business combinations. However, if RNER fails to consummate a business combination within the required time period under the RNER Charter, they will not have any claim against the Trust Account for reimbursement. Accordingly, RNER may not be able to reimburse these expenses if the Business Combination or another business combination is not completed by January 7, 2023 (or such later date as may be approved by RNER's stockholders in an amendment to the RNER Charter). As of the record date, the Sponsor and RNER's officers and directors and their affiliates had incurred approximately $136,000 of unpaid reimbursable expenses.

- The Sponsor will benefit from the completion of a business combination and may be incentivized to complete an acquisition of a less favorable target company or on terms less favorable to public stockholders rather than liquidate,

- Based on the difference in the purchase price of $0.006 that the Sponsor paid for the 4,312,500 Founder Shares for an aggregate purchase price of $25,000, as compared to the purchase price of $10.00 per Public Unit sold in the IPO, the Sponsor may earn a positive rate of return even if the share price of the Combined Company after the Closing falls below the price initially paid for the Units in the RNER IPO and the Public Shareholders experience a negative rate of return following the Closing of the Business Combination.

- In the event that a business combination is not effected, the Sponsor will not be entitled to any reimbursement of funds invested in RNER. In total, the Sponsor has invested $5,987,000 for securities that would be worthless absent the completion of a business combination.

- The Business Combination Agreement provides for the continued indemnification of RNER's current directors and officers and the continuation of directors and officers liability insurance covering RNER's current directors and officers.

- RNER's Sponsor, officers and directors (or their affiliates) may make loans from time to time to RNER to fund certain capital requirements. On March 12, 2021, the Sponsor agreed to loan RNER an aggregate of up to $975,000 to cover expenses related to the RNER IPO pursuant to a promissory note that was repaid in full upon the completion of the RNER IPO. On October 26, 2022, the Sponsor agreed to loan RNER up to an aggregate total of $300,000 to be used for working capital. Additional loans may be made after the date of this proxy statement/prospectus. If the Business Combination is not consummated, the loans will not be repaid and will be forgiven except to the extent there are funds available to RNER outside of the Trust Account.

- Matthew Kearney, RNER's chairman and CEO will be a member of the board of directors of HUB Security following the closing of the Business Combination and, therefore, in the future Mr. Kearney will receive any cash fees, stock options or stock awards that HUB Security's board of directors determines to pay to its non-executive directors.

- Each of RNER's directors and officers presently has fiduciary or contractual obligations to other entities pursuant to which such officer or director is required to present a business combination opportunity to such entity. RNER's directors and officers also may have become aware of business combination opportunities which may have been appropriate for presentation to RNER and the other entities to which they owe certain fiduciary or contractual duties. Accordingly, they may have had conflicts of interest in determining to which entity a particular business opportunity should have been

10

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

TABLE OF CONTENTS

presented. These conflicts may not have been resolved in RNER's favor and such potential business combination opportunities may have been presented to other entities prior to their presentation to RNER. RNER's Amended and Restated Certificate of Incorporation provides that, to the extent permitted by applicable law, RNER renounces any interest or expectancy in, or in being offered an opportunity to participate in, any potential transaction or matter (i) which may be a business combination opportunity for an entity related to a director or officer of RNER, on the one hand, and RNER, on the other, or (ii) the presentation of which would breach an existing legal obligation of a director or officer to another entity, and RNER waives any claim or cause of action it may have in respect thereof. RNER does not believe, however, that the fiduciary duties or contractual obligations of its officers or directors or waiver of corporate opportunity materially affected its search for an acquisition target nor will materially impact its ability to complete the proposed Business Combination.

**Recommendation of the RNER Board**

RNER's board of directors has determined that each of the proposals outlined above is in the best interests of RNER and its stockholders and recommended that RNER stockholders vote "FOR" the Business Combination Proposal, "FOR" each of the Charter Proposals and "FOR" the Adjournment Proposal, if presented.

**Certain Material U.S. Federal Income Tax Considerations (page 205)**

For a description of certain material U.S. federal income tax consequences of the Business Combination, the exercise of redemption rights in respect of shares of RNER common stock and the ownership and disposition of HUB Security ordinary shares and/or HUB Security warrants, please see "*Certain Material U.S. Federal Income Tax Considerations*" beginning on page 205.

**Certain Material Israeli Tax Considerations (page 221)**

For a description of certain material Israeli tax consequences of the ownership and disposition of HUB Security ordinary shares and/or HUB Security warrants, please see "*Certain Material Israeli Tax Considerations*" beginning on page 221.

**Anticipated Accounting Treatment**

The Transactions are comprised of a series of transactions pursuant to the Business Combination Agreement, as described elsewhere in this proxy statement/prospectus. For accounting purposes, the Transactions will be effectuated by three main steps:

(1)  The exchange of shares held by HUB Security shareholders, which is accounted for as a recapitalization in accordance with IFRS.

(2)  The merger of RNER with Merger Sub, which is not within the scope of IFRS 3 ("Business Combinations") since RNER does not meet the definition of a business in accordance with IFRS 3. Any difference between the fair value of HUB Security ordinary shares issued and the fair value of RNER's identifiable net assets should to be recorded as a transaction expense related to the recapitalization. For purposes of the unaudited pro forma condensed combined financial information, it is assumed that the fair value of each individual HUB Security ordinary share issued to RNER Stockholders is equal to the fair value of each individual HUB Security ordinary share resulting from the $1.28 billion pro forma combined enterprise value assigned to HUB Security in the Business Combination Agreement.

(3)  The Subscription Agreements related to the PIPE, which were executed concurrently with the Business Combination Agreement, will result in the issuance of HUB Security ordinary shares, leading to an increase in share capital and share premium.

**Comparison of Rights of Stockholders of RNER and Shareholders of HUB Security (page 236)**

If the Business Combination is successfully completed, holders of RNER Common Stock will become holders of HUB Security ordinary shares and their rights as shareholders will be governed by HUB Security's

11

organizational documents. There are also differences between the laws governing RNER, a Delaware corporation, and HUB Security, an Israeli company. Please see "*Comparison of Rights of HUB Security Shareholders and RNER Stockholders*" on page 236 for more information.

**Emerging Growth Company**

Each of RNER and HUB Security is, and, following the Business Combination, the combined company will be, an "emerging growth company," as defined in Section 2(a) of the Securities Act, as modified by the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"). As such, the combined company will be eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies" including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), reduced disclosure obligations regarding executive compensation in the combined company's periodic reports and proxy statements, and exemptions from the requirements of holding a non-binding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. If some investors find the combined company's securities less attractive as a result, there may be a less active trading market for the combined company's securities and the prices of the combined company's securities may be more volatile.

The combined company will remain an emerging growth company until the earlier of: (i) the last day of the fiscal year (a) following the fifth anniversary of the date on which HUB Security ordinary shares were offered in exchange for RNER Common Stock in connection with the Transactions, (b) in which the combined company has total annual gross revenue of at least $1.07 billion, or (c) in which the combined company is deemed to be a large accelerated filer, which means the market value of the combined company's common equity that is held by non-affiliates exceeds $700 million as of the last business day of its most recently completed second fiscal quarter; and (ii) the date on which the combined company has issued more than $1.00 billion in non-convertible debt securities during the prior three-year period. References herein to "emerging growth company" have the meaning associated with it in the JOBS Act.

**Regulatory Matters**

The Business Combination is not subject to any federal or state regulatory requirement or approval, except for filings with the State of Delaware necessary to effectuate the Business Combination.

**Summary Risk Factors**

You should consider all the information contained in this proxy statement/prospectus in deciding how to vote for the proposals presented in this proxy statement/prospectus. In particular, you should consider the risk factors described under "*Risk Factors*" beginning on page 17. Such risks include, but are not limited to:

- HUB is a company with a history of net losses. HUB anticipates increasing operating expenses in the future, and it may not be able to achieve or maintain profitability.

- HUB's limited operating history makes it difficult to evaluate its business and future prospects and increases the risk of your investment.

- HUB's reputation and business could be harmed based on real or perceived shortcomings, defects or vulnerabilities in its solutions or if its customers experience security breaches, which could have a material adverse effect on HUB's business, reputation and operating results.

- HUB's ability to introduce new products, features, integrations, and enhancements is dependent on adequate research and development resources.

- HUB currently has and targets many customers that are large corporations and government entities, which are subject to a number of challenges and risks, such as increased competitive pressures, administrative delays and additional approval requirements.

- HUB may not be able to convert its customer orders in backlog or pipeline into revenue.

12

- HUB may need to raise additional funds in the future in order to execute its business plan and these funds may not be available to HUB when it needs them. If HUB cannot raise additional funds when it needs them, its business, prospects, financial condition and operating results could be negatively affected.

- The COVID-19 pandemic has impacted and may continue to impact HUB's business, operating results and financial condition.

- A shortage of components or manufacturing capacity could cause a delay in HUB's ability to fulfill orders or increase its manufacturing costs.

- Most of HUB's management team has limited experience managing a U.S. listed public company.

- HUB's business relies on the performance of, and HUB faces stark competition for, highly skilled personnel, including its management, other key employees and qualified employees, and the loss of one or more of such personnel or of a significant number of its team members or the inability to attract and retain executives and qualified employees HUB needs to support its operations and growth, could harm HUB's business.

- Changes in tax laws or exposure to additional income tax liabilities could affect HUB's future profitability.

- As a cyber security provider, if any of HUB's systems, its customers' cloud or on-premises environments, or its internal systems are breached or if unauthorized access to customer or third-party data is otherwise obtained, public perception of its business may be harmed, and HUB may lose business and incur losses or liabilities.

- Undetected defects and errors may increase HUB's costs and impair the market acceptance of its products and solutions.

- HUB may not be able to adequately protect or enforce its intellectual property rights or prevent unauthorized parties from copying or reverse engineering its products or technology. Its efforts to protect and enforce its intellectual property rights and prevent third parties from violating its rights may be costly.

- The dynamic regulatory environment around privacy and data protection may limit HUB's offering or require modification of its products and services, which could limit its ability to attract new customers and support its existing customers and increase its operational expenses. HUB could also be subject to investigations, litigation, or enforcement actions alleging that it fails to comply with the regulatory requirements, which could harm its operating results and adversely affect its business.

- HUB's actual or perceived failure to adequately protect personal data could subject it to sanctions and damages and could harm HUB's reputation and business.

- HUB may be required to indemnify its directors and officers in certain circumstances.

- A market for HUB's securities may not develop or be sustained, which would adversely affect the liquidity and price of its securities.

- HUB Security has identified a material weakness in its internal control over financial reporting. If HUB Security's remediation of the material weakness is not effective, or it fails to develop and maintain effective internal controls over financial reporting, HUB Security's ability to produce timely and accurate financial statements or comply with applicable laws and regulations could be impaired.

- HUB's ordinary shares are currently listed and, following the consummation of the Business Combination, unless otherwise approved by the Israeli court, may continue to be listed for a period of time on the Tel Aviv Stock Exchange (TASE), and this may result in price variations.

- Class action litigation due to stock price volatility or other factors could cause HUB to incur substantial costs and divert management's attention and resources.

- If HUB's estimates or judgments relating to its critical accounting policies are based on assumptions that change or prove to be incorrect, HUB's operating results could fall below expectations of securities analysts and investors, resulting in a decline in HUB's stock price.

13

- Provisions of Israeli law and HUB Security Articles may delay, prevent or make difficult an acquisition of HUB, prevent a change of control, and negatively impact HUB's share price.

- The HUB ordinary shares and HUB warrants may not be listed on a national securities exchange after the Business Combination, which could limit investors' ability to make transactions in such securities and subject HUB to additional trading restrictions.

- If, following the Business Combination, securities or industry analysts do not publish or cease publishing research or reports about HUB, its business, or its market, or if they change their recommendations regarding the HUB ordinary shares adversely, then the price and trading volume of the HUB ordinary shares could decline.

- As HUB is a "foreign private issuer" and intends to follow certain home country corporate governance practices, its shareholders may not have the same protections afforded to shareholders of companies that are subject to all Nasdaq corporate governance requirements.

- The listing of HUB securities on Nasdaq will not benefit from the process undertaken in connection with an underwritten initial public offering, which could result in diminished investor demand, inefficiencies in pricing and a more volatile public price for HUB's securities.

- Conditions in Israel could materially and adversely affect HUB's business.

- It may be difficult to enforce a U.S. judgment against HUB, its officers and directors and the Israeli experts named in this proxy statement/prospectus in Israel or the United States, or to assert U.S. securities laws claims in Israel or serve process on HUB's officers and directors and these experts.

- Code Section 7874 may limit the ability of RNER and certain related U.S. corporations to use certain tax attributes following the Business Combination, increase HUB's U.S. affiliates' U.S. taxable income or have other adverse consequences to HUB and HUB's shareholders.

- RNER may not have sufficient funds to consummate the Business Combination.

- HUB may issue additional HUB ordinary shares or other equity securities without seeking approval of the HUB shareholders, which would dilute the ownership interests represented by HUB ordinary shares and may depress the market price of the HUB ordinary shares.

- The Sponsor, an affiliate of current officers and directors of RNER, is liable to ensure that proceeds of the Trust Account are not reduced by vendor claims in the event the Business Combination is not consummated. Such liability may have influenced RNER's board of directors' decision to pursue the Business Combination and RNER's board of directors' decision to approve it.

- The projections and forecasts presented in this proxy statement/prospectus may not be an indication of the actual results of the transaction or HUB's future results.

- The Business Combination may be completed even though material adverse effects may result from the announcement of the Business Combination, industry-wide changes and other causes.

- Delays in completing the Business Combination may substantially reduce the expected benefits of the Business Combination.

- If RNER is unable to complete the Business Combination or another business combination by January 7, 2023 (or such other date as approved by RNER stockholders through approval of an amendment to the RNER Charter), RNER will cease all operations except for the purpose of winding up, redeeming 100% of the outstanding public shares and, subject to the approval of its remaining stockholders and its board of directors, dissolving and liquidating. In such event, RNER public stockholders may only receive $10 per share (or less than such amount in certain circumstances) and RNER warrants will expire worthless.

- Pursuant to the terms of the Put and Call Option Agreement, HUB may be required to buy back certain of its ordinary shares from certain members of the Sponsor group to cover certain tax liabilities of such members.

- If the Adjournment Proposal is not approved, RNER's board of directors will not have the ability to adjourn the special meeting to a later date.

14

TABLE OF CONTENTS

**SUMMARY UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION**

The following summary unaudited pro forma condensed combined financial information ("Summary Pro Forma Information") gives effect to the Transactions contemplated by the Business Combination Agreement and related transactions, as well as the acquisitions of ALD and Comsec, assuming the Stock Split has been effected. The following unaudited pro forma condensed combined financial information has been prepared in accordance with Article 11 of Regulation S-X as amended by the final rule, Release No. 33-10786 "Amendments to Financial Disclosures about Acquired and Disposed Businesses." Defined terms included below have the same meaning as terms defined and included elsewhere in this proxy statement/prospectus.

The following Summary Pro Forma Information as of June 30, 2022 is derived from the unaudited pro forma combined balance sheet as of June 30, 2022 and combines the unaudited interim balance sheets of HUB Security and RNER on a pro forma basis as if the Transactions had been consummated as of June 30, 2022.

The following Summary Pro Forma Information for the six months ended June 30, 2022 is derived from the unaudited pro forma combined statement of operations for the six months ended June 30, 2022 and combines the unaudited interim statements of operations of HUB Security and RNER for such period on a pro forma basis as if the Transactions had occurred as of January 1, 2021.

The following Summary Pro Forma Information for the year ended December 31, 2021 is derived from the unaudited pro forma combined statement of operations for the year ended December 31, 2021 and combines the historical statements of operations of HUB Security, RNER, ALD and Comsec for such period on a pro forma basis as if the Pro Forma Transactions had occurred as of January 1, 2021.

This information is only summary and should be read together with the historical and interim financial statements of HUB Security and related notes thereto, RNER's historical and interim financial statements and related notes thereto, and sections entitled "*Unaudited Pro Forma Condensed Combined Financial Information*", "*HUB Security's Management's Discussion and Analysis of Financial Condition and Results of Operations,*" and "*RNER's Management's Discussion and Analysis of Financial Condition and Results of Operations*" and other financial information included elsewhere in this proxy statement/prospectus. The unaudited pro forma condensed combined financial information has been prepared assuming two alternative levels of redemption into cash of RNER Common Stock:

- **Assuming No Redemptions:** This presentation assumes that no RNER stockholders exercise redemption rights with respect to their RNER Common Stock for a pro rata share of the funds in the Trust Account upon consummation of the Transactions.

- **Assuming Maximum Redemptions:** This presentation assumes that RNER stockholders holding 17,250,000 of RNER Common Stock will exercise their redemption rights for their pro rata share ($10.20 per share) of the funds in the Trust Account. The maximum redemption scenario assumes all shares of RNER Common Stock held by the RNER stockholders will be redeemed. This scenario gives effect to redemptions of approximately 17,250,000 shares of RNER Common Stock for aggregate redemption payments of $175.95 million using a per share redemption price of $10.20 per share, along with the balance in the Trust Account, and shares outstanding and subject to redemption.

The financial statements of HUB Security have been prepared in accordance with IFRS and the financial statements of RNER have been prepared in accordance with U.S. GAAP. The financial information of RNER has been adjusted to give effect to the differences between U.S. GAAP and IFRS for the purposes of the unaudited pro forma combined financial information.

The Summary Pro Forma Information is for illustrative purposes only. The financial results may have been different had the companies always been combined. The unaudited pro forma condensed combined financial information should not be relied upon as being indicative of the historical results that would have been achieved had the companies always been combined or the future results that the combined company will experience. HUB Security and RNER have not had any historical relationship prior to the Transactions.

15

)        )        )        )

| | Pro Forma Combined | | | |
| | Assuming No Redemptions | Assuming 25% Redemptions | Assuming 75% Redemptions | Assuming Maximum Redemptions |
| --- | --- | --- | --- | --- |
| | (in thousands, except share and per share data) | | | |
| **Summary Unaudited Pro Forma Condensed Combined Statement of Operations Data for the Six Months Ended June 30, 2022** | | | | |
| Revenue | $ 37,418 | $ 37,418 | $ 37,418 | $ 37,418 |
| Net loss per share – basic and diluted | $ (0.13) | $ (0.14) | $ (0.15) | $ (0.16) |
| Weighted average number of shares outstanding – basic and diluted | 114,650,310 | 110,251,560 | 100,083,531 | 95,684,781 |
| **Summary Unaudited Pro Forma Condensed Combined Statement of Operations Data for the Year Ended December 31, 2021** | | | | |
| Revenue | $ 77,740 | $ 77,740 | $ 77,740 | $ 77,740 |
| Net loss per share – basic and diluted | $ (1.00) | $ (1.06) | $ (1.20) | $ (1.28) |
| Weighted average number of shares outstanding – basic and diluted | 109,600,223 | 105,201,473 | 95,033,445 | 90,634,695 |
| **Summary Unaudited Pro Forma Condensed Combined Statement of Financial Position Data as of June 30, 2022** | | | | |
| Total assets | $ 301,371 | $ 257,384 | $ 155,704 | $ 111,463 |
| Total liabilities | $ 48,447 | $ 48,447 | $ 48,447 | $ 48,447 |
| Total equity | $ 250,723 | $ 206,736 | $ 105,055 | $ 60,814 |

The following table sets forth the per share data of each of HUB Security and RNER on a stand-alone basis and the unaudited pro forma combined per share data for the six months ended June 30, 2022 and the year ended December 31, 2021 after giving effect to the Business Combination and the assumed issuance of shares to the PIPE Investors, assuming the following in the two pro forma scenarios presented:

- **Assuming No Redemptions:** This presentation assumes that no RNER stockholders exercise redemption rights with respect to their RNER Common Stock for a pro rata share of the funds in the Trust Account upon consummation of the Transactions.

- **Assuming Maximum Redemptions:** This presentation assumes that RNER stockholders holding 17,250,000 of RNER Common Stock will exercise their redemption rights for their pro rata share ($10.20 per share) of the funds in the Trust Account. The maximum redemption scenario assumes all shares of RNER Common Stock held by the RNER stockholders will be redeemed. This scenario gives effect to redemptions of approximately 17,250,000 shares of RNER Common Stock for aggregate redemption payments of $175.95 million using a per share redemption price of $10.20 per share, along with the balance in the Trust Account, and shares outstanding and subject to redemption.

The unaudited pro forma combined earnings per share information below does not purport to represent the earnings per share which would have occurred had the companies been combined during the periods presented, nor earnings per share for any future date or period. The unaudited pro forma combined book value per share information below does not purport to represent what the value of HUB Security and RNER would have been had the companies been combined during the periods presented.

16

TABLE OF CONTENTS

| | HUB Security | RNER | Combined Pro Forma | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Assuming No Redemptions | Assuming 25% Redemptions | Assuming 75% Redemptions | Assuming Maximum Redemptions |
| **As of and for the six months ended June 30, 2022** | | | | | | |
| Book value per share[1] | $        0.44 | (0.30) | 2.10 | 1.80 | 1.00 | 0.61 |
| Weighted average shares outstanding – basic and diluted | 122,135,432 | 22,158,700 | 114,650,310 | 110,251,560 | 100,083,531 | 95,684,781 |
| Basic and diluted net loss per share | $        (0.18) | (0.03) | (0.13) | (0.14) | (0.15) | (0.16) |
| **As of and for the year ended December 31, 2021** | | | | | | |
| Weighted average shares outstanding – basic and diluted | 108,382,482 | 22,158,700 | 109,600,223 | 105,201,473 | 95,033,445 | 90,634,695 |
| Basic and diluted net loss per share | $        (0.17) | (0.03) | (1.00) | (1.06) | (1.20) | (1.28) |

(1)   Book value per share equals total equity excluding RNER Common Stock subject to possible redemption divided by total shares outstanding.

17

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

# RISK FACTORS

*If the Business Combination is completed, the combined company will operate in a market environment that is difficult to predict and that involves significant risks, many of which will be beyond its control. You should carefully consider the risks described below before voting your shares. Additional risks and uncertainties not presently known to HUB and RNER or that they do not currently believe are important to an investor, if they materialize, also may adversely affect the Business Combination. If any of the events, contingencies, circumstances or conditions described in the following risks actually occur, the combined company's business, financial condition or results of operations could be seriously harmed. If that happens, the trading price of HUB ordinary shares or, if the Business Combination is not consummated, RNER Common Stock could decline, and you may lose part or all of the value of any HUB ordinary shares or, if the Business Combination is not consummated, you may lose part or all of the value of any shares of RNER Common Stock that you hold.*

## Risks Related to the Combined Company Following the Business Combination

Any of the following risk factors could cause the combined company's actual results to differ materially from anticipated results. These risks and uncertainties are not the only ones that the combined company faces.

## Risks Related to HUB's Business and Industry

### *HUB is a company with a history of net losses. HUB anticipates increasing operating expenses in the future, and it may not be able to achieve or maintain profitability.*

HUB has incurred net losses in each year since its inception (not taking into account the operating history of ALD and Comsec prior to the respective acquisitions), including net losses of $13,623 thousand and $2,760 thousand in the years ended December 31, 2021, and 2020 and net losses of $20,231 thousand and $4,612 thousand in the six months ended June 30, 2022 and 2021, respectively. In addition, HUB may continue to incur net losses for the foreseeable future, and it may not achieve or maintain profitability in the future. Because the market for HUB's network security solutions and products is rapidly evolving and has not yet reached widespread adoption, it is difficult for HUB to predict its future results of operations or the limits of its market opportunity. HUB expects its operating expenses will increase significantly over the next several years, as it hires additional personnel, expands its operations and infrastructure, continues to enhance its brand, develops and expands its product features, integrations, and enhancements, and increases its spending on sales and marketing. These efforts may prove more expensive than HUB currently anticipates, and it may not succeed in increasing its revenue sufficiently, or at all, to offset these higher expenses. If HUB is unable to maintain revenue high enough to offset the expected increases in its operating expenses, it may not achieve or maintain profitability in future periods.

### *HUB's operating history makes it difficult to evaluate its business and future prospects and increases the risk of your investment.*

HUB began operations in 2017 and operates in the network security industry, which is rapidly evolving. Further, significant portions of HUB's growth has been through mergers with, and acquisitions, of other companies. As a result, there is limited information that investors can use in evaluating HUB's business, strategy, operating plan, results and prospects. HUB intends to derive most of its revenues from the delivery of its confidential computing protection solution ("Confidential Computing"), which is a newly developed technology. It is difficult to predict future revenues and appropriately budget for expenses, and HUB has limited insight into trends that may emerge and affect its business. In addition, HUB has encountered and expects to continue to encounter risks and uncertainties frequently experienced by growing companies in rapidly evolving industries, such as the risks and uncertainties described herein. As a result, if HUB does not address these risks successfully, or if the assumptions it uses to plan and operate its business are incorrect or change, its results of operations could differ materially from its expectations and HUB's business, financial condition and results of operations could be materially adversely affected.

### *The network security market is rapidly evolving within the increasingly challenging cyber threat landscape. If HUB's solutions fail to adapt to market changes and demands, sales may not continue to grow or may decline.*

HUB offers a combined hardware and software solution that provides end-to-end data protection across all phases of data storage and processing. If customers do not recognize the benefit of HUB's

18

solutions as a critical layer of an effective security strategy, HUB's revenues may fail to grow or otherwise decline. Security solutions such as HUB's, create a protective envelope around each data processing component to protect data while it is being processed. However, advanced cyber attackers are skilled at adapting to new technologies and developing new methods of gaining access to organizations' sensitive data and technology assets, including those of IT and cybersecurity providers. The techniques they use to access or sabotage networks or applications or to disrupt operations (for example, via ransomware) change frequently and are frequently not recognized until launched against a target. In addition, the COVID-19 pandemic has significantly impacted online behavior and the security of businesses and individuals, and HUB has observed a significant increase in cyberattack activity since the beginning of the pandemic. HUB expects that its customers, and thereby its solutions, will face new and increasingly sophisticated methods of attack, particularly due to the increased use by attackers of tools and techniques that are designed to circumvent security controls, to avoid detection and to remove or obfuscate evidence. HUB faces significant challenges in ensuring that its solutions effectively identify and respond to sophisticated attacks while avoiding disruption to its customers' businesses. As a result, HUB must continually modify and improve its products and solutions in response to market and technology trends and evolvement, including obtaining interoperability with existing or newly introduced technologies and systems, to ensure HUB is meeting market needs and continuing to provide valuable solutions that can be deployed in a variety of IT environments. If HUB fails to identify and respond to new and increasingly complex methods of attack or to update its solutions to detect or prevent such threats in time to protect its customers' critical business data, the integrity of HUB's solutions and reputation, as well as its business and operating results, could suffer.

HUB cannot guarantee that it will be able to anticipate future market needs and opportunities or be able to develop or acquire product enhancements or new products or solutions to meet such needs or opportunities in a timely manner or at all. Additionally, HUB cannot guarantee that it will be able to comply with new regulatory requirements (see "— *The dynamic regulatory environment around privacy and data protection may limit HUB's offering or require modification of its products and services, which could limit its ability to attract new customers and support its existing customers and increase its operational expenses. HUB could also be subject to investigations, litigation, or enforcement actions alleging that it fails to comply with the regulatory requirements, which could harm its operating results and adversely affect its business.*"). Furthermore, new technologies and solutions that may make HUB's solutions obsolete may be introduced into the market, lowering the demand for HUB's products, and reducing its sales. Even if HUB is able to anticipate, develop and commercially introduce new features and solutions and ongoing enhancements to its existing solutions, there can be no assurance that such enhancements or new solutions will achieve widespread market acceptance. Delays in developing, completing or delivering new or enhanced solutions could cause HUB's offerings to be less competitive, impair customer acceptance of its solutions and result in delayed or reduced revenue.

