**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE HUB CYBER SECURITY LTD.,

Master File No. 1:23-cv-05764-AS

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.      INTRODUCTION ...............................................................................................................1

II.     STATEMENT OF FACTS .................................................................................................2

        A.      The Business Combination Was Conditioned Upon A $50 Million
                Minimum Cash Condition...................................................................................2

        B.      The Offering Documents Contained Actionable Statements About Moshe's
                Embezzlement, The Company's Internal Controls, PIPE Financing, And
                Hub's Flagship Product.......................................................................................3

        C.      Defendants Confirm Public Reporting That Moshe And His Wife Had Been
                Terminated Prior To The Business Combination Because They Embezzled
                Corporate Funds..................................................................................................4

        D.      Upon The Completion Of The Business Combination, The Company
                Revealed It Had Not Received The PIPE Financing .................................................5

        E.      Defendant Moscovich Concedes That At All Relevant Times Legacy Hub
                Did Not Have A Mature Or Proven Product For Sale ...........................................6

III.    ARGUMENT......................................................................................................................6

        A.      Legal Standards Disfavor Defendants' Motion ........................................................6

        B.      Plaintiffs Have Standing For All Claims ................................................................7

        C.      The Complaint Is Subject To Notice Pleading Because It Does Not Sound
                In Fraud................................................................................................................7

        D.      Plaintiffs Are Not Required To Plead That Defendants Should Have, Or
                Could Have, Known Of The Undisclosed Facts ......................................................9

        E.      The Offering Documents Contained False Statements And Omitted
                Material Facts Necessary To Make Them Not Misleading Under Sections
                11 And 12(a)(2).....................................................................................................9

                1.      Then-Existing Internal Control Issues Enabled The Already
                        Occurring Embezzlement....................................................................10

                2.      The PIPE Financing Was Not Committed .................................................13

                3.      Hub's Product Was Not Market-Ready ......................................................14

                4.      The Foregoing Facts Were Also Required To Be Disclosed Under
                        Items 105 And 303 ..............................................................................15

F.       The Individual Defendants Are Statutory Sellers For Section 12(a)(2) Liability .................................................................................................................18

G.      The Individual Defendants Are Control Persons For Section 15 Liability ............18

IV.    CONCLUSION ..................................................................................................................19

# TABLE OF AUTHORITIES

## CASES

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012)................................................................................................... 6

*Avalon Holdings Corp. v. Gentil*e,
  2019 WL 4640206 (S.D.N.Y. Sept. 24, 2019)...................................................................... 15

*Briarwood Investments Inc. v. Care Inv. Tr. Inc.*,
  2009 WL 536517 (S.D.N.Y. Mar. 4, 2009) ......................................................................... 18

*City of Westland Police & Fire Ret. Sys. v. Metlife, Inc.*,
  2016 WL 6652731 (S.D.N.Y. Nov. 10, 2016)...................................................................... 18

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017).................................................................................... 7

*Gallagher v. Abbott Labs.*,
  269 F.3d 806 (7th Cir. 2001) .............................................................................................. 11

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000)................................................................................................ 13

*Halperin v. eBanker USA.com, Inc.*,
  295 F.3d 352 (2d Cir. 2002)................................................................................................ 12

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983).......................................................................................................... 7, 9

*Hutchison v. CBRE Realty Fin., Inc.*,
  638 F. Supp. 2d 265 (D. Conn. 2009).................................................................................... 9

*In re BHP Billiton Ltd. Sec. Litig.*,
  276 F. Supp. 3d 65 (S.D.N.Y. 2017)................................................................................... 17

*In re CannaVest Corp. Sec. Litig.*,
  307 F. Supp. 3d 222 (S.D.N.Y. 2018)............................................................................. 6, 17

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013).................................................................................. 12

*In re Facebook, Inc., IPO, Sec. & Deriv. Litig.*,
  2013 WL 11319408 (S.D.N.Y. Dec. 12, 2013) ................................................................... 11

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  352 F. Supp. 2d 429 (S.D.N.Y. 2005)...................................................................... 18

*In re Fuwei Films Sec. Litig.*,
  634 F. Supp. 2d 419 (S.D.N.Y. 2009) ....................................................................... 8

*In re HEXO Corp. Sec. Litig.*,
  524 F. Supp. 3d 283 (S.D.N.Y. 2021)...................................................................... 14

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ........................................................... 14

*In re IBM Corp. Sec. Litig.*,
  163 F.3d 102 (2d Cir. 1998).................................................................................... 11

*In re Lehman Bros. Sec. & Erisa Litig.*,
  799 F. Supp. 2d 258 (S.D.N.Y. 2011)...................................................................... 18

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010)...................................................................... 7, 12, 13, 15

*In re NIO, Inc. Sec. Litig.*,
  2021 WL 3566300 (E.D.N.Y. Aug. 12, 2021).......................................................... 19

*In re OSG Sec. Litig.*,
  971 F. Supp. 2d 387 (S.D.N.Y. 2013)........................................................................ 8

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007)...................................................................... 19

*In re Sanofi Sec. Litig.*,
  87 F. Supp. 3d 510 (S.D.N.Y. 2015)........................................................................... 8

*In re Scot. Re Grp. Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007)................................................................. 18, 19

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016).................................................................................... 13

*In re WorldCom, Inc. Sec. Litig.*,
  346 F. Supp. 2d 628 (S.D.N.Y. 2004)...................................................................... 16