***HUB's reputation and business could be harmed based on real or perceived shortcomings, defects or vulnerabilities in its solutions or if its customers experience security breaches, which could have a material adverse effect on HUB's business, reputation and operating results.***

Network security products, solutions and services such as HUB's are complex in development, design and deployment and may contain errors, bugs, misconfigurations or vulnerabilities that are potentially incapable of being remediated or detected until after their deployment, if at all. Any real or perceived errors, bugs, design failures, defects, vulnerabilities, misconfigurations in HUB's solutions, or untimely or insufficient remediation thereof, could cause HUB's solutions to not meet specifications, be vulnerable to security attacks or fail to secure networks or applications which could negatively impact customer operations and consequently harm HUB's business and reputation.

In addition, HUB may suffer significant adverse publicity and reputational harm if its solutions are associated, or are believed to be associated with, or fail to reasonably protect against, a security attack or a breach at a high-profile customer. Moreover, any actual or perceived cyber-attack, other security breach, exposure or theft of HUB's or its customers' data, regardless of whether the breach or theft is attributable to the failure of HUB's solutions, could:

- adversely affect the market's perception of HUB's solutions,

- cause current or potential customers to look to HUB's competitors for alternatives,

19

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

- require HUB to expend significant financial resources to analyze, correct or eliminate any vulnerabilities, and

- lead to investigations, litigation, fines and penalties, any of which could have a material adverse effect on HUB's operations, financial condition and reputation.

Furthermore, security breaches or defects in HUB's solutions could result in loss or alteration of, or unauthorized access to, customers' data and compromise its customers' networks and applications that are secured by its solutions. If such a security breach results in the disruption or loss of availability, integrity or confidentiality of customers' data, HUB could incur significant liability to its customers and to businesses or individuals whose information was being handled by HUB's customers, in addition to regulatory agencies. There can be no assurance that limitation of liability, indemnification or other protective provisions that HUB attempts to include in its contracts would be applicable, enforceable or adequate in connection with a security breach, or would otherwise protect HUB from any such liabilities or damages with respect to any particular claim.

There is no guarantee that HUB's solutions will be free of flaws or vulnerabilities. HUB's customers may also misuse or improperly install HUB's solutions, which could result in vulnerabilities to a breach or theft of business data.

***Competition in the market for cyber security solutions, in general, is intense. If HUB is unable to compete effectively, its business, financial condition and results of operations could be harmed.***

The network security solutions market in which HUB operates is characterized by intense competition, constant innovation, rapid adoption of different technological solutions and services, and evolving security threats. HUB competes with a multitude of companies that offer a broad array of network security products and that employ different approaches and delivery models to address these evolving threats.

HUB's primary competitors in the network security industry consist of Cisco Systems, Inc., Juniper Networks, Inc., Fortinet Inc., Check Point Software Technologies Ltd., and Palo Alto Networks, Inc., as well as companies that have network security capabilities as part of broader IT solutions offerings, such as Microsoft Corporation, McAfee, Inc., International Business Machines Corporation, Hewlett-Packard Enterprise Company and FireEye, Inc.

In addition, IT security spending is spread across a wide variety of solutions and strategies, including, for example, endpoint, network and cloud security, vulnerability management and identity and access management. Organizations continually evaluate their security priorities and investments and may allocate their IT security budgets to other solutions and strategies and may not adopt or expand use of HUB's solutions. Accordingly, HUB may also compete for budgetary reasons with additional vendors that offer threat protection solutions in adjacent or complementary markets to HUB's.

Most of HUB's competitors have greater financial, personnel and other resources than HUB has, which may limit HUB's ability to effectively compete with them. HUB also expects to continue to face additional competition as new participants enter the market or extend their portfolios into related technologies. Current and future participants may also be able to respond more quickly to new or emerging technologies and changes in customer demands and to devote greater resources to the development, promotion and sale of their products than HUB can. Larger companies with substantial resources, brand recognition and sales channels may form alliances with or acquire competing security solutions and emerge as significant competitors.

Competition may result in lower prices or reduced demand for HUB's solutions and a corresponding reduction in HUB's ability to recover its costs, which may impair HUB's ability to achieve, maintain and increase profitability. Furthermore, the dynamic market environment poses a challenge in predicting market trends and expected growth. HUB cannot assure you that it will be able to implement its business strategy in a manner that will allow it to be competitive. If any of HUB's competitors offer products or services that are more competitive than HUB's, HUB could lose market share and its business, financial condition and results of operations could be materially and adversely affected as a result.

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

***HUB's ability to introduce new products, features, integrations, and enhancements is dependent on adequate research and development resources.***

To remain competitive, HUB must maintain adequate research and development resources, such as the appropriate personnel and development technology, to meet the demands of the market. If HUB is unable to develop new products, features, integrations, and enhancements internally due to certain constraints, such as employee turnover, a lack of management ability or a lack of other research and development resources, HUB's business may be harmed. Moreover, research and development projects can be technically challenging and expensive. The nature of these research and development cycles may cause HUB to experience delays between the time it incurs expenses associated with research and development and the time it is able to offer compelling features, integrations, and enhancements and generate revenue, if any, from such investment. If HUB expends a significant amount of resources on research and development and its efforts do not lead to the successful introduction or competitive improvement of products, features, integrations, and enhancements, it could harm HUB's business, results of operations and financial condition. For example, HUB is in the process of developing its "single chip" solution, which is a complicated process and there is no assurance that HUB will be able to successfully release this solution as planned. In addition, HUB's failure to maintain adequate research and development resources or to compete effectively with the research and development programs of its competitors may harm HUB's business, results of operations and financial condition.

***If HUB is unable to acquire large enterprise customers for its security solutions or sell additional products and services to its existing customers, its future revenues and operating results will be harmed.***

HUB's success and continued growth will depend in part on its ability to convince large enterprises to adopt its technologies and solutions and selling incremental or new solutions to existing customers. If HUB is unable to succeed in such efforts, it will likely be unable to generate revenue growth at desired or projected rates. In addition, competition in the industry may lead HUB to acquire fewer new customers or result in HUB providing more favorable commercial terms to new or existing customers. Macro-economic effects may also affect HUB's ability to maintain its customer base and expand it, and the COVID-19 pandemic and its associated global response may also make establishing relationships among potential customers more challenging (see "— *The COVID-19 pandemic has impacted and may continue to impact HUB's business, operating results and financial condition*.").

Additional factors that impact HUB's ability to acquire new customers or sell additional products and services to its existing customers include the consumption of their past purchases, a reduction in the perceived need for network security, the size of HUB's prospective and existing customers' IT budgets, the utility and efficacy of HUB's solution offerings, whether proven or perceived, changes in HUB's pricing models, and general economic conditions. These factors may have a material negative impact on future revenues and operating results.

***HUB currently has and targets many customers that are large corporations and government entities, which are subject to a number of challenges and risks, such as increased competitive pressures, administrative delays and additional approval requirements.***

Many of HUB's existing and potential customers are large corporations and government agencies who store sensitive data. Selling to large corporations and government entities can be highly competitive, expensive and time consuming, often requiring significant upfront time and expense without any assurance that HUB will complete a sale. Large enterprise customers frequently demand terms of sale which are less favorable than the prevailing market terms. In addition, government demand and payment for HUB's products and services may be impacted by public sector budgetary cycles and funding authorizations, funding reductions, government shutdowns or delays, such that any of these occurrences may adversely affect public sector demand for HUB's products. Finally, some large corporations and government entities require products such as HUB's to be certified by industry-approved security agencies as a pre-condition of purchasing them. HUB has initiated the process of obtaining such certifications but HUB cannot be certain that any certificate will be granted, remain in effect or renewed, or that it would be able to satisfy the technological and other requirements to maintain certifications. The loss of any of HUB's existing certificates, or the failure to obtain new ones, could result in the imposition of various penalties, reputational

21

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

TABLE OF CONTENTS

harm, loss of existing customers, or could deter new and existing customers from purchasing its solutions, any of which could adversely affect HUB's business, operating results or financial condition.

***The market's acceptance of Confidential Computing as is implemented by HUB's solutions is not fully proven, is evolving and this market may develop more slowly than or differently from HUB's expectations.***

HUB's solutions use a unique combination of hardware and software to provide network security. This method is different from traditional network security solutions that rely on software implementation of network perimeter protection. The market adoption of HUB's solutions is relatively new, rapidly evolving, and not fully proven. Accordingly, it is difficult to predict customer adoption and renewals and demand for HUB's products and services, or the future growth rate, expansion, longevity, and the size of the market for its products. HUB's ability to penetrate its target market depends on a number of factors, including: its ability to educate its target customers of the benefits of its solutions, the cost, performance, and perceived value associated with its solutions, and the extent to which its solutions improve network security and are easy to use for its customers. If HUB's solutions do not achieve market acceptance, or there is a reduction in demand caused by decreased customer acceptance, technological challenges, weakening economic conditions, privacy, data protection and data security concerns, governmental regulation, competing technologies and products, or decreases in information technology spending or otherwise, the market for HUB's solutions may not continue to develop or may develop more slowly than HUB expects, which could adversely affect its business, financial condition, and results of operations.

***HUB may not be able to convert its customer orders in backlog or pipeline into revenue.***

As of July 31, 2022, HUB's backlog estimates consisted of approximately NIS 30 million in customer contracts, and HUB had an estimated NIS 90 million in pipeline, consisting of customer contracts in various stages of negotiation and initial revenue indications from potential customers that have not been contractually committed. There is no assurance that its backlog will materialize into actual revenues, or that HUB will be able to convert its pipeline into executed contracts that generate revenues.

HUB's ability to convert its estimated backlog into revenue is dependent upon the successful delivery of its solutions to customers, and assumes that its customers will not cancel or amend the terms of their contracts. The conversion of HUB's pipeline into executed, revenue-generating contracts depends upon a number of factors including the continued interest in potential customers in its products and the successful negotiation of contracts with those customers. If HUB is able to successfully enter into contracts with potential customers, the realization of estimated revenues from those contracts remains subject to its ability to successfully deliver network security solutions to those customers.

In addition, since storage and protection of sensitive data is subject to numerous regulatory and industry requirements, some of HUB's solutions may need to qualify under relevant standards in order for HUB to implement for its customers. Such standards include, for example, the Payment Card Industry Data Security Standards for storing credit card data and the Federal Information Processing Standard Publication 140-2 for providing network security to US government entities. HUB's solutions have not yet obtained qualification under any relevant regulatory or industry standards, and achieving such qualifications may be a time-consuming and costly process. There can be no assurance that HUB's solutions will obtain the necessary qualification. A delay or failure to obtain qualification will impair HUB's ability to deliver solutions to its customers.

As a result, the contracts comprising HUB's backlog may not result in actual revenue in any particular period, or at all, and the actual revenue from such contracts may differ from its backlog estimates.

***HUB may fail to fully execute, integrate, or realize the benefits expected from acquisitions, which may require significant management attention, disrupt its business and adversely affect its results of operations.***

As part of HUB's business strategy and in order to remain competitive, HUB continually evaluates acquiring or making investments in complementary companies, products or technologies. HUB may not be able to find suitable acquisition candidates or complete such acquisitions on favorable terms. HUB may incur significant expenses, divert employee and management time and attention from other business-related

22

tasks and its organic strategy and incur other unanticipated complications while engaging with potential target companies where no transaction is eventually completed.

If HUB does complete acquisitions, it may not ultimately strengthen its competitive position or achieve its goals or expected growth, and any acquisitions HUB completes could be viewed negatively by its customers, or experience unexpected competition from market participants. Any integration process may require significant time and resources. HUB may not be able to manage the process successfully and may experience a decline in its profitability as it incurs expenses prior to fully realizing the benefits of the acquisition. HUB acquired two companies within the past 24 months and greatly increased its number of employees and fields of operation. The smooth integration into HUB of the operations of these companies and of their employees is an important part of HUB's sales and growth plan. The staff of the first company that was acquired, Advanced Logistics Development Ltd., are the foundation upon which HUB will build its professional services business, and the strengths of the second acquired company, COMSEC Ltd, in marketing, support and sales are to be the foundation of HUB's sales efforts. The failure of HUB to smoothly integrate the operations and employees of these two companies into HUB's goals and plans will reduce HUB's prospects for growth. There is no assurance that the acquired companies, including their personnel and operations, can be successfully integrated with HUB's existing employees and operations.

HUB could also expend significant cash and incur acquisition related costs and other unanticipated liabilities associated with the acquisition, the product or the technology, such as contractual obligations, potential security vulnerabilities of the acquired company and its products and services and potential intellectual property infringement. In addition, any acquired technology or product may not comply with legal or regulatory requirements and may expose HUB to regulatory risk and require it to make additional investments to make them compliant.

HUB may not successfully evaluate or utilize the acquired technology or personnel, or accurately forecast the financial impact of an acquisition transaction, including accounting charges and tax liabilities. HUB could become subject to legal claims following an acquisition or fail to accurately forecast the potential impact of any claims. Any of these issues could have a material adverse impact on HUB's business and results of operations.

***The market for network security solutions may not continue to grow.***

Continued growth of the network security industry will depend, to a great extent, upon:

- the adoption of data security measures for data encryption and data loss-prevention technologies;

- continued access to mobile application program interface, applications and application stores;

- expansion of government regulation of the internet and governmental and non-governmental requirements and standards with respect to data security and privacy;

- general economic conditions in the markets in which HUB and its customers operate;

- the continued expansion of internet usage and the number of organizations that allow for remote working;

- the continued adoption of "cloud" infrastructure by organizations;

- the ability of the infrastructures implemented by organizations to support an increasing number of users and services;

- the continued development of new and improved services for implementation across the internet and between the internet and intranets; and

- the continued media attention on penetration of supposedly secure networks by cyber attackers and other malicious intruders.

A failure or slowdown in one or more of the trends listed above may delay the purchase by large organizations of network security equipment and may reduce demand for HUB's products.

23

***HUB may need to raise additional funds in the future in order to execute its business plan and these funds may not be available to HUB when it needs them. If HUB cannot raise additional funds when it needs them, its business, prospects, financial condition and operating results could be negatively affected.***

HUB may require additional capital in the future in order to fund its growth strategy or to respond to technological advancements, competitive dynamics or technologies, customer demands, business opportunities, challenges, acquisitions or unforeseen circumstances. HUB may also determine to raise equity or debt financing for other reasons. For example, in order to further enhance business relationships with current or potential customers or partners, HUB may issue equity or equity-linked securities to such current or potential customers or partners.

HUB may not be able to timely secure additional debt or equity financing on favorable terms, or at all. If HUB raises additional funds through the issuance of equity or convertible debt or other equity-linked securities, its existing shareholders could experience significant dilution. In addition, any debt financing obtained by HUB in the future, whether in the form of a credit facility or otherwise, could involve restrictive covenants relating to its capital raising activities and other financial and operational matters, which may make it more difficult for HUB to obtain additional capital and to pursue business opportunities, including potential acquisitions. If HUB is unable to obtain adequate financing or financing on terms satisfactory to HUB when HUB requires it, HUB's ability to continue to grow or support its business and to respond to business challenges could be significantly limited. In addition, because HUB's decision to issue debt or equity in the future will depend on market conditions and other factors beyond its control, it cannot predict or estimate the amount, timing, nature or success of its future capital raising efforts.

***The COVID-19 pandemic has impacted and may continue to impact HUB's business, operating results and financial condition.***

The COVID-19 pandemic has resulted in a widespread health crisis that has adversely affected businesses, economies and financial markets worldwide, placed constraints on the operations of businesses, caused disruptions in global supply chains, and decreased consumer mobility and activity. HUB's business has been affected in various ways, including in its sales and marketing, supply chain and employees.

The COVID-19 pandemic has negatively impacted HUB's business by causing some delays in purchasing decisions by some of its customers, and some difficulties in acquiring new customers given travel limitations and limits on in-person interactions with its customers and prospective customers, as well as some disruptions in its supply chain and delivery of products to customers. For example, circumstances related to the COVID-19 pandemic have triggered disruptions in global supply chains and interruptions and delays involving freight carriers that, in turn, have caused difficulties in timely obtaining components from HUB's suppliers, as well as transportation of HUB's products after manufacture to its customers.

The extent to which COVID-19 will continue to impact HUB's business, financial condition or results of operations, will depend on future developments, which are uncertain and cannot be predicted, including new information which may emerge concerning the severity of COVID-19 and the actions to contain COVID-19 or treat its impact, among others.

***A shortage of components or manufacturing capacity could cause a delay in HUB's ability to fulfill orders or increase its manufacturing costs.***

HUB's ability to meet customer demands depends in part on its ability to obtain timely deliveries of parts from its suppliers and contract manufacturers. There is no assurance that HUB will not encounter supply and fulfilment issues in the future and certain components are presently available to HUB only from limited sources. HUB may not be able to diversify sources in a timely and cost-effective manner, which could harm its ability to deliver products to customers and adversely impact present and future sales and profitability.

HUB may experience a shortage of certain component parts as a result of its own manufacturing issues, manufacturing issues at its suppliers or contract manufacturers, capacity problems or transportation and freight carriers issues experienced by its suppliers or contract manufacturers, or strong demand in the industry for those parts, especially if there is growth in the overall economy. If there is growth in the economy,

24

such growth is likely to create greater pressures on HUB and its suppliers to accurately project overall component demand and component demands within specific product categories and to establish optimal component levels. If shortages or delays persist, such as due to the global chip shortage, the price of these components may increase, or the components may not be available at all. In addition, disruptions in HUB's supply chain, particularly as a result of the global chip shortage, could delay HUB's development of its single chip solution and have a material adverse effect on HUB's business, financial condition and results of operations.

### HUB relies on a few suppliers for components and subcontractors for the manufacture of its products.

HUB relies on a limited number of suppliers and contract manufacturers for the components, subassemblies, and modules necessary for the manufacture or integration of HUB's products. HUB's reliance on such suppliers and subcontractors involves several risks, including potential inability to obtain an adequate supply of required components, subassemblies, or modules and limited control over pricing, quality, and timely delivery of components, subassemblies or modules. Such risks could be exacerbated to the extent such suppliers and subcontractors are materially disrupted by quarantines, factory slowdowns or shutdowns, border closings, and travel restrictions resulting from the COVID-19 pandemic.

If HUB is unable to continue to acquire from these suppliers or subcontractors on acceptable terms or should any of these suppliers or subcontractors cease to supply HUB with such components, subassemblies, or modules for any reason, HUB may not be able to identify and integrate an alternative source of supply in a timely fashion or at the same costs. Any transition to one or more alternate suppliers or contract manufacturers could result in delays, operational problems and increased costs, and may limit HUB's ability to deliver its products to customers on time during such a transition period, any of which could have a material adverse effect on HUB's business, financial condition and results of operations.

### HUB's management team has limited experience managing a U.S. listed public company.

HUB's management team has limited experience managing a U.S. listed publicly traded company, interacting with U.S. public company investors and complying with the increasingly complex laws pertaining to U.S. listed public companies. HUB's management team may not successfully or efficiently manage their new roles and responsibilities, HUB's transition to being a U.S. listed public company subject to significant regulatory oversight and reporting obligations under the federal securities laws and the continuous scrutiny of securities analysts and investors. These new obligations and constituents will require significant attention from HUB's senior management and could divert their attention away from the day-to-day management of HUB's business, which could adversely affect HUB's business, financial condition and operating results.

### HUB's business relies on the performance of, and HUB faces stark competition for, highly skilled personnel, including its management, other key employees and qualified employees, and the loss of one or more of such personnel or of a significant number of its team members or the inability to attract and retain executives and qualified employees HUB needs to support its operations and growth, could harm HUB's business.

HUB's success and future growth depend upon the continued services of its management team and other key employees, including in companies HUB acquired. In particular, the founders who are members of HUB's leadership team are critical to its overall management, as well as the continued development of HUB's solutions, culture and strategic direction. From time to time, there may be changes in HUB's management team resulting from the hiring or departure of executives and key employees, which could disrupt HUB's business. HUB is also dependent on the continued service of its existing engineering team because of the complexity of its product and solutions. HUB may terminate any employee's employment at any time, with or without cause, and any employee may resign at any time, with or without cause, subject only to the notice periods prescribed by their respective agreements if done without cause. The loss of one or more members of HUB's senior management or key employees could harm HUB's business, and HUB may not be able to find adequate replacements. There is no assurance that HUB will be able to retain the services of any members of its senior management or key employees and there is no assurance that HUB will be able to retain members of senior management or key employees in companies it has acquired.

In addition, HUB must attract and retain highly qualified personnel in order to execute its growth plan. HUB has had difficulty quickly filling certain open positions in the past, and expects to have significant future

25

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

tm2223104-17_424b3 - none - 138.6881299s

TABLE OF CONTENTS

hiring needs. Competition is intense, particularly in Israel and other areas in which HUB has offices, for engineers experienced in designing and developing cyber security products, research and development specialists, providers of professional service in the cyber field and experienced sales professionals. Israeli high-tech industry experienced record growth and activity in 2021. This flurry of growth and activity has caused a sharp increase in job openings in both Israeli high-tech companies and Israeli research and development centers of foreign companies, and intensified competition among employers to attract qualified employees in Israel, leading to a severe shortage of skilled human capital. In order to continue to access top talent, HUB will likely continue to grow its footprint of office locations, which may add to the complexity and costs of its business operations. From time to time, HUB has experienced, and expects to continue to experience, difficulty in hiring and retaining employees with appropriate qualifications. Many of the companies with which HUB competes for experienced personnel have greater resources than HUB has and HUB may not succeed in recruiting additional experienced or professional personnel, retaining personnel or effectively replacing current personnel who may depart with qualified or effective successors. If HUB hires employees from competitors or other companies, their former employers may attempt to assert that these employees, or HUB, have breached their legal obligations, resulting in a diversion of HUB's time and resources. In addition, prospective and existing employees often consider the value of the equity awards they receive in connection with their employment. If the perceived value of HUB's equity awards declines, experiences significant volatility or increases, including after Closing, such that prospective employees believe there is limited upside to the value of HUB's equity awards, it may adversely affect HUB's ability to offer competitive compensation packages and thereby adversely impact HUB's ability to recruit and retain key employees. If HUB fails to attract new personnel or fails to retain and motivate its current personnel, its business and future growth prospects would be harmed. In addition, as a result of the intense competition for highly qualified personnel, the high-tech industry has also experienced and may continue to experience significant wage inflation. Accordingly, HUB's efforts to attract, retain and develop personnel may also result in significant additional expenses, which could adversely affect HUB's profitability.

HUB enters into non-competition agreements with its employees in certain jurisdictions. These agreements prohibit HUB's employees from competing with HUB or working for its competitors for a limited period. HUB may be unable to enforce these agreements under the laws of the jurisdictions in which those employees work, and it may be difficult for HUB to restrict its competitors from benefiting from the expertise HUB's former employees developed while working for HUB. For example, Israeli labor courts have required employers seeking to enforce non-compete undertakings of a former employee to demonstrate that the competitive activities of the former employee will harm one of a limited number of material interests of the employer that have been recognized by the courts, such as the protection of a company's trade secrets or other intellectual property.

***HUB will be educating its target market on the benefits of its technology and the need for its products, and such education will be expensive and time consuming.***

HUB's technology is new and not widely understood among its customer base. HUB will have to educate its customers of the benefits of its technology and the difference between its solution and other available solutions. Educating customers is frequently time consuming and expensive, and requires expertise, patience and a delicate touch. There can be no assurance that HUB will be able to educate the market of the benefits of its solution, or that potential customers will understand or appreciate the superior performance of HUB's products. Delays in the market's understanding of HUB's superior products will delay the expected pace of HUB's growth in revenues.

***HUB has experienced rapid growth, and if HUB fails to effectively manage its growth, then its business, results of operations and financial condition could be adversely affected.***

HUB has experienced substantial growth in its business since 2020. For example, HUB has experienced significant growth in the number of employees, corporate divisions, and office locations. This growth has placed and may continue to place significant demands on its corporate culture, operational infrastructure and management. Any failure to manage HUB's anticipated growth and organizational changes in a manner that preserves the key aspects of its culture could hurt its chance for future success, including its ability to recruit and retain personnel, and effectively focus on and pursue its corporate objectives. This, in turn, could adversely affect its business, results of operations and financial condition.

26

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

In addition, HUB's ability to manage its operations and future growth will require HUB to continue to improve its operational, financial and management controls, compliance programs and reporting systems. HUB is currently in the process of strengthening its compliance programs, including its compliance programs related to export controls, privacy and cybersecurity and anti-corruption. HUB may not be able to implement improvements in an efficient or timely manner and may discover deficiencies in existing controls, programs, systems and procedures, which could have an adverse effect on its business, reputation and financial results.

***Prolonged economic uncertainties or downturns in certain regions or industries could materially adversely affect HUB's business.***

HUB's business depends on its current and prospective customers' ability and willingness to invest money in network security, which in turn is dependent upon their overall economic health. Negative economic conditions in the global economy or certain regions, including conditions resulting from financial and credit market fluctuations, exchange rate fluctuations, or inflation, could cause a decrease in corporate spending on network security solutions and services. Other matters that influence consumer confidence and spending, including COVID-19 and its reverberating economic consequences, political unrest, public health crises, terrorist attacks, armed conflicts (such as the conflict between Russia and Ukraine) and natural disasters could also negatively affect HUB's customers' spending on its solutions and services. A significant portion of HUB's business operations are concentrated in core geographic areas such as the Middle East and Europe, and if they were to experience economic downturns, this could severely affect HUB's business operations. In addition, some of HUB's business operations depend on emerging markets that are less resilient to fluctuations in the global economy. In 2021, HUB generated 98% of its revenues from Europe, the Middle East and Africa, 2% of its revenues from the United States, and less than 1% from the rest of the world.

In addition, a significant portion of HUB's revenue is generated from customers in the financial services industry, including banking and insurance. Negative economic conditions may cause customers generally, and in that industry in particular, to reduce their IT spending. Customers may delay or cancel IT projects perceived to be discretionary, choose to focus on in-house development efforts or seek to lower their costs by renegotiating contracts. Further, customers may be more likely to make late payments in worsening economic conditions, which could lead to increased collection efforts and require HUB to incur additional associated costs to collect expected revenues. If the economic conditions of the general economy or industries in which HUB operates worsen from present levels, its results of operation could be adversely affected.

***HUB's sales and operations in international markets expose it to operational, financial and regulatory risks.***

HUB currently offers its solutions in over 30 countries and intends to continue to expand its international operations. While it has committed resources to expanding its international operations and sales channels, these efforts may not be successful. International operations are subject to a number of other risks, including:

- Exchange rate fluctuations;

- Political and economic instability, particularly in emerging markets;

- Global or regional health crises, such as the COVID-19 pandemic;

- Potential for violations of anti-corruption laws and regulations, such as those related to bribery and fraud;

- Less effective protection of intellectual property;

- Difficulties and costs of staffing and managing foreign operations, including recruiting and retaining talented and capable employees;

- Import and export laws, including technology import and export license requirements, and the impact of tariffs;

- Trade restrictions, including as a result of trade disputes or other disputes between countries or regions in which HUB sells and operates;

27

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

- Difficulties in complying with a variety of foreign laws and legal standards and changes in regulatory requirements;

- Difficulties in collecting receivables from foreign entities or delayed revenue recognition;

- The introduction of exchange controls and other restrictions by foreign governments; and

- Changes in local tax and customs duty laws or changes in the enforcement, application or interpretation of such laws.

There is no assurance that the foregoing factors will not have a material adverse effect on HUB's future revenues and, as a result, on its business, operating results and financial condition.