*In re: Petrobras Sec. Litig.*,
  152 F. Supp. 3d 186 (S.D.N.Y. 2016)...................................................................... 18

iv

*Lian v. Tuya Inc.*,
  2024 WL 966263 (S.D.N.Y. Mar. 5, 2024) ........................................................................ 9, 12

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (S.D.N.Y. 2011) ...................................................................................... 7, 12, 13

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015) ................................................................................................ 19

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ............................................................................................................... 13

*Merritt v. Molecular Partners AG*,
  2024 WL 495140 (S.D.N.Y. Feb. 5, 2024) ..................................................................... 14, 19

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014) ................................................................................................ 11

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
  709 F.3d 109 (2d Cir. 2013) .................................................................................................. 7

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
  681 F.3d 114 (2d Cir. 2012) ................................................................................................ 16

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
  2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020) .................................................................... 16

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) .................................................................................................. 8

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010) ................................................................................................ 15

*Swanson v. Interface, Inc.*,
  2022 WL 2003990 (E.D.N.Y. June 6, 2022) ....................................................................... 13

*Thomas v. Roach*,
  165 F.3d 137 (2d Cir. 1999) .................................................................................................. 9

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ............................................................................................................. 12

*Winter v. Stronghold Digital Mining, Inc.*,
  686 F. Supp. 3d 295 (S.D.N.Y. 2023) ............................................................................... 9, 11

## **STATUTES**

15 U.S.C. § 77k ............................................................................................................. 7

## **RULES**

Fed. R. Civ. P. 15 ........................................................................................................ 19

## **REGULATIONS**

17 C.F.R. § 229.105 .................................................................................................... 16

**GLOSSARY OF DEFINED TERMS**

| Term | Definition |
|------|-----------|
| Additional Plaintiffs | Rodrigue Fodjo and Dustin Green |
| Bitan | Ayelet Bitan, Moshe's wife |
| Business Combination | The transaction whereby Mount Rainier and Legacy Hub combined to form Hub, which closed on or about February 28, 2023 |
| Complaint or AC | Amended Class Action Complaint for Violation of the Federal Securities Laws (ECF No. 45) |
| Defendants | Hub, Manish Agarwal, Matthew Kearney, Hugo Goldman, Uzi Moscovich, Zeev Zell, Moti Franko, Levana Shifman, Moshe Raines, and Eyal Moshe |
| Hub or the Company | Hub Cyber Security Ltd. f/k/a Mount Rainier Acquisition Corp. |
| Individual Defendants | Manish Agarwal, Matthew Kearney, Hugo Goldman, Uzi Moscovich, Zeev Zell, Moti Franko, Levana Shifman, Moshe Raines, and Eyal Moshe |
| Lead Plaintiffs | Aryeh Agam and Shimon Aharon |
| Legacy Hub | Hub Cyber Security (Israel) Ltd. |
| Moscovich | Uzi Moscovich |
| Moshe | Eyal Moshe |
| Moshe MTD | Memorandum of Law in Support of Eyal Moshe's Motion to Dismiss Plaintiffs' Amended Complaint (ECF No. 93) |
| Mount Rainier | Mount Rainier Acquisition Corp. |
| MTD | Defendants' Memorandum of Law in Support of Motion to Dismiss Plaintiffs' Amended Class Action Complaint (ECF No. 86) |
| Offering Documents | The Registration Statement on Form F-4 filed on August 24, 2022 (and all amendments thereto) and the Proxy/Prospectus filed on Form 424B3 on December 9, 2022 (and all supplements thereto) |
| Plaintiffs | Lead Plaintiffs and Additional Plaintiffs |
| Proxy/Prospectus | The Form 424B3 filed on December 9, 2022 (and all supplements thereto) |
| Registration Statement | The Form F-4 filed on August 24, 2022 (and all amendments thereto) |
| Securities Act | Securities Act of 1933 |
| SPAC | Special purpose acquisition company |

Plaintiffs respectfully submit this memorandum of law in opposition to the motion to dismiss filed by Defendants Hub, Manish Agarwal, Matthew Kearney, Hugo Goldman, Uzi Moscovich, Zeev Zell, Moti Franko, Levana Shifman, and Moshe Raines (ECF No. 85), which is joined by Defendant Eyal Moshe (ECF No. 93 at 20).[1]

## I.    INTRODUCTION

Defendants have admitted that Legacy Hub lacked any meaningful internal controls and that, as a result, Moshe and his wife were able to embezzle hundreds of thousands of dollars from the non-profitable company.  Likewise, Hub has admitted that the "committed" PIPE financing was not in fact "committed" before the Business Combination, which is confirmed by the fact that Legacy Hub and its executives were actively seeking alternative financing and were forced to borrow $11 million "at a high interest rate" to close the Business Combination.  Additionally, Moscovich admitted that Legacy Hub did not have a mature or proven product at the time of the Business Combination.  None of these material facts were contained in the Offering Documents. As such, they are actionable.

Faced with this reality, Defendants make a series of specious arguments against liability. Defendants claim that the Registration Statement was not misleading because the omitted information was not known at the time the Registration Statement was effective.  Knowledge is not an element of Plaintiffs' Securities Act claims.  Moreover, this argument ignores that the Offering Documents must be accurate as of the closing of the Business Combination, not merely when they were filed.  The embezzlement, deficient controls, lack of PIPE financing, and lack of a mature product all existed at the time the Business Combination closed, but were not disclosed. Regardless, the omitted information was both "knowable" and "known." For example, the

---

[1]    All citations to "¶ __" are to the Complaint.  Unless otherwise noted, all emphasis is added, and internal case citations and quotations are omitted throughout.

embezzlement was orchestrated by Moshe, who was forced out as CEO ahead of the Business Combination but "promoted" to President of U.S. Operations to ward off suspicion of turmoil. The circumstances and nature of his exit make clear that Defendants knew of the undisclosed facts. Defendants also claim that Plaintiffs lack standing, but each Plaintiff purchased or acquired Hub securities that were newly registered by the Offering Documents, for the reasons explained in the concurrently filed opposition to Moshe's motion to dismiss.