### *Changes in tax laws or exposure to additional income tax liabilities could affect HUB's future profitability.*

Factors that could materially affect HUB's future, effective tax rates, include but are not limited to:

- Changes in tax laws or the regulatory environment;

- Changes in accounting and tax standards or practices;

- Changes in the composition of operating income by tax jurisdiction; and

- HUB's operating results before taxes.

Because HUB does not have a long operating history and it has significant expansion plans, HUB's effective tax rate may fluctuate in the future. Future effective tax rates could be affected by operating losses in jurisdictions where no tax benefit can be recorded, changes in the composition of earnings in countries with differing tax rates, changes in deferred tax assets and liabilities, or changes in tax laws.

### *Fluctuations in currency exchange rates could harm HUB's operating results and financial condition.*

HUB offers its solutions to customers globally and have sales in over 30 countries. Although a large portion of HUB's cash generated from revenue is denominated in U.S. dollars, most of its revenues and operating expenses are incurred in Israel and denominated in Israeli New Shekels ("NIS"). As a result, HUB's consolidated U.S. dollar financial statements are subject to fluctuations due to changes in exchange rates as its revenues and operating expenses are translated from NIS into U.S. dollars. In particular, for the last two fiscal years, there has been a significant decrease in the value of the U.S. dollar relative to the NIS, with the representative exchange rate having dropped from NIS 3.456 per U.S. dollar on December 31, 2019 to NIS 3.215 per U.S. dollar on December 31, 2020 to NIS 3.11 per U.S. dollar on December 31, 2021. If this trend continues, it could increase the U.S. dollar amount of HUB's future revenues and operating expenses significantly. HUB's financial results are also subject to changes in exchange rates that impact the settlement of transactions in non-local currencies. Because HUB conducts business in currencies other than U.S. dollars but report its results of operations in U.S. dollars, it also faces re-measurement exposure to fluctuations in currency exchange rates, which could hinder its ability to predict future results and earnings and could materially and adversely impact its financial condition and results of operations. HUB evaluates periodically the various currencies to which it is exposed and take selective hedging measures to reduce the potential adverse impact from the appreciation or the devaluation of its non-U.S. dollar-denominated expenses, as appropriate and as reasonably available to HUB. There can be no assurances that HUB's hedging activities will be successful in protecting it from adverse impacts from currency exchange rate fluctuations.

### Risks Related to HUB's Systems and Technology

### *As a cyber security provider, if any of HUB's systems, its customers' cloud or on-premises environments, or its internal systems are breached or if unauthorized access to customer or third-party data is otherwise obtained, public perception of its business may be harmed, and HUB may lose business and incur losses or liabilities.*

The success of HUB's security solution capturing significant market share depends in part on the market's perception of the integrity of the HUB solution in securely storing, transmitting, and processing data. Because its solutions and services are used by its customers to encrypt large data sets that often contain proprietary, confidential, and sensitive information (including in some instances personal or identifying

28

information and personal health information), components protected by HUB's products will be perceived by computer hackers as an attractive target for attacks, and its software could face threats of unintended exposure, exfiltration, alteration, deletion, or loss of data. Additionally, because many of HUB's customers use its solutions to store, transmit, and otherwise process proprietary, confidential, or sensitive information, and complete mission critical tasks, they have a lower risk tolerance for security vulnerabilities in its solutions and services than for vulnerabilities in other, less critical, software products and services.

HUB, and the third-party vendors upon which HUB relies, have experienced, and may in the future experience, cybersecurity threats, including threats or attempts to disrupt its information technology infrastructure and unauthorized attempts to gain access to sensitive or confidential information. Its and its third-party vendors' technology systems may be damaged or compromised by malicious events, such as cyberattacks (including computer viruses, malicious and destructive code, phishing attacks, and denial of service attacks), physical or electronic security breaches, natural disasters, fire, power loss, telecommunications failures, personnel misconduct, and human error. Such attacks or security breaches may be perpetrated by internal bad actors, such as employees or contractors, or by third parties (including traditional computer hackers, persons involved with organized crime, or foreign state or foreign state-supported actors). Cybersecurity threats can employ a wide variety of methods and techniques, which may include the use of social engineering techniques, are constantly evolving, and have become increasingly complex and sophisticated; all of which increase the difficulty of detecting and successfully defending against them. Furthermore, because the techniques used to obtain unauthorized access or sabotage systems change frequently and generally are not identified until after they are launched against a target, HUB and its third-party vendors may be unable to anticipate these techniques or implement adequate preventative measures. Although prior cyberattacks directed at HUB have not had a material impact on its financial results, and HUB is continuing to bolster its threat detection and mitigation processes and procedures, HUB cannot guarantee that future cyberattacks against its own computer components or components owned by third parties that are protected by HUB's solutions, will not have a material impact on its business or financial results.

Many governments have enacted laws requiring companies to provide notice of data security incidents involving certain types of data, including personal data. In addition, most of HUB's customers contractually require HUB to notify them of data security breaches. If an actual or perceived breach of security measures, unauthorized access to HUB's system or the systems of the third-party customers that are protected by HUB's solutions, HUB may face direct or indirect liability, costs, or damages, contract termination, its reputation in the industry and with current and potential customers may be compromised, its ability to attract new customers could be negatively affected, and its business, financial condition, and results of operations could be materially and adversely affected.

Further, a successful hacking of systems that are protected by HUB's solutions could result in the loss of information; significant remediation costs; litigation, disputes, regulatory action, or investigations that could result in damages, material fines, and penalties; indemnity obligations; interruptions in the operation of its business, including its ability to provide new product features, new solutions, or services to its customers; and other liabilities. Moreover, its remediation efforts may not be successful. Any or all of these issues, or the perception that any of them have occurred, could negatively affect HUB's ability to attract new customers, cause existing customers to terminate or not renew their agreements, hinder HUB's ability to obtain and maintain required or desirable cybersecurity certifications, and result in reputational damage, any of which could materially adversely affect its results of operations, financial condition, and future prospects. There can be no assurance that any limitations of liability provisions in HUB's license arrangements with customers or in its agreements with vendors, partners, or others would be enforceable, applicable, or adequate or would otherwise protect it from any such liabilities or damages with respect to any particular claim.

HUB maintains cybersecurity insurance and other types of insurance, subject to applicable deductibles and policy limits, but its insurance may not be sufficient to cover all costs associated with a potential data security incident. HUB also cannot be sure that its existing general liability insurance coverage and coverage for cyber liability or errors or omissions will continue to be available on acceptable terms or will be available in sufficient amounts to cover one or more large claims or that the insurer will not deny coverage as to any future claim. The successful assertion of one or more large claims against HUB that exceed available insurance coverage, or the occurrence of changes in its insurance policies, including premium increases or

29

tm2223104-17_424b3 - none - 138.6881299s

TABLE OF CONTENTS

the imposition of large deductible or co-insurance requirements, could result in its business, financial condition and results of operations being materially adversely affected. In addition, HUB's cybersecurity risk could be increased as a result of the ongoing military conflict between Russia and Ukraine and the related sanctions imposed against Russia. HUB implements continuous multi-layered cyber security protection for its operations and resources, and also has an internal professional group of cyber security services to ensure protection against attacks by state actors, including with respect to any new cybersecurity threats that may be presented by the unfolding conflict between Russia and Ukraine.

***Undetected defects and errors may increase HUB's costs and impair the market acceptance of its products and solutions.***

HUB's products and solutions have occasionally contained, and may in the future contain, undetected defects or errors, especially when first introduced or when new versions are released, due to defects or errors that HUB fails to detect, including in components supplied to HUB by third parties. In addition, because HUB's customers integrate its products into their networks with products from other vendors, it may be difficult to identify the product that has caused the problem in the network. Regardless of the source of these defects or errors, HUB will then need to divert the attention of its engineering personnel from its product development efforts to detect and correct these errors and defects. In the past, HUB has not incurred significant warranty or repair costs, nor has HUB been subject to liability claims for material damages related to product errors or defects, nor has it experienced any material lags or delays as a result thereof. However, there can be no assurance that these costs, liabilities, lags and delays will continue to be immaterial in the future. Any insurance coverage that HUB maintains may also not provide sufficient protection should a claim be asserted. Moreover, the occurrence of errors and defects, whether caused by HUB's products or the components supplied by another vendor, may result in significant customer relations problems and injure HUB's reputation, thereby impairing the market acceptance of its products.

***Interruption or failure of HUB's information technology and communications systems could impact its ability to effectively provide its products and services.***

The availability and effectiveness of HUB's services depend on the continued operation of information technology and communications systems. Its systems will be vulnerable to damage or interruption from, among others, physical theft, fire, terrorist attacks, natural disasters, power loss, war, telecommunications failures, viruses, denial or degradation of service attacks, ransomware, social engineering schemes, insider theft or misuse or other attempts to harm its systems. HUB utilizes reputable third-party service providers or vendors for all of its IT and communications systems, and these providers could also be vulnerable to harms similar to those that could damage its systems, including sabotage and intentional acts of vandalism causing potential disruptions. Some of its systems will not be fully redundant, and its disaster recovery planning cannot account for all eventualities. Any problems with its third-party cloud hosting providers could result in lengthy interruptions in its business. In addition, HUB's services and functionality are highly technical and complex technology which may contain errors or vulnerabilities that could result in interruptions in its business or the failure of its systems.

***HUB incorporates third-party technologies in its products, which makes it dependent on the providers of these technologies and exposes it to potential intellectual property claims.***

HUB's products contain certain technologies that are licensed from other companies. Third-party developers or owners of such technologies may be unwilling to enter into, or renew, license agreements with HUB for the technologies that HUB needs on acceptable terms, or at all. If HUB cannot obtain licenses to these technologies, it could lose competitive advantage compared to its competitors who are able to license these technologies. In addition, when HUB obtains licenses for third-party technologies, it may have little or no ability to determine in advance whether the technology infringes the intellectual property rights of others. HUB's suppliers and licensors may not be required or may not be able to indemnify HUB if claims of infringement are asserted against HUB, or they may be required to indemnify HUB only up to a maximum amount, and HUB would be responsible for any costs or damages above such maximum amount. Any failure to obtain licenses to intellectual property or any exposure to liability as a result of incorporating third-party technologies into HUB's products could materially and adversely affect its business, results of operations and financial condition.

30

*If HUB's products do not effectively interoperate with its customers' existing or future IT infrastructures, implementations of HUB's products could be delayed or cancelled, which could harm its business.*

HUB's products must effectively interoperate with its customers' existing or future IT infrastructures, which often have different specifications, utilize multiple protocol standards, deploy products from multiple vendors and contain multiple generations of products that have been added over time. If HUB finds errors in the existing software or defects in the hardware used by HUB's customers' infrastructure or problematic network configurations or settings, HUB may need to modify its software or hardware so that its products will interoperate with its customers' infrastructure and business processes.

HUB may not deliver or maintain interoperability quickly or cost-effectively, or at all. These efforts require capital investment and engineering resources. If HUB fails to maintain compatibility of its products with its customers' internal networks and infrastructures, its customers may not be able to fully utilize its network and products, and HUB may, among other consequences, lose or fail to increase its market share and number of customers and experience reduced demand for its products, and its business, financial condition and results of operations could be materially adversely affected.

### Risks Related to HUB's Intellectual Property

*HUB's proprietary rights may be difficult to enforce, which could enable others to copy or use aspects of HUB's products without compensating HUB.*

HUB relies primarily on patent, trademark, copyright and trade secrets laws and confidentiality procedures and contractual provisions to protect its technology. Valid patents may not issue from HUB's pending applications, and the claims eventually allowed on any patents may not be sufficiently broad to protect HUB's technology or products. Any issued patents may be challenged, invalidated or circumvented, and any rights granted under these patents may not actually provide adequate defensive protection or competitive advantages to HUB. Patent applications in the United States are typically not published until at least 18 months after filing, or, in some cases, not at all, and publications of discoveries in industry-related literature lag behind actual discoveries. HUB cannot be certain that it was the first to make the inventions claimed in its pending patent applications or that it was the first to file for patent protection. Additionally, the process of obtaining patent protection is expensive and time-consuming, and HUB may not be able to prosecute all necessary or desirable patent applications at a reasonable cost or in a timely manner. In addition, recent changes to the patent rules in the United States may bring into question the validity of certain software patents and may make it more difficult and costly to prosecute patent applications. As a result, HUB may not be able to obtain adequate patent protection or effectively enforce its issued patents.

Despite HUB's efforts to protect its intellectual proprietary rights, unauthorized parties may attempt to copy aspects of HUB's products or obtain and use information that HUB regard as proprietary. HUB generally enters into confidentiality or license agreements with its employees, consultants, vendors and customers, and generally limits access to and distribution of its proprietary information. However, HUB cannot guarantee that the steps taken by it will prevent misappropriation of its technology. Policing unauthorized use of HUB's technology or products is difficult. In addition, the laws of some foreign countries do not protect proprietary rights to as great an extent as the laws of the United States or Israel, many foreign countries do not enforce these laws as diligently as government agencies and private parties in the United States or Israel. From time to time, legal action by HUB may be necessary to enforce its patents and other IP rights, to protect its trade secrets, to determine the validity and scope of the proprietary rights of others or to defend against claims of infringement or invalidity. Such litigation could result in substantial costs and diversion of resources, and could negatively affect HUB's business, operating results and financial condition. If HUB is unable to protect its proprietary rights (including aspects of its software and products protected other than by patent rights), HUB may find itself at a competitive disadvantage to others who need not incur the additional expense, time and effort required to create the innovative products that HUB creates.

*HUB may not be able to adequately protect or enforce its intellectual property rights or prevent unauthorized parties from copying or reverse engineering its products or technology. Its efforts to protect and enforce its intellectual property rights and prevent third parties from violating its rights may be costly.*

The success of its products and business depend in part on its ability to obtain patents and other intellectual property rights and maintain adequate legal protection for its products. As of the date of this

31

proxy statement/prospectus, HUB owns eight patents registered in the US and one registered patent in each of Israel and the EU. HUB has a further three patent applications pending in the US and one application pending in Israel. HUB relies on a combination of patent, service mark, and trade secret laws, as well as confidentiality procedures and contractual restrictions, to establish and protect its proprietary rights, all of which provide only limited protection.

HUB cannot be sure that any patents will be issued with respect to its currently pending patent applications or that any trademarks will be registered with respect to its currently pending applications in a manner that provides adequate defensive protection or competitive advantages, if at all, or that any patents issued to HUB will not be challenged, invalidated or circumvented. HUB may file for patents and trademarks in the U.S. and other international jurisdictions, but such protections may not be available in all countries in which it operates or in which HUB seeks to enforce its intellectual property rights, or may be difficult to enforce in practice. For example, the legal environment relating to intellectual property protection in certain emerging market countries where HUB may operate in the future is relatively weaker, often making it difficult to create and enforce such rights. Its currently-registered intellectual property and any intellectual property that may be issued or registered, as applicable, in the future with respect to pending or future applications may not provide sufficiently broad protection or may not prove to be enforceable in actions against alleged infringers. HUB cannot be certain that the steps HUB has taken will prevent unauthorized use of its technology or the reverse engineering of its technology. Moreover, others may independently develop technologies that are competitive to or infringe its intellectual property.

Protecting against the unauthorized use of its intellectual property, products and other proprietary rights is expensive and difficult, particularly internationally. HUB believes that its intellectual property is foundational in the area of Confidential Computing and it intends to enforce the intellectual property portfolio that HUB has built. Unauthorized parties may attempt to copy or reverse engineer its technology or certain aspects of its products that it considers proprietary. Litigation may be necessary in the future to enforce or defend its intellectual property rights, to prevent unauthorized parties from copying or reverse engineering its products or technology to determine the validity and scope of the proprietary rights of others or to block the importation of infringing products into the U.S., Israel or other jurisdictions in which HUB seeks to protect its intellectual property rights.

Any such litigation, whether initiated by HUB or a third party, could result in substantial costs and diversion of management resources, either of which could adversely affect its business, operating results and financial condition. Even if HUB obtains favorable outcomes in litigation, HUB may not be able to obtain adequate remedies, especially in the context of unauthorized parties copying or reverse engineering its products or technology.

Effective patent, trademark, service mark, copyright and trade secret protection may not be available in every country in which HUB's products are available and competitors based in other countries may sell infringing products in one or more markets. Failure to adequately protect its intellectual property rights could result in its competitors offering similar products, potentially resulting in the loss of some of its competitive advantage, and HUB's business, financial condition and results of operations could be materially adversely affected.

***Third-party claims that HUB is infringing intellectual property, whether successful or not, could subject it to costly and time-consuming litigation or expensive licenses, and its business could be adversely affected.***

Participants in HUB's industry typically protect their technology, especially embedded software, through copyrights and trade secrets in addition to patents. As a result, there is frequent litigation based on allegations of infringement, misappropriation or other violations of intellectual property rights. HUB may in the future receive inquiries from other intellectual property holders and may become subject to claims that it infringes their intellectual property rights, particularly as HUB expands its presence in the market, expands to new use cases and faces increasing competition. In addition, parties may claim that the names and branding of HUB's products infringe their trademark rights in certain countries or territories. If such a claim were to prevail, HUB may have to change the names and branding of its products in the affected territories and could incur other costs.

32

TABLE OF CONTENTS

HUB may in the future need to initiate infringement claims or litigation in order to try to protect its intellectual property rights. In addition to litigation where HUB is a plaintiff, its defense of intellectual property rights claims brought against it or its customers or suppliers, with or without merit, could be time-consuming, expensive to litigate or settle, could divert management resources and attention and could force HUB to acquire intellectual property rights and licenses, which may involve substantial royalty or other payments and may not be available on acceptable terms or at all. Further, a party making such a claim, if successful, could secure a judgment that requires HUB to pay substantial damages or obtain an injunction and HUB may also lose the opportunity to license its technology to others or to collect royalty payments. An adverse determination could also invalidate or narrow HUB's intellectual property rights and adversely affect its ability to offer its products to its customers and may require that HUB procure or develop substitute products that do not infringe, which could require significant effort and expense. If any of these events were to materialize, HUB's business, financial condition and results of operations could be materially adversely affected.

***Certain of HUB's products contain third-party open-source software components, and failure to comply with the terms of the underlying open source software licenses could restrict its ability to sell its products or expose HUB to other risks.***

HUB's products contain software modules licensed to it by third-party authors under "open source" licenses. From time to time, there have been claims against companies that distribute or use open-source software in their products and services, asserting that open source software infringes the claimants' IP rights. HUB could be subject to suits by parties claiming infringement of IP rights in what HUB believes to be licensed open-source software. Use and distribution of open-source software may entail greater risks than use of third-party commercial software, as, for example, open source licensors generally do not provide warranties or other contractual protections regarding infringement claims or the quality of the code. Some open-source licenses contain requirements that HUB makes available source code for modifications or derivative works HUB creates based upon the type of open source software HUB uses. If HUB combines its proprietary software with open-source software in a certain manner, HUB could, under certain open source licenses, be required to release the source code of its proprietary software to the public. This would allow its competitors to create similar products with lower development effort and time and ultimately could result in a loss of product sales for HUB.

Although HUB monitors its use of open-source software to avoid subjecting its products to conditions HUB does not intend, the terms of many open source licenses have not been interpreted by U.S. courts, and there is a risk that these licenses could be construed in a way that, for example, could impose unanticipated conditions or restrictions on its ability to commercialize its products. In this event, HUB could be required to seek licenses from third parties to continue offering its products, to make its proprietary code generally available in source code form, to re-engineer its products or to discontinue the sale of its products if re-engineering could not be accomplished on a timely basis, and HUB's business, financial condition and results of operations could be materially adversely affected.

***HUB's intellectual property applications, including patent applications, may not be approved or granted or may take longer than expected to be approved, which may have a material adverse effect on its ability to prevent others from commercially exploiting products similar to its.***

HUB cannot be certain that it is the first inventor of the subject matter to which it has filed a particular patent application or if it is the first party to file such a patent application. The process of securing definitive patent protection can take five or more years. If another party has filed a patent application to the same subject matter as HUB has, HUB may not be entitled to some or all of the protection sought by the patent application. HUB also cannot be certain whether the claims included in a patent application will ultimately be allowed in the applicable issued patent or the timing of any approval or grant of a patent application. Further, the scope of protection of issued patent claims is often difficult to determine. As a result, HUB cannot be certain that the patent applications that HUB files will issue, or that its issued patents will afford protection against competitors with similar technology. In addition, if its competitors may design around its registered or issued intellectual property, HUB's business, financial condition and results of operations could be materially adversely affected.

33

TABLE OF CONTENTS

*In addition to patented technology, HUB relies on unpatented proprietary technology, trade secrets, designs, experiences, workflows, data, processes, software and know-how.*

HUB relies on proprietary information (such as trade secrets, designs, experiences, workflows, data, know-how and confidential information) to protect intellectual property that may not be patentable or subject to copyright, trademark, trade dress or service mark protection, or that HUB believes is best protected by means that do not require public disclosure. HUB generally seeks to protect this proprietary information by entering into confidentiality agreements, or consulting, services or employment agreements that contain non-disclosure and non-use provisions with its employees, consultants, customers, contractors and third parties. However, HUB may fail to enter into the necessary agreements, and even if entered into, such agreements may be breached or may otherwise fail to prevent disclosure, third-party infringement or misappropriation of its proprietary information, may be limited as to their term and may not provide adequate remedies in the event of unauthorized disclosure or use of proprietary information. HUB has limited control over the protection of trade secrets used by its current or future manufacturing counterparties and suppliers and could lose future trade secret protection if any unauthorized disclosure of such information occurs. In addition, its proprietary information may otherwise become known or be independently developed by its competitors or other third parties. To the extent that HUB's employees, consultants, customers, contractors, advisors and other third parties use intellectual property owned by others in their work for it, disputes may arise as to the rights in related or resulting know-how and inventions. Costly and time-consuming litigation could be necessary to enforce and determine the scope of its proprietary rights, and failure to obtain or maintain protection for its proprietary information could adversely affect its competitive business position. Furthermore, laws regarding trade secret rights in certain markets where HUB operate may afford little or no protection to its trade secrets.

HUB also relies on physical and electronic security measures to protect its proprietary information, but cannot provide assurance that these security measures will not be breached or provide adequate protection for its property. There is a risk that third parties may obtain and improperly utilize its proprietary information to its competitive disadvantage. HUB may not be able to detect or prevent the unauthorized use of such information or take appropriate and timely steps to enforce its intellectual property rights, and HUB's business, financial condition and results of operations could be materially adversely affected.

### Risks Related to HUB's Legal and Regulatory Environment

*The dynamic regulatory environment around privacy and data protection may limit HUB's offering or require modification of its products and services, which could limit its ability to attract new customers and support its existing customers and increase its operational expenses. HUB could also be subject to investigations, litigation, or enforcement actions alleging that it fails to comply with the regulatory requirements, which could harm its operating results and adversely affect its business.*

Federal, state and international bodies continue to adopt, enact, and enforce new laws and regulations, as well as industry standards and guidelines, addressing cybersecurity, privacy, data protection and the collection, processing, storage, cross-border transfer and use of personal information.

HUB is subject to diverse laws and regulations relating to data privacy, including but not limited to the EU General Data Protection Regulation 2016/679 (GDPR), the California Consumer Privacy Act (CCPA), the Health Insurance Portability and Accountability Act as amended by the Health Information Technology for Economic and Clinical Health Act (HIPAA), the U.K. Data Protection Act 2018, national privacy laws of EU Member States and other laws relating to privacy, data protection, and cloud computing. These laws are evolving rapidly, as exemplified by the recent adoption by the European Commission of a new set of Standard Contractual Clauses, the prospect of a new European "ePrivacy Regulation" (to replace the existing "ePrivacy Directive," Directive 2002/58 on Privacy and Electronic Communications) and the forthcoming California Privacy Rights Act. Compliance with these laws, as well as efforts required to understand and interpret new legal requirements, require HUB to expend significant capital and other resources. HUB could be found to not be in compliance with obligations or suffer from adverse interpretations of such legal requirements either as directly relating to its business or in the context of legal developments impacting its customers or other businesses, which could impact HUB's ability to offer its products or services, impact operating results, or reduce demand for its products or services.

34

Compliance with privacy and data protection laws and contractual obligations may require changes in services, business practices, or internal systems resulting in increased costs, lower revenue, reduced efficiency, or greater difficulty in competing with companies that are not subject to these laws and regulations. For example, GDPR and the UK compliance regime impose several stringent requirements for controllers and processors of personal data and increase HUB's obligations such as, requiring robust disclosures to individuals, establishing an individual data rights regime, setting timelines for data breach notifications, imposing conditions for international data transfers, requiring detailed internal policies and procedures and limiting retention periods. Ongoing compliance with these and other legal and contractual requirements may necessitate changes in services and business practices, which may lead to the diversion of engineering resources from other projects.

As a company that focuses on cyber security, HUB's customers may rely on its products and services as part of their own efforts to comply with security control obligations under GDPR and other laws and contractual commitments. If HUB's products or services are found insufficient to meet these standards in the context of an investigation into HUB or its customers, or HUB is unable to engineer products that meet these standards, it could experience reduced demand for its products or services. There is also increased international scrutiny of cross-border transfers of data, including by the EU for personal data transfers to countries such as the United States, following recent case law and regulatory guidance. This increased scrutiny, as well as evolving legal and other regulatory requirements around the privacy or cross-border transfer of personal data could increase HUB's costs, restrict its ability to store and process data as part of its solutions, or, in some cases, impact its ability to offer its solutions or services in certain jurisdictions.

Enactment of further privacy laws in the United States, at the state or federal level, or introduction of new services or products that are subject to additional regulations, as well as ensuring compliance of solutions that HUB obtained through acquisitions, may require HUB to expend considerable resources to fulfill regulatory obligations, and could carry the potential for significant financial or reputational exposure to HUB's business, delay introduction to the market and affect adoption rates.

Claims that HUB has breached its contractual obligations or failed to comply with applicable privacy and data protection laws, even if it is not found liable, could be expensive and time-consuming to defend and could result in adverse publicity that could harm its business. In addition to litigation, HUB could face regulatory investigations, negative market perception, potential loss of business, enforcement notices and/or fines (which, for example, under GDPR / UK regime can be up to 4% of global turnover for the preceding financial year or €20 / £17.5 million, whichever is higher).

***Failure to comply with applicable economic sanctions laws and regulations could harm HUB's business.***

HUB's failure to comply with trade compliance and economic sanctions laws and regulations of the United States, the European Union (including Germany), Israel and the United Kingdom and other applicable international jurisdictions could materially adversely affect HUB's reputation and operations.

HUB's business must be conducted in compliance with applicable economic and trade sanctions laws and regulations, such as those administered and enforced by the U.S. Department of Treasury's Office of Foreign Assets Control, the U.S. Department of State, the U.S. Department of Commerce, the United Nations Security Council, the European Union, His Majesty's Treasury of the United Kingdom and other relevant sanctions authorities. HUB's global operations expose HUB to the risk of violating, or being accused of violating, economic and trade sanctions laws and regulations.

While HUB has taken certain precautions to prevent its solutions from being provided in violation of applicable trade controls laws and regulations, HUB's products may have been in the past, and could in the future be, provided inadvertently, and without its knowledge, in violation of such laws. Violations of U.S. trade controls laws and regulations can result in significant fines or penalties and possible criminal liability for responsible employees and managers, in addition to potential reputational harm.

Any change in export or import regulations, economic sanctions or related laws or regulations, or change in the countries, governments, persons or technologies targeted by such regulations, could result in decreased use of HUB's solutions by, or in its decreased ability to export or sell its solutions to, existing or potential end-customers with international operations. Any decreased use of HUB's solutions or limitation

35

tm2223104-17_424b3 - none - 138.6881299s

TABLE OF CONTENTS

on its ability to export or sell its solutions could adversely affect its business, financial condition, results of operations, and growth prospects.