The MTD should be denied in its entirety.

## II.    STATEMENT OF FACTS

### A.    The Business Combination Was Conditioned Upon A $50 Million Minimum Cash Condition

This case concerns the materially false misstatements and omissions disseminated in connection with the Business Combination between Mount Rainier (a Delaware corporation) and Legacy Hub (an Israeli corporation). Mount Rainier, as a special purpose acquisition company, had no business activities of its own and was formed in February 2021 to take an existing company public. ¶¶34, 40. Legacy Hub, formed in 2017, claimed to be a cybersecurity company that offered an advanced encrypted computing solution to protect sensitive commercial and government information. ¶45. Legacy Hub merged in June 2021 with Advanced Logistics Development Ltd., purportedly a leading provider of quality and reliability certification training and services. *Id.*

On March 23, 2022, Legacy Hub and Mount Rainier issued a joint press release announcing the Business Combination, which stated that the cash proceeds from the transaction were expected to be $176 million, net of redemptions by Mount Rainier's stockholders and expenses "and approximately $50 million attributed to the PIPE investment anchored by Israeli and American institutional and existing investors." ¶¶47-48. That same day, Mount Rainier filed a Form 8-K stating that a "Condition[] of Closing" of the Business Combination is that the combined company

would have an aggregate cash amount of at least $50 million, including from PIPE investors. ¶49.

**B.     The Offering Documents Contained Actionable Statements About Moshe's Embezzlement, The Company's Internal Controls, PIPE Financing, And Hub's Flagship Product**

The Registration Statement falsely claimed that the PIPE investments were "committed." ¶117. Specifically, it stated that "qualifying Israeli and U.S. institutional investors ('the PIPE investors') committed to invest a gross US$ 50 million [to satisfy] the minimum investment commitment required for closing the merger transaction." *Id.* Moreover, it stated that "PIPE investors have agreed to purchase" Hub shares "for an aggregate purchase price of $50,000,000." *Id.* The Proxy/Prospectus likewise indicated that the PIPE financing was committed. ¶118. These statements were materially false and misleading when made because the PIPE financing was ***not*** committed. ¶119.

The Registration Statement downplayed the severity of an existing material weakness. It stated that the Company had deficiencies in "information technology, in the areas of access management, segregation of duties, change management, data governance and defined processes and controls over the financial statement close process." ¶120. These deficiencies amounted to "a material weakness in its internal control over financial reporting" that "could . . . impair[]" the timeliness and accuracy of its financial statements. *Id.* The Registration Statement claimed to remediate these deficiencies and presented risks to financial control and compliance as hypothetical. ¶¶121-22. These statements were materially false and because, among other things, they failed to disclose the utter lack of controls over the Company's financial accounts and the resulting embezzlement by Moshe and others. ¶123.

The Registration Statement touted that Legacy Hub had an "established business, with established products" and a "range of new products. ¶124. However, Moscovich has admitted that its flagship product was not ready for market and improvements were still required. ¶125.

3

C.    **Defendants Confirm Public Reporting That Moshe And His Wife Had Been Terminated Prior To The Business Combination Because They Embezzled Corporate Funds**

Weeks before the Business Combination, Legacy Hub claimed that Moshe had "resigned" as CEO and had been "promoted" to President of U.S. operations. ¶¶65-66. Moshe's wife, Ayelet Bitan, had also "resigned" as an officer. ¶66. Notably, Legacy Hub claimed that Moshe's resignation "was not the result of any disagreement with the Company on any matters relating to the Company's operations, policies or practices." *Id.*    In reality, Moshe and his wife had embezzled funds and were able to do so due to a complete lack of internal controls. ¶¶82-92.

After the Business Combination, a March 6 article alluded to the fact that Moshe's purported promotion appeared suspicious because his name had disappeared from the company website. ¶82. Two months later, on April 20, 2023, Hub admitted that a Special Committee was investigating "allegations of potential misappropriation and other potential fraudulent actions raised against a former senior officer of the Company." ¶83. Another article that same day reported that this investigation concerned suspicions that Moshe and Bitan used Hub's funds for personal needs, including for the purchase of a house in Tel Aviv and various related expenses. ¶84. That article stated that Moshe had been "ousted" but Hub had announced his purported promotion "in order not to rock the ship" before the Business Combination closed. ¶85.

The ongoing investigation delayed Hub's filing of its 2022 annual report by nearly three months and, as a result, the Company was at risk of being delisted from the Nasdaq. ¶¶87-90. When it finally filed the annual report on August 15, 2023, the Company disclosed that Moshe and Bitan had stolen NIS 2 million (approximately $582,000) to renovate their home from a "Company bank account over which Mr. Moshe had sole signatory rights." ¶91. Moreover, Hub disclosed that "one of the controllers of the Company, with the permission of Mr. Moshe, used Company credit cards for personal use in the amount of approximately NIS 400,000 (approximately $110

4

thousand)," and these funds were not recorded in the controller's payroll or in the Company's books. *Id.* Moshe also allowed the same controller to pay a bonus to contractors without proper documentation or approval. *Id.*

Unsurprisingly, the Company also admitted on August 15, 2023 that there were "material weaknesses in [its] internal control over financial reporting as of December 31, 2021, which had not been remedied as of December 31, 2022." ¶93. In addition to the previously disclosed IT deficiencies, Hub lacked the most basic of controls, such as "oversight of certain signatory rights relating to our financial accounts" and "supervision and monitoring of our accounting and reporting functions." *Id.* These gross deficiencies enabled Moshe to steal large sums from his own company.