***HUB's business may be affected by sanctions, export controls and similar measures targeting Russia and other countries and territories as well as other responses to Russia's military conflict in Ukraine, including indefinite suspension of operations in Russia and dealings with Russian entities by many multi-national businesses across a variety of industries.***

As a result of Russia's military conflict in Ukraine, governmental authorities in the United States, the European Union and the United Kingdom, among others, launched an expansion of coordinated sanctions and export control measures, including:

- blocking sanctions on some of the largest state-owned and private Russian financial institutions (and their subsequent removal from SWIFT);

- blocking sanctions against Russian and Belarusian individuals, including the Russian President, other politicians and those with government connections or involved in Russian military activities;

- blocking sanctions against certain Russian businessmen and their businesses, some of which have significant financial and trade ties to the European Union;

- blocking of Russia's foreign currency reserves and prohibition on secondary trading in Russian sovereign debt and certain transactions with the Russian Central Bank, National Wealth Fund and the Ministry of Finance of the Russian Federation;

- expansion of sectoral sanctions in various sectors of the Russian and Belarusian economies and the defense sector;

- United Kingdom sanctions introducing restrictions on providing loans to, and dealing in securities issued by, persons connected with Russia;

- restrictions on access to the financial and capital markets in the European Union, as well as prohibitions on aircraft leasing operations;

- sanctions prohibiting most commercial activities of U.S. and EU persons in Crimea and Sevastopol;

- enhanced export controls and trade sanctions targeting Russia's imports of technological goods as a whole, including tighter controls on exports and reexports of dual-use items, stricter licensing policy with respect to issuing export licenses, and/or increased use of "end-use" controls to block or impose licensing requirements on exports, as well as higher import tariffs and a prohibition on exporting luxury goods to Russia and Belarus;

- closure of airspace to Russian aircraft; and

- ban on imports of Russian oil, liquefied natural gas and coal to the United States.

As the conflict in Ukraine continues, there can be no certainty regarding whether the governmental authorities in the United States, the European Union, the United Kingdom or other counties will impose additional sanctions, export controls or other measures targeting Russia, Belarus or other territories. Furthermore, in retaliation against new international sanctions and as part of measures to stabilize and support the volatile Russian financial and currency markets, the Russian authorities also imposed significant currency control measures aimed at restricting the outflow of foreign currency and capital from Russia, imposed various restrictions on transacting with non-Russian parties, banned exports of various products and other economic and financial restrictions.

HUB must be ready to comply with the existing and any other potential additional measures imposed in connection with the conflict in Ukraine. The imposition of such measures could adversely impact HUB's business, including preventing it from performing existing contracts, recognizing revenue, pursuing new business opportunities or receiving payment for products already supplied or services already performed with customers.

Furthermore, even if an entity is not formally subject to sanctions, customers and business partners of such entity may decide to reevaluate or cancel projects with such entity for reputational or other reasons. As

36

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

result of the ongoing conflict in Ukraine, many U.S. and other multi-national businesses across a variety of industries, including consumer goods and retail, food, energy, finance, media and entertainment, tech, travel and logistics, manufacturing and others, have indefinitely suspended their operations and paused all commercial activities in Russia and Belarus. Depending on the extent and breadth of sanctions, export controls and other measures that may be imposed in connection with the conflict in Ukraine, it is possible that HUB's business, financial condition and results of operations could be materially and adversely affected.

***HUB is subject to complex, evolving regulatory requirements that may be difficult and expensive to comply with and that could negatively impact its business.***

HUB's business and operations are subject to a variety of often changing regulatory requirements in the countries in which it operates or offers its solutions, including, among other things, with respect to trade compliance, anti-corruption, sanction regimes, information security, data privacy and protection, tax, labor and government contracts. Compliance with these regulatory requirements may be onerous, time-consuming, and expensive, especially where these requirements are inconsistent from jurisdiction to jurisdiction, or where the jurisdictional reach of certain requirements is not clearly defined or seeks to reach across national borders. Regulatory requirements in one jurisdiction may make it difficult or impossible to do business in another jurisdiction. HUB may also be unsuccessful in obtaining permits, licenses, or other authorizations required to operate its business, such as for the marketing or sale or import or export of its products and services.

While HUB endeavors to implement policies, procedures, and systems designed to achieve compliance with these regulatory requirements, there is no assurance that these policies, procedures, or systems will be adequate or that HUB or its personnel will not violate these policies and procedures or applicable laws and regulations. Violations of these laws or regulations may harm HUB's reputation and deter government agencies and other existing or potential customers or partners from purchasing its solutions. Furthermore, non-compliance with applicable laws or regulations could result in fines, damages, criminal sanctions against HUB, its officers, or its employees, restrictions on the conduct of HUB's business, and damage to its reputation.

Moreover, regulatory requirements are subject to constant updates, modifications and revisions by the authorities adopting and implementing such requirements which result in uncertainty as well as difficulties in planning ahead of time. Adapting HUB's practices, policies and procedures to this ever-changing regulatory environment involves resources and time and requires HUB's regulatory compliance teams to be on the watch for any actual or potential changes and may have an impact on our ability to pursue business opportunities and anticipate the future results.

***HUB is subject to anti-corruption, anti-bribery, anti-money laundering and similar laws, and non-compliance with such laws can subject HUB to criminal penalties or significant fines and harm its business and reputation.***

HUB is subject to anti-corruption and anti-bribery and similar laws, such as the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "FCPA"), the U.S. domestic bribery statute contained in 18 U.S.C. § 201, U.S. Travel Act, the USA PATRIOT Act, the U.K. Bribery Act 2010, Chapter 9 (sub-chapter 5) of the Israeli Penal Law, 5737-1977, the Israeli Prohibition on Money Laundering Law, 5760-2000, and other anti-corruption, anti-bribery laws and anti-money laundering laws in countries in which it conducts activities. Anti-corruption and anti-bribery laws have been enforced aggressively in recent years and are interpreted broadly and generally prohibit companies and their employees and agents from directly or indirectly promising, authorizing, making, offering, soliciting, or receiving improper payments of anything of value to or from government officials or others in the private sector. As HUB increases its international sales and business, its risks under these laws may increase. Although HUB has internal policies and procedures, including a code of ethics and proper business conduct, reasonably designed to promote compliance with anti-bribery laws, HUB cannot be sure that its employees or other agents will not engage in prohibited conduct and render HUB responsible under the FCPA, the U.K. Bribery Act or any similar anti-bribery laws in other jurisdictions. Noncompliance with these laws could subject HUB to investigations, sanctions, settlements, prosecutions, other enforcement actions, disgorgement of profits, significant fines, damages, other civil and criminal penalties or injunctions, collateral litigation, adverse media coverage and other consequences. Any investigations, actions or sanctions could harm HUB's business, results of operations and financial condition.

37

tm2223104-17_424b3 - none - 138.6881299s

*HUB is subject to risks related to corporate social responsibility.*

Many companies now face increasing scrutiny related to their environmental, social and governance ("ESG") practices and requested disclosures by institutional and individual investors who are increasingly using ESG screening criteria in making investment decisions. HUB's disclosures on these matters or a failure to satisfy evolving stakeholder expectations for ESG practices and reporting may potentially harm its reputation and impact relationships with investors. Certain market participants including major institutional investors use third-party benchmarks or scores to measure HUB's ESG practices in making investment decisions. Furthermore, some of HUB's customers and suppliers evaluate its ESG practices or request that HUB adopts certain ESG policies. In addition, HUB's failure or perceived failure to pursue or fulfill its goals, targets and objectives or to satisfy various reporting standards within the timelines it announces, or at all, could expose HUB to government enforced actions and/or private litigation. As ESG best practices, reporting standards and disclosure requirements continue to develop, HUB may incur increasing costs related to ESG monitoring and reporting.

*If HUB fails to comply with environmental requirements, its business, financial condition, operating results and reputation could be adversely affected.*

HUB is subject to various environmental laws and regulations, including laws governing the hazardous material content of its products, laws relating to real property and future expansion plans and laws concerning the recycling of Electrical and Electronic Equipment ("EEE"). The laws and regulations to which HUB may be subject to include the EU RoHS Directive, EU Regulation 1907/2006 — Registration, Evaluation, Authorization and Restriction of Chemicals (the "REACH Regulation") and the EU Waste Electrical and Electronic Equipment Directive (the "WEEE Directive"), as well as the implementing legislation of the EU member states. Similar laws and regulations have been passed or are pending in China, South Korea, Norway and Japan and may be enacted in other regions, including in the United States, and HUB may in the future be, subject to these laws and regulations.

The EU RoHS Directive and the similar laws of other jurisdictions ban or restrict the presence of certain hazardous substances such as lead, mercury, cadmium, hexavalent chromium and certain fire-retardant plastic additives in electrical equipment, including HUB's products. HUB attempts to comply with these laws, including research and development costs, costs associated with assuring the supply of compliant components and costs associated with writing off scrapped noncompliant inventory. HUB expects to continue to incur costs related to environmental laws and regulations in the future.

As part of the Circular Economy Action Plan, the European Commission amended the EU Waste Framework Directive ("WFD") to include a number of measures related to waste prevention and recycling, whereby HUB may be responsible for submitting product data to a database of hazardous substances established under the WFD and managed by the European Chemicals Agency. HUB may incur costs to comply with this new requirement.

The EU has also adopted the WEEE Directive, which requires electronic goods producers to be responsible for the collection, recycling and treatment of such products. Although currently HUB's EU international channel partners may be responsible for the requirements of this directive as the importer of record in most of the European countries in which HUB sells our products, changes in interpretation of the regulations may cause HUB to incur costs or have additional regulatory requirements in the future to meet in order to comply with this directive, or with any similar laws adopted in other jurisdictions.

HUB's failure to comply with these and future environmental rules and regulations could result in reduced sales of its products, increased costs, substantial product inventory write-offs, reputational damage, penalties and other sanctions.

*Investors' expectations of HUB's performance relating to environmental, social and governance factors may impose additional costs and expose HUB to new risks.*

There is an increasing focus from certain investors, employees and other stakeholders concerning corporate responsibility, specifically related to environmental, social and governance matters. Some investors may use these factors to guide their investment strategies and, in some cases, may choose not to

38

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

invest in HUB if they believe our policies relating to corporate responsibility are inadequate. Third-party providers of corporate responsibility ratings and reports on companies have increased to meet growing investor demand for measurement of corporate responsibility performance. The criteria by which HUB's corporate responsibility practices are assessed may change, which could result in greater expectations of HUB and cause HUB to undertake costly initiatives to satisfy such new criteria. If HUB elects not to or is unable to satisfy such new criteria, investors may conclude that its policies with respect to corporate social responsibility are inadequate. HUB may face reputational damage in the event that its corporate social responsibility procedures or standards do not meet the standards set by various constituencies.

Furthermore, if HUB's competitors' corporate social responsibility performance is perceived to be better than that of HUB, potential or current investors may elect to invest with HUB's competitors instead. In addition, in the event that HUB communicates certain initiatives and goals regarding environmental, social and governance matters, it could fail, or be perceived to fail, in its achievement of such initiatives or goals, or HUB could be criticized for the scope of such initiatives or goals. If HUB fail to satisfy the expectations of investors, employees and other stakeholders or HUB's initiatives are not executed as planned, HUB's reputation and business, operating results and financial condition could be adversely impacted.

### *HUB's actual or perceived failure to adequately protect personal data could subject it to sanctions and damages and could harm HUB's reputation and business.*

A variety of state, national, foreign, and international laws and regulations apply to the collection, use, retention, protection, disclosure, transfer, and other processing of personal data. These privacy and data protection related laws and regulations are evolving, with new or modified laws and regulations proposed and implemented frequently and existing laws and regulations subject to new or different interpretations. Compliance with these laws and regulations can be costly and can delay or impede the development and offering of new products and services.

For example, the General Data Protection Regulation, which became applicable on May 25, 2018, adopts more stringent requirements for data processors and controllers. Such requirements include more fulsome disclosures about the processing of personal information, data retention limits and deletion requirements, mandatory notification in the case of a data breach and elevated standards regarding valid consent in some specific cases of data processing. The General Data Protection Regulation also includes substantially higher penalties for failure to comply, inter alia, a fine up to 20 million Euros or up to 4% of the annual worldwide turnover, whichever is greater, can be imposed. These more stringent requirements on privacy user notifications and data handling require HUB to adapt its business and incur additional costs. Additionally, California passed the California Consumer Privacy Act ("CCPA"), which became effective on January 1, 2020. The CCPA provides new data privacy rights for consumers and new operational requirements for companies. California voters also passed the California Privacy Rights Act ("CPRA") into law on November 3, 2020, which will not take substantial effect until January 1, 2023. The CPRA will significantly modify the CCPA, including adding new privacy rights and increasing regulation on online advertising. Further, starting on January 1, 2021, as a result of the United Kingdom's exit from the European Union, the United Kingdom has brought the GDPR into domestic United Kingdom law with the Data Protection Act 2018 which will remain in force. The United Kingdom Data Protection Act 2018 mirrors the fines under the GDPR.

HUB's actual or alleged failure to comply with applicable laws and regulations, or to protect personal data, could result in enforcement actions, significant penalties or other legal action against HUB or its customers or suppliers, which could result in negative publicity, increased operating costs, subject HUB to claims or other remedies and have a material adverse effect on HUB's business and results of operations.

### *HUB's business could be negatively affected as a result of the actions of activist shareholders, and such activism could impact the trading value of HUB's securities.*

In recent years, U.S. and non-U.S. companies listed on securities exchanges in the United States have been faced with governance-related demands from activist shareholders, unsolicited tender offers and proxy contests. Although as a foreign private issuer HUB is not subject to U.S. proxy rules, responding to any action of this type by activist shareholders could be costly and time-consuming, disrupting HUB's operations and diverting the attention of management and HUB's employees. Such activities could interfere with

39

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

TABLE OF CONTENTS

HUB's ability to execute its strategic plans. In addition, a proxy contest for the election of directors at HUB's annual meeting would require HUB to incur significant legal fees and proxy solicitation expenses and require significant time and attention by management and HUB's board of directors. The perceived uncertainties due to such actions of activist shareholders also could affect the market price of HUB's securities.

***A small number of shareholders own a substantial portion of HUB's ordinary shares, and they may make decisions with which investors may disagree.***

As of September 30, 2022, HUB's directors and executive officers owned approximately 11.40% of the voting power of HUB's outstanding ordinary shares, and approximately 15.98% of HUB's outstanding ordinary shares if the percentage includes options currently exercisable or exercisable within 60 days of September 30, 2022. The interests of these shareholders may differ from the interests of other shareholders and may present a conflict. If these shareholders act together, they could exercise significant influence over HUB's operations and business strategy. For example, although these shareholders may at any time hold considerably less than a majority of HUB's outstanding ordinary shares, they may have sufficient voting power to influence matters requiring approval by HUB's shareholders, including the election and removal of directors and the approval or rejection of mergers or other business combination transactions. In addition, this concentration of ownership may delay, prevent or deter a change in control, or deprive a shareholder of a possible premium for its ordinary shares as part of a sale of HUB to a third party.

***HUB may be required to indemnify its directors and officers in certain circumstances.***

HUB's articles of association allow it to indemnify, exculpate and insure HUB's directors and senior officers to the fullest extent permitted under the Israeli Companies Law. As such, HUB has entered into agreements with each of its directors and senior officers to indemnify, exculpate and insure them against some types of claims, subject to dollar limits and other limitations. Subject to Israeli law, these agreements provide that HUB will indemnify each of these directors and senior officers for any of the following liabilities or expenses that they may incur due to an act performed or failure to act in their capacity as directors or senior officers:

- Monetary liability imposed on the director or senior officer in favor of a third party in a judgment, including a settlement or an arbitral award confirmed by a court.

- Reasonable legal costs, including attorneys' fees, expended by a director or senior officer as a result of an investigation or proceeding instituted against the director or senior officer by a competent authority; provided, however, that such investigation or proceeding concludes without the filing of an indictment against the director or senior officer and either:

  - no financial liability was imposed on the director or senior officer in lieu of criminal proceedings, or

  - financial liability was imposed on the director or senior officer in lieu of criminal proceedings, but the alleged criminal offense does not require proof of criminal intent.

- Reasonable legal costs, including attorneys' fees, expended by the director or senior officer or for which the director or senior officer is charged by a court:

  - in an action brought against the director or senior officer by us, on HUB's behalf or on behalf of a third party,

  - in a criminal action in which the director or senior officer is found innocent, or

  - in a criminal action in which the director or senior officer is convicted, but in which proof of criminal intent is not required.

***HUB's cash balances and investment portfolio may be adversely affected by market conditions and interest rates.***

HUB maintains substantial balances of cash and cash equivalents for purposes of acquisitions and general corporate purposes. While HUB does not currently hold any marketable securities, there is no guarantee that HUB will not maintain marketable securities in the future. The performance of the debt

40

capital markets affects the values of funds that are held in marketable securities. These assets are subject to market fluctuations, changes in interest rates and credit spreads, market liquidity and various other factors, including, without limitation, rating agency downgrades that may impair their value, or unexpected changes in the financial markets' healthiness worldwide. In addition, in case HUB holds liquid investments in the future and would like to liquidate some of its investments and turn them into cash, HUB will be dependent on market conditions and liquidity opportunities, which may be impacted by global economic trends, including, without limitation, the economic effects of the COVID-19 pandemic.

### *Currency fluctuations may affect the results of HUB's operations or financial condition.*

HUB's functional and reporting currency is the New Israeli Shekel. In the six months ended June 30, 2022 and the year ended December 31, 2021, HUB incurred approximately 93% and 99% of its expenses in currencies other than the US dollar, respectively, primarily Israeli Shekels and Euros. As such, changes in exchange rates may have a material adverse effect on HUB's business, results of operations and financial condition. The exchange rates between the U.S. dollar and certain foreign currencies have fluctuated substantially in recent years and may continue to fluctuate substantially in the future. The New Israeli Shekel has steadily appreciated for several years relative to the US dollar. HUB expects that a growing amount of its future revenues will continue to be generated in U.S. dollars and EURO for the foreseeable future and that a significant portion of its expenses, including personnel costs, as well as capital and operating expenditures, will continue to be denominated in New Israeli Shekel. The results of HUB's operations may be adversely affected in relation to foreign exchange fluctuations.

The imposition of exchange or price controls or other restrictions on the conversion of foreign currencies could also have a material adverse effect on HUB's business, results of operations and financial condition.

Changes in currency rates around the globe, including, without limitation, the economic effects of the COVID-19 or "Brexit" could have an adverse impact on HUB's business and results of operations. These changes may have an impact on some of HUB's expenses which are paid in non-US dollars, as well as an impact on HUB's non-US customers which have their budgets in non-US dollar currencies.

### Risks Related to Being a U.S. Listed Public Company

### *HUB will incur increased costs as a result of operating as a U.S. listed public company, and its management will devote substantial time to new compliance initiatives.*

Upon the completion of the Business Combination, HUB will become a U.S. listed public company subject to reporting requirements in the United States, in addition to the Israeli regulations it is currently subject to and it will incur significant legal, accounting and other expenses that it did not incur previously, and these expenses may increase even more after HUB is no longer an emerging growth company, as defined in Section 2(a) of the Securities Act. As a U.S. listed public company, HUB will be subject to the reporting requirements of the Exchange Act, the Sarbanes-Oxley Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act, as well as rules adopted, and to be adopted, by the SEC and Nasdaq. HUB's management and other personnel will need to devote a substantial amount of time to these compliance initiatives. Moreover, HUB expects these rules and regulations to substantially increase its legal and financial compliance costs and to make some activities more time-consuming and costly. For example, HUB expects these rules and regulations to make it more difficult and more expensive for it to obtain director and officer liability insurance and it may be forced to accept reduced policy limits or incur substantially higher costs to maintain the same or similar coverage. HUB cannot predict or estimate the amount or timing of additional costs it may incur to respond to these requirements. The impact of these requirements could also make it more difficult for HUB to attract and retain qualified persons to serve on its board of directors, its board committees or as executive officers.

### *A market for HUB's securities may not develop or be sustained, which would adversely affect the liquidity and price of its securities.*

Following the Business Combination, the price of HUB's securities may fluctuate significantly due to the market's reaction to the Business Combination and general market and economic conditions. An active

41

trading market for HUB's securities following the Business Combination may never develop or, if developed, it may not be sustained. In addition, the price of HUB's securities after the Business Combination can vary due to general economic conditions and forecasts, among other factors. Additionally, if HUB's securities become delisted from Nasdaq and are quoted on the OTC Bulletin Board (an inter-dealer automated quotation system for equity securities that is not a national securities exchange) or the combined company's securities are not listed on Nasdaq and are quoted on the OTC Bulletin Board, the liquidity and price of HUB's securities may be more limited than if HUB was quoted or listed on the NYSE, Nasdaq or another national securities exchange. HUB's securities may thereby become more difficult to sell or trade unless a market can be established or maintained.

***HUB Security has identified a material weakness in its internal control over financial reporting. If HUB Security's remediation of the material weakness is not effective, or it fails to develop and maintain effective internal controls over financial reporting, HUB Security's ability to produce timely and accurate financial statements or comply with applicable laws and regulations could be impaired.***

As HUB Security prepared the financial statements that are included in this prospectus, its management determined that HUB Security has a material weakness in its internal control over financial reporting. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of HUB's annual or interim consolidated financial statements will not be prevented or detected on a timely basis.

Specifically, the deficiencies identified relate to a lack of certain defined processes and controls over information technology, in the areas of access management, segregation of duties, change management, data governance and defined processes and controls over the financial statement close process. These deficiencies, when aggregated, are a material weakness and could result in a material misstatement to HUB Security's financial statements that may not be able to be prevented or detected. Prior to the consummation of the Business Combination, HUB Security does not have sufficient resources assigned to ensure the necessary processes and controls to effectively implement information technology and financial statement close controls required of a public company in the United States.

HUB Security is taking the following actions to remediate this material weakness:

- the hiring of additional accounting and finance resources with public company experience;

- broadening the scope and improving the effectiveness of existing information technology general controls for identity and access management, segregation of duties, change management, data governance, and program development;

- reviewing, strengthening, and developing policies related to each of these areas of information technology general controls;

- engaging internal and external resources to assist us with remediation and monitoring remediation progress;

- delivering periodic training to our team members, including but not limited to technology and accounting staff, on internal controls over financial reporting; and

- strengthening HUB's information technology compliance and accounting functions with additional experienced hires to assist in the expansion and effectiveness of the existing risk assessment, management processes and the design and implementation of controls responsive to those deficiencies.

HUB Security cannot assure you the measures it is taking to remediate the material weakness will be sufficient or that they will prevent future material weaknesses. Additional material weaknesses or failure to maintain effective internal control over financial reporting could cause the combined company to fail to meet its reporting obligations as a public company and may result in a restatement of HUB Security's or the combined company's financial statements for prior periods.

The combined company's independent registered public accounting firm is not required to attest to the effectiveness of its internal control over financial reporting until after HUB Security is no longer an "emerging growth company" as defined in the JOBS Act. At such time, HUB Security's independent registered public accounting firm may issue a report that is adverse in the event in the event its internal controls over financial

42

reporting do not operate effectively. If the combined company is not able to complete our initial assessment of our internal controls and otherwise implement the requirements of Section 404 of the Sarbanes-Oxley Act in a timely manner or with adequate compliance, its independent registered public accounting firm may not be able to certify as to the effectiveness of its internal controls over financial reporting. Any failure to implement and maintain effective internal control over financial reporting also could adversely affect the results of periodic management evaluations and annual independent registered public accounting firm attestation reports regarding the effectiveness of our internal control over financial reporting that the combined company will eventually be required to include in its periodic reports that are filed with the SEC. If HUB Security is unable to remediate our existing material weakness or identify additional material weaknesses and are unable to comply with the requirements of Section 404 in a timely manner or assert that its internal control over financial reporting is effective, or if the combined company's independent registered public accounting firm is unable to express an opinion as to the effectiveness of the combined company's internal control over financial reporting once it is no longer an emerging growth company, investors may lose confidence in the accuracy and completeness of the financial reports and the market price of the ordinary shares of the combined company could be negatively affected, and it could become subject to investigations by the stock exchange on which the combined company's securities are listed, the SEC or other regulatory authorities, which could require additional financial and management resources.

**Risks Related to Ownership of the Combined Company's Shares**

***HUB must adapt its financial and disclosure systems and operations to meet the standards required for a company traded on Nasdaq and subject to US securities regulations.***

HUB is an Israeli company whose shares are traded on the Tel Aviv Stock Exchange. HUB's accounting policies, corporate governance systems and compliance programs have been geared toward maintaining the standards that are applicable to Israeli companies. These standards differ, in some cases materially, from the standards that must be maintained by companies whose shares are traded on the NASDAQ and who are subject to rules and regulations of United Stated Securities Exchange Commission. Reworking HUB's accounting, regulatory and compliance systems will require significant management attention both leading up to the offer of HUB's securities in the US, and in the several quarters following the offer. HUB's failure to properly comply with these rules and regulations may attract regulatory attention, and result in fines, negative publicity and the loss of investor confidence. Any of these results may depress HUB's share price and future prospects.

***Uncertainties in the interpretation and application of worldwide tax reforms, complex tax laws and regulations could materially affect HUB's tax obligations and effective tax rate.***

The 2017 Tax Cuts and Jobs Act (the Tax Act) was enacted on December 22, 2017, and significantly affected U.S. tax law by changing how the U.S. imposes income tax on multinational corporations. The U.S. Department of Treasury has broad authority to issue regulations and interpretative guidance that may significantly impact how HUB will apply the law and may impact results of operations. In addition, the 2022 Inflation Reduction Act was enacted on August 16, 2022. The legislation introduces a number of U.S. federal income tax changes, including imposition of certain minimum tax on U.S. corporations and a 1% excise tax on certain share buybacks by U.S. corporations. As of today, it is difficult to predict the magnitude of the effect, if any, of the Inflation Reduction Act of 2022 on HUB's financial results. The OECD is currently working on an initiative called "Addressing the Tax Challenges Arising from the Digitalization of the Economy" (BEPS 2.0) that may change current international tax principles. HUB will evaluate the potential impact of these changes on its business models once final rules will be set out. As of today, it is difficult to predict the magnitude of the effect, if any, of this initiative on HUB's financial results.

Indirect taxes including Digital Service tax (DST) measures as adopted unilaterally in certain countries could also adversely affect our tax obligations.

***HUB's ordinary shares are currently listed and, following the consummation of the Business Combination, unless otherwise approved by the Israeli court, may continue to be listed for a period of time on the Tel Aviv Stock Exchange (TASE), and this may result in price variations.***

HUB's ordinary shares have been traded on Tel Aviv Stock for more than 20 years. The total market value of HUB on the TASE has been and continues to be significantly lower than the value of HUB as is

43

TABLE OF CONTENTS

contemplated by the Business Combination Agreement. Further, it is possible that (i) the HUB Security shareholders will fail to approve the motion to apply for the immediate delisting of HUB Security ordinary shares and/or (ii) the Israeli court will fail to approve HUB's motion to delist immediately upon the consummation of the Business Combination and thus the HUB Security ordinary shares will remain traded on the TASE for a period of time following the consummation of the Business Combination. Trading in HUB's securities on two separate markets will take place in different currencies (USD on Nasdaq and NIS on the TASE) and at different times (resulting from different time zones, different trading days and different public holidays in the United States and Israel). The trading prices of HUB's securities on these two markets may differ due to these and other factors. Any decrease in the price of HUB's securities on one of these markets could cause a decrease in the trading price of HUB's securities on the other market.

***Class action litigation due to stock price volatility or other factors could cause HUB to incur substantial costs and divert management's attention and resources.***

In the past, following periods of volatility in the market price of a public company's securities, securities class action litigation has often been instituted against that company. Companies such as HUB who are in the technology industry are particularly vulnerable to this kind of litigation as a result of the volatility of their stock prices. Any litigation of this sort against HUB could result in substantial costs and a diversion of management's attention and resources.