**D.     Upon The Completion Of The Business Combination, The Company Revealed It Had Not Received The PIPE Financing**

On February 28, 2023, upon the completion of the Business Combination, the Company disclosed that the $50 million "PIPE Financing did not consummate at closing of the Business Combination." ¶73. That is, Defendants effectuated the Business Combination even though one of the closing conditions had not been satisfied. *See id.* On this news, the Company's shares declined $0.94 per share, or about 37%, and it continued to decline 21% the next trading session. ¶74. This confirmed media reports speculating that the Business Combination was "in danger of falling through" because a major PIPE investor "withdrew" and Legacy Hub was seeking alternative financing from one of its financial advisors. ¶¶70-72. Nevertheless, Legacy Hub had not demanded the capital from the substitute investors, which "raise[d] a very large question mark regarding how committed these grantees were to investing in the first place." ¶72.

Days later, an article reported that Hub was "forced to rely on $11 million borrowed at a high interest rate to complete the offering." ¶76 ("Due to a lack of funding from PIPE investors,

which was a precondition for the merger to take place, and *in order to complete the move to the U.S. anyway*, the company entered into an 'Equity Line' agreement . . . to [obtain] a line of credit in exchange for shares and options. This agreement characterizes *companies in problematic situations* and results in a deal with underwriters to provide a line of credit in exchange for shares and options."). The Company has admitted its desperation to complete the Business Combination and access U.S. capital markets, conceding that it could not pay its $12 million bill to its financial advisor unless it "could generate liquidity based on the value of Hub Cyber stock following the transaction." ¶¶80-81.

E.      **Defendant Moscovich Concedes That At All Relevant Times Legacy Hub Did Not Have A Mature Or Proven Product For Sale**

After the Company reported that it was on track to report a meager $1.1 million revenue for fiscal 2023, short of the expected $93 million, Moscovich admitted that, when the Offering Documents were issued and the Business Combination closed: "There was no product and there were no sales. The product was not ready at all." ¶94. According to a January 17, 2024 article, Moscovich conceded "that after eight months of work under his guidance, the company *now* has a mature product." ¶94. In fact, Hub had signed an agreement to merge with another company after the Business Combination because the Company did not have its own marketable product. ¶96.

III.    **ARGUMENT**

A.      **Legal Standards Disfavor Defendants' Motion**

"In considering a motion to dismiss[,] the court is to accept as true all facts alleged in the complaint, and must draw all reasonable inferences in favor of the plaintiff." *In re CannaVest Corp. Sec. Litig*., 307 F. Supp. 3d 222, 235 (S.D.N.Y. 2018). "Fact-specific questions cannot be resolved on the pleadings." *Anderson News, L.L.C. v. Am. Media, Inc*., 680 F.3d 162, 185 (2d Cir.

2012). A plaintiff with standing "need only show a material misstatement or omission to establish his *prima facie* case" as to a registration statement (for Section 11) or prospectus or oral communication (for Section 12). *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983). "[U]nlike securities fraud claims pursuant to section 10(b) of the [Exchange Act], plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).

### B.    Plaintiffs Have Standing For All Claims

Plaintiffs respond to Defendants' overlapping arguments about standing in the concurrently filed opposition to Moshe's motion to dismiss.

### C.    The Complaint Is Subject To Notice Pleading Because It Does Not Sound In Fraud

Because the Securities Act "impos[es] a stringent standard of liability on the parties who play a direct role in a registered offering," the statute "places a relatively minimal burden on a plaintiff." *Herman & MacLean*, 459 U.S. at 381-82. As a result, this is an "ordinary notice pleading case, subject only to the 'short and plain statement' requirements of [Rule] 8(a)." *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 120 (2d Cir. 2013). Defendants' attempt to cast the Complaint as fraud-based is unavailing. *See* MTD at 9-11.

Defendants claim the Complaint "sounds in fraud," but the allegations they quote "simply track the language of Section 11." *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc*., 268 F. Supp. 3d 526, 559 (S.D.N.Y. 2017); *compare* MTD at 9-10 (quoting ¶¶113, 116, 123, 125, 132, 136, 145), *with* 15 U.S.C. § 77k. Courts resoundingly reject Defendants' argument because it would mean "that bare recitations of the elements of the causes of action triggered Rule 9(b)." *comScore, Inc*., 268 F. Supp. 3d at 559 (collecting cases). The Item 303 and 105 allegations also do not convert the strict liability misconduct into one sounding in fraud. *E.g.*, *Litwin v. Blackstone Grp.,*

7

*L.P.*, 634 F.3d 706, 716-18 (S.D.N.Y. 2011).

Defendants improperly inject allegations of fraudulent intent where the Complaint has none. *E.g.*, MTD at 10 ("either the Defendants told the truth or intentionally misrepresented that fact"). They rely on the knowledge of one defendant to claim that "[i]t betrays common sense to suggest that such statements would be the product of negligence rather than intentional design." MTD at 10-11. By Defendants' logic, all cases would become fraud suits merely because some defendants knew of the undisclosed facts. *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 406 (S.D.N.Y. 2013) (allegations that they "knew or should have known . . . does not constitute an allegation of fraud"). As Defendants recognize, the dispute is "binary"—either the material fact existed at the time of the Offering Documents or it did not—and that analysis does not necessarily wade into questions of knowledge, concealment, or fraudulent intent. *See* MTD at 10.