On March 29, 2022, two plaintiffs petitioned the District Court in Tel Aviv for certification of a class of plaintiffs in a class action suit against HUB and seven individuals serving as officers and directors of HUB on such date. The request for certification is based on a delay in HUB's making a public announcement of the cancellation of a contract tender whose award to HUB had been previously announced. The cancelled contract represented revenue to HUB of NIS 800,000 (approximately US$250,000) per year, and HUB's previous announcement stated that the contract tender would have a material effect on its 2022 financial results.

HUB was notified of the cancellation of the award of the tender on the afternoon of Wednesday, March 23, 2022, which was the same day that HUB announced its execution of the Business Combination Agreement. HUB reported the cancellation of the award on Sunday, March 27, 2022. The applicable rules of the Tel Aviv Stock Exchange (TASE) and the Israel Securities Authority, require announcements of this kind to be made not later than the trading day following a company's receipt of the relevant information. Friday is not a trading day on the TASE, so HUB's report can be said to have been made one day late. The price of HUB's ordinary shares on the TASE fell by approximately 35% on March 27, 2022. The plaintiff's request to the court cites total damages at NIS 229 million (approximately US$70 million).

Though HUB believes that the request for certification on this claim will be denied by the court, and that any class action that may ultimately be allowed to proceed will settled for a small fraction of the amount claimed, there can be no assurance that a court will not find HUB liable for larger sums. A courts' finding of significant liability against HUB could negatively affect HUB's share price and investors' faith in the integrity of HUB's reporting and compliance procedures.

***If HUB's estimates or judgments relating to its critical accounting policies are based on assumptions that change or prove to be incorrect, HUB's operating results could fall below expectations of securities analysts and investors, resulting in a decline in HUB's stock price.***

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported in its consolidated financial statements and accompanying notes. HUB bases its estimates on various assumptions that it believes to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. HUB's operating results may be adversely affected if its assumptions change or if actual circumstances differ from those in its assumptions. These could cause HUB's operating results to fall below the expectations of securities analysts and investors, resulting in a decline in HUB's stock price. Significant assumptions and estimates used in preparing HUB's consolidated financial statements include those related to revenue recognition, valuation of inventory, accounting for business combination, contingent liabilities and accounting for income taxes.

44

***Forecasting HUB's estimated annual effective tax rate is complex and subject to uncertainty, and there may be material differences between forecasted and actual tax rates.***

HUB conducts business in several countries and is subject to taxation in many of such jurisdictions. The taxation of HUB's business is subject to the application of multiple and sometimes conflicting tax laws and regulations, as well as multinational tax conventions. HUB's effective tax rate will depend upon the geographic distribution of its worldwide earnings or losses, the tax regulations and tax holidays in each geographic region, the availability of tax credits and the effectiveness of its tax planning strategies. The application of tax laws and regulations is subject to legal and factual interpretation, judgment and uncertainty. Tax laws themselves are subject to change as a result of changes in fiscal policy, changes in legislation and the evolution of regulations and court rulings. Consequently, tax authorities may impose tax assessments or judgments against HUB that could materially impact its tax liability and effective income tax rate.

The Organization for Economic Co-operation and Development ("OECD"), an international association comprised of 37 countries, including the United States, has issued and continues to issue guidelines and proposals that change various aspects of the existing framework under which HUB's tax obligations are determined in many of the countries in which it does business. Due to HUB's international business activities, any changes in the taxation of such activities could increase its tax obligations in many countries and may increase its worldwide effective tax rate.

***The HUB Security Articles and Israeli law could prevent a takeover that shareholders consider favorable and could also reduce the market price of HUB ordinary shares.***

Certain provisions of Israeli law and the HUB Security Articles could have the effect of delaying or preventing a change in control and may make it more difficult for a third party to acquire HUB or for HUB's shareholders to elect different individuals to its board of directors, even if doing so would be beneficial to its shareholders, and may limit the price that investors may be willing to pay in the future for the HUB ordinary shares. Among other things:

- Israeli corporate law regulates mergers and requires that a tender offer be effected when more than a specified percentage of shares in a company are purchased;

- Israeli corporate law requires special approvals for certain transactions involving a company with its directors, officers or significant shareholders and regulates other matters that may be relevant to these types of transactions;

- Israeli corporate law does not provide for shareholder action by written consent for public companies, thereby requiring all shareholder actions to be taken at a general meeting of shareholders;

- the HUB Security Articles divide the HUB directors into three classes, each of which is elected once every three years;

- the HUB Security Articles require that any amendment thereto will be approved by HUB's board of directors, in addition to by a vote of the holders of a majority of the HUB outstanding ordinary shares entitled to vote present and voting on the matter at a general meeting of shareholders;

- the HUB Security Articles do not permit a director to be removed except by a vote of the holders of at least 65% of the HUB outstanding shares entitled to vote at a general meeting of shareholders; and

- the HUB Security Articles provide that director vacancies may be filled by the HUB board of directors until a replacement is appointed at the first meeting of the shareholders following the appointment of the replacement director.

Further, Israeli tax considerations may make certain transactions undesirable to HUB or to some of its shareholders whose country of residence does not have a tax treaty with Israel granting tax relief to such shareholders from Israeli tax. See the section titled "*Certain Material Israeli Tax Considerations — Taxation of HUB shareholders*."

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

tm2223104-17_424b3 - none - 138.6881299s

TABLE OF CONTENTS

***Provisions of Israeli law and HUB Security Articles may delay, prevent or make difficult an acquisition of HUB, prevent a change of control, and negatively impact HUB's share price.***

Israeli corporate law regulates acquisitions of shares through tender offers and mergers, requires special approvals for transactions involving directors, officers or significant shareholders, and regulates other matters that may be relevant to these types of transactions. Furthermore, Israeli tax considerations may make potential acquisition transactions unappealing to HUB or to some of our shareholders. For example, Israeli tax law may subject a shareholder who exchanges his or her ordinary shares for shares in a foreign corporation, to taxation before disposition of the investment in the foreign corporation. These provisions of Israeli law may delay, prevent or make difficult an acquisition of HUB, which could prevent a change of control and, therefore, depress the price of HUB's shares.

***HUB does not intend to pay dividends for the foreseeable future. Accordingly, you may not receive any return on investment unless you sell your HUB ordinary shares for a price greater than the price you paid for the RNER Common Stock.***

HUB has never declared or paid any cash dividends on its shares. It currently intends to retain all available funds and any future earnings for use in the operation of its business and does not anticipate paying any dividends on the HUB ordinary shares in the foreseeable future. Consequently, you may be unable to realize a gain on your investment except by selling sell such shares after price appreciation, which may never occur.

HUB's board of directors has sole discretion whether to pay dividends. If HUB's board of directors decides to pay dividends, the form, frequency, and amount will depend upon its future, operations and earnings, capital requirements and surplus, general financial condition, contractual restrictions and other factors that its directors may deem relevant. The Israeli Companies Law, 1999 (the "Companies Law") imposes restrictions on HUB's ability to declare and pay dividends. See the section titled "*Description of HUB ordinary shares — Dividend and Liquidation Rights*" for additional information. Payment of dividends may also be subject to Israeli withholding taxes. See the section titled "*Certain Material Israeli Tax Considerations*" for additional information.

***The HUB ordinary shares and HUB warrants may not be listed on a national securities exchange after the Business Combination, which could limit investors' ability to make transactions in such securities and subject HUB to additional trading restrictions.***

As a condition to the consummation of the Business Combination, HUB intends to apply to have the HUB ordinary shares and HUB warrants approved for listing on Nasdaq after the consummation of the Business Combination. HUB will be required to meet certain initial listing requirements to be listed, including having a minimum number of round lot shareholders. HUB may not be able to meet the initial listing requirements in connection with the Business Combination. If HUB fails to meet the initial listing requirements and Nasdaq does not list the HUB ordinary shares and HUB warrants (and the related closing condition with respect to the initial listing of the HUB ordinary shares is waived by the parties), HUB could face significant material adverse consequences, including:

- a limited availability of market quotations for the HUB ordinary shares and HUB warrants;

- a reduced level of trading activity in the secondary trading market for the HUB ordinary shares and HUB warrants;

- a limited amount of news and analyst coverage for HUB;

- a decreased ability to issue additional securities or obtain additional financing in the future; and

Further, even if the HUB ordinary shares and HUB warrants are so listed, HUB may be unable to maintain the listing of such securities in the future. HUB's securities would not be "covered securities" under the National Securities Markets Improvement Act of 1996, which is a federal statute that prevents or pre-empts the states from regulating the sale of certain securities, including securities listed on Nasdaq, in which case HUB's securities would be subject to regulation in each state where HUB offers and sells securities.

46

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

***The market price and trading volume of the HUB ordinary shares on Nasdaq may be volatile and could decline significantly following the Business Combination.***

The stock markets, including Nasdaq on which HUB intends to list the HUB ordinary shares and HUB warrants to be issued in the Business Combination under the symbol "HUBC" and "HUBCW," respectively, have from time to time experienced significant price and volume fluctuations. Even if an active, liquid and orderly trading market develops and is sustained for the HUB ordinary shares and HUB warrants following the Business Combination, the market price of the HUB ordinary shares and HUB warrants ordinary shares may be volatile and could decline significantly. In addition, the trading volume in the HUB ordinary shares and HUB warrants may fluctuate and cause significant price variations to occur. If the market price of the HUB ordinary shares and HUB warrants ordinary shares declines significantly, you may be unable to resell your shares or warrants at or above the market price of the ordinary shares HUB ordinary shares and HUB warrants as of the date immediately following the consummation of the Business Combination. HUB and RNER cannot assure you that the market price of the HUB ordinary shares and HUB warrants ordinary shares will not fluctuate widely or decline significantly in the future in response to a number of factors, including, among others, the following:

- the realization of any of the risk factors presented in this proxy statement/prospectus;
- actual or anticipated differences in HUB's estimates, or in the estimates of analysts, for HUB's revenues, gross margin, adjusted EBITDA, results of operations, liquidity or financial condition;
- additions and departures of key personnel;
- failure to comply with the requirements of Nasdaq;
- failure to comply with the Sarbanes-Oxley Act or other laws or regulations;
- future issuances, sales, resales or repurchases or anticipated issuances, sales, resales or repurchases, of RNER's securities including due to the expiration of contractual lock-up agreements;
- publication of research reports about HUB;
- the performance and market valuations of other similar companies;
- failure of securities analysts to initiate or maintain coverage of HUB, changes in financial estimates by any securities analysts who follow HUB or HUB's failure to meet these estimates or the expectations of investors;
- new laws, regulations, subsidies, or credits or new interpretations of existing laws applicable to HUB;
- commencement of, or involvement in, litigation involving HUB;
- broad disruptions in the financial markets, including sudden disruptions in the credit markets;
- speculation in the press or investment community;
- actual, potential or perceived control, accounting or reporting problems;
- changes in accounting principles, policies and guidelines; and
- other events or factors, including those resulting from infectious diseases, health epidemics and pandemics (including the ongoing COVID-19 public health emergency), natural disasters, war, acts of terrorism or responses to these events.

In the past, securities class-action litigation has often been instituted against companies following periods of volatility in the market price of their shares. This type of litigation could result in substantial costs and divert RNER's management's attention and resources, which could have a material adverse effect on us.

***HUB's quarterly operating results may fluctuate significantly and could fall below the expectations of securities analysts and investors due to seasonality and other factors, some of which are beyond its control, resulting in a decline in its stock price.***

HUB's quarterly results of operations have fluctuated in the past and may vary significantly in the future. As such, historical comparisons of its operating results may not be meaningful. Accordingly, the

47

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

results of any one quarter should not be relied upon as an indication of future performance. HUB's quarterly financial results may fluctuate as a result of a variety of factors, many of which are outside of its control and may not fully reflect the underlying performance of HUB's business. These fluctuations could adversely affect HUB's ability to meet its expectations or those of securities analysts or investors. If HUB does not meet these expectations for any period, the value of its business and its securities, or those of the combined company, could decline significantly. Factors that may cause these quarterly fluctuations include, without limitation, those listed below:

- The timing of revenues generated in any quarter;

- Pricing changes HUB may adopt to drive market adoption or in response to competitive pressure;

- HUB's ability to retain its existing customers and attract new customers;

- HUB's ability to develop, introduce and sell services and products in a timely manner that meet customer requirements;

- Disruptions in HUB's sales efforts or termination of its relationship with suppliers or subcontractors;

- Delays in customers' purchasing cycles or deferments of customers' purchases in anticipation of new services or updates from HUB or its competitors;

- Fluctuations in demand pressures for HUB's products;

- The duration of the global COVID-19 pandemic and the time it takes for economic recovery;

- The timing and rate of broader market adoption of HUB's cyber security solutions;

- Any change in the competitive dynamics of HUB's markets, including consolidation of competitors, regulatory developments and new market entrants;

- Changes in the source, cost, availability of hardware components HUB uses;

- Adverse litigation, judgments, settlements or other litigation-related costs, or claims that may give rise to such costs; and

- General economic, industry and market conditions, including trade disputes.

***If, following the Business Combination, securities or industry analysts do not publish or cease publishing research or reports about HUB, its business, or its market, or if they change their recommendations regarding the HUB ordinary shares adversely, then the price and trading volume of the HUB ordinary shares could decline.***

The trading market for the HUB ordinary shares will be influenced by the research and reports that industry or financial analysts publish about its business. HUB does not control these analysts, or the content and opinions included in their reports. As a new U.S. listed public company, HUB may be slow to attract research coverage and the analysts who publish information about the HUB ordinary shares will have had relatively little experience with HUB, which could affect their ability to accurately forecast HUB's results and make it more likely that HUB fails to meet their estimates. In the event HUB obtains industry or financial analyst coverage, if any of the analysts who cover HUB issues an inaccurate or unfavorable opinion regarding it, HUB's share price would likely decline. In addition, the share prices of many companies in the technology industry have declined significantly after those companies have failed to meet, or significantly exceed, the financial guidance publicly announced by the companies or the expectations of analysts. If HUB's financial results fail to meet, or significantly exceed, its announced guidance or the expectations of analysts or public investors, analysts could downgrade the HUB ordinary shares or publish unfavorable research about it. If one or more of these analysts cease coverage of HUB or fail to publish reports on it regularly, HUB's visibility in the financial markets could decrease, which in turn could cause its share price or trading volume to decline.

***HUB's failure to meet the continued listing requirements of Nasdaq could result in a delisting of its Securities.***

If, after listing, HUB fails to satisfy the continued listing requirements of Nasdaq such as the corporate governance requirements or the minimum closing bid price requirement, Nasdaq may take steps to delist its securities. Such a delisting would likely have a negative effect on the price of the securities and would

48

impair shareholders' ability to sell or purchase the securities when they wish to do so. In the event of a delisting, HUB can provide no assurance that any action taken by it to restore compliance with listing requirements would allow its securities to become listed again, stabilize the market price or improve the liquidity of its securities, prevent its securities from dropping below Nasdaq minimum bid price requirement or prevent future non-compliance with Nasdaq's listing requirements. Additionally, if HUB's securities are not listed on, or become delisted from, Nasdaq for any reason, and are quoted on the OTC Bulletin Board, an inter-dealer automated quotation system for equity securities that is not a national securities exchange, the liquidity and price of HUB's securities may be more limited than if it were quoted or listed on Nasdaq or another national securities exchange. Shareholders may be unable to sell their securities unless a market can be established or sustained.

***HUB will qualify as an emerging growth company within the meaning of the Securities Act, and if HUB takes advantage of certain exemptions from disclosure requirements available to emerging growth companies, this could make HUB's securities less attractive to investors and may make it more difficult to compare HUB's performance with other public companies.***

HUB is eligible to be treated as an emerging growth company, as defined in Section 2(a) of the Securities Act, as modified by the JOBS Act. Under the JOBS Act, emerging growth companies can delay adopting new or revised financial accounting standards until such time as those standards apply to companies that that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act . HUB intends to take advantage of this extended transition period under the JOBS Act for adopting new or revised financial accounting standards.

For as long as HUB continues to be an emerging growth company, it may also take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies, including presenting only limited selected financial data and not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act. As a result, its shareholders may not have access to certain information that they may deem important. HUB could be an emerging growth company for up to five years, although circumstances could cause it to lose that status earlier, including if its total annual gross revenue exceeds $1.07 billion, if it issues more than $1.0 billion in non-convertible debt securities during any three-year period, or if before that time it is a "large accelerated filer" under U.S. securities laws.

HUB cannot predict if investors will find HUB ordinary shares less attractive because it may rely on these exemptions. If some investors find HUB ordinary shares less attractive as a result, there may be a less active trading market for HUB ordinary shares and HUB's share price may be more volatile. Further, there is no guarantee that the exemptions available to HUB under the JOBS Act will result in significant savings. To the extent that HUB chooses not to use exemptions from various reporting requirements under the JOBS Act, it will incur additional compliance costs, which may impact HUB's financial condition.

***HUB will be a foreign private issuer and, as a result, it will not be subject to U.S. proxy rules and will be subject to Exchange Act reporting obligations that, to some extent, are more lenient and less frequent than those of a U.S. domestic public company.***

Upon the closing of the Business Combination, HUB will report under the Exchange Act as a non-U.S. company with foreign private issuer status. Because HUB qualifies as a foreign private issuer under the Exchange Act, it is exempt from certain provisions of the Exchange Act that are applicable to U.S. domestic public companies, including (1) the sections of the Exchange Act regulating the solicitation of proxies, consents or authorizations in respect of a security registered under the Exchange Act, (2) the sections of the Exchange Act requiring insiders to file public reports of their share ownership and trading activities and liability for insiders who profit from trades made in a short period of time and (3) the rules under the Exchange Act requiring the filing with the SEC of quarterly reports on Form 10-Q containing unaudited financial and other specified information, although it is subject to Israeli laws and regulations with regard to certain of these matters and intend to furnish comparable quarterly information on Form 6-K. In addition, foreign private issuers are not required to file their annual report on Form 20-F until 120 days after the end of each fiscal year, while U.S. domestic issuers that are accelerated filers are required to file their annual report on Form 10-K within 75 days after the end of each fiscal year and U.S. domestic issuers that

49

are large accelerated filers are required to file their annual report on Form 10-K within 60 days after the end of each fiscal year. Foreign private issuers are also exempt from Regulation FD, which is intended to prevent issuers from making selective disclosures of material information. As a result of all of the above, you may not have the same protections afforded to shareholders of a company that is not a foreign private issuer.

***HUB may lose its foreign private issuer status in the future, which could result in significant additional costs and expenses.***

As discussed above, HUB is a foreign private issuer, and therefore is not required to comply with all of the periodic disclosure and current reporting requirements of the Exchange Act. The determination of foreign private issuer status is made annually on the last business day of an issuer's most recently completed second fiscal quarter, and, accordingly, the next determination will be made with respect to HUB on June 30, 2023. In the future, HUB would lose its foreign private issuer status if (1) more than 50% of its outstanding voting securities are owned by U.S. residents and (2) a majority of its directors or executive officers are U.S. citizens or residents, or it fails to meet additional requirements necessary to avoid loss of foreign private issuer status. If HUB loses its foreign private issuer status, it will be required to file with the SEC periodic reports and registration statements on U.S. domestic issuer forms, which are more detailed and extensive than the forms available to a foreign private issuer. HUB would also have to mandatorily comply with U.S. federal proxy requirements, and its officers, directors and principal shareholders will become subject to the short-swing profit disclosure and recovery provisions of Section 16 of the Exchange Act. In addition, it would lose its ability to rely upon exemptions from certain corporate governance requirements under the listing rules of Nasdaq. As a U.S. listed public company that is not a foreign private issuer, HUB would incur significant additional legal, accounting and other expenses that it will not incur as a foreign private issuer.

***As HUB is a "foreign private issuer" and intends to follow certain home country corporate governance practices, its shareholders may not have the same protections afforded to shareholders of companies that are subject to all Nasdaq corporate governance requirements.***

As a foreign private issuer, following the closing of the Business Combination, HUB will have the option to follow certain home country corporate governance practices rather than those of Nasdaq, provided that it discloses the requirements it is not following and describes the home country practices it is following. HUB intends to rely on this "foreign private issuer exemption" with respect to Nasdaq rules for shareholder meeting quorums and Nasdaq rules requiring shareholder approval. HUB may in the future elect to follow home country practices with regard to other matters. As a result, its shareholders may not have the same protections afforded to shareholders of companies that are subject to all Nasdaq corporate governance requirements.

On August 9, 2022, the Israeli court approved convening a meeting of HUB Security's shareholders and traded options holders (two separate meetings), which will be also held separately for the following separate classes — (1) the controlling shareholders, company's officers and principal shareholders; and (2) securities holders from the public to vote on (1) the approval of the Business Combination and related matters and (2) to the extent the Business Combination resolution is approved, to instruct HUB Security to apply to the Israeli court to approve the delisting (or suspension) from trade in on the TASE simultaneously with the beginning of trade on Nasdaq, such that there will be no simultaneous trading in both markets.

As a company incorporated in Israel, even if approved by the Israeli court for delisting from the TASE, the Israeli Securities Law shall continue to apply and HUB Security shall still be subject to reporting obligations in Israel unless otherwise exempt in accordance with Israeli law.

The Israeli court approval for convening the shareholders and optionholder meetings does not necessarily mean that the court will approve the resolution calling for the delisting of HUB Security shares and options from the TASE. Further, the Israeli court decision remains subject to any objections, to the extent filed, by the Israeli Securities Authority and/or the TASE.

50

***The HUB Security Articles will provide that unless HUB consents to an alternate forum, the federal district courts of the United States shall be the exclusive forum of resolution of any claims arising under the Securities Act.***

The HUB Security Articles will provide that, unless HUB consents in writing to the selection of an alternative forum, the federal district courts of the United States shall be the sole and exclusive forum for any claim asserting a cause of action arising under the Securities Act (for the avoidance of any doubt, such provision does not apply to any claim asserting a cause of action arising under the Exchange Act). Section 22 of the Securities Act creates concurrent jurisdiction for federal and state courts over all such Securities Act actions. Accordingly, both U.S. state and federal courts have jurisdiction to entertain such claims. This choice of forum provision may limit a shareholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with HUB or its directors, officers or other employees and may increase the costs associated with such lawsuits, which may discourage such lawsuits against HUB and its directors, officers and employees. However, the enforceability of similar forum provisions in other companies' organizational documents has been challenged in legal proceedings, and there is uncertainty as to whether courts would enforce the exclusive forum provisions in the HUB Security Articles. If a court were to find these provisions of the HUB Security Articles inapplicable to, or unenforceable in respect of, one or more of the specified types of actions or proceedings, HUB may incur additional costs associated with resolving such matters in other jurisdictions, which could adversely affect HUB's business and financial condition. Any person or entity purchasing or otherwise acquiring any interest in HUB's share capital shall be deemed to have notice of and to have consented to the choice of forum provisions of the HUB Security Articles described above. This provision would not apply to suits brought to enforce a duty or liability created by the Exchange Act or any other claim for which the U.S. federal courts have exclusive jurisdiction.

***The listing of HUB securities on Nasdaq will not benefit from the process undertaken in connection with an underwritten initial public offering, which could result in diminished investor demand, inefficiencies in pricing and a more volatile public price for HUB's securities.***

HUB will apply to list the HUB ordinary shares and HUB warrants on Nasdaq under the symbols "HUBC" and "HUBCW," respectively, to be effective at the Closing. Unlike an underwritten initial public offering of the HUB securities, the initial listing of HUB's securities as a result of the Business Combination will not benefit from the following:

- the book-building process undertaken by underwriters that helps to inform efficient price discovery with respect to opening trades of newly listed securities;

- underwriter support to help stabilize, maintain or affect the public price of the new issue immediately after listing; and

- underwriter due diligence review of the offering and potential liability for material misstatements or omissions of fact in a prospectus used in connection with the securities being offered or for statements made by its securities analysts or other personnel.

Underwriters have liability under the U.S. securities laws for material misstatements or omissions in a registration statement pursuant to which an issuer sells securities. Section 11 of the Securities Act ("Section 11") imposes liability on parties, including underwriters, involved in a securities offering if the registration statement contains a materially false statement or material omission. To effectively establish a due diligence defense against a cause of action brought pursuant to Section 11, a defendant, including an underwriter, carries the burden of proof to demonstrate that he or she, after reasonable investigation, believed that the statements in the registration statement were true and free of material omissions. In order to meet this burden of proof, underwriters in a registered offering typically conduct extensive due diligence of the registrant and vet the registrant's disclosure. Due diligence entails engaging legal, financial and/or other experts to perform an investigation as to the accuracy of an issuer's disclosure regarding, among other things, its business, prospects and financial results. In making their investment decision, investors have the benefit of such diligence in underwritten public offerings. RNER's investors must rely on the information in this proxy statement/prospectus and will not have the benefit of an independent review and investigation of the type normally performed by an independent underwriter in a public securities offering. While sponsors, private investors and management in a business combination undertake a certain level of due diligence, it

51

tm2223104-17_424b3 - none - 138.6881299s

TABLE OF CONTENTS

is not necessarily the same level of due diligence undertaken by an underwriter in a public securities offering and, therefore, there could be a heightened risk of an incorrect valuation of HUB's business or material misstatements or omissions in this proxy statement/prospectus.

In addition, because there are no underwriters engaged in connection with the Transactions, prior to the opening of trading on the trading day immediately following the Closing Date, there will be no traditional "roadshow" or book building process, and no price at which underwriters initially sold shares to the public to help inform efficient and sufficient price discovery with respect to the initial post-closing trades. Therefore, buy and sell orders submitted prior to and at the opening of initial post-closing trading of HUB's securities will not have the benefit of being informed by a published price range or a price at which the underwriters initially sold shares to the public, as would be the case in an underwritten initial public offering. There will be no underwriters assuming risk in connection with an initial resale of HUB's securities or helping to stabilize, maintain or affect the public price of HUB's securities following the closing. Moreover, neither HUB nor RNER will engage in, nor will they, directly or indirectly, request financial advisors to engage in, any special selling efforts or stabilization or price support activities in connection with the HUB's securities that will be outstanding immediately following the closing. In addition, since HUB will become public through a merger, securities analysts of major brokerage firms may not provide coverage of HUB since there is no incentive to brokerage firms to recommend the purchase of its ordinary shares. No assurance can be given that brokerage firms will, in the future, want to conduct any offerings on HUB's behalf. All of these differences from an underwritten public offering of HUB's securities could result in a more volatile price for the HUB's securities.

In addition, the Sponsor, certain members of RNER's board of directors and its officers, as well as their respective affiliates and permitted transferees, have interests in the Transactions that are different from or are in addition to those of holders of RNER's or HUB's securities following completion of the Business Combination, and that would not be present in an underwritten public offering of HUB's securities. Such interests may have influenced the board of directors of RNER in making their recommendation that RNER stockholders vote in favor of the approval of the Business Combination Proposal and the other proposals described in this proxy statement/prospectus. See the section entitled *"Proposal One — The Business Combination Proposal — Interests of Certain Persons in the Business Combination."*

Such differences from an underwritten public offering may present material risks to unaffiliated investors that would not exist if HUB became a U.S. publicly listed company through an underwritten initial public offering instead of upon completion of the merger. Further, the lack of such processes in connection with the listing of HUB's securities could result in diminished investor demand, inefficiencies in pricing and a more volatile public price for HUB's securities during the period immediately following the listing than in connection with an underwritten initial public offering.