Even if Rule 9(b) were to apply (it does not), the "Rule does not add substantive elements such as scienter to any claim." *In re Sanofi Sec. Litig*., 87 F. Supp. 3d 510, 528 n.8 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016); *see also In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 434 (S.D.N.Y. 2009) (assessing only specificity of allegations). The Complaint still alleges strict liability, not negligence as Defendants contend. *See* MTD at 11 ("Even if the Court disagrees and applies a negligence standard"). To satisfy Rule 9(b) heightened pleading, Plaintiffs need only identify with specificity the allegedly actionable statements and the reasons for falsity. *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). Contrary to Defendants' bald assertion, MTD at 11, the Complaint plainly meets this standard: it specifies the actionable statements (¶¶117-18, 120-22, 124); identifies the speaker (*id.*); states where and when they were made (¶¶117-18, 120-22, 124); and explains why they were material misrepresentations and/or omissions (¶¶119, 123, 125).

8

**D.      Plaintiffs Are Not Required To Plead That Defendants Should Have, Or Could Have, Known Of The Undisclosed Facts**

As a threshold matter, Defendants repeatedly (and incorrectly) proclaim that Plaintiffs must show that "Defendants knew or should have known about misconduct prior to its eventual disclosure." MTD at 2; *see also* MTD at 13, 15, 16.  However, "plaintiffs need not plead that the defendants knew or should have known" of omissions "in order to state a claim for failure to disclose" a material fact.  *Hutchison v. CBRE Realty Fin., Inc.*, 638 F. Supp. 2d 265, 273-75 (D. Conn. 2009).

Hub is the issuer of the security, so its liability is "virtually absolute, even for innocent misstatements." *Herman & MacLean*, 459 U.S. at 382; *Lian v. Tuya Inc.*, 2024 WL 966263, at *11 (S.D.N.Y. Mar. 5, 2024) ("Section 11 does not have a requirement that the omitted fact be known, or should have been known, by issuers."). To the extent the Individual Defendants claim they did not or could not have known the omitted fact, their affirmative defenses cannot defeat well-pled allegations. *Winter v. Stronghold Digital Mining, Inc.*, 686 F. Supp. 3d 295, 305 (S.D.N.Y. 2023) ("The Circuit has also made clear that Section 11's due diligence and Section 12(a)(2)'s reasonable care requirements regarding a defendant's knowledge are affirmative defenses, not pleading requirements that plaintiffs must overcome on a motion to dismiss.").

**E.      The Offering Documents Contained False Statements And Omitted Material Facts Necessary To Make Them Not Misleading Under Sections 11 And 12(a)(2)**

Plaintiffs allege that Defendants violated their disclosure obligations under the Securities Act **and** under Items 303 and 105 of Regulation S-K as to each misstatement and omission in the Registration Statement.  *See* ¶¶106-15, 116-25.  Defendants ignore this and only address the Item 303 and 105 aspects of certain misleading statements.  *See, e.g.*, MTD at 14.  Defendants' failure to address the remaining allegations constitutes waiver.  *See Thomas v. Roach*, 165 F.3d 137, 145

(2d Cir. 1999) (argument is waived unless a party raises it in its opening brief).

### 1.    Then-Existing Internal Control Issues Enabled The Already Occurring Embezzlement

The Company has admitted that Moshe and Bitan had embezzled money from Legacy Hub and that they were able to get away with it due to the lack of adequate internal controls. Specifically, the Company has admitted that Moshe and Bitan had exploited Legacy Hub's lack of internal controls to embezzle more than a half a million dollars in funds for personal use and improperly approved payments to third-party contractors. ¶¶91-92. These control issues included granting Moshe with sole signatory rights over Company accounts and improper procedures to the "supervision and monitoring of [Hub's] accounting and reporting functions." ¶93. These admissions show that Defendants violated their disclosure obligations in the Registration Statement by failing to disclose that Hub had inadequate controls and systems and that its CEO and his wife were embezzling significant funds from accounts they controlled and were instructing others to steal money from the Company.

The embezzlement and longstanding control issues existed before the Business Combination. First, it was announced that both Moshe and Bitan "resigned" on February 2, 2023, well before the Business Combination. ¶66. Second, despite claiming that Moshe's resignation "was not the result of any disagreement with the Company on any matters relating to the Company's operations, policies or practices," Moshe's name disappeared from the Company's website and he was not present at the traditional bell-ringing ceremony at Nasdaq—even though other Israeli-based executives traveled to the U.S. for the event on a special flight. ¶85. Third, the Company announced material weaknesses, in addition to those that had been previously identified in the Registration Statement, which had existed for more than one year, *i.e.* before the Business Combination closed. ¶93. That these control weaknesses existed for more than a year is an

10

admission that they had been exploited before the Business Combination closed.