**Risks Related to HUB's Incorporation and Operations in Israel**

*Conditions in Israel could materially and adversely affect HUB's business.*

Many of HUB's employees, including its founders and certain members of its management team, operate from its headquarters that are located in Tel Aviv, Israel. In addition, a number of HUB's officers and directors are residents of Israel. Accordingly, political, economic, and military conditions in Israel and the surrounding region may directly affect HUB's business and operations. Recently, there has been significant political instability in Israel, with five sets of elections for the Israeli parliament, or Knesset, in a two-year period. There is no guarantee that any new government elected will last for a significant portion of its full four-year term and provide political stability. On the military front, in recent years, Israel has been engaged in sporadic armed conflicts with Hamas, an Islamist terrorist group that controls the Gaza Strip, with Hezbollah, an Islamist terrorist group that controls large portions of southern Lebanon, and with Iranian-backed military forces in Syria. In addition, Iran has threatened to attack Israel and may be developing nuclear weapons. Some of these hostilities were accompanied by missiles being fired from the Gaza Strip, Lebanon and Syria against civilian targets in various parts of Israel, including areas in which HUB's employees are located, which negatively affected business conditions in Israel. Any hostilities involving Israel, regional political instability or the interruption or curtailment of trade between Israel and its trading partners could adversely affect HUB's operations and results of operations.

52

tm2223104-17_424b3 - none - 138.6881299s

TABLE OF CONTENTS

HUB's commercial insurance does not cover losses that may occur as a result of events associated with war and terrorism. Although the Israeli government currently covers the reinstatement value of property damages and certain direct and indirect damages that are caused by terrorist attacks or acts of war, such coverage would likely be limited, may not be applicable to HUB's business (either due to the geographic location of HUB's offices or the type of business that it operates) and may not reinstate HUB's loss of revenue or economic losses more generally. Furthermore, HUB cannot assure you that this government coverage will be maintained or that it will sufficiently cover HUB's potential damages. Any losses or damages incurred by HUB could have a material adverse effect on its business. Any armed conflicts or political instability in the region would likely negatively affect business conditions and could harm HUB's results of operations.

Further, in the past, the State of Israel and Israeli companies have been subjected to economic boycotts. Several countries still restrict business with the State of Israel and with Israeli companies. These restrictive laws and policies may have an adverse impact on HUB's results of operations, financial condition or the expansion of its business. A campaign of boycotts, divestment, and sanctions has been undertaken against Israel, which could also adversely affect HUB's business. Actual or perceived political instability in Israel or any negative changes in the political environment, may individually or in the aggregate adversely affect the Israeli economy and, in turn, HUB's business, financial condition, results of operations, and prospects.

In addition, many Israeli citizens are obligated to perform several days, and in some cases more, of annual military reserve duty each year until they reach the age of 40 (or older, for reservists who are military officers or who have certain occupations) and, in the event of a military conflict, may be called to active duty. In response to increases in terrorist activity, there have been periods of significant call-ups of military reservists. It is possible that there will be military reserve duty call-ups in the future. HUB's operations could be disrupted by such call-ups, which may include the call-up of members of its management. Such disruption could materially adversely affect HUB's business, prospects, financial condition, and results of operations.

***As a public company incorporated in Israel, HUB may become subject to further compliance obligations and market trends or restrictions, which may strain HUB's resources and divert management's attention.***

Being an Israeli publicly traded company in the United States and being subject to both U.S. and Israeli rules and regulations may make it more expensive for HUB to obtain directors and officers liability insurance, and HUB may be required to continue incurring substantially higher costs for reduced coverage. In addition, as a company that has publicly offered securities in Israel via prospectus, even if approved by the Israeli court for delisting from the TASE, the Israeli Securities Law, 5728-1968 (the "Israeli Securities Law") shall continue to apply and HUB shall still be subject to reporting obligations in Israel unless otherwise exempt in accordance with Israeli law. These factors could also make it more difficult for HUB to attract and retain qualified members of its board of directors, particularly to serve on its audit committee, and qualified executive officers. In accordance with the provisions of the Companies Law, approval of HUB's directors and officers insurance is limited to the terms of its duly approved compensation policy, unless otherwise approved by HUB's shareholders.

***HUB may become subject to claims for remuneration or royalties for assigned service invention rights by HUB's employees, which could result in litigation and adversely affect HUB's business.***

A significant portion of HUB's intellectual property has been developed by its employees in the course of their employment by HUB. Under the Israeli Patents Law, 5727-1967 (the "Patents Law"), inventions conceived by an employee during and as a result of his or her employment with a company are regarded as "service inventions," which belong to the employer, absent an agreement between the employee and employer providing otherwise. The Patents Law also provides that if there is no agreement between an employer and an employee determining whether the employee is entitled to receive consideration for service inventions and on what terms, this will be determined by the Israeli Compensation and Royalties Committee (the "Committee"), a body constituted under the Patents Law. Case law clarifies that the right to receive consideration for "service inventions" can be waived by the employee and that in certain circumstances, such waiver does not necessarily have to be explicit. The Committee will examine, on a case-by-case basis, the general contractual framework between the parties, using interpretation rules of the general Israeli contract

53

laws. Further, the Committee has not yet determined one specific formula for calculating this remuneration, but rather uses the criteria specified in the Patents Law. Although HUB generally enters into agreements with its employees pursuant to which such individuals assign to it all rights to any inventions created during and as a result of their employment with HUB, HUB may face claims demanding remuneration in consideration for assigned inventions. As a consequence of such claims, HUB could be required to pay additional remuneration or royalties to its current and/or former employees, or be forced to litigate such monetary claims (which will not affect HUB's proprietary rights), which could negatively affect its business.

***Certain tax benefits that may be available to HUB, if obtained by HUB, would require it to continue to meet various conditions and may be terminated or reduced in the future, which could increase HUB's costs and taxes.***

HUB may be eligible for certain tax benefits provided to "Preferred Technological Enterprises" under the Israeli Law for the Encouragement of Capital Investments, 5719-1959, referred to as the Investment Law. If HUB obtains tax benefits under the "Preferred Technological Enterprises" regime then, in order to remain eligible for such tax benefits, it will need to continue to meet certain conditions stipulated in the Investment Law and its regulations, as amended. If these tax benefits are reduced, cancelled or discontinued, HUB's Israeli taxable income may be subject to the Israeli corporate tax rate of 23% in 2018 and thereafter. Additionally, if HUB increase its activities outside of Israel through acquisitions, for example, its activities might not be eligible for inclusion in future Israeli tax benefit programs. See "*Certain Material Israeli Tax Considerations*."

***It may be difficult to enforce a U.S. judgment against HUB, its officers and directors and the Israeli experts named in this proxy statement/prospectus in Israel or the United States, or to assert U.S. securities laws claims in Israel or serve process on HUB's officers and directors and these experts.***

Most of HUB's directors or officers are not residents of the United States and most of their and HUB's assets are located outside the United States. Service of process upon HUB or its non-U.S. resident directors and officers and enforcement of judgments obtained in the United States against HUB or its non-U.S. directors and executive officers may be difficult to obtain within the United States. HUB has been informed by its legal counsel in Israel that it may be difficult to assert claims under U.S. securities laws in original actions instituted in Israel or obtain a judgment based on the civil liability provisions of U.S. federal securities laws. Israeli courts may refuse to hear a claim based on a violation of U.S. securities laws against HUB or its non-U.S. officers and directors because Israel may not be the most appropriate forum to bring such a claim. In addition, even if an Israeli court agrees to hear a claim, it may determine that Israeli law and not U.S. law is applicable to the claim. If U.S. law is found to be applicable, the substance of applicable U.S. law must be proved as a fact, which can be a time-consuming and costly process. Certain matters of procedure will also be governed by Israeli law. There is little binding case law in Israel addressing the matters described above. Israeli courts might not enforce judgments rendered outside Israel, which may make it difficult to collect on judgments rendered against HUB or its non-U.S. officers and directors.

Moreover, an Israeli court will not enforce a non-Israeli judgment if (among other things) it was given in a state whose laws do not provide for the enforcement of judgments of Israeli courts (subject to exceptional cases), or if its enforcement is likely to prejudice the sovereignty or security of the State of Israel, or if it was obtained by fraud or in absence of due process, or if it is at variance with another valid judgment that was given in the same matter between the same parties, or if a suit in the same matter between the same parties was pending before a court or tribunal in Israel, at the time the foreign action was brought. For more information, see "*Enforceability of Civil Liabilities*."

***The rights and responsibilities of HUB shareholders will be governed by Israeli law, which may differ in some respects from the rights and responsibilities of shareholders of U.S. corporations.***

HUB is incorporated under Israeli law. The rights and responsibilities of holders of the HUB ordinary shares are governed by the HUB Security Articles and the Companies Law. These rights and responsibilities differ in some respects from the rights and responsibilities of shareholders in typical U.S. corporations. In particular, pursuant to the Companies Law each shareholder of an Israeli company has to act in good faith in exercising his or her rights and fulfilling his or her obligations toward the company and other shareholders and to refrain from abusing his or her power in the company, including, among other things,

54

in voting at the general meeting of shareholders and class meetings, on amendments to a company's articles of association, increases in a company's authorized share capital, mergers, and transactions requiring shareholders' approval under the Companies Law. In addition, a controlling shareholder of an Israeli company or a shareholder who knows that it possesses the power to determine the outcome of a shareholder vote or who has the power to appoint or prevent the appointment of a director or officer in the Company, or has other powers toward the Company has a duty of fairness toward the Company. However, Israeli law does not define the substance of this duty of fairness. These provisions may be interpreted to impose additional obligations and liabilities on holders of HUB's ordinary shares that are not typically imposed on shareholders of U.S. corporations There is limited case law available to assist in understanding the implications of these provisions that govern shareholder behavior.

***The HUB Security Articles provide that unless HUB consents otherwise, the competent courts of Tel Aviv, Israel shall be the sole and exclusive forum for substantially all disputes between HUB and its shareholders under the Companies Law and the Israeli Securities Law.***

The competent courts of Tel Aviv, Israel shall, unless HUB consents otherwise in writing, be the exclusive forum for (i) any derivative action or proceeding brought on behalf of HUB, (ii) any action asserting a claim of breach of fiduciary duty owed by any director, officer or other employee of HUB to HUB or HUB's shareholders, or (iii) any action asserting a claim arising pursuant to any provision of the Companies Law or the Israeli Securities Law. This exclusive forum provision is intended to apply to claims arising under Israeli law and would not apply to claims brought pursuant to the Securities Act or the Exchange Act or any other claim for which federal courts would have exclusive jurisdiction. Such exclusive forum provision in the HUB Security Articles will not relieve HUB of its duties to comply with federal securities laws and the rules and regulations thereunder, and shareholders of HUB will not be deemed to have waived HUB's compliance with these laws, rules and regulations. This exclusive forum provision may limit a shareholders ability to bring a claim in a judicial forum of its choosing for disputes with HUB or its directors or other employees which may discourage lawsuits against HUB, its directors, officers and employees.

***If HUB or any of its subsidiaries are characterized as a Passive Foreign Investment Company ("PFIC") for U.S. federal income tax purposes, U.S. Holders may suffer adverse tax consequences.***

A non-U.S. corporation generally will be treated as a PFIC for U.S. federal income tax purposes, in any taxable year if either (1) at least 75% of its gross income for such year is passive income or (2) at least 50% of the value of its assets (generally based on an average of the quarterly values of the assets) during such year is attributable to assets that produce or are held for the production of passive income. Based on the current and anticipated composition of the income, assets and operations of HUB and its subsidiaries, HUB does not believe it will be treated as a PFIC for the taxable year that includes the Business Combination, however there can be no assurances in this regard or any assurances that HUB will not be treated as a PFIC in any future taxable year. Moreover, the application of the PFIC rules is subject to uncertainty in several respects, and HUB cannot assure you that the IRS will not take a contrary position or that a court will not sustain such a challenge by the IRS.

Whether HUB or any of its subsidiaries are a PFIC for any taxable year is a factual determination that depends on, among other things, the composition of HUB's income and assets, and the market value of its and its subsidiaries' shares and assets. Changes in the composition of our income or composition of HUB or any of its subsidiaries assets may cause us to be or become a PFIC for the current or subsequent taxable years. Whether HUB is treated as a PFIC for U.S. federal income tax purposes is a factual determination that must be made annually at the close of each taxable year and, thus, is subject to significant uncertainty.

If HUB is a PFIC for any taxable year, a U.S. Holder (as defined in "*Certain Material U.S. Federal Income Tax Considerations*") of HUB ordinary shares may be subject to adverse tax consequences and may incur certain information reporting obligations. For a further discussion, see "*Certain Material U.S. Federal Income Tax Considerations — U.S. Holders — Passive Foreign Investment Company Rules.*" U.S. Holders of HUB ordinary shares and HUB warrants are strongly encouraged to consult their own advisors regarding the potential application of these rules to HUB and the ownership of HUB ordinary shares and/or HUB warrants.

55

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

***If a U.S. Holder is treated as owning at least 10% of the HUB ordinary shares, such U.S. Holder may be subject to adverse U.S. federal income tax consequences.***

For U.S. federal income tax purposes, if a U.S. Holder is treated as owning (directly, indirectly or constructively) at least 10% of the value or voting power of the HUB ordinary shares, such person may be treated as a "United States shareholder" with respect to HUB, or any of its direct or indirect non-U.S. subsidiaries, if HUB or such subsidiary is a "controlled foreign corporation." If, as expected, HUB has one or more U.S. subsidiaries, certain of HUB's non-U.S. subsidiaries will likely be treated as a controlled foreign corporation regardless of whether HUB is treated as a controlled foreign corporation (although there are recently promulgated final and currently proposed Treasury regulations that may limit the application of these rules in certain circumstances).

Certain United States shareholders of a controlled foreign corporation may be required to report annually and include in their U.S. federal taxable income their pro rata share of the controlled foreign corporation's "Subpart F income" and, in computing their "global intangible low-taxed income," "tested income" and a pro rata share of the amount of certain U.S. property (including certain stock in U.S. corporations and certain tangible assets located in the United States) held by the controlled foreign corporation regardless of whether such controlled foreign corporation makes any distributions. The amount includable by a United States shareholder under these rules is based on a number of factors, including potentially, but not limited to, the controlled foreign corporation's current earnings and profits (if any), tax basis in the controlled foreign corporation's assets, and foreign taxes paid by the controlled foreign corporation on its underlying income. Failure to comply with these reporting obligations (or related tax payment obligations) may subject such United States shareholder to significant monetary penalties and may extend the statute of limitations with respect to such United States shareholder's U.S. federal income tax return for the year for which reporting (or payment of tax) was due. The IRS has provided limited guidance on situations in which investors may rely on publicly available information to comply with their reporting and taxpaying obligations with respect to certain controlled foreign corporations. HUB cannot provide any assurances that it will assist U.S. Holders in determining whether HUB or any of its subsidiaries are treated as a controlled foreign corporation for U.S. federal income tax purposes or whether any U.S. Holder is treated as a United States shareholder with respect to any of such controlled foreign corporations or furnish to any holder information that may be necessary to comply with reporting and tax paying obligations if HUB, or any of its subsidiaries, is treated as a controlled foreign corporation for U.S. federal income tax purposes.

***The IRS may not agree that HUB should be treated as a non-U.S. corporation for U.S. federal income tax purposes.***

Under current U.S. federal income tax law, a corporation generally will be considered to be a U.S. corporation for U.S. federal income tax purposes if it is created or organized in the United States or under the law of the United States or of any State. Accordingly, under generally applicable U.S. federal income tax rules, HUB, which is incorporated and tax resident in Israel, would generally be classified as a non-U.S. corporation for U.S. federal income tax purposes. Section 7874 of the Code and the Treasury regulations promulgated thereunder, however, contain specific rules that may cause a non-U.S. corporation to be treated as a U.S. corporation for U.S. federal income tax purposes. If it were determined that HUB is treated as a U.S. corporation for U.S. federal income tax purposes under Section 7874 of the Code and the Treasury regulations promulgated thereunder, HUB would be liable for U.S. federal income tax on its income in the same manner as any other U.S. corporation and certain distributions made by HUB to Non-U.S. Holders (as defined in "*Certain Material U.S. Federal Income Tax Considerations*") of HUB may be subject to U.S. withholding tax.

As more fully described in the section titled "*Certain Material U.S. Federal Income Tax Considerations — U.S. Federal Income Tax Treatment of HUB — Tax Residence of HUB for U.S. Federal Income Tax Purposes,*" based on the terms of the Business Combination and certain factual assumptions, HUB does not currently expect to be treated as a U.S. corporation for U.S. federal income tax purposes under Section 7874 of the Code after the Business Combination. However, the application of Section 7874 of the Code is complex, subject to detailed regulations (the application of which is uncertain in various respects and would be impacted by changes in such U.S. Treasury regulations with possible retroactive effect) and

56

certain factual uncertainties, some of which must be determined after the completion of the Business Combination. Accordingly, there can be no assurance that the IRS will not challenge the status of HUB as a non-U.S. corporation for U.S. federal income tax purposes under Section 7874 of the Code or that such challenge would not be sustained by a court.

If the IRS were to successfully challenge under Section 7874 of the Code HUB's status as a non-U.S. corporation for U.S. federal income tax purposes, HUB and certain HUB shareholders may be subject to significant adverse tax consequences, including a higher effective corporate income tax rate on HUB and future withholding taxes on certain HUB shareholders, depending on the application of any applicable income tax treaty that may apply to reduce such withholding taxes.

See "*Certain Material U.S. Federal Income Tax Considerations — U.S. Federal Income Tax Treatment of HUB — Tax Residence of HUB for U.S. Federal Income Tax Purposes*" for a more detailed discussion of the application of Section 7874 of the Code to HUB. You should consult your own advisors regarding the application of Section 7874 of the Code to the Business Combination and the tax consequences if the classification of HUB as a non-U.S. corporation is not respected.

***Code Section 7874 may limit the ability of RNER and certain related U.S. corporations to use certain tax attributes following the Business Combination, increase HUB's U.S. affiliates' U.S. taxable income or have other adverse consequences to HUB and HUB's shareholders.***

Following the acquisition of a U.S. corporation by a foreign corporation, Code Section 7874 can limit the ability of the acquired U.S. corporation and certain U.S. affiliates to use U.S. tax attributes (including net operating losses and certain tax credits) to offset U.S. taxable income resulting from certain transactions, as well as result in certain other adverse tax consequences, even if the acquiring foreign corporation is respected as a foreign corporation for purposes of Code Section 7874. In general, if a foreign corporation acquires, directly or indirectly, substantially all of the properties held directly or indirectly by a U.S. corporation, and after the acquisition the former shareholders of the acquired U.S. corporation hold at least 60% (by either vote or value) but less than 80% (by vote and value) of the shares of the foreign acquiring corporation by reason of holding shares in the acquired U.S. corporation, subject to other requirements, certain adverse tax consequences under Section 7874 of the Code may apply.

If these rules apply to the Business Combination, HUB and certain of HUB's shareholders (including former RNER securityholders) may be subject to adverse tax consequences including, but not limited to, restrictions on the use of tax attributes with respect to "inversion gain" recognized over a 10-year period following the transaction, disqualification of dividends paid from preferential "qualified dividend income" rates and the requirement that any U.S. corporation owned by HUB include as "base erosion payments" that may be subject to a minimum U.S. federal income tax any amounts treated as reductions in gross income paid to certain related foreign persons. Furthermore, certain "disqualified individuals" (including officers and directors of a U.S. corporation) may be subject to an excise tax on certain stock-based compensation held thereby at a rate of 20%.

As more fully described in the section titled "*Certain Material U.S. Federal Income Tax Considerations — U.S. Federal Income Tax Treatment of Hub — Utilization of RNER's Tax Attributes and Certain Other Adverse Tax Consequences to HUB and HUB's Shareholders,*" based on the terms of the Business Combination, the rules for determining share ownership under Section 7874 of the Code and the Section 7874 Regulations (as defined in "*Certain Material U.S. Federal Income Tax Considerations — U.S. Federal Income Tax Treatment of HUB — Tax Residence of HUB for U.S. Federal Income Tax Purposes*"), and certain factual assumptions, HUB is not currently expected to be subject to these rules under Code Section 7874 after the Business Combination. The above determination, however, is subject to detailed regulations (the application of which is uncertain in various respects and would be impacted by future changes in such U.S. Treasury regulations, with possible retroactive effect) and is subject to certain factual uncertainties. Accordingly, there can be no assurance that the IRS will not challenge whether HUB is subject to the above rules or that such a challenge would not be sustained by a court.

However, even if HUB is not subject to the above adverse consequences under Section 7874, HUB may be limited in using its equity to engage in future acquisitions of U.S. corporations over a 36-month period following the Business Combination. If HUB were to be treated as acquiring substantially all of the assets of

57

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

a U.S. corporation within a 36-month period after the Business Combination, the Section 7874 Regulations would exclude certain shares of HUB attributable to the Business Combination for purposes of determining the Section 7874 Percentage (as defined in "*Certain Material U.S. Federal Income Tax Considerations — U.S. Federal Income Tax Treatment of HUB — Tax Residence of HUB for U.S. Federal Income Tax Purposes*") of that subsequent acquisition, making it more likely that Code Section 7874 will apply to such subsequent acquisition.

See "*Certain Material U.S. Federal Income Tax Considerations — U.S. Federal Income Tax Treatment of HUB — Utilization of RNER's Tax Attributes and Certain Other Adverse Tax Consequences to HUB and HUB's Shareholders*" for a more detailed discussion of the application of Code Section 7874 to the Business Combination. Investors in HUB should consult their own advisors regarding the application of Code Section 7874 to the Business Combination.

**Risks Related to the Business Combination**

***RNER may not have sufficient funds to consummate the Business Combination.***

As of June 30, 2022, RNER had $174,236 available to it outside the Trust Account to fund its working capital requirements. If RNER is required to seek additional capital, it would need to borrow funds from the Sponsor, its management team or other third parties to operate or it may be forced to liquidate. None of such persons is under any obligation to advance funds to RNER in such circumstances. Any such advances would be repaid only from funds held outside the Trust Account or from funds released to RNER upon completion of the Business Combination. If RNER is unable to consummate the Business Combination because it does not have sufficient funds available, and if RNER is not able to consummate another business combination within the timeline set forth in its Charter, RNER will be forced to cease operations and liquidate the Trust Account. Consequently, RNER's public stockholders may receive less than $10 per share and their warrants will expire worthless.

***If RNER's stockholders fail to properly demand redemption rights, they will not be entitled to convert their RNER Common Stock into a pro rata portion of the Trust Account.***

RNER stockholders holding public shares may demand that RNER convert their public shares into a pro rata portion of the Trust Account, calculated as of two (2) business days prior to the special meeting. To demand redemption rights, RNER stockholders must deliver their shares (either physically or electronically) to RNER's transfer agent no later than two (2) business days prior to the special meeting. Any stockholder who fails to properly demand redemption rights by delivering his, her or its shares will not be entitled to convert his, her or its shares into a pro rata portion of the Trust Account. See the section of this proxy statement/prospectus titled "*Special Meeting of RNER Stockholders — Redemption Rights*" for the procedures to be followed if you wish to convert your shares to cash.

***The Business Combination remains subject to conditions that RNER cannot control, including a minimum cash condition and the receipt of the requisite approval of the HUB Shareholders and if such conditions are not satisfied or waived, the Business Combination may not be consummated.***

The Business Combination is subject to a number of conditions, including the condition that RNER (or its successor) has at least $5,000,001 of net tangible assets (as determined in accordance with Rule 3a51-5(g)(1) of the Exchange Act) upon consummation of the Business Combination, that there is no legal prohibition against consummation of the Business Combination, that the HUB ordinary shares be approved for listing on Nasdaq subject only to official notice of issuance thereof and the requirement to have a sufficient number of round lot holders, receipt of securityholder approvals, continued effectiveness of the registration statement of which this proxy statement/prospectus is a part, the truth and accuracy of RNER's and HUB's representations and warranties made in the Business Combination Agreement, the non-termination of the Business Combination Agreement and consummation of certain ancillary agreements. The Business Combination is also subject to a condition in favor of HUB that the minimum cash condition is satisfied (despite the minimum cash condition currently being equal to the amount committed as part of the PIPE Investment). There are no assurances that all conditions to the Business Combination will be satisfied or that the conditions will be satisfied in the time frame expected.

58

If the conditions to the Business Combination are not met (and are not waived, to the extent waivable), either RNER or HUB may, subject to the terms and conditions of the Business Combination Agreement, terminate the Business Combination Agreement. See the section of this proxy statement/prospectus titled "*The Business Combination Agreement — Termination*."

***The exercise of RNER's directors' and officers' discretion in agreeing to changes or waivers in the terms of the Business Combination may result in a conflict of interest when determining whether such changes to the terms of the Business Combination or waivers of conditions are appropriate and in RNER's stockholders' best interest.***

In the period leading up to the closing of the Business Combination, events may occur that, pursuant to the Business Combination Agreement, would require RNER to agree to amend the Business Combination Agreement, to consent to certain actions taken by HUB or to waive rights that RNER is entitled to under the Business Combination Agreement. Waivers may arise because of changes in the course of HUB's business, a request by HUB to undertake actions that would otherwise be prohibited by the terms of the Business Combination Agreement or the occurrence of other events that would have a material adverse effect on HUB's business and would entitle RNER to terminate the Business Combination Agreement. In any of such circumstances, it would be at RNER's discretion, acting through its board of directors, to grant its consent or waive those rights. The existence of the financial and personal interests of the directors and officers described in the following risk factors may result in a conflict of interest on the part of one or more of the directors or officers between what he or they may believe is best for RNER and what he or they may believe is best for himself or themselves in determining whether or not to take the requested action. As of the date of this proxy statement/prospectus, RNER does not believe there will be any changes or waivers that RNER's directors and officers would be likely to make after stockholder approval of the Business Combination Proposal has been obtained. While certain changes could be made without further stockholder approval, RNER will circulate a new or amended proxy statement/prospectus and resolicit RNER's stockholders if changes to the terms of the Business Combination that would have a material impact on its stockholders or represent a fundamental change in the proposals being voted upon.

***HUB may issue additional HUB ordinary shares or other equity securities without seeking approval of the HUB shareholders, which would dilute the ownership interests represented by HUB ordinary shares and may depress the market price of the HUB ordinary shares.***

Upon consummation of the Business Combination, HUB will have warrants outstanding to purchase up to an aggregate of 13,384,650 HUB ordinary shares. Further, HUB may choose to seek third party financing to provide additional working capital for the HUB business, in which event HUB may issue additional equity securities. Following the consummation of the Business Combination, HUB may also issue additional HUB ordinary shares or other equity securities of equal or, subject to applicable law, of senior rank in the future for any reason or in connection with, among other things, future acquisitions, the redemption of outstanding warrants or repayment of outstanding indebtedness, without shareholder approval, in a number of circumstances.

The issuance of additional HUB ordinary shares or other equity securities of equal or, subject to any applicable law, senior rank would have the following effects:

- HUB's existing shareholders' proportionate ownership interest in HUB will decrease;
- the amount of cash available per share, including for payment of dividends in the future, may decrease;
- the relative voting strength of each previously outstanding HUB ordinary share may be diminished; and
- the market price of the HUB ordinary shares may decline.

***Future resales of the HUB ordinary shares issued in connection with the Business Combination may cause the market price of the HUB to drop significantly, even if HUB's business is doing well.***

Certain equityholders of RNER entered into the Sponsor Support Agreement with HUB. Pursuant to the Sponsor Support Agreement such RNER equityholders have agreed that, for a period of 9 months after

59

tm2223104-17_424b3 - none - 138.6881299s

TABLE OF CONTENTS

the Closing Date, they will not transfer any HUB ordinary shares, subject to certain limited exceptions. See the section of this proxy statement/prospectus titled "*Agreements Entered Into in Connection with the Business Combination — Support Agreements*."