Defendants claim that "Plaintiffs have not alleged that embezzlement was known as of December 2022, when the Registration Statement became effective." MTD at 14; *see also* MTD at 12. There is no knowledge requirement. *See* Sec. III.D., *supra*. Rather, the proper inquiry is whether the undisclosed fact had "already transpired at the time of the offering." *Winter*, 2023 WL 5152177, at \*7. Also, liability attaches not only when the Registration Statement became effective; Defendants have a continuing duty to update prior statements in light of changes between the effective date and the closing of the Business Combination. *In re Facebook, Inc., IPO, Sec. & Deriv. Litig.*, 2013 WL 11319408, at \*23 (S.D.N.Y. Dec. 12, 2013) ("Defendants had a duty to correct and update them once they were found to be untrue."); *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998) (similar); *see also Gallagher v. Abbott Labs.*, 269 F.3d 806, 810-11 (7th Cir. 2001) ("A registration statement and prospectus for a new issue of securities must be accurate when it is used to sell stock, and not just when it is filed."). Here, the Company has admitted that the deficient internal controls existed at the time of the Business Combination, and additional facts demonstrate that Moshe's embezzlement had occurred before the Business Combination closed (if not when the Registration Statement was filed). That the founder was noticeably absent from the milestone event of the Nasdaq bell ceremony underscores his tenuous reputation with the Company.

Defendants incorrectly claim that the Registration Statement discloses the "exact weakness" that Plaintiffs allege was omitted. MTD at 16. None of the disclosed weaknesses relate to Moshe's sole signatory rights over Company accounts. *Compare* ¶121 (Registration Statement material weaknesses), *with* ¶93; s*ee, e.g.*, *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 252 (2d Cir. 2014) (omissions are not cured by disclosures of other information ). It is a question

of fact whether a reasonable investor understood the Registration Statement's disclosure of insufficient accounting and IT personnel to encompass the later-disclosed weakness of inadequate supervision of accounting and reporting functions for financial statements. *See* ¶93. Regardless, the Registration Statement did not disclose that the then-existing internal control issues had led to the embezzlement. *See, e.g.*, *Tuya*, 2024 WL 966263, at \*14 ("Most fundamentally, the risk disclosures Defendants highlight do not "pertain[ ] to the specific risk that was realized.""); *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("The Company's purported risk warnings misleadingly represented that this revenue cut was merely possible when, in fact, it had already materialized."). An accurate discussion required disclosing the complete picture, including that the internal controls were so non-existent that it enabled the embezzlement to occur, because the information was "necessary to prevent existing disclosures from being misleading." *Morgan Stanley*, 592 F.3d at 360.

Finally, materiality is "an inherently fact-specific finding" that is not a basis for dismissal. *Litwin,* 634 F.3d at 718 (pleading materiality is "even lower" than Rule 8's "relatively minimal burden"). Defendants succeed only "if *no reasonable investor* could have been misled about the nature of the risk when he invested." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002) (emphasis in original). Indeed, a fact may be material even if it would not have changed an investor's ultimate investment decision. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). The non-disclosure that a non-profitable company had such a lack of internal controls that its CEO could embezzle hundreds of thousands of dollars to finance his private residence and other expenses is not a situation where "no reasonable investor could have been misled." *Halperin*, 295 F.3d at 359.

Defendants improperly treat the embezzlement separate and apart from the lack of internal

12

controls and summarily apply a 5% threshold to claim that the embezzlement was immaterial. MTD at 15-16 (using market capitalization as the denominator without rhyme or reason).  But such a "rigid" approach of 5% in assessing materiality has been consistently rejected, "especially . . . where the denominator is picked by defendants," because it allows "defendants to move the goal posts . . . so long as the net effect was just below that threshold."[2]  *Swanson v. Interface, Inc.*, 2022 WL 2003990, at *2 (E.D.N.Y. June 6, 2022); *see also Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000); *Litwin*, 634 F.3d at 717.  Instead, "a court must consider "both 'quantitative' and 'qualitative' factors in assessing an item's materiality," and that consideration should be undertaken in an integrative manner." *Litwin*, 634 F.3d at 717.

Here, Legacy Hub "incurred net losses in each year since its inception."  *See* ECF No. 88-1 at 47.  For a company that reported no net income to investors, Moshe's embezzlement is material by any measure.  Indeed, there is a "substantial likelihood" that the disclosure of Moshe's half-a-million-dollar embezzlement "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available," especially where Defendants avoided disclosure precisely so as "not to rock the boat" until the Business Combination closed. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011).

### 2.     The PIPE Financing Was Not Committed

"It is well-established . . . that once a company speaks on an issue or topic, there is a duty to tell the whole truth, [e]ven when there is no existing independent duty to disclose information on the issue or topic." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016); *see Morgan Stanley*, 592 F.3d at 366 ("[W]hen an offering participant makes a disclosure about a particular

---

[2]     The 5% threshold is, at best, "the preliminary assumption of immateriality," but even Defendants agree that it is not the sole factor to determine materiality. MTD at 15;  *see also Litwin,* 634 F.3d at 719 (reversing holding that undisclosed fact was immaterial solely because it fell well below the 5% threshold).

topic, whether voluntary or required, the representation must be complete and accurate").

Here, the Registration Statement repeatedly touted the PIPE investments were "committed." ¶¶117, 118. They were not. *See* Sec. II.D., *supra*. This is confirmed by the fact that Defendants were actively looking for different investors to substitute for purportedly "committed" investors and that the PIPE financing was not received before or at the time of the Business Combination. ¶¶70-72. Knowledge (if it were required) can be inferred from the facts that sought relief from other bills that Defendants could not pay unless they could "generate liquidity based on the value of Hub Cyber stock following the transaction" and that Hub actually borrowed $11 million "at a high interest rate to complete the offering." ¶¶73, 76, 80-81. Yet, only after the Business Combination was it revealed that "PIPE Financing did not consummate." ¶73.