Further, concurrently with the execution of the Business Combination Agreement, HUB, certain equityholders of HUB and certain equityholders of RNER entered into the Registration Rights Agreement, providing such stockholders with customary demand registration rights and piggy-back registration rights with respect to registration statements filed by HUB after the closing. See the section of this proxy statement/prospectus titled "*Agreements Entered Into in Connection with the Business Combination — Registration Rights Agreement*."

Upon expiration of the applicable lockup periods set forth in the Sponsor Support Agreement and upon the effectiveness of any registration statement HUB files pursuant to the above-referenced Registration Rights Agreement, in a registered offering of securities pursuant to the Securities Act or otherwise in accordance with Rule 144 under the Securities Act, the HUB shareholders may sell large amounts of HUB ordinary shares and warrants in the open market or in privately negotiated transactions, which could have the effect of increasing the volatility in the trading price of the HUB ordinary shares or the HUB warrants or putting significant downward pressure on the price of the HUB ordinary shares or warrants. Additionally, downward pressure on the market price of the HUB ordinary shares or HUB warrants likely will result from sales of HUB ordinary shares issued in connection with the exercise of warrants. Further, sales of HUB ordinary shares or warrants upon expiration of the applicable lockup period could encourage short sales by market participants. Generally, short selling means selling a security, contract or commodity not owned by the seller. The seller is committed to eventually purchase the financial instrument previously sold. Short sales are used to capitalize on an expected decline in the security's price. Short sales of HUB ordinary shares or warrants could have a tendency to depress the price of the HUB ordinary shares or the HUB warrants, respectively, which could increase the potential for short sales.

Additionally, through the Subscription Agreements, HUB has agreed with the PIPE Investors to register the PIPE Shares on a resale registration statement following the closing of the Transactions. These shares will be freely tradable without restriction or further registration under the Securities Act, unless the shares are held by any of RNER's or HUB's "affiliates" as such term is defined in Rule 144 under the Securities Act. This additional liquidity in the market for HUB ordinary shares may lead to downward pressure on the market price of the HUB ordinary shares.

***RNER's board of directors did not obtain a third-party fairness opinion in determining whether or not to proceed with the Business Combination.***

The board of directors of RNER originally determined that it would attempt to obtain a fairness opinion in order to support its decision prior to execution of the Business Combination Agreement. However, the negotiation of the transaction progressed at an accelerated pace and the analysis of Hub Security required significant time and resources. As a result, the investment banking firm that was engaged was not able to complete its review prior to the completion of negotiations. RNER's officers and directors have substantial experience in evaluating the operating and financial merits of companies from a wide range of industries and have substantial experience with mergers and acquisitions. Furthermore, in analyzing the Business Combination, RNER's board of directors conducted significant due diligence on HUB Security and again concluded that its members' collective experience and backgrounds, together with the experience and sector expertise of RNER's advisors, enabled it to make the necessary analyses and determinations regarding the Business Combination. Accordingly, the board of directors of RNER, after a thorough analysis, made the determination that the Business Combination was in the best interest of the stockholders of the Company and decided to proceed with the transaction notwithstanding the fact that the firm had not completed its analysis. The board of directors determined that it would attempt to obtain the fairness opinion after the execution of the definitive Business Combination Agreement as additional support for the decision made by the board of directors. After the execution of the Business Combination Agreement, RNER once more commenced the process to obtain the fairness opinion with the firm. However, shortly thereafter, the firm notified RNER that it did not intend to continue the engagement since the Business Combination Agreement had already been signed. The Board of RNER has decided not to obtain a fairness opinion in connection with the Business Combination. As such, investors will be relying solely

60

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

on the judgment of RNER's board of directors and management in valuing HUB's business, and RNER's board of directors and management may not have properly valued such business. As the RNER board of directors will not obtain such a fairness opinion prior to the closing of the Business Combination, such lack of a third-party fairness opinion may lead an increased number of stockholders to vote against the proposed Business Combination or demand redemption of their shares for cash, which could potentially impact RNER's ability to consummate the Business Combination or adversely affect HUB's liquidity following the consummation of the Business Combination.

### *RNER and HUB will incur significant transaction and transition costs in connection with the Business Combination.*

RNER and HUB have both incurred and expect to incur significant, non-recurring costs in connection with consummating the Transactions and operating as a U.S. listed public company following the consummation of the Transactions. HUB may also incur additional costs to retain key employees. All expenses incurred in connection with the Business Combination, including all legal, accounting, consulting, investment banking and other fees, expenses and costs, will be for the account of the party incurring such fees, expenses and costs or paid by HUB following the Closing, *provided* that the Unpaid SPAC Liabilities and Unpaid SPAC Expenses shall collectively not exceed $10 million without the prior written consent of HUB Security, with any such excess reducing the equity consideration issuable to the Sponsor in connection with the Business Combination.

### *Subsequent to the completion of the Business Combination, the combined company may be required to take write-downs or write-offs, restructuring and impairment or other charges that could have a significant negative effect on its financial condition, results of operations and the combined company's ordinary share price, which could cause the price of HUB's shares to fall and shareholders to lose some or all of their investment.*

Although RNER has conducted extensive due diligence on HUB, RNER cannot be certain that this diligence will surface all material issues that may be present in HUB's business, that it would be possible to uncover all material issues through a customary amount of due diligence, or that factors outside of HUB's business and outside of its control will not later arise. As a result of these factors, the combined company may be forced to later write-down or write-off assets, restructure its operations, or incur impairment or other charges that could result in its reporting losses. Even if RNER's due diligence successfully identified certain risks, unexpected risks may arise and previously known risks may materialize in a manner not consistent with RNER's preliminary risk analysis. Even though these charges may be non-cash items and would not have an immediate impact on the combined company's liquidity, the fact that the combined company reports charges of this nature could contribute to negative market perceptions of the combined company or its securities. In addition, charges of this nature may cause the combined company to violate net worth or other covenants to which the combined company may be subject as a result of assuming pre-existing debt held by HUB's business or by virtue of the combined company obtaining post-combination debt financing. Accordingly, any stockholders of HUB following the Business Combination could suffer a reduction in the value of their shares. Such shareholders are unlikely to have a remedy for such reduction in value.

### *The HUB securities to be received by RNER's securityholders as a result of the Business Combination will have different rights from RNER securities.*

Following completion of the Business Combination, RNER's securityholders will no longer be securityholders of RNER but will instead be securityholders of HUB. There will be important differences between the current rights as a RNER securityholder and the rights of a HUB securityholder. See "*Comparison of Rights of HUB Shareholders and RNER Stockholders*" for a discussion of the different rights associated with the HUB securities.

### *RNER's stockholders will have a reduced ownership and voting interest after consummation of the Business Combination and will exercise less influence over management.*

After the completion of the Business Combination, RNER's stockholders will own a smaller percentage of the combined company than they currently own of RNER. At the Closing, existing HUB shareholders

61

would hold approximately 75.1% of the issued and outstanding HUB ordinary shares and current stockholders of RNER (including the Sponsor) would hold approximately 20.3% of the issued and outstanding HUB ordinary shares (assuming no holder of RNER Common Stock exercises redemption rights as described in this proxy statement/prospectus, and based on current estimates of transaction expenses). Consequently, RNER's stockholders, as a group, will have reduced ownership and voting power in the combined company compared to their ownership and voting power in RNER.

***Even if the Business Combination is consummated, there is no guarantee that the HUB warrants will ever be in the money, and they may expire worthless and the terms of RNER's warrants may be amended.***

The exercise price for the HUB warrants will be $11.50 per ordinary share. Upon consummation of the Business Combination, each RNER warrant will become one HUB warrant, and the exercise price and number of shares issuable upon exercise of such warrants may change if the Stock Split is not effected or does not result in a price per HUB ordinary share of $10.00. There is no guarantee that the HUB warrants, following the Business Combination, will ever be in the money prior to their expiration, and as such, the warrants may expire worthless.

***RNER's current directors' and executive officers' affiliates own shares of RNER Common Stock and private placement units that will be worthless if the Business Combination is not approved. Such interests may have influenced their decision to approve the Business Combination.***

If the Business Combination or another business combination is not consummated by January 7, 2023 (or such later date as may be approved by RNER's stockholders in an amendment to the RNER Charter), RNER will cease all operations except for the purpose of winding up, redeeming 100% of the outstanding public shares for cash and, subject to the approval of its remaining stockholders and its board of directors, dissolving and liquidating. In such event, the 4,312,500 shares of Common Stock held by the Sponsor Group that were acquired for an aggregate purchase price of $25,000 prior to the RNER IPO, would be worthless because the holders are not entitled to participate in any redemption or distribution with respect to such shares. Further, the Sponsor and certain of RNER's executive officers purchased an aggregate of 596,200 private placement units at a price of $10.00 per unit, simultaneously with the consummation of the RNER IPO and the subsequent exercise of the underwriter's overallotment option, for an aggregate purchase price of $5,962,000. The Founder Shares and the private placement units will become worthless if RNER does not consummate a business combination by January 7, 2023 (or such later date as may be approved by RNER's stockholders in an amendment to the RNER Charter). On the other hand, if the Business Combination is consummated, each outstanding share of Common Stock will convert into one HUB ordinary share, subject to adjustment described herein, at the closing and each outstanding RNER warrant will become an HUB warrant. Such shares and warrants had an aggregate market value of approximately $50.5 million and approximately $785,000, respectively, based upon the closing price of $10.28 per share and $0.16 per warrant on Nasdaq on December 8, 2022. On December 5, 2022, RNER filed a proxy statement in connection with a special meeting of stockholders to (a) extend the date by which RNER has to consummate a business combination from January 7, 2023 to March 1, 2023 and (b) adjust the net tangible assets requirement under the RNER Charter. The special meeting is scheduled to take place on December 21, 2022 at 10:00 a.m., Eastern Time, for shareholders of record at the close of business on November 18, 2022.

As such, the Sponsor Group will benefit from the completion of a business combination and may be incentivized to complete an acquisition of a less favorable target company or on terms less favorable to shareholders, rather than liquidate. In addition, based on the difference in the purchase price of $0.006 that the Sponsor paid for the 4,312,500 Founder Shares for an aggregate price of $25,000, as compared to the purchase price of $10.00 per Public Unit sold in the IPO, the Sponsor may earn a positive rate of return even if the share price of the Combined Company after the Closing falls below the price initially paid for the Public Units in the IPO and the Public Shareholders experience a negative rate of return following the Closing of the Business Combination. In the event that a business combination is not effected, the Sponsor Group will not be entitled to any reimbursement of funds invested in RNER. In total, the Sponsor Group has invested $5,987,000 for securities that would be worthless absent the completion of a business combination.

These financial interests may have influenced the decision of RNER's directors and officers to approve the Business Combination and to continue to pursue the Business Combination. In considering the

62

recommendations of RNER's board of directors to vote for the Business Combination Proposal and other proposals, its stockholders should consider these interests. See the section of this proxy statement/prospectus titled "*Proposal One — The Business Combination Proposal — Interests of Certain Persons in the Transactions.*"

***The Sponsor, an affiliate of current officers and directors of RNER, is liable to ensure that proceeds of the Trust Account are not reduced by vendor claims in the event the Business Combination is not consummated. Such liability may have influenced RNER's board of directors' decision to pursue the Business Combination and RNER's board of directors' decision to approve it.***

If the Business Combination or another business combination is not consummated by RNER on or before January 7, 2023, the Sponsor, an affiliate of current officers and directors of RNER, will be liable to ensure that the proceeds in the Trust Account are not reduced by the claims of target businesses or claims of vendors or other entities that are owed money by RNER for services rendered or contracted for or for products sold to RNER, but only if such a vendor or target business has not executed a waiver agreement. If RNER consummates a business combination, on the other hand, RNER will be liable for all such claims. RNER has no reason to believe that the Sponsor will not be able to fulfill its indemnity obligations to RNER.

These obligations of the Sponsor may have influenced RNER's board of directors' decision to pursue the Business Combination with HUB or RNER's board of directors' decision to approve the Business Combination. In considering the recommendations of RNER's board of directors to vote for the Business Combination Proposal and other proposals, stockholders should consider these interests. See the section of this proxy statement/prospectus titled "*Proposal One — The Business Combination Proposal — Interests of Certain Persons in the Transactions.*"

***RNER's directors may decide not to enforce the indemnification obligations of the Sponsor, resulting in a reduction in the amount of funds in the Trust Account available for distribution to RNER's public stockholders in the event a business combination is not consummated.***

If proceeds in the Trust Account are reduced below $10.00 per public share and the Sponsor asserts that it is unable to satisfy its indemnification obligations or that it has no indemnification obligations related to a particular claim, RNER's independent directors would determine whether to take legal action against the Sponsor to enforce its indemnification obligations. While RNER currently expects that its independent directors would take legal action on RNER's behalf against the Sponsor to enforce the Sponsor's indemnification obligations, it is possible that RNER's independent directors in exercising their business judgment may choose not to do so in any particular instance. If RNER's independent directors choose not to enforce these indemnification obligations, the amount of funds in the Trust Account available for distribution to RNER's public stockholders may be reduced below $10.00 per share.

***Activities taken by existing RNER stockholders to increase the likelihood of approval of the Business Combination Proposal and other proposals could have a depressive effect on the RNER Common Stock.***

At any time prior to the special meeting, during a period when they are not then aware of any material nonpublic information regarding RNER or its securities, RNER, the Sponsor, RNER's officers and directors, HUB, the HUB officers and directors and/or their respective affiliates may purchase RNER Common Stock from institutional and other investors who vote, or indicate an intention to vote, against the Business Combination Proposal, or execute agreements to purchase such shares from such investors in the future, or they may enter into transactions with such investors and others to provide them with incentives to acquire shares of RNER Common Stock or vote their shares of RNER Common Stock in favor of the Business Combination Proposal. The purpose of such purchases and other transactions would be to increase the likelihood of approval of the Business Combination Proposal by the holders of a majority of the outstanding shares of RNER Common Stock and ensure that RNER has in excess of $5,000,001 of net assets to consummate the Business Combination where it appears that such requirement would otherwise not be met. While the exact nature of any such incentives has not been determined as of the date of this proxy statement/prospectus, they might include, without limitation, arrangements to protect such investors or holders against potential loss in value of their shares, including the granting of put options and the transfer to such investors or holders of shares owned by the Sponsor for nominal value. Entering into any such arrangements

63

may have a depressive effect on the RNER Common Stock. For example, as a result of these arrangements, an investor or holder may have the ability to effectively purchase shares of RNER Common Stock at a price lower than market and may therefore be more likely to sell the RNER Common Stock he owns, either prior to or immediately after the special meeting.

In addition, if such purchases are made, the public "float" of the HUB ordinary shares following the Business Combination and the number of beneficial holders of HUB securities may be reduced, possibly making it difficult to obtain or maintain the quotation, listing or trading of HUB securities on Nasdaq or another national securities exchange or reducing the liquidity of the trading market for the HUB ordinary shares.

***The Business Combination may be completed even though material adverse effects may result from the announcement of the Business Combination, industry-wide changes and other causes.***

In general, either RNER or HUB may refuse to complete the Business Combination if there is a material adverse effect affecting the other party between the signing date of the Business Combination Agreement and the planned closing. However, certain types of changes do not permit either party to refuse to consummate the Business Combination, even if such change could be said to have a material adverse effect on HUB or RNER, including the following events (except, in certain cases where the change has a disproportionate effect on a party):

- changes generally affecting the economy and the financial or securities markets, including the COVID-19 pandemic;

- the outbreak or escalation of war or any act of terrorism, civil unrest or natural disasters;

- changes (including changes in law) or general conditions in the industry in which the party operates;

- changes in IFRS, or the authoritative interpretation of IFRS; or

- changes attributable to the public announcement or pendency of the Transactions or the execution or performance of the Business Combination Agreement.

Furthermore, RNER or HUB may waive the occurrence of a material adverse effect affecting the other party. If a material adverse effect occurs and the parties still consummate the Business Combination, the market trading price of the HUB ordinary shares and HUB warrants may suffer.

***Delays in completing the Business Combination may substantially reduce the expected benefits of the Business Combination.***

Satisfying the conditions to, and completion of, the Business Combination may take longer than, and could cost more than, RNER expects. Any delay in completing or any additional conditions imposed in order to complete the Business Combination may materially adversely affect the benefits that RNER expects to achieve from the Business Combination.

***RNER and HUB have no history operating as a combined company. The unaudited pro forma condensed combined financial information may not be an indication of HUB's financial condition or results of operations following the Business Combination, and accordingly, investors may have limited financial information on which to evaluate HUB and make investment decisions.***

HUB has a limited operating history and HUB and RNER currently operate as separate entities and have no prior history as a combined entity and their operations have not been previously managed on a combined basis. The unaudited pro forma condensed combined financial information contained in this proxy statement/prospectus has been prepared using the consolidated historical financial statements of RNER and HUB, and is presented for illustrative purposes only and should not be considered to be an indication of the results of operations including, without limitation, future revenue, or financial condition of RNER following the Business Combination. Certain adjustments and assumptions have been made regarding RNER after giving effect to the Business Combination. HUB and RNER believe these assumptions are reasonable, however, the information upon which these adjustments and assumptions have been made is preliminary, and these kinds of adjustments are difficult to make with accuracy. These assumptions may not

64

prove to be accurate, and other factors may affect RNER's results of operations or financial condition following the consummation of the Business Combination. For these and other reasons, the historical and pro forma condensed combined financial information included in this proxy statement/prospectus does not necessarily reflect HUB's results of operations and financial condition and the actual financial condition and results of operations of HUB following the Business Combination may not be consistent with, or evident from, this pro forma financial information.

***The projections and forecasts presented in this proxy statement/prospectus may not be an indication of the actual results of the transaction or HUB's future results.***

This proxy statement/prospectus contains projections and forecasts prepared by HUB. None of the projections and forecasts included in this proxy statement/prospectus have been prepared with a view toward public disclosure other than to certain parties involved in the Business Combination or toward complying with SEC guidelines or IFRS. Accordingly, such projections and forecasts should not be viewed as public guidance. The projections and forecasts were prepared based on numerous variables and assumptions which are inherently uncertain and may be beyond the control of HUB and RNER and exclude, among other things, transaction-related expenses. Important factors that may affect actual results and results of HUB's operations following the Business Combination, or could lead to such projections and forecasts not being achieved include, but are not limited to: client demand for HUB's products, an evolving competitive landscape, rapid technological change, margin shifts in the industry, regulation changes in a highly regulated environment, successful management and retention of key personnel, unexpected expenses and general economic conditions. While HUB assumes responsibility for the accuracy and completeness of the projections and forecasts to the extent included in this proxy statement/prospectus, investors are cautioned not to place undue reliance on the projections, as the projections may be materially different than actual results.

***If RNER is unable to complete the Business Combination or another business combination by January 7, 2023 (or such other date as approved by RNER stockholders through approval of an amendment to the RNER Charter), RNER will cease all operations except for the purpose of winding up, redeeming 100% of the outstanding public shares and, subject to the approval of its remaining stockholders and its board of directors, dissolving and liquidating. In such event, RNER public stockholders may only receive $10 per share (or less than such amount in certain circumstances) and RNER warrants will expire worthless.***

If RNER is unable to complete the Business Combination or another business combination within the required time period, RNER will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem 100% of the outstanding public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account, including interest earned on the funds held in the Trust Account and not previously released to RNER to pay taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding RNER public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidation distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of RNER's remaining stockholders and its board of directors, dissolve and liquidate, subject (in the case of (ii) and (iii) above) to RNER's obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. In such case, RNER public stockholders may only receive $10 per share, and RNER warrants will expire worthless. In certain circumstances, RNER public stockholders may receive less than $10 per share on the redemption of their shares. On December 5, 2022, RNER filed a proxy statement in connection with a special meeting of stockholders to (a) extend the date by which RNER has to consummate a business combination from January 7, 2023 to March 1, 2023 and (b) adjust the net tangible assets requirement under the RNER Charter. The special meeting is scheduled to take place on December 21, 2022 at 10:00 a.m., Eastern Time, for shareholders of record at the close of business on November 18, 2022.

***If the Business Combination is not completed, potential target businesses may have leverage over RNER in negotiating a business combination, RNER's ability to conduct due diligence on a business combination as it approaches its dissolution deadline may decrease, and it may have insufficient working capital to continue to pursue potential target businesses, each of which could undermine its ability to complete a business combination on terms that would produce value for RNER stockholders.***

Any potential target business with which RNER enters into negotiations concerning an initial business combination will be aware that, unless RNER amends its existing charter to extend its life and amend certain

65

other agreements it has entered into, then RNER must complete its initial business combination by January 7, 2023. Consequently, if RNER is unable to complete this Business Combination, a potential target business may obtain leverage over it in negotiating an initial business combination, knowing that if RNER does not complete its initial business combination with that particular target business, it may be unable to complete its initial business combination with any target business. This risk will increase as RNER gets closer to the timeframe described above. In addition, RNER may have limited time to conduct due diligence and may enter into its initial business combination on terms that it would have rejected upon a more comprehensive investigation. Additionally, RNER may have insufficient working capital to continue efforts to pursue a business combination.

*In the event of liquidation by RNER, third parties may bring claims against RNER and, as a result, the proceeds held in the Trust Account could be reduced and the per-share liquidation price received by stockholders could be less than $10 per share.*

Under the terms of the RNER Charter, RNER must complete the Business Combination or another business combination by January 7, 2023 (unless such date is extended by RNER's stockholders) or RNER must cease all operations except for the purpose of winding up, redeeming 100% of the outstanding public shares and, subject to the approval of its remaining stockholders and its board of directors, dissolving and liquidating. In such event, third parties may bring claims against RNER. Although RNER has obtained waiver agreements from certain vendors and service providers it has engaged and owes money to, and the prospective target businesses it has negotiated with, whereby such parties have waived any right, title, interest or claim of any kind they may have in or to any monies held in the Trust Account, there is no guarantee that they or other vendors who did not execute such waivers will not seek recourse against the Trust Account notwithstanding such agreements. Furthermore, there is no guarantee that a court will uphold the validity of such agreements. Accordingly, the proceeds held in the Trust Account could be subject to claims which could take priority over those of RNER's public stockholders. If RNER is unable to complete a business combination within the required time period, the Sponsor has agreed that it will be liable to RNER if and to the extent any claims by a vendor for services rendered or products sold to it, or a prospective target business with which it has discussed entering into a transaction agreement, reduces the amount of funds in the Trust Account to below $10.00 per public share, except as to any claims by a third party who executed a waiver of any and all rights to seek access to the Trust Account and except as to any claims under RNER's indemnity of the underwriter of the initial public offering against certain liabilities, including liabilities under the Securities Act. Moreover, in the event that an executed waiver is deemed to be unenforceable against a third party, the Sponsor will not be responsible to the extent of any liability for such third party claims. Furthermore, the Sponsor will not be liable to public stockholders and instead will only have liability to RNER. RNER has not independently verified whether the Sponsor has sufficient funds to satisfy its indemnity obligations and, therefore, the Sponsor may not be able to satisfy those obligations. RNER has not asked the Sponsor to reserve for such eventuality. Therefore, the per-share distribution from the Trust Account in such a situation may be less than the approximately $10.26 (based on the amounts held in the Trust Account as of the record date, after deducting unpaid income and franchise tax obligations) estimated to be in the Trust Account as of two business days prior to the special meeting date, due to such claims.

Additionally, if RNER is forced to file a bankruptcy case or an involuntary bankruptcy case is filed against it which is not dismissed, or if RNER otherwise enters compulsory or court supervised liquidation, the proceeds held in the Trust Account could be subject to applicable bankruptcy law and may be included in its bankruptcy

*RNER's stockholders may be held liable for claims by third parties against RNER to the extent of distributions received by them.*

If RNER is unable to complete the Business Combination or another business combination within the required time period, RNER will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem 100% of the outstanding public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account, including interest earned on the funds held in the Trust Account and not previously released to RNER to pay taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of

66

then outstanding RNER public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidation distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of RNER's remaining stockholders and its board of directors, dissolve and liquidate, subject (in the case of (ii) and (iii) above) to RNER's obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. RNER cannot be certain that it will properly assess all claims that may be potentially brought against RNER. As a result, RNER's stockholders could potentially be liable for any claims to the extent of distributions received by them (but no more) and any liability of its stockholders may extend well beyond the third anniversary of the date of distribution. Accordingly, RNER cannot be certain that third parties will not seek to recover from its stockholders amounts owed to them by RNER.

Additionally, if RNER is forced to file a bankruptcy case or an involuntary bankruptcy case is filed against it that is not dismissed, any distributions received by stockholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover all amounts received by RNER's stockholders. Because RNER intends to distribute the proceeds held in the Trust Account to its public stockholders promptly after the expiration of the time period to complete a business combination, this may be viewed or interpreted as giving preference to its public stockholders over any potential creditors with respect to access to or distributions from its assets. Furthermore, RNER's board of directors may be viewed as having breached their fiduciary duties to its creditors and/or may have acted in bad faith, and thereby exposing itself and RNER to claims of punitive damages, by paying public stockholders from the Trust Account prior to addressing the claims of creditors. RNER cannot be certain that claims will not be brought against it for these reasons.

***RNER may be a target of securities class action and derivative lawsuits which could result in substantial costs and may delay or prevent the Business Combination from being completed.***

Securities class action lawsuits and derivative lawsuits are often brought against companies that have entered into business combination agreements or similar agreements. Even if the lawsuits are without merit, defending against these claims can result in substantial costs and divert management time and resources. An adverse judgment could result in monetary damages, which could have a negative impact on RNER's liquidity and financial condition. Additionally, if a plaintiff is successful in obtaining an injunction prohibiting consummation of the Transactions, then that injunction may delay or prevent the Transactions from being completed. Currently, RNER is not aware of any securities class action lawsuits or derivative lawsuits being filed in connection with the Transactions.

***The Sponsor has agreed to vote in favor of the Business Combination, regardless of how RNER's public stockholders vote.***

The Sponsor owns and is entitled to vote an aggregate of approximately 20% on an as-converted basis of the outstanding RNER Common Stock and has agreed to vote its shares in favor of the Business Combination Proposal. The Sponsor has also indicated that it intends to vote its shares in favor of all other proposals being presented at the meeting. Therefore, in addition to the Founder Shares held by the Sponsor and RNER's officers and directors, RNER would need 6,170,651 shares, or approximately 35.8%, of the 17,250,000 public shares to be voted in favor of the Business Combination Proposal and other proposals in order for them to be approved (assuming all outstanding shares are voted on each proposal). Accordingly, it is more likely that the necessary stockholder approval for the Business Combination Proposal and the other proposals will be received than would be the case if the Sponsor agreed to vote its Founder Shares in accordance with the majority of the votes cast by RNER's public stockholders.

***The ongoing COVID-19 pandemic may adversely affect RNER's and HUB's ability to consummate the Transactions.***

The COVID-19 pandemic has resulted in governmental authorities worldwide implementing numerous measures to contain the virus, including travel restrictions, quarantines, shelter-in-place orders and business limitations and shutdowns. More generally, the pandemic raises the possibility of an extended global

67

tm2223104-17_424b3 - none - 138.6881299s

economic downturn and has caused volatility in financial markets. The pandemic may also amplify many of the other risks described in this proxy statement/prospectus.

RNER and HUB may be unable to complete the Transactions if continued concerns relating to COVID-19 restrict travel and limit the ability to have meetings with potential investors or the HUB personnel. The extent to which COVID-19 impacts RNER's and HUB's ability to consummate the Transactions will depend on future developments, which are highly uncertain and cannot be predicted, including new information that may emerge concerning the severity of COVID-19 and the actions to contain COVID-19 or treat its impact, among others. If the disruptions posed by COVID-19 or other matters of global concern continue for an extended period of time, RNER's and HUB's ability to consummate the Transactions may be materially adversely affected.