As before, Defendants are wrong that the Court should only consider the situation as of December 2022 when the Registration Statement was declared effective. MTD at 11-12 (citing *In re Hi-Crush Partners L.P. Sec. Litig*., 2013 WL 6233561, at *7 (S.D.N.Y. Dec. 2, 2013). Defendants' authorities did not involve a situation, like here, where defendants became aware of new facts after the effective date and failed to update offering documents before the offering commenced. *Id*.; *In re HEXO Corp. Sec. Litig*., 524 F. Supp. 3d 283, 301 (S.D.N.Y. 2021) ("Nor do plaintiffs allege any particular facts indicating that the Securities Act Defendants knew at the time of the IPO that they would later exercise their business judgment and relieve the SQDC of its obligations under the ToP provision."); *Merritt v. Molecular Partners AG*, 2024 WL 495140, at *6 (S.D.N.Y. Feb. 5, 2024) (no suggestion that Amgen would repudiate agreement both before the registration statement became effective *and* at the time of IPO; "Amgen terminated the agreement about a year later").

### 3.    Hub's Product Was Not Market-Ready

Moscovich, the outgoing CEO admitted that "There was no product and there were no

14

sales. The product was not ready at all" at the time of the Offering Documents and Business Combination. ¶94. In fact, he admitted that it took eight months under his guidance for Hub to get a "mature product." ¶95. Defendants' failure to disclose this fact while touting its "established products" is actionable. ¶124; *Morgan Stanley*, 592 F.3d at 366 ("[W]hen an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate").

Defendants try to discredit Moscovich's admissions by claiming that they were translated from Hebrew because "context matters when assessing plausibility." MTD at 17. Setting aside that their argument is hypocritical (*see* Plaintiffs' concurrently filed opposition to Defendants' request to take judicial notice of translated documents), Defendants are improperly disputing the facts. *See* MTD at 17. Plaintiffs allege simply that his statements mean what they say, which must be accepted as true. *Avalon Holdings Corp. v. Gentil*e, 2019 WL 4640206, at *5 (S.D.N.Y. Sept. 24, 2019) ("In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor").

Defendants also claim that "Hub disclosed several risks about its products." MTD at 17-18. But none of those purported risk disclosures identified that there was no "mature" product. Instead, these risks just generally warned that Hub's products could have issues or would need to be improved in the future. *See id.* Such risks could apply to any company with a product and do not speak to the issues that existed at the time. *Slayton v. Am. Express Co.*, 604 F.3d 758, 772 (2d Cir. 2010) (cautionary language is not meaningful if it is "boilerplate," "general," and "vague")

### 4. The Foregoing Facts Were Also Required To Be Disclosed Under Items 105 And 303

Item 105 of Regulation S-K requires "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and an explanation of "how each risk

affects the registrant or the securities being offered." 17 C.F.R. § 229.105; *see also* SEC Release No. 7558, 1998 WL 425894, at *14 (July 29, 1998). An alleged Item 105 violation is evaluated under the materiality standard, and a "[p]laintiff need not allege Defendants' knowledge in order to plead" such a violation. *Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *10 (S.D.N.Y. Sept. 27, 2020). The adequacy of such disclosure is a question of fact, which is inappropriately resolved on a motion to dismiss. *See In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 691-92 (S.D.N.Y. 2004). Here, Plaintiffs have adequately pled an Item 105 violation due to the failure to disclose the risks to Hub from their lack of internal controls and resulting embezzlement, the PIPE financing not being "committed" and the lack of a mature product.

For an Item 303 violation under Regulation S-K, a plaintiff only needs to plead facts sufficient to give rise to a *plausible* inference (rather than a strong inference) that management knew about the trend or uncertainty and that management reasonably expected it would likely have a material effect on the registrant's financial condition. *See, e.g.*, *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 116 (2d Cir. 2012) ("the proposed complaint stated a claim because it *plausibly* alleged that the defects constituted a known trend or uncertainty that the Company reasonably expected would have a material unfavorable impact on revenues"). Plaintiffs have certainly plead facts demonstrating that management was aware of "trends" and "uncertainties" that likely would impact revenues.

Even if knowledge were required (it is not), the internal control issue and embezzlement were known trends or uncertainties that presented then-existing risks. Moshe, as a signatory of the Registration Statement and as the embezzler, knew of his own embezzling and failed to disclose

16

it.[3]  His knowledge is imputed to Hub.  *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 92

(S.D.N.Y. 2017) (imputing executives' knowledge and intent to company in a case brought under

section 10(b) of the Securities Exchange Act of 1934).  The remaining Defendants likewise knew,

or had reason to know, given Moshe's noisy exit from the Company around the time it was set to

go public on the U.S. exchange.  Moshe's promotion and simultaneous resignation, along with his

wife's resignation, should have caused the other defendants to question what happened.  Indeed,

public reports confirm that Moshe had been "ousted" but his purported promotion was announced

so "not to rock the ship" before the Business Combination.  ¶82.  These facts more than support a

plausible inference that management (outside of Moshe) knew about the trend or uncertainty.  *In*

*re CannaVest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 235 (S.D.N.Y. 2018) (court must "draw all

reasonable inferences in favor of the plaintiff"). And the fact that the Company decided not to start

a formal investigation until after the Business Combination does nothing to defeat these well-pled

facts.