***The Business Combination may be a taxable event for U.S. Holders of RNER Securities.***

There are significant factual and legal uncertainties as to (i) whether the Business Combination qualifies as a "reorganization" within the meaning of Section 368(a) of the Code and (ii) whether the Business Combination results in gain being recognized by U.S. Holders of RNER Common Stock and RNER warrants under Section 367(a) of the Code.

There are many requirements that must be satisfied in order for the Business Combination to qualify as a "reorganization" within the meaning of Section 368(a) of the Code, some of which are based upon factual determinations, and the reorganization treatment could be adversely affected by events or actions that occur or are taken after the Business Combination. One such requirement, among others, is that the acquiring corporation continue, either directly or indirectly through certain controlled entities, either a significant line of the acquired corporation's historic business or use a significant portion of the acquired corporation's historic business assets in a business, in each case, within the meaning of Treasury Regulations Section 1.368-1(d). However, due to the absence of guidance bearing directly on how the above rules apply in the case of an acquisition of a corporation with no active business and only investment-type assets, such as RNER, although the parties intend that the Business Combination qualifies as a "reorganization" within the meaning of section 368(a) of the Code, the qualification of the Business Combination as a reorganization is not free from doubt. In addition, the treatment of the Business Combination as a reorganization would depend on whether sufficient stockholders of RNER exchange their common stock for HUB Security ordinary shares rather than redeem it for cash and the amount of certain transaction expenses paid by RNER in connection with Closing. If a significant number of stockholders of RNER decide to redeem their common stock and/or RNER uses significant amounts of remaining cash to pay certain transaction expenses in connection with the Business Combination, the "continuity of business enterprise" requirement that is necessary to qualify as a reorganization under Section 368 of the Code may not be satisfied and the requirement that RNER retain "substantially all" of its assets to qualify as a reorganization under Section 368 of the Code may not be satisfied. In addition, the requirements of Section 368(a) of the Code limit the property other than HUB Security ordinary shares ("other property" or "boot") which may be used as consideration to acquire the RNER outstanding shares. "Other property" or "boot" can take many different forms and, if a sufficient threshold of "other property" or "boot" consideration is received by RNER stockholders in connection with the Business Combination, the Business Combination may not qualify as a "reorganization" within the meaning of Section 368(a) of the Code. The holders of RNER shares that are parties to the Put and Call Option Agreement may be treated as receiving valuable legal rights and entitlements that could constitute "other property," "boot" or a separate class of what is treated as equity for U.S. tax purposes of HUB Security in the Business Combination and this treatment, as well as the generally uncertain treatment of the Put and Call Option Agreement under the provisions of Section 368(a) of the Code, raises additional risk that the Business Combination will not qualify as a "reorganization" within the meaning of Section 368(a) of the Code or otherwise be taxable.

Moreover, Section 367(a) of the Code and the applicable Treasury Regulations promulgated thereunder provide that where a U.S. Holder exchanges stock in a U.S. corporation for stock in a non-U.S. corporation in a transaction that would otherwise qualify as a reorganization within the meaning of Section 368(a) of the Code, the U.S. Holder is required to recognize gain, but not loss, realized on such exchange unless certain requirements are met. In general, for the Business Combination to meet these additional requirements, certain reporting requirements must be satisfied and (i) no more than 50% of both the total voting power

68

and the total value of the stock of the transferee foreign corporation is received, in the aggregate, by the "U.S. transferors" (as defined in the Treasury Regulations and computed taking into account direct, indirect and constructive ownership) in the transaction; (ii) no more than 50% of each of the total voting power and the total value of the stock of the transferee foreign corporation is owned, in the aggregate, immediately after the transaction by "U.S. persons" (as defined in the Treasury Regulations) that are either officers or directors or "five-percent target shareholders" (as defined in the Treasury Regulations and computed taking into account direct, indirect and constructive ownership) of the transferred U.S. corporation; and (iii) the "active trade or business test" as defined in Treasury Regulations Section 1.367(a)-3(c)(3) must be satisfied. There are significant factual and legal uncertainties concerning the determination of whether these requirements will be satisfied in the case of the Business Combination.

The closing of the Business Combination is not conditioned upon the receipt of an opinion of counsel that the Business Combination will qualify as a reorganization within the meaning of Section 368(a) of the Code, and neither RNER nor HUB intends to request a ruling from the IRS regarding the U.S. federal income tax treatment of the Business Combination, and no such opinion is expected to be rendered. In particular, due to the absence of guidance bearing directly on whether an acquisition of a corporation with no active business and only investment-type assets, such as RNER, can qualify as a "reorganization" under Section 368(a) of the Code, Loeb & Loeb LLP, counsel for RNER, is not able to render an opinion that the Business Combination will qualify as a "reorganization" under Section 368(a) of the Code. Accordingly, even if the Business Combination were treated as a reorganization within the meaning of Section 368(a) of the Code, no assurance can be given that the IRS will not challenge the Business Combination's treatment as a reorganization within the meaning of Section 368(a) of the Code or that a court will not sustain such a challenge by the IRS. Neither RNER nor HUB, nor any of their respective advisors or affiliates, makes any representations or provides any assurances regarding the tax treatment of the Business Combination, including (i) whether the Business Combination qualifies as a "reorganization" within the meaning of Section 368(a) of the Code or (ii) whether the Business Combination results in gain being recognized by U.S. Holders of RNER Common Stock and RNER warrants under Section 367(a) of the Code. At this point, because of the legal and factual uncertainties described above, RNER and HUB may be unable to take a reporting position on their applicable tax returns that the Business Combination qualifies as a "reorganization" within the meaning of Section 368(a) of the Code.

If, as of the Closing Date, the Business Combination does not qualify as a "reorganization" within the meaning of Section 368(a) of the Code, a U.S. Holder that exchanges its RNER securities for the consideration under the Business Combination would recognize gain or loss in an amount equal to the difference, if any, between the fair market value (as of the Closing Date) of HUB Security ordinary shares and/or HUB Security warrants received in the Business Combination, over such U.S. Holder's aggregate tax basis in the corresponding RNER securities surrendered by such U.S. Holder in the Business Combination.

If, as of the Closing Date, the Business Combination qualifies as a "reorganization" within the meaning of Section 368(a) of the Code, but any requirement for Section 367(a) of the Code and the applicable Treasury Regulations promulgated thereunder is not satisfied, then a U.S. Holder of RNER securities would recognize gain (but not loss) in an amount equal to the excess, if any, of the fair market value as of the Closing Date of HUB Security ordinary shares and/or HUB Security warrants received in the Business Combination, over such U.S. Holder's aggregate tax basis in the corresponding RNER securities surrendered by such U.S. Holder in exchange for HUB Security ordinary shares and/or HUB Security warrants in the Business Combination.

U.S. Holders of RNER securities are strongly urged to consult their own tax advisors to determine the tax consequences if the Business Combination does not qualify as a reorganization within the meaning of Section 368(a) of the Code as well as the impact of Section 367 of the Code.

***Pursuant to the terms of the Put and Call Option Agreement, HUB may be required to buy back certain of its ordinary shares from certain members of the Sponsor group to cover certain tax liabilities of such members.***

In connection with the Business Combination Agreement, HUB entered into a Put and Call Option Agreement with certain stockholders of RNER ("Indemnitees") pursuant to which, in the event it is determined by HUB Security or the IRS pursuant to the terms set forth in the Put and Call Option Agreement that the Business Combination does not qualify for the Intended Tax Treatment or Treasury

69

Regulations Section 1.367(a)-3(c)(1), HUB may be required to buy back all or a portion of certain of HUB's ordinary shares held by the Indemnitees in the amount of up to $15 million to cover the Indemnities' U.S. federal, state and local income tax liability, as determined pursuant to the terms set forth in the Put and Call Option Agreement, from the exchange of shares in the Business Combination. Indemnitees include members of the Sponsor who acquired their Common Stock in RNER for $0.0001 and whose potential U.S. federal, state and local income tax liability from the Business Combination estimated to be is significantly greater than that of other RNER stockholders who acquired RNER Common Stock at $10 per share. To secure the obligations of HUB to the Indemnitees, HUB covenanted to keep $15 million of cash on its balance sheet until the expiration of its obligations to the Indemnitees. The buy-back price is the lowest of (i) $10 per share, (ii) the per-share redemption price that a public stockholder would receive if such stockholder chose to redeem a RNER share in connection with the Business Combination and (iii) the closing price of HUB's ordinary shares on the day after the consummation of the Business Combination Agreement.

The $15 million in cash that HUB must keep on its balance sheet during the term of its obligations under the Put and Call Option Agreement, is a material portion of the total sums that HUB will raise from the Business Combination. HUB's expenditure of all or part of such sums in the event of it must execute the share buyback may negatively affect HUB's ability to achieve its business development goals. HUB's expenditure on the buyback may have an adverse effect on HUB's profitability. The Initial Stockholders of RNER are the sole beneficiaries of the Put and Call Option Agreement and will derive all of its benefits. RNER stockholders who are not beneficiaries of the Put and Call Option Agreement may object to their exclusion from its benefits, and may bring legal action against HUB for such exclusion.

***HUB Security may redeem the unexpired HUB Security warrants issued upon conversion of RNER warrants prior to their exercise at a time that is disadvantageous to holders, thereby making such warrants worthless. Additionally, the exercise price for the warrants is $11.50 per share, and the warrants may expire worthless unless the share price is higher than the exercise price during the exercise period.***

HUB Security will have the ability to redeem outstanding HUB Security warrants issued upon conversion of RNER warrants at any time after they become exercisable and prior to their expiration at a price of $0.01 per warrant; provided that the last reported sales price of the HUB Security Ordinary Shares equals or exceeds $18.00 per share (subject to adjustment in compliance with the terms of the Warrant Agreement) for any 20 trading days within a 30 trading-day period ending on the third trading day prior to the date HUB Security sends the notice of such redemption to the warrant holders. If and when the HUB Security warrants become redeemable by HUB Security, HUB Security may exercise HUB Security's redemption right even if HUB Security is unable to register or qualify the underlying securities for sale under all applicable state securities laws. As a result, HUB Security may redeem the warrants as set forth above even if the holders are otherwise unable to exercise their warrants. Redemption of the outstanding warrants as described above could force warrant holders to (i) exercise their warrants and pay the exercise price therefor at a time when it may be disadvantageous for them to do so, (ii) sell their warrants at the then-current market price when they might otherwise wish to hold their warrants or (iii) accept the nominal redemption price which, at the time the outstanding HUB Security warrants issued upon conversion of RNER warrants are called for redemption, is likely to be substantially less than the market value of the warrants.

In addition, HUB Security will have the ability to redeem outstanding HUB Security warrants issued upon conversion of RNER warrants at any time after they become exercisable and prior to their expiration, at a price of $0.01 per warrant; provided that the last reported sales price of the HUB Security Ordinary Shares equals or exceeds $18.00 per share (subject to adjustment in compliance with the terms of the Warrant Agreement) for any 20 trading days within a 30 trading-day period ending on the third trading day prior to the date on which HUB Security sends the notice of redemption to the warrant holders; provided, further that holders will be able to exercise their warrants prior to redemption for a number of HUB Security Ordinary Shares determined based on the redemption date and the fair market value of the HUB Security Ordinary Shares.

Any such redemption may have similar consequences to a cash redemption described above. In addition, such redemption may occur at a time when the warrants are "out-of-the-money," in which case holders would lose any potential embedded value from a subsequent increase in the value of the HUB Security Ordinary Shares had their warrants remained outstanding.

70

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

***Holders of RNER Common Stock may continue to hold any HUB Security warrants to be issued upon conversion of RNER warrants that they own, which would result in additional dilution to non-redeeming holders upon the exercise of the warrants.***

Holders of RNER Common Stock who redeem their RNER Common Stock may continue to hold any HUB Security warrants issued upon conversion of RNER warrants that they own, which would result in additional dilution to non-redeeming holders upon the exercise of the HUB Security warrants issued upon conversion of RNER warrants. Assuming maximum redemption of the RNER Common Stock, 17,250,000 HUB Security warrants issued upon conversion of RNER warrants would be retained with an aggregate market value of $2,760,000, based on the market price of $0.16 per warrant as of December 8, 2022. As a result, the redeeming holders of RNER Common Stock would recoup their entire investment and continue to hold HUB Security warrants issued upon conversion of RNER warrants with an aggregate market value of $2,760,000, while non-redeeming holders of RNER Common Stock would suffer additional dilution in their percentage ownership and voting interest of HUB Security upon the exercise of the HUB Security warrants held by the redeeming holders.

**Risks Related to the Adjournment Proposal**

***If the Adjournment Proposal is not approved, RNER's board of directors will not have the ability to adjourn the special meeting to a later date.***

If, at the special meeting, the chairman presiding over the special meeting determines that it would be in the best interests of RNER to adjourn the special meeting to give RNER more time to consummate the Business Combination for whatever reason (such as if the Business Combination Proposal is not approved, or if RNER (or its successor) would have net tangible assets of less than $5,000,001 upon the consummation of the Transactions, or if additional time is needed to fulfil other closing conditions), the chairman presiding over the special meeting will seek approval to adjourn the special meeting to a later date or dates. If the Adjournment Proposal is not approved, the chairman will not have the ability to adjourn the special meeting to a later date in order to solicit further votes. In such event, the Business Combination would not be completed.

**Risks Related to Redemption**

***The ability of RNER public stockholders to exercise redemption rights with respect to a large number of RNER Shares could increase the probability that the Business Combination would be unsuccessful and that RNER stockholders would have to wait for liquidation in order to redeem RNER Common Stock.***

The obligations of HUB and Merger Sub to consummate the Business Combination is conditioned upon, among other things, RNER having an amount of available cash in its Trust Account, following payment by RNER to its stockholders who have validly elected to redeem their shares of RNER Common Stock and business combination agreement fees of approximately $6.9 million, plus proceeds from the PIPE Investment, of no less than approximately $50,000,000. If the Business Combination is not consummated, RNER stockholders would not receive its pro rata portion of the Trust Account until the Trust Account is liquidated. If RNER stockholders are in need of immediate liquidity, they could attempt to sell RNER Common Stock in the open market; however, at such time RNER Common Stock may trade at a discount to the pro rata amount per share in the Trust Account. In either situation, RNER stockholders may suffer a material loss on their investment or lose the benefit of funds expected in connection with RNER's redemption until RNER liquidates or RNER stockholders are able to sell RNER Common Stock in the open market.

***Public stockholders, together with any affiliates of theirs or any other person with whom they are acting in concert or as a "group," will be restricted from seeking redemption rights with respect to more than 15% of the public shares.***

A public stockholder of RNER, together with any affiliate or any other person with whom such stockholder is acting in concert or as a "group," will be restricted from seeking redemption rights with respect to more than 15% of the RNER public shares. Accordingly, if a holder of RNER common stock

71

holds more than 15% of the RNER public shares and the Business Combination Proposal is approved, it will not be able to seek redemption rights with respect to the full amount of such shares and may be forced to hold the shares in excess of 15% or sell them in the open market. RNER cannot be certain that the value of such excess shares will appreciate over time following a business combination or that the market price of RNER Common Stock will exceed the per-share redemption price.

***There is no guarantee that a RNER stockholder's decision to redeem its shares for a pro rata portion of the Trust Account will put the stockholder in a better future economic position.***

There is no assurance as to the price at which an RNER stockholder may be able to sell its HUB ordinary shares in the future following the completion of the Transactions or shares with respect to any alternative business combination. Certain events following the consummation of any initial business combination, including the Transactions, may cause an increase in the share price, and may result in a lower value realized now than a stockholder of RNER might realize in the future had the stockholder not redeemed his, her or its shares. Similarly, if a stockholder does not redeem its shares, the stockholder will bear the risk of ownership of the public shares after the consummation of any initial business combination, and there can be no assurance that a stockholder can sell its shares in the future for a greater amount than the redemption price set forth in this proxy statement/prospectus. A stockholder should consult the stockholder's tax and/or financial advisor for assistance on how this may affect his, her or its individual situation.

***RNER stockholders do not have any rights or interests in funds from the Trust Account, except under certain limited circumstances. To liquidate their investment, RNER stockholders may be forced to redeem or sell their public shares or warrants, potentially at a loss.***

RNER stockholders will be entitled to receive funds from the Trust Account only upon the earlier to occur of: (i) RNER's completion of the Business Combination or, if the Business Combination is not completed, an alternative business combination, and then only in connection with those shares of RNER Common Stock that such stockholder properly elected to redeem, subject to the limitations described herein, and (ii) the redemption of RNER's public shares if RNER is unable to complete an initial business combination by January 7, 2023, subject to applicable law and as further described herein. In addition, if RNER plans to redeem its public shares because RNER is unable to complete an initial business combination by January 7, 2023, for any reason, compliance with Delaware law may require that RNER submit a plan of dissolution to RNER's then-existing stockholders for approval prior to the distribution of the proceeds held in RNER's Trust Account. In that case, public stockholders may be forced to wait beyond January 7, 2023, before they receive funds from the Trust Account. In no other circumstances will Public Stockholders have any right or interest of any kind in the Trust Account. Accordingly, to liquidate their investment, public stockholders may be forced to sell their public shares or warrants, potentially at a loss. On December 5, 2022, RNER filed a proxy statement in connection with a special meeting of stockholders to (a) extend the date by which RNER has to consummate a business combination from January 7, 2023 to March 1, 2023 and (b) adjust the net tangible assets requirement under the RNER Charter. The special meeting is scheduled to take place on December 21, 2022 at 10:00 a.m., Eastern Time, for shareholders of record at the close of business on November 18, 2022.

72

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]

tm2223104-17_424b3 - none - 138.6881299s

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS; MARKET, RANKING AND OTHER INDUSTRY DATA

This proxy statement/prospectus contains forward-looking statements that involve substantial risks and uncertainties. All statements other than statements of historical facts contained in this proxy statement/prospectus, including statements regarding HUB Security's, RNER's or the combined company's future financial position, business strategy and plans and objectives of management for future operations, are forward-looking statements. In some cases, you can identify forward-looking statements by terminology such as "believe," "may," "estimate," "continue," "anticipate," "intend," "should," "plan," "expect," "predict," "potential" or the negative of these terms or other similar expressions. Forward-looking statements include, without limitation, HUB Security's or RNER's expectations concerning the outlook for their or the combined company's business, productivity, plans and goals for future operational improvements and capital investments, operational performance, future market conditions or economic performance and developments in the capital and credit markets and expected future financial performance, as well as any information concerning possible or assumed future results of operations of the combined company as set forth in the sections of this proxy statement/prospectus titled "*Proposal One — The Business Combination Proposal — RNER's Board of Directors' Reasons for the Business Combination and Recommendation of Its Board of Directors*." Forward-looking statements also include statements regarding the expected benefits of the proposed Business Combination between HUB Security and RNER.

Forward-looking statements involve a number of risks, uncertainties and assumptions, and actual results or events may differ materially from those projected or implied in those statements. Important factors that could cause such differences include, but are not limited to:

- HUB is a company with a history of net losses. HUB anticipates increasing operating expenses in the future, and it may not be able to achieve or maintain profitability.

- HUB's limited operating history makes it difficult to evaluate its business and future prospects and increases the risk of your investment.

- HUB's reputation and business could be harmed based on real or perceived shortcomings, defects or vulnerabilities in its solutions or if its customers experience security breaches, which could have a material adverse effect on HUB's business, reputation and operating results.

- HUB's ability to introduce new products, features, integrations, and enhancements is dependent on adequate research and development resources.

- HUB currently has and targets many customers that are large corporations and government entities, which are subject to a number of challenges and risks, such as increased competitive pressures, administrative delays and additional approval requirements.

- HUB may not be able to convert its customer orders in backlog or pipeline into revenue.

- HUB may need to raise additional funds in the future in order to execute its business plan and these funds may not be available to HUB when it needs them. If HUB cannot raise additional funds when it needs them, its business, prospects, financial condition and operating results could be negatively affected.

- The COVID-19 pandemic has impacted and may continue to impact HUB's business, operating results and financial condition.

- A shortage of components or manufacturing capacity could cause a delay in HUB's ability to fulfill orders or increase its manufacturing costs.

- HUB's management team has limited experience managing a U.S. listed public company.

- HUB's business relies on the performance of, and HUB faces stark competition for, highly skilled personnel, including its management, other key employees and qualified employees, and the loss of one or more of such personnel or of a significant number of its team members or the inability to attract and retain executives and qualified employees HUB needs to support its operations and growth, could harm HUB's business.

73

- Changes in tax laws or exposure to additional income tax liabilities could affect HUB's future profitability.

- As a cyber security provider, if any of HUB's systems, its customers' cloud or on-premises environments, or its internal systems are breached or if unauthorized access to customer or third-party data is otherwise obtained, public perception of its business may be harmed, and HUB may lose business and incur losses or liabilities.

- Undetected defects and errors may increase HUB's costs and impair the market acceptance of its products and solutions.

- HUB may not be able to adequately protect or enforce its intellectual property rights or prevent unauthorized parties from copying or reverse engineering its products or technology. Its efforts to protect and enforce its intellectual property rights and prevent third parties from violating its rights may be costly.

- The dynamic regulatory environment around privacy and data protection may limit HUB's offering or require modification of its products and services, which could limit its ability to attract new customers and support its existing customers and increase its operational expenses. HUB could also be subject to investigations, litigation, or enforcement actions alleging that it fails to comply with the regulatory requirements, which could harm its operating results and adversely affect its business.

- HUB's actual or perceived failure to adequately protect personal data could subject it to sanctions and damages and could harm HUB's reputation and business.

- HUB may be required to indemnify its directors and officers in certain circumstances.

- A market for HUB's securities may not develop or be sustained, which would adversely affect the liquidity and price of its securities.

- HUB's internal controls over financial reporting may not be effective and its independent registered public accounting firm may not be able to certify as to their effectiveness, which could have a significant and adverse effect on HUB's business and reputation.

- HUB's ordinary shares are currently listed and, following the consummation of the Business Combination, unless otherwise approved by the Israeli court, may continue to be listed for a period of time on the Tel Aviv Stock Exchange (TASE), and this may result in price variations.

- Class action litigation due to stock price volatility or other factors could cause HUB to incur substantial costs and divert management's attention and resources.

- If HUB's estimates or judgments relating to its critical accounting policies are based on assumptions that change or prove to be incorrect, HUB's operating results could fall below expectations of securities analysts and investors, resulting in a decline in HUB's stock price.

- Provisions of Israeli law and HUB's articles of association may delay, prevent or make difficult an acquisition of HUB, prevent a change of control, and negatively impact HUB's share price.

- The HUB ordinary shares and HUB warrants may not be listed on a national securities exchange after the Business Combination, which could limit investors' ability to make transactions in such securities and subject HUB to additional trading restrictions.

- If, following the Business Combination, securities or industry analysts do not publish or cease publishing research or reports about HUB, its business, or its market, or if they change their recommendations regarding the HUB ordinary shares adversely, then the price and trading volume of the HUB ordinary shares could decline.

- As HUB is a "foreign private issuer" and intends to follow certain home country corporate governance practices, its shareholders may not have the same protections afforded to shareholders of companies that are subject to all Nasdaq corporate governance requirements.

- The listing of HUB securities on Nasdaq will not benefit from the process undertaken in connection with an underwritten initial public offering, which could result in diminished investor demand, inefficiencies in pricing and a more volatile public price for HUB's securities.

74

- Conditions in Israel could materially and adversely affect HUB's business.

- It may be difficult to enforce a U.S. judgment against HUB, its officers and directors and the Israeli experts named in this proxy statement/prospectus in Israel or the United States, or to assert U.S. securities laws claims in Israel or serve process on HUB's officers and directors and these experts.

- Code Section 7874 may limit the ability of RNER and certain related U.S. corporations to use certain tax attributes following the Business Combination, increase HUB's U.S. affiliates' U.S. taxable income or have other adverse consequences to HUB and HUB's shareholders.

- RNER may not have sufficient funds to consummate the Business Combination.

- HUB may issue additional HUB ordinary shares or other equity securities without seeking approval of the HUB shareholders, which would dilute the ownership interests represented by HUB ordinary shares and may depress the market price of the HUB ordinary shares.

- The Sponsor, an affiliate of current officers and directors of RNER, is liable to ensure that proceeds of the Trust Account are not reduced by vendor claims in the event the Business Combination is not consummated. Such liability may have influenced RNER's board of directors' decision to pursue the Business Combination and RNER's board of directors' decision to approve it.

- The projections and forecasts presented in this proxy statement/prospectus may not be an indication of the actual results of the transaction or HUB's future results.

- The Business Combination may be completed even though material adverse effects may result from the announcement of the Business Combination, industry-wide changes and other causes.

- Delays in completing the Business Combination may substantially reduce the expected benefits of the Business Combination.

- If RNER is unable to complete the Business Combination or another business combination by January 7, 2023 (or such other date as approved by RNER stockholders through approval of an amendment to the RNER Charter), RNER will cease all operations except for the purpose of winding up, redeeming 100% of the outstanding public shares and, subject to the approval of its remaining stockholders and its board of directors, dissolving and liquidating. In such event, RNER public stockholders may only receive $10 per share (or less than such amount in certain circumstances) and RNER warrants will expire worthless.

- Pursuant to the terms of the Put and Call Option Agreement, HUB may be required to buy back certain of its ordinary shares from certain members of the Sponsor group to cover certain tax liabilities of such members.

- If the Adjournment Proposal is not approved, RNER's board of directors will not have the ability to adjourn the special meeting to a later date.

- The other matters described in the section titled "Risk Factors" beginning on page 18.

In addition, the Transactions are subject to the satisfaction of the conditions to the completion of the Business Combination set forth in the Business Combination Agreement and the absence of events that could give rise to the termination of the Business Combination Agreement, the possibility that the Business Combination does not close, and risks that the proposed Business Combination disrupts current plans and operations and business relationships, or poses difficulties in attracting or retaining employees for HUB Security.

HUB Security and RNER caution you against placing undue reliance on forward-looking statements, which reflect current beliefs and are based on information currently available as of the date a forward-looking statement is made. Forward-looking statements set forth herein speak only as of the date of this proxy statement/prospectus. Neither HUB Security nor RNER undertakes any obligation to revise forward-looking statements to reflect future events, changes in circumstances, or changes in beliefs. In the event that any forward-looking statement is updated, no inference should be made that HUB Security or RNER will make additional updates with respect to that statement, related matters, or any other forward-looking statements. Any corrections or revisions and other important assumptions and factors that could cause actual

75

tm2223104-17_424b3 - none - 138.6881299s

TABLE OF CONTENTS

results to differ materially from forward-looking statements, including discussions of significant risk factors, may appear, up to the consummation of the Business Combination, in RNER's public filings with the SEC or, upon and following the consummation of the Business Combination, in HUB Security's public filings with the SEC, which are or will be (as appropriate) accessible at www.sec.gov, and which you are advised to consult. For additional information, please see the section titled "*Where You Can Find More Information*" beginning on page 268.

Market, ranking and industry data used throughout this proxy statement/prospectus, including statements regarding market size and technology adoption rates, is based on the good faith estimates of HUB Security's management, which in turn are based upon HUB Security's Management's review of internal surveys, independent industry surveys and publications including third party research and publicly available information. These data involve a number of assumptions and limitations, and you are cautioned not to give undue weight to such estimates. While HUB Security is not aware of any misstatements regarding the industry data presented herein, its estimates involve risks and uncertainties and are subject to change based on various factors, including those discussed under the heading "*Risk Factors*" and "*HUB Security's Management's Discussion and Analysis of Financial Condition and Results of Operations*" in this proxy statement/prospectus.

76

https://www.sec.gov/Archives/edgar/data/1905660/000110465922125805/tm2223104-17_424b3.htm[5/31/2024 12:52:54 PM]