Defendants claim that under Item 303 Plaintiffs must show that Defendants actually knew

that the PIPE financing was not committed.  MTD at 12-13.  As discussed above, knowledge under

Item 303 is not the same as scienter – a plaintiff only needs to plead facts sufficient to give rise to

a ***plausible*** inference (rather than a strong inference) that management knew about the trend or

uncertainty.  But the facts alleged demonstrate under any standard that the Defendants were aware

that the PIPE financing was falling through, and they were actively looking (and acquiring)

different financing to replace this financing at the time of the Business Combination.

---

[3]     Moshe disputes that he embezzled (Moshe MTD at 9 n.3), but all other defendants admit
that he did (in the motion that Moshe joins).  Regardless, any factual dispute about whether Moshe
embezzled cannot defeat the Complaint, as such allegations must be accepted as true.

17

**F.      The Individual Defendants Are Statutory Sellers For Section 12(a)(2) Liability**

In addition to challenging the misleading nature of the Offering Documents, Defendants claim that the Individual Defendants are not statutory sellers to be liable under Section 12(a)(2). MTD at 18-19 (waiving challenge as to Hub). A statutory seller "is one who, in a public offering, either transferred title to the purchaser or successfully solicited the transfer for financial gain." *In re Lehman Bros. Sec. & Erisa Litig*., 799 F. Supp. 2d 258, 310 (S.D.N.Y. 2011). A plaintiff's allegation that he purchased securities pursuant to "pertinent offering documents," such as a prospectus, has "been construed to permit proof that the plaintiff purchased his or her security in the offering." *Id.* at 311.

Even if Defendants had not waived the argument, Hub is clearly a statutory seller. *In re: Petrobras Sec. Litig*., 152 F. Supp. 3d 186, 195 (S.D.N.Y. 2016). As to the Individual Defendants, contrary to Defendants' claims, courts have found allegations on a motion to dismiss that a defendant signed a registration statement is sufficient to show that they are a statutory seller. *E.g.*, *Briarwood Investments Inc. v. Care Inv. Tr. Inc.*, 2009 WL 536517, at *4 (S.D.N.Y. Mar. 4, 2009); *In re Flag Telecom Holdings, Ltd. Sec. Litig*., 352 F. Supp. 2d 429, 454 (S.D.N.Y. 2005). Therefore, the Individual Defendants are also statutory sellers. ¶¶24-32 (each Individual Defendant signed or authorized the signing of the Registration Statement).

**G.      The Individual Defendants Are Control Persons For Section 15 Liability**

Because the AC adequately pleads violations of the Securities Act, the §15 control-person claim is not subject to dismissal for lack of a primary violation. *See City of Westland Police & Fire Ret. Sys. v. Metlife, Inc.*, 2016 WL 6652731, at *16 (S.D.N.Y. Nov. 10, 2016). Even though "whether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss," *In re Scot. Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 401 (S.D.N.Y. 2007), Defendants claim that the control allegations are insufficient. MTD at 19-20

18

(citing ¶¶152-53).[4] But the AC explains their control (including Kearney's) relating to the offering in connection with the Business Combination (¶¶33, 153) and similar allegations have been deemed sufficient. *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 639 (S.D.N.Y. 2007) (finding similar statements and that corporate officers were "charged with the day-to-day operations of a public corporation" . . . "sufficient for purposes of a motion to dismiss."); *In re NIO, Inc. Sec. Litig.*, 2021 WL 3566300, at *11 (E.D.N.Y. Aug. 12, 2021) ("Plaintiffs have adequately alleged that the Individual Defendants had control over NIO because all of them signed NIO's Registration Statement."). And Defendants further ignore "culpable participation" does not need to be alleged "in order to state a claim under section 15." *Scot. Re Grp.*, 524 F. Supp. 2d at 387.

## IV.   CONCLUSION

Plaintiffs respectfully request that the Court deny the motion to dismiss in its entirety. Alternatively, should the Court grant any part of the motion, Plaintiffs respectfully request leave to amend. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 191 (2d Cir. 2015) (dismissal of claim without leave to amend violates the spirit of Fed. R. Civ. P. 15 and must be supported by a finding that there is an issue as to which "the complaint is deficient and [ ] amendment would be futile"); *Merritt*, 2024 WL 495140, at *8 (allowing leave to amend even when plaintiff did not request it because "this is the first motion to dismiss that Merritt's pleadings have faced").

---

[4]   Defendants claim that Shifman departed from the Board before the Business Combination after signing certain of the Offering Documents. MTD at 20. Defendants' factual basis for this contention is a document they improperly seek judicial notice of for the truth of the matter asserted therein. Assuming the accuracy of Defendants' representation, Plaintiffs are willing to dismiss Shifman.

Dated: July 15, 2024

Respectfully submitted,

*/s/ Casey E. Sadler*
**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Casey E. Sadler (admitted *pro hac vice*)
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Tel: (310) 201-9150
Fax: (310) 201-9160
rprongay@glancylaw.com
csadler@glancylaw.com
prajesh@glancylaw.com

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Tel: (212) 682-5340
Fax: (212) 884-0988
glinkh@glancylaw.com

**THE LAW OFFICE OF JACOB SABO**
Jacob Sabo
22a Mazzeh St.
Tel-Aviv, Israel
Tel: (++972) 39070770

*Counsel for Lead Plaintiffs and Co-Lead Counsel for the Class*

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, NY 10016
Tel: (212) 661-1100
Fax: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Counsel for Additional Plaintiffs Rodrigue Fodjo and Dustin Green*

20

## PROOF OF SERVICE

I hereby certify that on this 15th day of July, 2024, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*s/ Casey E. Sadler*
Casey E. Sadler